# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| [UNDER SEAL],<br><br>     Plaintiffs,<br><br>  v.<br><br>[UNDER SEAL],<br><br>     Defendants. | Civil Action No: 19-11680 c/w 19-11682<br><br>REF: In all cases<br><br>**SECOND AMENDED COMPLAINT**<br><br>SECTION: "T" (3)<br><br>JUDGE GREG GERARD GUIDRY<br><br>**FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |

**DOCUMENT TO BE KEPT UNDER SEAL**

**DO NOT ENTER INTO PACER**

1

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES *ex rel.* JOSHUA NEMZOFF, | Civil Action No: 19-11680 c/w 19-11682 |
| Plaintiffs, | REF: In all cases |
| v. | **SECOND AMENDED COMPLAINT** |
| LOUISIANA CHILDREN'S MEDICAL CENTER, INC.; WEST JEFFERSON HOLDINGS, LLC; THE SISUNG GROUP; UNITED PROFESSIONALS COMPANY, LLC; OCHSNER CLINIC FOUNDATION d/b/a OCHSNER HEALTH SYSTEM; and former DOES I THROUGH XIX: GJERSET & LORENZ LLP; CHRISTUS HEALTH CENTRAL LOUISIANA; HCA MIDAMERICA DIVISION; BATON ROUGE GENERAL MEDICAL CENTER; GENERAL HEALTH SYSTEM; KENDALL JOHNSON; SCOTT POSECAI; MAURICE LAGARDE III; STEPHEN WRIGHT; WARNER THOMAS; BOBBY BRANNON; PATRICK QUINLAN; MICHAEL HULEFELD; CHRIS KARAM; SCOTT MERRYMAN; KIM KELSCH; DIONNE VIATOR; NANCY CASSAGNE; PETER NOVEMBER; and DOE XX, | SECTION: "T" (3) |
| | JUDGE GREG GERARD GUIDRY |
| | **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |
| | **JURY TRIAL DEMANDED** |
| Defendants. | |

## I.    SUMMARY OF CLAIMS

1.      Pursuant to the *qui tam* provisions of the federal False Claims Act, Plaintiff-Relator Joshua Nemzoff ("Relator"), through his attorneys, on behalf of the United States of America (the "United States"), brings this Second Amended Complaint against Defendants Louisiana Children's Medical Center, Inc. (also referred to at various times in its operation and

2

growth, as relevant to this case, as "LCMC," "Louisiana Children's," or "the Louisiana

Children's System"); West Jefferson Holdings, LLC ("West Jefferson"); The Sisung Group

("Sisung Group"); United Professionals Company, LCC ("UPC"); Ochsner Clinic Foundation

d/b/a Ochsner Health System ("Ochsner Health"); and former Doe Defendants I-XIX, now

named: Gjerset & Lorenz LLP (together with that law firm's principals "Gjerset"); Christus

Health Central Louisiana ("Christus"); HCA MidAmerica Division ("HCA"); Baton Rouge

General Medical Center; General Health System (together with Baton Rouge General Medical

Center, "Baton Rouge"); Kendall Johnson; Scott Posecai; Maurice Lagarde III; Stephen Wright;

Warner Thomas; Bobby Brannon; Patrick Quinlan; Michael Hulefeld; Chris Karam; Scott

Merryman; Kim Kelsch; Dionne Viator; Nancy Cassagne; and Peter November, and Doe XX  for

defrauding the Medicaid program.

2.      More specifically, this action is brought to recover treble damages and civil

penalties on behalf of the United States arising from false and/or fraudulent claims, statements,

and records knowingly made and/or caused to be made by the Defendants in furtherance of

schemes to defraud Medicaid.  Additionally, Defendants have knowingly concealed and/or

improperly avoided or decreased obligations to pay or transmit money to the United States

Government by retaining overpayments of federal Medicaid reimbursement that resulted from

Defendants' unlawful schemes.

3.      By statute, Congress *requires* a combined investment of funds from the State

and/or local governments and the United States at proportional investment levels to fund

uncompensated indigent and uninsured care provided through the Medicaid program.  The

relative proportion of federal investment as compared to state or local investment is calculated

each federal fiscal year based on formulas set forth in federal law.  The federal government funds

600624.1

at least 50% of this care, but state and/or local governments must fund the rest in order to draw down these federal funds.

4.      Defendants' schemes are intended to override and defeat this statutory framework, such that, compared to what Congress authorized, the federal government is, in actual effect, disproportionately, or even solely, providing often entirely unwarranted funding to Defendants through Louisiana Medicaid supplemental payment programs, in violation of both federal and state law.

5.      Defendants in this action are comprised of: (1) private healthcare entities that assumed control and operations of formerly public hospitals in Louisiana; (2) private not-for-profit hospital systems and a publicly traded hospital corporation that entered into collaborations with the State and local governments units unlawfully to fund the non-federal share Medicaid program and to overstate their actual cost of providing uncompensated care in order to fraudulently draw down Medicaid funds; (3) individuals who were and, in many instances, remain executives at the Defendant private and public hospital systems and who planned, orchestrated, and benefitted from the fraudulent scheme; and (4) private consulting entities that planned, initiated, and oversaw the continuing operation of the fraudulent financial arrangements and transactions at issue in this case and shared in the profits that such unlawful schemes generated.

6.      Relator's Original and First Amended Complaints in this action alleged in detail what the Relator discovered regarding this fraud and many of the specific privately owned and operated entities that have been involved in Defendants' scheme as implemented in New Orleans.  These co-conspirators included Louisiana Children's, Ochsner Health, and the Sisung Group.  Those pleadings also named other non-rural public hospital and their private hospital co-

4

conspirators who were involved elsewhere in Louisiana in similar efforts to siphon improper DSH and UPL payments from the federal government during the same period of time, as also masterminded and facilitated by Gjerset & Lorenz and/or Sisung.

7.      Involved private hospitals include not only Louisiana Children's and Ochsner Health, but also HCA, Christus, and Baton Rouge General Medical Center / General Health System.  It provides a detailed road map of how the fraud was perpetuated (via twenty-six or more pass-through entities), who was keeping the books for these entities (Gjerset & Lorenz), and who ran these pass-through entities (the fourteen named individual Defendants, who are or were executives at the five Defendant hospital systems).

8.      Defendant Gjerset & Lorenz, whose principals other Defendants in this action identified to Relator as the original "masterminds" directly and/or indirectly behind the basic approach and many of the situation-specific fraudulent schemes and approaches alleged herein, enlisted the support of the Sisung Group (and its member United Professionals Company) who served as the coordinator and the liaison between the hospitals and the state.  Together they represented five of the largest hospital systems in the State of Louisiana, Defendants Ochsner Health System, Christus Health Central Louisiana, HCA MidAmerica Division, and Baton Rouge General Medical Center/ General Health System, Louisiana Children's, and together devised a massive scheme to defraud the federal government of Medicaid funds.

9.      Operating in conspiracy with—and under the direction of Gjerset &Lorenz and/or Sisung—these five systems formed at least twenty-six different pass-through corporations, both non-profit and for-profit, that were used to funnel money back and forth to the state.  Per their Form 990s, these pass-through entities generally had no income, but simply collected dues from members, and had no income or expenses reported on their tax returns.

5

10.     The five Defendant hospital systems then placed fourteen of their most senior executives—the individuals named as Defendants in this action—to act as directors for these corporations in an overlapping fashion.  Each of these pass-through entities had several directors from the Defendant hospital systems.

11.     These overlapping pass-through entities and their directors from the Defendants hospital systems worked in concert to execute the scheme.  Gjerset, Sisung and the Defendant hospital systems created this web of pass-through entities in order to hide the money trail of improper, non-bona fide donations.

12.     Numerous individuals described key aspects of the plan in significant detail to Relator without realizing that, in his capacity as the financial advisor to the Jefferson Parish Counsel, Relator had figured out what they were doing and had obtained documents to prove it.

13.     These individuals included Nancy Cassagne (CEO of West Jefferson Medical Center), Madeline Browning (CFO of West Jefferson Medical Center), Greg Feirn (CEO of LCMC), Suzanne Haggard (CFO of LCMC), Bruce Naramore (CFO of East Jefferson General Hospital), Lane Sisung (Principal of The Sisung Group), and Newell Normand (former Chairman of the Board of East Jefferson General Hospital and former Sheriff of Jefferson Parish).

14.     One internally emphasized aspect of Defendants' conspiracy was to not to put anything in writing that explicitly acknowledged or confirmed the quid pro connection between payments that would be made or guaranteed by the privately owned hospital defendants for the benefit of the public hospital entities involved in these schemes and the State-or-Parish-owned and/or operated hospitals and other State and local government entities that participated with Defendants in these plans to overcharge the United States for Medicaid program reimbursement.  It was made very clear to Relator and all parties concerned that there should not be any paper

6

trail because there could not be any relationship between the money paid to the State and the money subsequently paid back to the hospitals.

15.     A second emphasized aspect of Defendants' conspiracy and plan was to make sure that there was no discernable relationship between the money that the Defendant hospitals systems paid to the State, and the money they received back.

16.     A third emphasized aspect of Defendants' conspiracy and plan was to obtain matching funds from the federal Government by creating the appearance that the State was paying its minority share of Medicaid costs, when in fact it was actually receiving the funds from the Defendant hospitals in the form of prohibited, non-bona fide donations.

17.     Relator was told by numerous parties how this was done.  It was described to Relator by Bruce Naramore, then CFO at East Jefferson, as a "pool" of hospitals coordinated by Sisung.  Sisung's role was to act as the liaison between the State and the hospitals.  He would appear at each hospital and make a presentation, usually in Power Point and not typically distributed in hard copy, so as not to leave a paper trail.  He would explain to the hospital how he met with the State and how much money the hospital needed to give the State and how much it would get back.  For example, in the case of West Jefferson Medical Center, it gave the State approximately $7 million, and the amount it received from the State was "earmarked" at approximately $19 million.  Sisung would then go back to the State and confirm the amount each hospital was going to pay and the amount they wanted back.  Sisung and others were careful to not put anything in writing, to make sure there was no paper trail, and more importantly that there was no relationship between the money the hospitals sent to the State and the money they received back.

18.     This process was described to Relator by Naramore as a "wink and a nod"

7

arrangement.  As a nationally recognized hospital finance expert, Relator recognized that the hospital paying tens of millions of dollars to the State without a written agreement was an incredible red flag warning that something was wrong.  Sisung himself described it as a "trust based system" in his summary of the DSH and UPL program and the scheme, which was attached to an email sent by Henry Shane, the Chairman of the East Jefferson General Hospital Executive Committee of the Board, to Normand and other members of the Board.  Despite having written checks for tens of millions of dollars to the State even though there was no contract in writing that identified what East Jefferson was paying for, Shane commented in the email that "This is the first time that I have seen a detailed description of all the various processes . . .".

19.     Generally, the "pool" worked as such:  the five hospital systems (Defendants Louisiana Children's, Ochsner Health, Christus, HCA, and Baton Rouge General Medical Center / General Health System) and possibly others made up "the pool."  The twenty-six or more pass-through entities created by the hospital systems formed an extremely elaborate and sophisticated fraud structure, designed specifically for the purpose of hiding the flow of funds to the State and back to the hospitals.

20.     The twenty-six or more pass-through entities are shell corporations that the Defendant hospital systems and the State used to channel money to and from the hospitals.  The five hospital system Defendants ran these entities, with assistance from Gjerset, which kept the books and records of many of the entities, and was paid at least $72 million in fees by the hospital system Defendants to advise them.  The sole purpose of having Gjerset keep the books and records of these entities, and Sisung coordinating the flow of funds, was to make it extremely difficult for anyone to trace the flow of funds and to discover that all of these hospitals

8

were working in concert with the State of Louisiana to defraud the federal Government.

21.     For example, the State and West Jefferson Medical Center would tell the federal government that the amount owed in UPL payments to the hospital was $19 million; made up of a federal share of $12 million and a State share of $7 million.  What they did not tell the federal government is that West Jefferson returned $7 million back to the State through one or more of these pass-through entities, with no contract as to what the money was for.  Therefore, on a net basis, the State actually paid *nothing* instead of its mandated state share.  For example, in Shane's email to the Board, discussed previously, he noted that the State was currently retaining 15% of UPL funds and was going to increase that to 23% of UPL funds.

22.     Relator discovered the fraud based on his unique position and expertise.  Relator, a nationally recognized expert in the healthcare field with significant experience in hospital financial matters, was employed by Jefferson Parish for a period of almost three and a half years to advise the Parish on a very large $600 million transaction that brought him into a close working relationship with many of the Defendants and their executives.  As a hospital finance expert, Relator is very familiar with what is and is not considered to be the ordinary course of business in the industry.  Thus, when he discovered hundreds of millions of dollars that were being paid by hospitals to the State and even greater amounts being returned to these hospitals without any agreements in writing, it was obvious to Relator that something was very wrong.

23.     Collectively, Defendants have engaged in multi-step schemes to obtain and retain federal Medicaid funds that were unlawfully claimed and collected.  Such federal payments were improper for several related reasons:

       a. Defendants knowingly used prohibited non-bona fide donations and/or
          impermissible provider-based taxes to pay the mandatory non-federal share of

9

supplemental Medicaid payments.

b.  Defendants' schemes and conduct resulted in payment of Medicaid Upper

Payment Limit ("UPL") claims and/or Disproportionate Share Hospital ("DSH")

payments that had not yet been earned and thus were not lawfully payable when such

payments were claimed and paid.

c.  Defendants' schemes and conduct violated federal law requiring that State

Medicaid expenditures be financed and paid in accordance with State Medicaid plans

as approved by the federal Government.

24.     Defendants covered up their quid pro quo arrangements at the time they were

carried out and/or thereafter because they knew, within the meaning of the False Claims Act, that

such arrangements violated applicable federal law.

25.     Despite such knowledge, Defendants continued to conceal the true nature of their

arrangements, such that reviewing federal agencies could not adequately understand all material

aspects of Defendants' agreements and practices.

26.     Defendants either knew or came to know, within the meaning of the False Claims

Act, that their conduct resulted in overpayments to Defendants of federal funds that they were

never properly eligible to receive and/or that they were not entitled to retain.

27.     In support of his claims as summarized above, Relator therefore alleges, based

upon personal knowledge, relevant documents, and information and belief, as follows:

II.     **INTRODUCTION**

28.     This is an action to recover damages and civil penalties on behalf of the United

States of America for Defendants' violations of the federal False Claims Act, 31 U.S.C. §§ 3729-

3733 (the "FCA").

10

29.     This case involves Defendants' pursuit of legally unwarranted and often grossly excessive Medicaid payments from the Federal Government through abusive manipulation of Medicaid's Upper Payment Limit ("UPL") and Disproportionate Share Hospital ("DSH") supplemental payment programs.

30.     Defendants engaged in two separate but related schemes to improperly access federal UPL and DSH funds.

31.     First, Defendants fraudulently arranged and conspired to arrange for payment of hundreds of millions of dollars in unearned and legally unwarranted UPL and DSH payments— funded in great majority by the federal Government—to New Orleans' Louisiana Children's Medical Center ("Louisiana Children's") (a privately owned, nonprofit corporation).

32.     Louisiana Children's entered into a quid pro quo arrangement with the State of Louisiana to access federal funds to which Louisiana Children's was not entitled.  As described more fully below, Louisiana State University ("LSU") (a public entity) made "intergovernmental transfer" payments of millions of dollars to the State in order to access millions more in federal "matching" funds.  A large portion of the state and federal payments drawn down as a result of these intergovernmental transfers (a total of $284 million) were paid to Louisiana Children's. LSU made these transfers only because Louisiana Children's had agreed to return most of this payment—$257 million—to LSU, in the form of prepaid lease payments for the privilege of occupying and operating the new $1.5 billion hospital that the Federal Emergency Management Administration ("FEMA") was still paying to build for Louisiana after Hurricane Katrina devastated New Orleans in 2005.

33.     Second, this case also involves unlawful "Private UPL Programs" implemented by Defendants in Louisiana.  Under these programs, privately owned hospitals (that could benefit

11

from increased federal UPL payments) took over expenses previously borne by neighboring public hospital entities. In exchange, the public entities used the freed-up hospital funds to increase the amount of local government funds that could be invested in paying the non-federal share of increased UPL funding. These additional UPL funds were then paid to the private hospitals that assumed the public hospitals' prior costs.

34.    As a result of Defendants' unlawful conduct, the United States has made, and continues to make, Federal Financial Participation ("FFP") payments to the Louisiana Medicaid Program that improperly benefit and enrich Defendants. The United States would not have made these payments but for Defendants' false and fraudulent schemes. Defendants caused the State of Louisiana to submit false claims for approval and payment of FFP funds, to the United States' Centers for Medicare and Medicaid Services ("CMS"), in the form of the State's quarterly CMS Form 64. Such claims were false and fraudulent within the meaning of the False Claims Act because, as a result of Defendants' knowing misconduct, the amounts claimed, approved, and paid were higher than properly due under federal law.

35.    Additionally, Defendants knew, within the meaning of the False Claims Act, that they were engaged in fraudulent conduct at the time the schemes they planned and implemented were initiated. Some Defendants had actual knowledge that their conduct was illegal. Others acted with reckless disregard or in deliberate ignorance of the fact that their conduct was illegal, as all Defendants were on clear notice that the schemes described herein were designed and intended to wrongfully impose increased Medicaid costs on the federal government alone. Further, there were clear indications that these agreements were improper. For example, Defendants knew that they could not acknowledge their arrangements as "agreements" or reduce them to writing. Further, Defendants knew that these agreements made no business sense

12

without an understanding that each party would fulfill its end of the bargain.

36.     In entering into such arrangements and in carrying forward their respective roles in such schemes, each Defendant operated, at minimum, with reckless disregard or willful blindness to the patent reality that their schemes were inherently inconsistent with Medicaid statute, regulations, and policy and were unlawful.

37.     Additionally, even after it became increasingly clear to all parties that their schemes violated federal law, Defendants continued to conceal the true nature of the unlawful arrangements among themselves and certain Louisiana State and local government entities in order to retain ill-gotten gains and avoid or decrease their legal obligation to repay such known overpayments to the federal Government.

## III.    **PARTIES**

### A.    **Plaintiff/Relator**

38.     *Qui Tam* Plaintiff/Relator Joshua Nemzoff ("Relator") is a citizen of the United States of America and a resident of Pennsylvania.  He is a nationally recognized hospital merger and acquisition expert.  Relator has a B.A. from the University of Pennsylvania, an M.B.A. from New York University, and an M.P.H. from Columbia University.  In his practice, he primarily represents hospital boards of trustees and acts as the project director and lead negotiator on very complex transactions, often involving hundreds of millions of dollars in value.  Over his 40 years of practical business experience, he has participated in over $14 billion of hospital transactions.

39.     On February 19, 2014, Relator's company, Nemzoff & Company LLC, was awarded a bid by the Jefferson Parish Council, the legislative and governing body of Jefferson Parish Louisiana, to "review and audit" the competing bids that had been submitted to Jefferson Parish Hospital District 3 ("District 3") for the sale or lease of West Jefferson Medical Center and East Jefferson General Hospital.  Jefferson Parish Council retained Nemzoff & Company

LLC to analyze the bids that had been submitted by Louisiana Children's, Ochsner Health, and HCA Healthcare. After Relator had reviewed the bids, Jefferson Parish Hospital District 2 ("District 2") also hired Relator to manage the process of converting the winning bid from Louisiana Children's into a contract and closing the deal. The Jefferson Parish Council members are also the Governing Boards of District 1 and Jefferson Parish Hospital District 2 ("District 2").

**B.**     **Defendants**

      **1.**     **Louisiana Children's Medical Center, Inc.**

40.     Defendant Louisiana Children's Medical Center, Inc. is a not-for-profit healthcare system based in New Orleans that was first incorporated in 2009. Early in its existence, Louisiana Children's partnered with Children's Hospital ("Children's") (a New Orleans-based non-profit hospital) and Touro Infirmary ("Touro") (another New Orleans-based non-profit hospital), through a Health Care Systems Agreement to form a two-hospital not-for-profit community-based hospital system that would provide a continuum of care for families living in the Gulf South region of Louisiana.

41.     The "Louisiana Children's System" (aka "the System") became operational on July 14, 2009. Within the System, Louisiana Children's functioned as the System Parent and sole member of both Children's Hospital and Touro Infirmary. All corporate powers of the Touro Group and the Children's Group at that time became vested in the Board of Trustees of Louisiana Children's.

42.     Effective May 29, 2013, Louisiana Children's entered into a Cooperative Endeavor Agreement ("CEA") with an affiliate of Louisiana State University, the University Medical Center Management Corporation (of which Louisiana Children's then became the sole member), the Board of Supervisors of LSU, the State of Louisiana's Division of Administration

14

("DOA"), and the State of Louisiana Department of Health and Hospitals ("DHH"). Through that agreement and a series of related agreements and transactions, Louisiana Children's assumed rights of occupancy and control over LSU's University Medical Center in New Orleans ("UMC"), including its existing "Interim Facility" hospital and LSU's then-still-under-construction "New Facility" hospital and their related properties and corporate entities located and operating in and around downtown New Orleans.

43.    On February 26, 2015, Louisiana Children's and its subsidiary West Jefferson Holdings, LLC ("West Jefferson Holdings") entered into a CEA with Jefferson Parish Hospital District No. 1 ("District 1"), a political subdivision of Jefferson Parish, Louisiana in order to maintain the viability of operations and range of patient care services and programs being provided at West Jefferson Medical Center ("West Jefferson") and its related facilities by District 1 at a financial loss. District 1 thereafter continued to own and operate the hospital and its associated facilities until September 30, 2015.

44.    Pursuant to that 2015 CEA, District 1 and West Jefferson Holdings then executed a Master Hospital Lease, which became effective October 1, 2015.

45.    On that date, West Jefferson Holdings took control over the operations of West Jefferson under the supervision and control of Louisiana Children's, West Jefferson Holdings' sole member. This change in control over West Jefferson's operations resulted from a triple net Master Hospital Lease to West Jefferson Holdings.

46.    Today, Louisiana Children's operates five hospital locations in and around New Orleans: Children's Hospital, Touro Infirmary, University Medical Center-New Orleans, New Orleans East Hospital, and West Jefferson. Louisiana Children's also offers a network of urgent care centers across the greater New Orleans area and beyond.

15

### 2.    West Jefferson Holdings, LLC

47.    Defendant West Jefferson Holdings, LLC ("West Jefferson Holdings") is a limited liability Louisiana corporation formed in November 2014 as a wholly owned subsidiary of Louisiana Children's.  Under the control and direction of Louisiana Children's, and pursuant to Louisiana Children's CEA and Master Hospital Lease with Jefferson Parish Hospital Service District No. 1 (a political subdivision of Jefferson Parish, Louisiana), since October 1, 2015, West Jefferson Holdings has operated West Jefferson Medical Center ("West Jefferson"), the d/b/a name of a 419-bed community hospital located in Marrero, Louisiana, just 15 minutes from downtown New Orleans.  "West Jefferson Medical Center" or "West Jefferson" remains the d/b/a trade name of Defendant West Jefferson Holdings.

### 3.    The Sisung Group

48.    Defendant The Sisung Group ("Sisung Group") is a New Orleans-based financial advisory firm, organized under the laws of the State of Louisiana providing investments, capital raising, real estate development, business development, consulting and project management services.  As used herein, Sisung Group includes that entity as a "parent" entity and unified whole and any separate Sisung Group affiliated entities and/or principals not separately named herein that were involved in and/or profited from the misconduct alleged herein.  Defendant Sisung Group and its corporate affiliate, Defendant United Professionals Company, LLC, have been a primary instigator and developer of the fraudulent schemes alleged in this lawsuit.

### 4.    United Professionals Company, LLC

49.    Defendant United Professionals Company, LLC ("UPC") is a consulting, program management, and business development company headquartered in New Orleans and a corporate affiliate and member of Defendant Sisung Group.  Its clients include for-profit and non-profit corporations, as well as government agencies, individuals, municipalities, foundations and trusts.

16

Since 2005, UPC has worked to help public and private health care providers maximize their revenues and save on costs.   To that end, UPC has developed and marketed aggressive strategies for utilizing states' unused Medicaid Upper Payment Limit Caps (UPLs), Managed Care Actuarial Limits, Certified Public Expenditures (CPEs), and Intergovernmental Transfers (IGTs) to increase net revenues realized by Louisiana healthcare providers from federally funded healthcare programs.

### 5.    Ochsner Clinic Foundation d/b/a Ochsner Health System

50.    Defendant Ochsner Clinic Foundation d/b/a Ochsner Health System ("Ochsner Health" or "Ochsner") is a not-for-profit healthcare provider based in southeast Louisiana.  Its flagship hospital is Ochsner Medical Center, located in Jefferson Parish, Louisiana, a short distance from the New Orleans city limits.  Ochsner Health also has various other clinics and medical centers in Greater New Orleans, Baton Rouge, and other locations across South Louisiana.  It also is the parent of Ochsner Community Hospitals, which was formed to purchase three hospitals (Ochsner Medical Center Westbank, Ochsner Medical Center Kenner, and Ochsner Baptist Medical Center) and operate them.

51.    Louisiana Children's, Christus, HCA, Ochsner Health, and Baton Rouge formed a collaboration with the State and Louisiana local government entities[1]  to fraudulently funnel donations through numerous pass-through entities to more fully fund the State's Medicaid program and receive increased supplemental payments in return.

### 6.    Gjerset & Lorenz LLP

52.    Defendant Gjerset & Lorenz LLP ("Gjerset") is an Austin, Texas based law firm

---

[1] At least as of 2010, those local government entities were: Jefferson Parish Hospital Service Districts No. 1 and 2, Natchitoches Hospital District No. 1, Jefferson Parish Human Services Authority, Terrebonne Parish Hospital Service District #1, Southern Regional Medical Corporation, Hospital Service District No. 3 of the Parish of Allen, The Parish Hospital Service District for the Parish of Orleans – District A, and Savoy Medical Center.

that often advises public and private health care entities in Louisiana and elsewhere on developing and implementing strategies designed to sidestep the federal prohibitions against use of non-bona fide donations and/or impermissible health care related taxes to fund the non-federal share of Medicaid program payments.

53.    Gjerset worked closely with the Sisung Group, and Lane Sisung, who acted as coordinator and liaison between the Defendant private hospital systems they represented (Baton Rouge General Medical Center / General Health System, Christus, HCA, Ochsner Health, and Louisiana Children's) and the State to plan and execute the arrangement, without leaving behind a paper trail that would evidence the real nature of the arrangement. Gjerset helped the private hospitals to set up at least twenty-six pass-through entities[2] related to the private hospitals. The directors of these shell entities are the named individual Defendants, all of whom were high-ranking executives at the Defendant private and public hospital systems, and who acted as directors for all of these pass-through entities. The private hospitals, with assistance and coordination from Gjerset and Sisung, then used these pass-through entities to funnel money back to the State in the guise of donations and services. Most of these pass-through entities' tax forms indicated that they did not have any income, but merely collected dues from their members, and also had no expenses—acting as true pass-through entities for the purpose of executing the donation scheme.

54.    For its efforts, the private hospital systems paid Gjerset handsomely. Gjerset

---

[2] These entities are: Allen Clinical Services, Inc.; Brent House Corporation; Community Medical Group, St. Charles, Inc.; Deuteron Realty; Eastern Louisiana Clinical Services, Inc.; EBR Medical Facilities, Inc.; Evangeline Clinical Services, Inc.; Hydra Clinical Services, Inc.; Jefferson Clinical Services, Inc.; Louisiana Clinical Services, Inc.; Louisiana Family Services, Inc.; Metairie Physician Services, Inc.; Natchitoches Clinical Services, Inc.; New Orleans Physician Services, Inc.; OCF Medical Facilities, Inc.; Ochsner System Protection Company; OMCNS Medical Facilities, Inc.; Paeon Health Services, Inc.; Satyr Clinical Services, Inc.; Vermilion Health Services, Inc. Orleans Clinical Services, Inc.; Orleans Health Services, Inc.; Sisyphus Clinical Services, Inc.; Southern Louisiana Clinical Services, Inc.; and Millennium Health Services, Inc.

received at least $72 million in payments over the years from the Defendant private hospital systems, in payment for its services in arranging, executing, and coordinating the scheme. Gjerset managed the books and records of many if not all of these shell entities and Gjerset's firm address is listed as the address for many of the entities. Defendants executed the flow of donation funding through these pass-throughs to obfuscate the fact that these funds were donations made by Defendants in concert with the State for the purpose of defrauding Medicaid.

55.    Newell Normand, the former Sheriff of Jefferson Parish and also the former Chairman of the Board of East Jefferson General Hospital ("EJGH"), referred Relator to Gjerset in order to gain a better understanding of how these programs worked. In doing so, Normand referred to Gjerset as the "mastermind" behind development of the kinds of financing schemes sued upon in this action.

### 7.    Christus Health Central Louisiana

56.    Defendant Christus Health Central Louisiana ("Christus") is, upon information and belief, the official corporate name of the Christus Health System general hospital and provider of other medical services located in Alexandria, Louisiana. It is a member of the collaboration formed with Defendants Ochsner Health, Louisiana Children's, HCA, and Baton Rouge to more fully fund the State's Medicaid program and receive increased supplemental payments in return. It, along with Ochsner Health, Louisiana Children's, HCA, and Baton Rouge, funneled money and other benefits through numerous pass-through entities to the State. In return for this quid pro quo agreement they received supplemental Medicaid payments.

### 8.    HCA MidAmerica Division

57.    Defendant HCA MidAmerica Division ("HCA") is, upon information and belief, the official corporate name of the Division of HCA Healthcare that operates HCA hospitals, ambulatory surgery centers, and physician practices within the Louisiana-Mississippi region.

19

HCA's parent company, HCA Healthcare, is the largest for-profit hospital operator in the world with annual revenue of roughly $60 billion and is a publicly traded corporation. HCA MidAmerica Division is a member of the collaboration formed with Defendants Ochsner Health, Louisiana Children's, Christus, and Baton Rouge to more fully fund the State's Medicaid program and receive increased supplemental payments in return. It, along with Ochsner Health, Louisiana Children's, Christus, and Baton Rouge, funneled money and other benefits through numerous pass-through entities to the State. In return for this quid pro quo agreement they received supplemental Medicaid payments.

### 9. Baton Rouge General Medical Center

58.    Defendant Baton Rouge General Medical Center is Louisiana nonprofit corporation that runs a hospital system with three campuses and clinics located in Baton Rouge, Louisiana.

59.    Baton Rouge General Medical Center (and/or the Baton Rouge hospital it owns and operates) is a member of the collaboration formed with Defendants Ochsner Health, Louisiana Children's, HCA, and Christus to more fully fund the State's Medicaid program and received increased supplemental payments in return. It, along with Ochsner Health, Louisiana Children's, HCA, and Christus, funneled money and other benefits through the nonprofit Defendants for the benefit of the public hospitals. In return for this quid pro quo agreement they received supplemental Medicaid payments.

### 10. General Health System

60.    Defendant General Health System is Defendant Baton Rouge General Medical Center's legal parent company.

61.    Collectively the two shall be referred to as "Baton Rouge" or "Baton Rouge General Medical Center / General Health System."

62.     General Health System is a member of the collaboration formed with Defendants Ochsner Health, Louisiana Children's, HCA, and Christus to more fully fund the State's Medicaid program and received increased supplemental payments in return.  It, along with Ochsner Health, Louisiana Children's, HCA, and Christus, funneled money and other benefits through numerous pass-through entities to the State.  In return for this quid pro quo agreement they received supplemental Medicaid payments.

### 11.     Kendall Johnson

63.     Defendant Kendall Johnson is currently the CFO of Baton Rouge General Medical Center / General Health System.  He became CFO in 2011.  Prior to that, he was Baton Rouge's Vice President of Finance.  He has worked at Baton Rouge for approximately twenty-seven years.  He is or has been a Director at seven of the pass-through entities formed by the private hospital systems, with assistance from Gjerset and Sisung.  Those pass-through entities Johnson acted as Director of are: New Orleans Physician Services, Inc.; Natchitoches Clinical Services Inc.; Metairie Physician Services, Inc.; Louisiana Clinical Services, Inc.; Allen Clinical Services, Inc.; Eastern Louisiana Clinical Services, Inc.; and Vermilion Health Services, Inc.  These entities at which Johnson acted as a Director were used by Gjerset, Sisung, and the hospital systems to channel the funds and services that constituted improper donations to the State.

### 12.     Scott Posecai

64.     Defendant Scott Posecai is the current Executive Vice President and CFO of Ochsner Health.  He became Executive Vice President in 2001.  He has worked for Ochsner for approximately twenty-six years.  He is or has been a Director at eighteen of the pass-through entities formed by the private hospital systems, with assistance from Gjerset and Sisung.  Those pass-through entities are: New Orleans Physician Services, Inc.; Natchitoches Clinical Services

21

Inc.; Metairie Physician Services, Inc.; Louisiana Family Services, Inc.; Orleans Clinical

Services, Inc.; Allen Clinical Services, Inc.; Paeon Health Services, Inc.; Satyr Clinical Services,

Inc.; Hydra Clinical Services, Inc.; Community Medical Group – St. Charles, Inc.; Deuteron

Realty; Millennium Healthcare Management, Inc.; Vermilion Health Services Inc.; OCF Medical

Facilities; OMCNS Medical Facilities Inc.; Ochsner System Protection Company; Brent House

Corporation; and EBR Medical Facilities. These entities at which Posecai acted as a Director

were used by Gjerset, Sisung, and the hospital systems to channel the funds and services that

constituted improper donations to the State.

### 13.    Maurice "Mel" Lagarde III

65.     Defendant Maurice "Mel" Lagarde III is the President and CEO of HCA

MidAmerica Division. He has worked at HCA MidAmerica Division for approximately twenty-

five years. He is or has been a Director at nine of the pass-through entities formed by the private

hospital systems, with assistance from Gjerset and Sisung. Those pass-through entities are:

Sisyphus Clinical Services, Inc.; Vermilion Health Services, Inc.; Natchitoches Clinical Services

Inc.; Metairie Physician Services, Inc.; New Orleans Physician Services, Inc.; Louisiana Family

Services, Inc.; Orleans Clinical Services, Inc.; Louisiana Clinical Services, Inc.; and Allen

Clinical Services, Inc. These entities of which Lagarde acted as a Director were used by Gjerset,

Sisung, and the hospital systems to channel the funds and services that constituted improper

donations to the State.

### 14.    Stephen Wright

66.     Defendant Stephen Wright was the President, Senior Vice President of Group

Operations, and CEO Christus Health Central Louisiana, until his retirement in 2018. He

worked at Christus for approximately thirty-seven years. He is or has been a Director at eight of

the pass-through entities formed by the private hospital systems, with assistance from Gjerset

22

and Sisung. Those pass-through entities are: New Orleans Physician Services, Inc.; Natchitoches Clinical Services, Inc.; Louisiana Clinical Services, Inc.; Jefferson Clinical Services, Inc.; Orleans Health Services, Inc.; Shreveport Clinical Services, Inc.; Sisyphus Clinical Services, Inc.; and Vermilion Health Services, Inc. These entities of which Wright acted as a Director were used by Gjerset, Sisung, and the hospital systems to channel the funds and services that constituted improper donations to the State.

### 15. **Warner Thomas**

67.    Defendant Warner Thomas is the CEO and President of Ochsner Health. He became President and CEO in 2012. He has worked at Ochsner for approximately twenty-two years. He is or has been a Director at five of the pass-through entities formed by the private hospital systems, with assistance from Gjerset and Sisung. Those pass-through entities are: OCF Medical Facilities; OMCNS Medical Facilities, Inc.; Ochsner System Protection Company; Brent House Corporation; and EBR Medical Facilities. These entities at which Thomas acted as a Director were used by Gjerset, Sisung, and the hospital systems to channel the funds and services that constituted improper donations to the State.

### 16. **Bobby Brannon**

68.    Defendant Bobby Brannon is the Executive Vice President and Treasurer of Ochsner Clinic Foundation. He is or has been a Director at five of the pass-through entities formed by the private hospital systems, with assistance from Gjerset and Sisung. Those pass-through entities are: Deuteron Realty; OCF Medical Facilities; OMCNS Medical Facilities Inc.; Ochsner System Protection Company; Brent House Corporation; and EBR Medical Facilities. These entities at which Brannon acted as a Director were used by Gjerset, Sisung, and the hospital systems to channel the funds and services that constituted improper donations to the State.

23

### 17.    Patrick Quinlan

69.    Defendant Patrick Quinlan was the CEO of Ochsner Health from 2001 until 2012, when he retired and Defendant Warner Thomas became CEO.  He maintains the title of CEO Emeritus of Ochsner and remains involved at Ochsner.  He is or has been a Director at two of the pass-through entities formed by the private hospital systems, with assistance from Gjerset and Sisung.  Those pass-through entities are: Ochsner System Protection Company and Brent House Corporation.  These entities of at which Quinlan acted as a Director were used by Gjerset, Sisung, and the hospital systems to channel the funds and services that constituted improper donations to the State.

### 18.    Michael Hulefeld

70.    Defendant Michael Hulefeld is the Executive Vice President and COO of Ochsner Health System.  He has worked at Ochsner for approximately thirteen years.  He is or has been a Director at one of the pass-through entities, Millennium Healthcare Management Inc., that were formed by the private hospital systems, with assistance from Gjerset and Sisung.  Millennium Health Management Inc. is a pass-through entity used by Gjerset, Sisung, and the hospital systems to channel the funds and services that constituted improper donations to the State.

### 19.    Chris Karam

71.    Defendant Chris Karam is the President and CEO of Christus St. Francis Cabrini Health System.  He became President and CEO in 2018 after the retirement of Defendant Stephen Wright.  Karam has worked at various Christus facilities for approximately thirty-three years.   He is or has been a Director at three of the pass-through entities that were formed by the private hospital systems, with assistance from Gjerset and Sisung.  Those pass-through entities are: Evangeline Clinical Services, Inc.; Natchitoches Clinical Services, Inc.; and Vermilion Health Services, Inc.  These entities at which Karam acted as a Director were used by Gjerset,

24

Sisung, and the hospital systems to channel the funds and services that constituted improper donations to the State.

### 20.    Scott Merryman

72.    Defendant Scott Merryman is the CFO at Christus Health Southeast Texas and Louisiana. He has worked in various positions at Christus for approximately twenty-nine years. He is or has been a Director at three of the pass-through entities formed by the private hospital systems, with assistance from Gjerset and Sisung. Those pass-through entities are: Allen Clinical Service, Inc.; Orleans Health Services, Inc.; and Evangeline Clinical Services, Inc. These entities at which Merryman acted as a Director were used by Gjerset, Sisung, and the hospital systems to channel the funds and services that constituted improper donations to the State.

### 21.    Kim Kelsch

73.    Defendant Kim Kelsch is the Secretary of Christus Health Southwestern Louisiana. She is or has been Secretary of Evangeline Clinical Services, Inc., one of the pass-through entities formed by the private hospital systems, with assistance from Gjerset and Sisung. This entity was used by Gjerset, Sisung, and the hospital systems to channel the funds and services that constituted improper donations to the State.

### 22.    Dionne Viator

74.    Defendant Dionne Viator was an Executive Vice President and CFO, among various other positions, at Baton Rouge General Medical Center / General Health System. She worked for Baton Rouge for approximately twenty-one years. Viator left Baton Rouge in or around 2014. She is or has been a Director at three of the pass-through entities formed by the private hospital systems, with assistance from Gjerset and Sisung. Those pass-through entities are: New Orleans Physician Services Inc.; Louisiana Family Services, Inc.; and Orleans Clinical

Services, Inc. These entities at which Viator acted as a Director were used by Gjerset, Sisung, and the hospital systems to channel the funds and services that constituted improper donations to the State.

### 23.    Nancy Cassagne

75.    Defendant Nancy Cassagne was the President and CEO of West Jefferson Medical Center. She became CEO in 2008 and retired in 2019. She is or has been a Director at three of the pass-through entities formed by the private hospital systems, with assistance from Gjerset and Sisung. Those pass-through entities are: New Orleans Physician Services Inc.; Southern Louisiana Clinical Services, Inc. and Orleans Clinical Services, Inc. These entities at which Cassagne acted as a Director were used by Gjerset, Sisung, and the hospital systems to channel the funds and services that constituted improper donations to the State.

### 24.    Peter November

76.    Defendant Peter November is an Executive Vice President and CFO at Ochsner Health System. He has worked in various roles at Ochsner since 2012. He is or has been a Director at seven of the pass-through entities that were formed by the private hospital systems, with assistance from Gjerset and Sisung. Those pass-through entities are Paeon Health Services, Inc.; Satyr Clinical Services, Inc.; Hydra Clinical Services, Inc.; Millennium Healthcare Management, Inc.; OCF Medical Facilities; OMCNS Medical Facilities, Inc.; and EBR Medical Facilities. These entities at which Viator acted as a Director were used by Gjerset, Sisung, and the private hospital systems to channel the funds and services that constituted improper donations to the State.

## IV.    JURISDICTION AND VENUE

77.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this

26

Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

78.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C.

§ 3732(a) because that section authorizes nationwide service of process and because Defendants

have minimum contacts with the United States.  Moreover, Defendants can be found in and have

transacted business related to this case in the Eastern District of Louisiana.

79.     Venue is proper in the Eastern District of Louisiana pursuant to 28 U.S.C.

§ 1391(b), 28 U.S.C. § 1395(a), and 31 U.S.C. § 3732(a) because the Defendants can be found

in, and/or transact or have transacted business related to this case, in this District.  At all times

relevant to this Complaint, Defendants regularly conducted, and continue to conduct, substantial

business within this District, and/or maintain employees and offices in this district.  The named

Defendants' principal places of business are in this District.  Many of the acts described in this

Complaint occurred in this District and/or related to fraud that all Defendants understood would

occur in this District.

80. ·   Although it is no longer jurisdictional, the public disclosure bar of the federal

False Claims Act does not bar this suit.  All or most of the claims set forth in Relator's complaint

are not based upon allegations or transactions of fraud that have been publicly disclosed within

the meaning of the False Claims Act.  To the extent that any allegations or transactions of fraud

related to Relator's Complaint, had been publicly disclosed within the meaning of the FCA,

Relator qualifies as an "original source" of the information within the meaning of that Act.

Relator voluntarily disclosed to the Government the information upon which the allegations and

transactions in his claims are based before any such public disclosure occurred.  Additionally,

Relator has knowledge that is independent of and materially adds to any such publicly disclosed

allegations or transactions, and has voluntarily provided the information to the Government

before filing this case.

## V.    APPLICABLE LAW

### A.    The False Claims Act

81.     Congress originally enacted the FCA during the Civil War and substantially amended the Act in 1986—and, again, in 2009 and 2010—to enhance the ability of the United States to recover losses sustained as a result of fraud against it.  Congress amended the FCA after finding that fraud in federal programs was pervasive and that the statute, which Congress characterized as the primary tool for combating fraud against the United States Government, needed modernization.  Congress amended the FCA to create incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

82.     The FCA prohibits, among other things, (a) knowingly presenting (or causing to be presented) to the federal Government a false or fraudulent claim for payment or approval; (b) knowingly making, using, or causing to be made or used, any false record or statement material to a false or fraudulent claim; (c) knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government; and (d) conspiring to violate any of the previous sections of the FCA.  31 U.S.C. §§ 3729(a)(1)(A)-(C), (G).  Any person who violates the FCA is liable for a civil penalty for each violation, plus three times the amount of the damages sustained by the United States.  31 U.S.C. § 3729(a)(1).

83.     For purposes of the FCA, a person "knows" a claim or statement is false if that person: "(i) has actual knowledge of [the falsity of] the information; (ii) acts in deliberate

28

ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1). The FCA does not require proof that a defendant specifically intended to commit fraud. *Id.*

84.     Any person with information about an FCA violation may act as a relator, bring a *qui tam* action on behalf of the United States, and share in any recovery. The FCA requires that the *qui tam* complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the Government time to conduct its own investigation and to determine whether to join the suit.

85.     The Statute of Limitations for an FCA civil action extends at least six years from the date that the actionable misconduct or the wrongful payment occurred and extends up to ten years provided that the United States Government official charged with the responsibility to act under the circumstances learned of the misconduct alleged in the complaint less than three years prior to the filing of the action. 31 U.S.C. § 3731(b). All claims for recovery alleged herein fall within those limitations-period criteria.

### B.      Medicaid – Administration and Provider Reimbursement

86.     The federal healthcare program involved in this action is Medicaid.

87.     CMS is the agency within the Department of Health and Human Services that administers Medicaid at the federal level. While day-to-day management of Medicaid is run by State and Parish, County and/or municipal governments at the local level, federal Medicaid statutes and regulations must be followed by both State and local governments.

88.     Title XIX of the Social Security Act (the "Medicaid Act") authorizes federal grants to the states for Medicaid programs to provide medical assistance to persons with limited income and resources. 42 U.S.C. § 1396, *et seq.*

89.    Medicaid is a healthcare payer of last resort, meaning that Medicaid will pay only if a patient meets Medicaid income and resource eligibility requirements and only after all other forms of insurance, including but not limited to potential Medicare insurance benefits, are exhausted and when self-payment is not financially feasible.

90.    Medicaid programs are administered by the states in accordance with federal statutes and regulations and according to a Medicaid state plan and any state plan amendments ("SPAs"), as approved by the federal Government through HHS and CMS.  42 C.F.R. §§ 430.0, 430.10.  Some kinds and minimum levels of care must be provided by States that elect to participate in the Medicaid program and other kinds and/or levels of care may be added to the program at States' options, provided that they are willing to contribute the mandated non-federal share of reimbursement for such care.

91.    To carry out the mandates and objectives of the Medicaid program, the state Medicaid agency pays providers for medical care and services provided to eligible Medicaid recipients.  Providers that wish to participate in the Medicaid program must agree with the State to comply with certain requirements specified in a provider agreement.

92.    Standard Medicaid reimbursement rates rarely (if ever) suffice to pay even the full, reasonable cost of providers in caring for Medicaid patients.

93.    However, when adequate federal funding is budgeted and available near the close of each federal fiscal year—and when state and/or local government entities are willing and able to invest their prescribed share—the federal Government may supplement regular Medicaid reimbursements through Medicaid "Upper Payment Limit" expenditures that track Medi*care* reimbursement rates.  Such supplemental "UPL" Medicaid payments thus can raise overall Medi*caid* reimbursement up to a maximum of the total amount Medi*care* would pay for the same

30

services.  42 C.F.R. § 447.272.

94.      In contrast to standard Medicaid reimbursement, Medicare is generally required, under Section 1814(b) of the Medicare Act (for services covered under Part A) and under Section 1833(a)(2) of The Act (for services covered under Part B) to pay for services furnished by providers on the basis of reasonable costs of patient care as defined in Section 1861(v) of the Act, or the provider's customary charges for those services, if lower.

95.      The primary underlying policy and purpose of this rule is to help ensure that Medicare neither pays more or less than the reasonable costs associated with patient care.  The goal is that Medicare payment rates for patient care neither subsidize the care provided to non-Medicare patients nor requires non-Medicare patients to subsidize care received by Medicare patients.  *See* 42 C.F.R. § 413.9.

96.      By tying the maximum UPL rate for Medicaid to standard Medicare reimbursement rates, Congress has also tied Medicaid UPL payment rates to the same, reasonable-cost-based reimbursement goals and considerations that guide all Medicare reimbursement.  *See Medicaid Program; Revision to Medicaid Upper Payment Limit Requirements for Hospital Services, Nursing Facility Services, Intermediate Care Facility Services for the Mentally Retarded, and Clinic Services*, 66 Fed. Reg. 3148 (Jan. 12, 2001); *Ark. Dep't. of Human Servs. v. Sebelius*, 818 F. Supp. 2d 107, 109 (D.D.C. 2011).

97.      Because Medicaid supplemental UPL payments are limited to what Medicare would pay for the same services, UPL payments are restrained by the same principles that limit the amount of Medicare expenditures.  In other words, in no event should such annual UPL payments to any class of healthcare facilities exceed the lesser of: (1) those providers' reasonable all-in aggregate costs for the care provided to Medicaid-eligible patients in the relevant year; or

31

(2) the providers' aggregate customary charges to the general public for such care.  Medicaid payments should never be manipulated to create a profit center for any class of providers or their related entities.  Nor should Medicaid payments be prepaid and billed to the United States Government for medical services that have not yet been rendered, especially not for services that may never be rendered in the fiscal year in which prepayment is sought.  Medicaid pays only for patient services already rendered, and—as is more fully explained below—the portion of total authorized Medicaid reimbursement that the federal government pays varies from federal fiscal year to federal fiscal year, based on annual recalculations of federal financial participation made under a formula set by federal statute.

98.    Federal law also requires that States prepare and maintain State Medicaid Plans that have been reviewed and approved by CMS as being consistent with federal law and Medicaid reimbursement policy, economic efficiency and non-discrimination principles.  States must operate their programs in conformity with those "State Plans."  Any changes States wish to make to their State Plans must be submitted to CMS for review and approval before the States implement any such proposed changes to what the State Medicaid Plan covers or how the Medicaid Program is administered in the State.  Federal reimbursement is not warranted for payments States make in violation of these requirements.

99.    The law governing the Medicaid program also requires that a person or entity who receives an overpayment from Medicaid must report and return the overpayment within 60 days of identifying it.  Overpayments retained beyond 60 days are "obligations" for purposes of the False Claims Act's "reverse" false claims provision.  42 U.S.C. § 1320a-7k(d)(1)-(3).

C.    **Medicaid – Government Financing**

100.    While Medicaid programs are administered principally by the States, they are

32

jointly financed (in descending order of contribution percentage) by the federal, state, and local governments.

101.    The federal Government pays the lion's share of medical assistance expenditures to the state on a quarterly basis according to: (1) statements of expenditures submitted by the state to CMS on a CMS 64 Form (*see* 42 C.F.R. § 430.30(c)), and (2) a formula used to calculate how much of the total reported expenditures the federal Government will reimburse the state, as described in Sections 1903 [42 U.S.C. § 1396b] and 1905(b) [42 U.S.C. § 1396d(b)] of the Medicaid Act. The amount of the federal share of medical assistance expenditures is called Federal Financial Participation ("FFP"). 42 C.F.R. § 430.1. The state collects and/or pays the non-federal share of medical assistance expenditures from state and local government funds in accordance with the requirements of Section 1902(a)(2) [42 U.S.C. § 1396a(a)(2)] of the Medicaid Act.

102.    Different levels of federal funding are provided to different states each federal fiscal year, depending on the States' needs as calculated for that year and available federal funding. The minimum federal matching rate share is 50% of total program costs. The federal Government calculates the precise level of federal funding for each state every federal fiscal year. In Louisiana, the annual federal share of Medicaid expenditures, called the Federal Medical Assistance Percentage ("FMAP"), was 62.11% in Fiscal Year 2014 and 62.05% in Fiscal Year 2015. In other words, for every dollar that Louisiana spent to fund its Medicaid program, the federal Government reimbursed Louisiana slightly more than $0.62 in 2014 and 2015.

103.    The remaining percentage is the "state's share" of Medicaid program costs. Most states fund their share of Medicaid expenditures through state revenues and intergovernmental

transfers ("IGTs") of local government funds, such as tax revenue and publicly owned provider funds.

104.    Because some combination of both state and local government funds are used for various Medicaid programs to draw down matching federal Medicaid funding, state and local government funding is often referred to generically as the "non-federal share" of Medicaid funding or expenditures, or the "state share" of such funding and expenditures.

105.    Funds from "public" hospitals and other "public" health care providers that are owned and operated by State or local government entities are lawfully regarded as state or local government funds, and such public institutions may be a legitimate source of the non-federal share of Medicaid funding. So too, may a hospital or other publicly-run provider that has contracted with a private entity to provide management to oversee that public provider's day-to-day operations. Such government entities can make intergovernmental transfer ("IGT") payments of the non-federal share of Medicaid funding payments for purposes of drawing down federal funding to be directed to the public health care providers themselves. Government entities may also make IGT payments to draw down federal Medicaid funding to more fully reimburse privately owned or operated hospitals and other private health care providers that have provided undercompensated care to eligible patients.

106.    However, as is more thoroughly described below, a critical caveat to this principle is that privately owned and operated health care providers may not directly or indirectly fund any part of the non-federal share of Medicaid payments in which those providers share. Such prohibited conduct includes: (1) the making of "non-bona fide donations" by private health care providers or their related entities (i.e., a "donation" which the donor will get back); or (2) "provider-based taxes" that target providers that will be receiving a portion of the Medicaid

34

funding that results from the "taxes." The hallmark of these improper practices is that the provider gets back at least part of its "donation" or "tax payment" (often all of it, if not much more).

107.    Such "hold harmless" donation and provider-based tax arrangements raise at least three concerns that undermine congressional Medicaid policy.

108.    First, such non-bona fide donations and provider-based taxes effectively relieve state and/or local governments from investing their full, federally mandated share of Medicaid expenditures. This undermines Congress's objective of incentivizing state and local governments to do their own cost/benefit analysis of what level of overall Medicaid spending is really necessary and financially prudent in their home localities. In this respect, one goal of such rules is similar to the purpose of patient co-payments—only when the beneficiaries of federally subsidized healthcare spending are also investing additional funds for increased care do they have any genuine incentive to analyze whether the extra care is worth the extra costs.

109.    Second, the rules against these kinds of non-federal-share financing arrangements were implemented to protect the federal treasury. Passing along the cost of funding the non-federal share of Medicaid expenditures in whole or part to providers (who will receive these payments back), rather than state or local government entities, as Congress intended, changes the formula for funding indigent care uniformly to the disadvantage of the United States and federal taxpayers. When the reported level of spending by state and local governments on the non-federal share of Medicaid is inflated to include resources actually gleaned from providers that are the intended beneficiaries of the additional reimbursement of uncompensated costs, the United States' real level of proportionate investment is inflated both with respect to the particular Medicaid payments at issue and in the aggregate.

35

110.    Third, providers who do not participate in these schemes are being shortchanged. Providers who merely seek reimbursement for their genuine unreimbursed costs for providing care to Medicaid and other indigent patients are being short changed because they are being forced to pay some or all of the non-federal share of such reimbursements themselves. Even if the effect of being pressured to pay such non-bona fide donations and/or provider-based taxes is a net financial gain in comparison to having state or local governments refuse to invest in such additional payments at all, in the long term such arrangements overstate actual state and local government resources currently being committed to charitable care. This ultimately conceals the level of genuine investment needed at the state and local level to optimize the long-term future of Medicaid reimbursement in those localities.

**D.    Louisiana's Medicaid Base Funding and Supplemental Payment Programs**

111.    The sole agency that administers the Louisiana Medicaid program is the Louisiana Department of Health ("LDH") also known as the Department of Health and Hospitals ("DHH").

112.    LDH makes base Medicaid payments to non-state operated hospitals according to prospective per diem rates for various "peer groups" of hospitals. The main peer group classifications are major teaching hospitals, minor teaching hospitals, non-teaching with fewer than 58 beds, non-teaching hospitals with 58 through 138 beds, and non-teaching hospitals with more than 138 beds. Other peer groups include long-term (ventilator) hospitals, children's hospitals, and free-standing rehabilitation clinics. Louisiana State Medicaid Plan, Attachment 4.19-A Item 1, Pages 2-3 (effective July 1, 2012).

113.    In addition to the base payments described above, the Louisiana Medicaid program provides for several kinds of supplemental payments for inpatient hospital care.

36

114.    At all times between December 31, 2010 and March 1, 2017, LDH made annual supplemental payment to non-rural, non-state government hospitals and private hospitals that qualified as "high Medicaid hospitals"—meaning they had a Medicaid inpatient utilization ratio of over 30 percent—based on the annual upper payment limit calculation per state fiscal year. *Id.* at Page 8b.  Such supplemental payments were not to exceed the UPL as set forth in 42 C.F.R. § 447.272 and were calculated based on the pro rata share of each qualifying hospitals' paid Medicaid days. *Id.*  Since March 1, 2017, the annual appropriation for supplemental payments to the same hospitals has been reduced to $1,000 (per Medicaid day, Relator believes), with each hospital's supplemental payment calculated based on its pro rata share of the reduced appropriation. *Id.*

115.    Thus, at no time relevant to the allegations made in this case has Louisiana's State Medicaid Plan, as approved by CMS, authorized Supplemental Medicaid payments to non-rural, non-State Government hospitals and/or private hospitals at levels that were not tethered to and capped by a reasonable estimate of the actual cost of such care that each such hospital provided to Medicaid-eligible patients during the state fiscal year in which such care was actually provided.

116.    LDH also makes quarterly supplemental payments to qualifying non-rural, non-state government hospitals for inpatient services.  Hospitals can qualify through several criteria, including: (1) status as a designated non-teaching hospital located in a Major Metropolitan Statistical Area under 42 C.F.R. § 413.231(b)(1) that provides inpatient obstetrical and neonatal intensive care unit services and that has greater than 21 percent in Medicaid inpatient day utilization and greater than 65 percent in Medicaid newborn day utilization; (2) being located in a city with a population of over 300,000 as of the 2010 Census; or (3) status as an LDH-

37

designated major teaching hospital that has at least 300 licensed acute beds. *Id.* at 8(c)(3). East Jefferson General Hospital qualifies for these supplemental payments as an LDH-designated major teaching hospital with at least 300 licensed acute beds. Quarterly payments to these hospitals are the difference between the hospital's inpatient Medicaid billed charges and Medicaid payments the hospital receives for covered inpatient services provided to Medicaid beneficiaries. *Id.* at 8(c)(3)(a). In the aggregate, the payments are not to exceed the UPL for all hospitals included in the non-state government owned group. *Id.*

117.    LDH also makes payment adjustments to Disproportionate Share Hospitals ("DSHs"). To qualify as a DSH, among other things, a hospital must meet specified minimum utilization rates. *Id.* at 10(a)-(d). DSH payments are not to exceed the federal DSH allotment for Louisiana for the given federal fiscal year. *Id.* at 10(d). Qualification for DSH payments is based on the hospital's cost reports, related uncompensated cost data, and/or utilization, depending on the type of hospital at issue. *Id.* at 10(e).

118.    One form of supplemental payment programs that has been made under Louisiana Medicaid is the Low-Income and Needy Care Collaboration Agreement program ("LINCCA"), which became effective in 2010. Under LINCCA, LDH makes quarterly supplemental payments to qualifying non-rural, non-state acute care hospitals, which—in aggregate—are not to exceed the UPL. *Id.* at 10 1 (4). Non-state hospitals include hospitals owned or operated by a private entity. *Id.*

119.    To qualify for LINCCA supplemental payments, the hospital must be affiliated with a state or local governmental entity through a LINCCA—an agreement between a hospital and a state or local governmental entity to collaborate for purposes of providing health care services to low income and needy patients. *Id.*

38

120.    According to Louisiana's federally approved State Medicaid Plan, supplemental LINCCA payments are limited to one-fourth of the lesser of: (a) the difference between the qualifying hospital's inpatient Medicaid billed charges and Medicaid payments the hospital receives for covered inpatient services provided to Medicaid recipients; or (2) for hospitals participating in the Medicaid DSH program, the difference between the hospital's specific DSH limit and the hospital's DSH payments for the applicable payment period. *Id.*

121.    In March 2011, Louisiana's then-governor announced that the State had made the largest payment ever up to that point under the LINCCA program: $83 million to 27 private hospitals. *See* Press release, "Governor Jindal Announces $83 Million in Payments to Hospitals," (Mar. 29, 2011), *available at*: http://ldh.la.gov/index.cfm/newsroom/detail/1626 (last accessed October 29, 2019). The announcement stated, "Under the LINCCA program, a public entity, such as a local public hospital district, an LSU hospital or even LDH, partners with a private entity to take over the costs of providing services to low income and needy patients. Those collaborations can include paying for physician services at an LSU Hospital emergency room that cares for low income and needy patients or behavioral health services provided through the LDH Office of Behavioral Health." *Id.*

122.    Louisiana's supplemental payment programs provide the majority of funding to qualifying hospitals. According to a 2018 report to the Medicaid and CHIP Payment and Access Commission, for fiscal year 2016, supplemental Medicaid payments amounted to 61.2% of total state Medicaid payments to hospitals in Louisiana.

123.    During the period immediately following Hurricane Katrina in 2005 and continuing into federal fiscal year ("FFY") 2010, Louisiana received the benefit of substantially higher federal participation payments for Medicaid (Federal Medical Assistance Percentages or

"FMAP" rates), with federal participation reaching as high as 72.47% in fiscal year 2008. State and local government is responsible for the remainder.

124.    From federal fiscal years 2011-2014, special disaster recovery FMAP adjustments continued to be made each year for the State. Louisiana's normal FMAP rate would have fallen from 67.61% in FFY 2010 to 63.61% in 2011 based on the normal formula through which FMAP is calculated for every other state, but for Louisiana it was then specially adjusted back up to 68.04% for the 4th quarter of that year. Similar special adjustments were approved and made each year thereafter into FFY 2014. These increased Louisiana's normally calculated FMAP rates from 61.09% to 69.78% in FFY 2012; from 61.24% to 65.51% in 2013; and from 60.98% to 62.11% in 2014. *See* Medicaid's Federal Medical Assistance Percentage (FMAP), FY2014, note c (January 30, 2013) EveryCRSReport.com, https://www.everycrsreport.com/reports/R42941.html.

125.    Enhanced Federal Medical Assistance Percentages ("e-FMAPs") for the Children's Health Insurance Program ("CHIP")—which is where Louisiana Children's Hospital gets the vast majority of its revenue—have been even higher, ranging in the period from 2005-2015 in Louisiana from a high of 80.73% in FFY 2008 to a low of 72.69 % in 2014. Starting in FFY 2016 those rates increased nationally even higher, ranging from a low of 96.55% in FFY 2016 to a high of 98.50% in FFY 2019. In 2020, that rate is currently expected to decline to 88.30%. Again, Louisiana State and/or local governments are responsible for funding the balance.

126.    In this case, the amount of money that Defendant hospitals (Louisiana Children's, Ochsner Health, Christus, HCA, and Baton Rouge) and other privately-owned hospitals impermissibly received was linked to and depended upon the amount of money that they (and/or

40

their related affiliates) paid to the local or state public entities (e.g., Louisiana State University and/or local parish governments) to fund the non-federal share of supplemental Medicaid reimbursement. This allowed the State to draw down additional federal funds at little or no additional cost to either the State or local government entities. Such private-hospital payments took the form of either (a) prohibited sham "donations"—made directly or indirectly by the hospitals or their corporate affiliates, in cash or in kind, and/or (b) contractual or other arrangements where the providers that would benefit from increased supplemental payments paid what is essentially a tax to cover some or all of the non-federal cost of the supplemental Medicaid reimbursement that those providers would receive.

127.    Under both of these kinds of arrangements, the State of Louisiana has then used funds that LSU or other public government entities collected through such methods and transferred them to its Medicaid Program accounts to maximize state and federal medical assistance expenditures and thus draw down matching federal Medicaid funds. Those federal funds and the non-federal share of such additional funding were then paid by Louisiana to the private providers that supplied the donations or paid the effective health care related tax.

128.    As is explained more fully below, although federal law permits states to finance up to 60 percent of the non-federal share of Medicaid spending from local government funds, 42 U.S.C. § 1396a(a)(2), 42 C.F.R. § 433.53(b), no non-federal funds may come from "donations" or impermissible health care related "taxes" that are related to Medicaid payments the donors or related entities receive. *See* 42 C.F.R. § 433.57.

    **E.    Funding Abuses Used to Pay the Non-Federal Share of Medicaid**

129.    Because of years of past abuses by state and local governments, since 1991 the federal Medicaid Act and its implementing regulations have excluded funds obtained from non-

41

bona-fide provider donations or revenues generated by certain healthcare-specific taxes from funds available for FFP matching. *See* 42 C.F.R. § 433.50, *et seq.*

130.    The Health Care Financing Administration ("HCFA"), the predecessor to CMS, was concerned that states were using private provider donations and health care related taxes to fund the non-federal share of Medicaid payments. By relying on these funds, rather than funds genuinely raised and invested by state or local governments, states circumvented their obligation under the Medicaid Act to expend funds for their fair share of the real cost of providing such medical assistance to the poor in their own states, and diluted the benefit to the providers who were supposed to be receiving genuine financial support provided proportionately from federal and non-federal sources. *See* Medicaid Program; State Share of Financial Participation, 56 Fed. Reg. 46,380, 46,382 (Sept. 12, 1991).

131.    The Medicaid Act requires that, where a state circumvents its obligation to shoulder its fair share of the cost-sharing implemented by the Act, it must return excess funds received as a result. Under Section 1903(w)(1)(A) of the Medicaid Act [42 U.S.C. §1396b(w)(1)(A) (1991)] and its implementing regulations, *see* 42 C.F.R. § 433.52, a reduction in FFP <u>must</u> occur if, during the federal fiscal year at hand, a state receives revenues from either:

> (i) "provider-related donations" (in cash or kind) made by, or on behalf of, health care providers unless the donations are, as relevant here, "bona fide" donations; or
>
> (ii)  health care related taxes (other than broad-based health care related taxes) and/or a broad-based health care related tax, if there is in effect a hold harmless provision.  42 C.F.R. § 433.67.

132.    As used hereafter, an "impermissible health care related tax" refers to taxes for which Section 1903(w)(1)(A) of the Medicaid Act [42 U.S.C. § 1396b(w)(1)(A) (1991)] and its

implementing regulations require a reduction of FFP pursuant to the provisions cited above.

133.    The primary reason that such financing mechanisms have been affirmatively disallowed by Congress is that each ultimately passes on the cost of funding the non-federal share of Medicaid payments to the very same providers that are supposed to be receiving the benefit of such reimbursement. *See* 42 C.F.R. §§ 433.70(a), 433.68. Such outcomes undermine the partnership Congress requires between the federal Government and "non-federal" State and local governments to share the burden of Medicaid expenditures.

134.    This partnership, and the cost-sharing rules Congress has attached to it, are vital so that state and local governments are not imposing Medicaid program costs on the United States without investing their own fair share of such expenditures. These rules also ensure that state and local governments are not manipulating the Medicaid financing system to impose a higher share of overall Medicaid, indigent, and uncompensated care costs on the United States Government than Congress, in exercising its constitutional power of the federal purse, has authorized the federal Government to contribute.

135.    The mandatory reduction of Federal Financial Participation is merely a partial administrative remedy that Section 1396b(w) provides against states. As implemented by CMS, even when this remedy is applied, the federal government still ultimately pays a higher proportion of actual Medicaid reimbursement than permitted by statute. Thus, even when unlawful manipulation of funding of the non-federal share of Medicaid programs is discovered and the United States takes administrative action against the relevant State, the United States remains financially damaged.

136.    For example, in a State in which the federal government pays 70% of Medicaid costs, if the non-federal $30 share of a $100 supplemental Medicaid payment is funded by a non-

43

bona fide donation from the private hospital that ultimately receives that $100 payment, the federal government will end up paying $70 (70% of $100) that was not properly matched by qualified State or local government matching funds.  To make the United States whole for what it was improperly induced to pay out to match that $30 provider donation, it would need to be paid back the full $70 in unwarranted federal matching funding that it was duped into paying out. However, under the administrative remedy that CMS applies in such circumstances, the amount of the improper $30 donation is subtracted from the total $100 "total state expenditure" ($30 of purported local government money IGT'd to the State plus $70 in advanced federal matching funds) that was ultimately sent by the private hospital by the State ($100- $30 = $70).  That $70 adjusted amount would then still be paid 70% by the federal government, resulting in an adjusted federal payment of:  70% x $70 payment = $49.

137.    As noted above, however, that $49 federal payment includes no match whatsoever from State or local government.  That unmatched federal investment in supplemental payment results in precisely the same kind of manipulative cost-shifting that Congress intended to stop by banning use of non-bona fide donations and impermissible healthcare related taxes to fund the non-federal share of Medicaid payments in the first place.  Private providers and State or local governments still succeed in imposing additional Medicaid costs on the federal Government at no genuine additional cost to State or local government, and thus unilaterally increase the federal Government's total share above and beyond the annual Federal Financial Participation percentage that is set by application of the formula Congress has mandated to be used to set that percentage for each federal fiscal year.

138.    Moreover, such abuses create an economic incentive for private providers to cheat more and more.  Even after such an administrative action against the State, and any successful

State efforts to chase after a guilty provider for refunds the State has been required by administrative disallowances to pay, the wrongdoing donating hospital would still retain $19 more than the $30 investment it unlawfully "donated" in the first place in order to draw down the original $100 supplemental payment.

139.    The State, meanwhile, is left bearing the initial cost of any federal administrative disallowances that result and with the expense and effort needed for the State to go after the private hospital and/or the local government entity for the $21 administrative adjustment due back to the federal government from the $70 outlay it was originally mischarged.

140.    However, such abuse of the Medicaid program is not unavoidable because the existence of the partial, strict-liability administrative remedy against States that is provided by Section 1396b(w) does not prohibit the United States from pursuing additional remedies against any local government entity or private persons or entities that engage in misconduct that damages the United States and/or that creates liabilities for a State to the United States for using prohibited means to finance the non-federal share of Medicaid program costs.

141.    When such local government and private entities "knowingly" violate the False Claims Act, they are also subject to FCA remedies, including treble damages and FCA civil penalties, for the full amount of the financial losses the United States suffers as a result of their misconduct. Any partial remuneration that the federal Government may receive through an administrative action against the State serves only as a set-off against the full treble damages and civil penalties that may be pursued under the FCA.

### 1.    Non-Bona Fide Donations

142.    A donation by a private health care provider to a unit of state or local government is considered "bona fide" only if it has no direct or indirect relationship to Medicaid payments

45

received by the health care provider, any related entity that provides health care items and services, or other providers furnishing the same class of items or services as the provider or its related entities.

143.    Provider-related donations are considered to have no direct or indirect relationship to Medicaid payments only if those donations are not returned to the individual provider, the provider class, or any related entity under a "hold harmless provision or practice." 42 C.F.R. §§ 433.54(a)-(b).

144.    A hold harmless practice exists if any of the following is true:
a.    The State (or other unit of government) provides for a direct or indirect non-Medicaid payment to those providers or others making, or responsible for, the donation, and the payment amount is positively correlated to the donation. A positive correlation includes any positive relationship between these variables, even if not consistent over time.
b.    All or any portion of the Medicaid payment to the donor, provider class, or related entity, varies based only on the amount of the donation, including where Medicaid payment is conditional on receipt of the donation.
c.    The State (or other unit of government) receiving the donation provides for any direct or indirect payment, offset, or waiver such that the provision of that payment, offset, or waiver directly or indirectly guarantees to return any portion of the donation to the provider (or other parties responsible for the donation).
*Id.* § 433.54(c).

145.    Moreover, while CMS generally will "presume" that provider-related donations by a privately-owned and operated health care organizational entity to a local entity of government are bona fide if they do not exceed $50,000 per year, to the extent that even such small annual donations actually contain a hold harmless provision as described in 42 C.F.R. § 433.54(c), they will <u>not</u> be considered bona fide donations. *Id.* §§ 433.54(d)-(e).

146.    Therefore, provider-related donations that are used, directly or indirectly, to fulfill state matching-fund obligations to the Medicaid program for the benefit of the "donating" provider thus do not meet the definition of "bona fide" donations and may not be used to draw down FFP. The result of such arrangements is that there is no true state or local government-

46

funded match of federal funds used to pay for Medicaid program costs. Rather, there is only a non-bona fide "donation" of funds by the provider hospital itself, which is ultimately returned to the hospital through hold harmless agreements and practices—along with additional "matching" funds from the federal government—within at least a year of the so-called "donation."

147. In a guidance letter to state Medicaid Directors published on May 9, 2014 with respect to non-bona fide donations, CMS reiterated that "[g]overnment entities are free to enter into agreements with private entities," unless there is a hold harmless provision in the agreement. Cindy Mann, CMS State Medicaid Director Letter, SMDL No.14-004 (May 9, 2014). "A hold harmless practice exists if there is a positive correlation between the agreement and the Medicaid payments, Medicaid payments are conditioned upon the receipt of a donation from a private entity, or if there is a guarantee that the private entity will see a return of some, or all, of that donation through a Medicaid payment," whether directly or indirectly. *Id.* Where there is an "effective return of some, or all, of the donation to the private provider through Medicaid supplemental payments, a hold harmless arrangement exists." *Id.* Arrangements are "not considered bona fide, and . . . the Centers for Medicare & Medicaid Services (CMS) will not approve any SPAs [state plan amendments] that include non-bona fide donations as a portion, or all, of the non-Federal share of the Medicaid payments. Payment methodologies contingent upon the receipt of a non-bona fide donation would also be grounds for disapproval of a SPA." *Id.*

148. CMS's guidance letter also directed that where a governmental unit cedes its responsibility—such as the responsibility to retain physicians and other healthcare providers at public hospitals—to a private entity through a provider arrangement, this would not be bona fide. "Any arrangement . . . that obligate[s] a private hospital to either assume the programmatic

47

responsibility of a unit of government or sign lease agreements at an amount that is greater than fair market value would be considered a hold harmless arrangement. The donation would not be considered bona fide when such arrangements are tied *in any way*, directly or indirectly, to Medicaid reimbursement under the Medicaid state plan." *Id.* (emphasis in original).

149.    Furthermore, non-bona fide supplemental payments or other forms of increased payments based on the arrangements described above raise concerns with regard to the Medicaid program's requirement that Medicaid payments to be consistent with economy, efficiency, and quality of care. To the extent that the overall payment exceeds the amount payable to other providers of the same services, such payments "are not consistent with section 1902(a)(30)(A) of the Act because they are not economical and efficient." *Id.*; *see also* 42. C.F.R. § 447.200.

150.    Under such improper donation arrangements, private providers make it possible for state and local government officials to substantially increase federal Medicaid payments to the providers at no commensurate cost to the state or local governments. Such arrangements undermine the safeguards Congress incorporated into the Medicaid program to condition certain categories of federal Medicaid spending (up to established overall limits) on the willingness of state and local governments to bear a defined, fair portion of the extra costs in exchange for the benefits additional payments provide to Medicaid participants within their jurisdictions.

## 2.    Impermissible Health Care Related Taxes

151.    Under provisions of the Medicaid Act and its relevant implementing regulations that are relevant to this matter, a prohibited "health care related tax" includes, among other things, a "tax" that "is related to health care items or services, or to the provision of, the authority to provide, or payment for, such items and services." 42 U.S.C. §§ 1396b(w)(1)(ii), (3)(A).[3]

---

[3] Also precluded are "broad-based health care related tax[es]" if there is in effect a hold harmless provision. *See* § 1396b(w)(1)(iii). For purposes of this provision, a "hold harmless provision" is defined in § 1396b(w)(4).

48

152.    As used in this statutory provision, "[t]he term 'tax' includes *any* licensing fee, assessment, *or other mandatory payment*" except a criminal or civil fine or penalty.  42 U.S.C. § 1396b(w)(7)(F) (emphasis added).

153.    A state or local government that mandates that a private hospital or any other private health care provider pay any assessed compensation that the state or local government then uses, directly or indirectly, to fund the non-federal share of any part of a Medicaid program expenditure (recognizing that money so-collected is fungible) may not lawfully claim or dispense federal matching Medicaid funds for the improperly obtained state or local funds.

154.    Just as with non-bona fide provider donations, use of such "tax" arrangements between state or local governments and private providers makes it possible for state or local government officials to substantially increase federal Medicaid payments to the providers at no commensurate cost increase to state or local governments.

### 3.    Both Non-Bona Fide Donations and Impermissible Health Care Related Taxes Create the Same Kind of Harm to the United States Government

155.    Any arrangement designed to allow private providers to self-fund the non-federal share of Medicaid program payments that they will receive is improper—whether these payments are deemed "taxes" or "donations."  Both types of direct or indirect contributions are prohibited sources of the non-federal share of Medicaid expenditures.  Both result in the same illegal consequences.

156.    Federal law mandates that <u>all</u> such donations and health-care-related taxes be reported to the federal Government and documented.  42 C.F.R. § 433.74.  Federal law also mandates that, whenever the existence and amount of such donations and/or health-care-related

---

However, to Relator's current knowledge no such "broad-based health care related tax" provisions are relevant to this action.

taxes are reported, Federal Financial Participation in Medicaid funding must be reduced in

proportion to the amount of all provider-related donations that are not bona fide within the

meaning of the regulations.  42 C.F.R. §§ 433.66, 433.74(d).  No discretionary exceptions exist.

## VI.    FACTUAL ALLEGATIONS

### A.    Defendants Knowingly Manipulated Medicaid Supplemental Payment Programs to Illegally Draw Down Federal Matching Funds

157.    In 2005, after Hurricane Katrina, hospitals in Louisiana, and Jefferson Parish in

particular, were overwhelmed by expanding uncompensated care needs that could not be readily

met by existing infrastructure (which was usable after the hurricane) or State and federal

healthcare insurance programs.  FEMA was largely responsible for construction and repair of

needed healthcare facilities.  Defendants The Sisung Group ("Sisung Group") and its affiliate,

United Professionals Company, LCC ("UPC"), entrepreneurially embarked on a profit-driven

quest to find ways to more fully tap federal healthcare funding through supplemental payment

programs offered by Medicaid if State and/or local government funding could be secured to

match and draw down such additional federal co-investments in Louisiana healthcare.

158.    But convincing Louisiana state and local government entities to pay the non-

federal share of any such additional Medicaid program payments proved exceedingly difficult.

The political will to raise the needed funds at the state or local government level simply did not

exist.

159.    Additionally, alternative CMS-approved ways of funding the non-federal share of

Medicaid supplemental payments were already being fully utilized by Louisiana at the State

level to support rural hospitals and Louisiana's state-level charity care programs.  For example,

publicly owned hospitals (which, as State or local government-owned institutions, can make

IGTs to the State in support of their own or any other provider's supplemental Medicaid

50

payments) were already being granted full IGT credit each federal fiscal year to draw down matching federal funds for uncompensated costs of patient care that those public hospitals retained on their books that year. But those federal funds went to the State for its priority rural and charity care projects and thus did not benefit the private urban hospitals in Louisiana that were not included in the State program.

160.    Defendants Sisung Group and UPC, in consultation with Gjerset, therefore began to explore creative alternative ways to secure non-federal funding needed to draw down matching supplemental federal funding for privately owned urban hospitals.

161.    As sophisticated legal and finance professionals in the health care field, Sisung Group, UPC, and Gjerset were all aware that federal law prohibits the use of non-bona fide donations or impermissible healthcare related taxes as a source of any portion of the non-federal share of supplemental Medicaid payments.

162.    Furthermore, as healthcare reimbursement experts, professionals, and licensed attorneys being paid to help State and local government entities seek and receive millions of additional federal dollars, Sisung Group's, UPC's, and Gjerset's principals and agents were well aware of the federal False Claims Act and the liabilities that would flow from application of their schemes. The other Defendants in this action were similarly sophisticated actors who knew or should have known that their activities were improper and the consequences of such misconduct.

163.    More generally, Defendants also knew or should have known that it was improper to engage in any conduct that sought to substantially increase the federal Government's investment in Medicaid care with little or no increased cost to state and local government entities. Defendants were well aware that Congress explicitly precluded such cost-shifting by prohibiting non-bona fide donations and/or impermissible healthcare related taxes as a means of

51

funding the non-federal share of Medicaid payments.

164.    As companies comprised of professional principals and agents paid to help State and local government entities seek and receive millions of additional dollars in supplemental Medicaid payments, Sisung Group, UPC, and Gjerset must also have known it was highly risky to engage in any conduct that required all involved parties to falsely deny and avoid putting in writing material facts that all such parties knew were actually true. However, in fact, such agreements were understood by all involved parties to exist, and, in practice, the intended quid pro quo ("donations" or "taxes" in exchange for IGTs to benefit the "donor" / "taxed" party) was routinely carried out in accordance with the parties' plans. In fact, in or around the spring of 2015, Bruce Naramore, the CFO at East Jefferson General Hospital at the time, explained to Relator that EJGH as part of the pool of hospitals, coordinated by Sisung, had given the State $5 million in return for $14 million back from the State. When Relator expressed confusion at how this transaction could have happened without Board approval, and asked where the associated paperwork with this transaction was, Naramore explained to Relator that these arrangements were not in writing but were a "wink and a nod type agreement."

165.    All Defendants in this action were on plain notice that the arrangements in which they engaged were deals that, at best, sought to evade and/or circumvent federal law and policy and, through clever artifice, to achieve precisely the kind of financial outcome that Congress had intended to prohibit in its 1991 proscription against the use of non-bona fide donations and/or impermissible health care related taxes. More specifically, all Defendants were on notice and understood that the convoluted schemes they employed constituted manipulation by private health care providers and state and/or local government entities or officials of how the non-federal share of Medicaid payments was paid and by whom. All Defendants also understood that

such manipulation was designed and executed in a manner specifically intended to undermine the federal/state partnership for overall funding of Medicaid programs so that the real cost for reimbursing health care providers for uncompensated or undercompensated care was imposed on the federal Government at levels that Congress had not approved or authorized, while the costs to state and local governments of increased reimbursement to providers was reduced or avoided entirely.

166.    As a nationally known hospital expert, Relator recognized that private hospitals sending tens of millions of dollars to the State with nothing in writing to explain why the payments were being made was highly unusual, and he expressed his concerns that these arrangements appeared fishy, disingenuous, and sometimes outright fraudulent.

167.    To Relator's observation, knowledge, and understanding, all of Sisung Group's and UPC's co-Defendants in this action were alerted by Sisung Group and/or UPC (and/or otherwise already knew or learned during their course of dealings with their co-Defendants) that federal law precluded the existence of agreements of the type they entered into.

168.    All Defendant participants also knew and understood that the specific business arrangements at issue in this case would not have occurred, would not have continued to occur, and/or would not have made good business sense to enter into unless all parties involved in the proposed arrangement fulfilled their expected part of the bargain.

169.    Nevertheless, all Defendants in this action fully understood that these agreements could not be set down in writing or enforced in court. Rather, there was a common understanding and acknowledgement of a spoken-but-never-to-be-written understanding, agreement, and practice. All Defendants understood that the principal purpose of the plans proposed and implemented by Sisung Group and UPC was to fund the non-federal share of supplemental

53

Medicaid payments to secure additional payments for the private entities funding the IGTs. Defendants further understood that this purpose would be defeated if each involved party did not fulfill its anticipated part of the bargain.

170.    Each Defendant also understood that denying the existence of these agreements was a necessary artifice. Acknowledgment—especially written acknowledgement—of the existence of the agreements or practices would, if discovered by CMS, put an end to the deals.

171.    In light of these facts, each and every Defendant in this action acted "knowingly," within the meaning of the False Claims Act, in defrauding the United States as alleged herein.

**B.**    **Fraudulent Medicaid Funding Schemes Leading Up to and Including Louisiana Children's Takeover and Operation of LSU's UMC**

172.    Upon information and belief, Defendants Louisiana Children's, West Jefferson Holdings, Sisung Group, UPC, Ochsner Health, Christus, HCA, Baton Rouge, Kendall Johnson, Scott Posecai, Maurice Lagarde III, Stephen Wright, Warner Thomas, Bobby Brannon, Patrick Quinlan, Michael Hulefeld, Chris Karam, Scott Merryman, Kim Kelsch, Dionne Viator, Nancy Cassagne, and Peter November conspired with LSU and others: (a) to secure Medicaid supplemental payments for Louisiana Children's in excess of amounts to which it was legally entitled; and (b) to help Louisiana Children's, Ochsner Health, Christus, HCA, and Baton Rouge to effectively self-fund the non-federal share of federal Medicaid supplemental payments they received, in violation of federal law.

173.    Defendants accomplished the former by entering into a conspiracy with LSU. In exchange for huge, multi-decade pre-paid lease payments (which no rational commercial actor would ever make), LSU made outrageously excessive UPL payments to Louisiana Children's, Christus, HCA, Ochsner Health, and Baton Rouge. Through these transactions, these Defendants took over the operation and running of several non-rural hospital facilities previously

54

owned and operated by LSU.  Moreover, because of the excessive UPL payments made to

Louisiana Children's, Louisiana Children's effectively took over several LSU hospital facilities

for *free*.  The UPL payments to Louisiana Children's, Ochsner Health, HCA, Christus, and Baton

Rouge were not even remotely warranted by the uncompensated care that such Defendants had

actually provided to Medicaid eligible or other indigent patients.  Nor was payment of such

amounts compliant with Louisiana's approved State Medicaid Plan or federal law.

174.    After wrongfully securing possession and control over former public hospitals run

by LSU, Defendants Louisiana Children's, Ochsner Health, HCA, Christus, and Baton Rouge

proceeded to improperly self-fund the non-federal share of subsequent UPL payments to benefit

the hospitals they had taken over.  This was accomplished by use of non-bona fide donations

and/or prohibited health-care-related taxes.  Defendants entered both types of arrangements with

the specific and unlawful goal of funding certain hospital operations solely to cause the public

hospitals to use the resulting savings to fund IGTs to Louisiana.  Those IGTs would result in

increased Medicaid reimbursement to the privately owned "donor" hospitals in approximately

three times the amount of their "donations."

### 1.    Louisiana's Move Toward Greater Participation of Private Hospitals in Serving the Medicaid Population

175.    Historically, the State of Louisiana owned and operated a public hospital system.

In 1997, the Louisiana Legislature assigned LSU the responsibility for owning and operating the

State public hospital system.  Until the events described below, there were ten hospitals within

that system: (1) Earl K. Long in Baton Rouge; (2) the Interim LSU Public Hospital in New

Orleans, which was then serving temporarily as the interim hospital facility until completion of

the new University Medical Center ("UMC"); (3) University Medical Center in Lafayette; (4)

W.O. Moss in Lake Charles; (5) Bogalusa Medical Center in Bogalusa; (6) Leonard J. Chabert

Medical Center in Houma; (7) Lallie Kemp Medical Center in Independence; (8) Louisiana State University Medical Center ("LSU-S") in Shreveport; (9) E.A. Conway in Monroe; and (10) Huey P. Long in Pineville.

176.    For decades, this system served Louisiana reasonably well. However, over time, a growing portion of the care provided to the State's uninsured and high-cost Medicaid-insured populations fell to the public hospital system.

177.    The challenges that the public hospital system faced were heightened when Hurricane Katrina hit Louisiana in 2005. That storm forced the closure of LSU's "Big Charity" hospital facility in New Orleans, and, consequently, the movement of the LSU patient population and LSU's teaching programs into the private sector in New Orleans and surrounding communities, including Baton Rouge, until a replacement facility could be built. LSU, the State, and private parties therefore began working collaboratively to restructure the State public hospital system to better fit Louisiana's evolving circumstances. Additional impetus was provided by the immediate need to address the obsolete Earl K. Long inpatient facility and declining inpatient census in Baton Rouge.

178.    In responding to this situation, the State and LSU elected to move away from a two-tier structure of public and private hospital systems to support patients and LSU's graduate medical education ("GME") program needs. Accordingly, in 2009, LSU negotiated two Memorandums of Understanding ("MOUs") that initiated a substantial change in the State's role in providing hospital care.

179.    LSU executed one such MOU with Our Lady of the Lake Hospital ("OLOL") in Baton Rouge. That MOU then served as the basis for entering into a 2010 public-private partnership in the form of a Cooperative Endeavor Agreement ("CEA") by and among LSU,

56

OLOL and the State (via DHH). That CEA provided that, beginning in 2013, the Earl K. Long facility would be closed, OLOL would assure access to care for uninsured and high-risk Medicaid patients, and OLOL would serve as the principal training site for LSU's GME programs that were previously based at Earl K. Long.

180.    The above plans made it necessary for the State to seek to amend Louisiana's State Medicaid Plan to authorize DHH to make future supplemental Medicaid payments to private health care entities that were willing and able to take over the provision of medical care to indigent and Medicaid-eligible patients previously treated by public hospitals.  On October 31, 2012 and November 1, 2012, Louisiana proposed to CMS State Medicaid Plan amendments that, respectively, would permit such payments for inpatient and outpatient hospital care. *See* Louisiana Title XIX State Plan Transmittal Nos. ("TN") 12-63, suggesting amendments to Louisiana's State Medicaid Plan ("State Plan") ATTACHMENT 4.19-A, Item l, Page 8c (4), at section f (1) a & b (proposed 10-31-12). *See also* TN12-64, suggesting amendments to State Plan ATTACHMENT 4.19-B, Item 2.a., Page 9, Public-Private Partnerships, Section A (Non-State Privately Owned Hospitals, Qualifying Criteria a & b (proposed 11-1-12).

181.    As proposed, those two amendments would have authorized supplemental Medicaid payments to "non-state privately owned hospitals" that were "[a]ssuming the management and operation of services of a facility where such services were previously provided by a state owned and operated facility" or that were "[p]roviding services that were previously delivered and terminated or reduced by a state owned and operated facility." *See* TN 12-64 at 3.

182.    In early 2013, however, CMS deferred giving a response on both proposed State Plan amendments because it needed additional information in order to evaluate the proposed changes, as outlined in letters it sent to the State on January 30, 2013 (re TN 12-63) and which

the State responded to on April 25, 2013 (re TN 12-64). In its letter to the State, CMS specifically noted (inter alia) that, to approve any such State Plan change, it would need proof from the State that the proposed Plan amendment: (a) would not result in payments that, in aggregate, exceeded a reasonable estimate of what Medicare would pay for similar services; (b) would result in payment rates consistent with the requirement of Section 1902(a)(30)(A) of the Social Security Act that rates be consistent with "efficiency, economy, and quality of care"; and (c) would not raise issues regarding improper funding sources for the non-federal share of the new contemplated payments to private hospitals. The letter also noted the important of the timing of when supplemental payments can properly be made: "Supplemental payments can only occur after a Medicaid service has been rendered."

183.    Rather than addressing those inquiries for the full scope of hospitals that Louisiana originally wanted the proposed State Plan amendments to cover, the State withdrew the original proposals and re-wrote them to limit the proposed changes in the State Plan to the Earl K. Long Medical Center in Baton Rouge. It then limited the information it provided in response to CMS's prior request with respect to the anticipated financial impact of making such payments to Our Lady of the Lake Hospital, Inc., the private provider that would be entering a Cooperative Endeavor Agreement with Louisiana's DHH and LSU and taking over provision of such care in the Baton Rouge area. CMS approved that limited State Plan Amendment in July 2013.

184.    Thereafter, instead of making any subsequent attempt to address CMS's stated concerns about making similar changes applicable to the broader range of private providers that the State had originally included in TN 12-63 and TN 12-64, Louisiana simply abandoned pursuit of a State Plan amendment that would implement the broadly applicable supplemental

payment program it originally proposed.

185.    Any general authority for seeking—and necessary attendant standards for distributing—federal financial participation payments from Medicaid to hospitals which have entered into Cooperative Endeavor Agreements with state or local government entities to assume control of previously government-owned and operated facilities thus remains beyond the scope of Louisiana's State Medicaid Plan.

186.    In the absence of a State Plan amendment that, with federal review and approval, authorizes those types of program payments to specific private hospitals, off-the-cuff arrangements that are not addressed in Louisiana's State Medicaid Plan and that have not been disclosed to and vetted by CMS are not lawfully permitted to receive reimbursement with federal participation funding from Medicaid.

187.    Despite this, Defendants Louisiana Children's, Ochsner Health, Christus, HCA, Baton Rouge, and the State carried forward their plan to implement these arrangements, already knowing that unwarranted supplemental federal funding would certainly result from the scheme.

188.    Such payments would be unwarranted for at least four reasons:

189.    First, the payments were not part of any approved provision of Louisiana's State Medicaid Plan.

190.    Second, as Defendants were aware, Medicaid cannot properly be billed at all for medical services not yet rendered.

191.    Third, even if the payments had been otherwise valid, during part of the period for which prepayment occurred, as detailed more fully below, the federal share of funding for Medicaid and indigent care expenditures dropped from 65.51% in FFYI 2013 to 62.11% in FFY 2014, and to 62.05% in FFY 2015.  For that reason, Louisiana Children's and the State knew that

59

any Required Program Funding prepayments made in FFY 2014 in part for services that would

not to be rendered until October 1, 2014 or later also would have caused the federal government

to overpay for the portion of that pre-paid care that was not actually provided until that beginning

date of FFY 2015.

192.    Fourth, Under the Medicaid Program's UPL rules, reimbursement cannot exceed

the lesser of: (1) those providers' reasonable all-in aggregate costs for the care provided to

Medicaid-eligible patients in the relevant year; or (2) the providers' aggregate customary charges

to the general public for such care.  However, despite that Louisiana Children's should have

therefore been reimbursed at this "cost," in 2014 it had a profit of over $250 million.  It is clearly

mathematically impossible for any entity that has cost-based reimbursement to show a profit, let

alone a $250 million profit.

193.    Despite the facts set forth in the allegations above, and as is alleged in fuller detail

below, LSU made grossly excessive UPL payments to Defendant Louisiana Children's, Ochsner

Health, Christus, HCA, and Baton Rouge in order to help those private entities finance the

takeover of operations at State owned and operated hospitals in and around 2012-2013 at below

fair market rates.

###### 2. News Delivered in Louisiana State Fiscal Year 2013 that the Federal Government Would Start Phasing Out Special, Post-Katrina Upward Adjustments it Had Been Adding to the Federal Share of Medicaid Spending in the State Increased the State's Desire to Transfer Operation of Failing Public Hospitals to Private Sector Companies

194.    According to a January 3, 2014 letter from DHH and LSU officials to Bill Brooks

of the Dallas Regional Office of CMS, the urgency of the State's and LSU's movement away

from direct provision of health care and into a public-private partnership model "dramatically

increased sometime in state fiscal year 2013 [which ended on 6/30/2013], when Louisiana was

notified that its blended Federal medical assistance percentage (FMAP) would be reduced from 71.38% to 66.28%." That reduction resulted in a cut in excess of $329 million to the Medicaid budget of the State public hospital system.

195.    Once it became aware of that proposed FMAP reduction, Louisiana sought to accelerate the timeline for transitioning the State public hospital system to the public-private model.

196.    On May 29, 2013, LSU, the State of Louisiana, Tulane University, and newly-created University Medical Center Management Corporation (a non-profit corporation affiliated with LSU) entered into an MOU that provided for University Medical Center Management Corporation to run the new University Medical Center in New Orleans, once that facility was complete and ready to serve as a replacement for "Big Charity." The MOU further provided that University Medical Center Management Corporation would be operated in accordance with best practices in private hospital management, but also in accordance with the State's historical commitment to care for the uninsured and high-risk Medicaid populations and in support of LSU's and Tulane's GME programs. The MOU also contemplated that a subsequent CEA would be put in place to further define the public-private partnership with University Medical Center Management Corporation.

197.    Having failed in 2012 to get HHS approval for its plan to gain general State Plan authority to make supplemental Medicaid payments to private hospitals willing to take over operations of financially troubled public hospitals, the State moved in 2013 to a model of seeking approval of these sorts of arrangements on a hospital-by-hospital basis. Thus on June 27, 2013, Louisiana sent TNs 13-23, 13-24, and 13-25 to CMS to propose amendments to Louisiana's State Medicaid Plan to establish Supplemental and/or DSH Medicaid payments for non-state-

owned hospitals participating in public-private partnerships with DHH and LSU.

198.    The State proposed in TN 13-23 to amend Louisiana' State Medicaid Plan to allow Louisiana Children's to receive supplemental Medicaid payments as a result of its CEA with LSU to take over LSU's facilities in New Orleans (including UMC). More specifically, TN 13-23 provided that, by entering into CEAs with DHH, Louisiana Children's and Lafayette General Health System, Inc. would increase their provision of inpatient Medicaid hospital services by assuming the management and operation of services at previously State owned and operated facilities located, respectively, in New Orleans and Lafayette.

199.    In exchange, Louisiana Children's (in New Orleans) and Lafayette General Health System, Inc. (in Lafayette) would be paid quarterly supplemental Medicaid payments.

200.    The deal would be effective for dates of service after June 24, 2013, and the amount each private hospital would be paid was to be based on the UPL calculation for each state fiscal year, in an amount not to exceed those private hospital's Medicaid inpatient charge differential (Medicaid inpatient charges minus Medicaid inpatient base and supplemental payments) for that state fiscal year.

201.    Transmittal 13-24 provided for similar conditions and supplemental payments for Lafayette General Health System, Inc. for taking over costs of Medicaid care for outpatient Medicaid hospital services in Lafayette.

202.    Transmittal 13-25 evidently supplemented TN 13-23 by further amending the State Plan, noting that the State entities that previously had been providing Medicaid care in the "New Orleans Area CEA" (University Medical Center Management Corporation being the LSU-affiliated entity that was to transfer operations), the "Lafayette Area CEA" (University Hospital and Clinics being the transferring state entity), the "Houma Area CEA" (Southern Regional

62

Medical Center being the transferring state entity), and the "Lake Charles Area CEA" (W.O. Moss. Regional Medical Center being the transferring state entity) had entered into CEAs with private healthcare providers through which management and operation of local hospitals was being transferred to private entities that had agreed to sign CEAs with DHH.  In exchange, these private providers were to be made eligible to receive DSH payments for 100% of their uncompensated costs each year.  All such changes were to be effective for dates of service on or after June 24, 2013.

203.    Southwest Louisiana Hospital Association d/b/a Lake Charles Memorial Hospital is the privately-owned entity that assumed the management and operation of formerly public hospital entities under the Lake Charles Area CEA, effective for care rendered on or after June 24, 2013.

204.    Similarly, on July 12, 2013, Louisiana sent Transmittal Number 13-28, seeking to further amend the State Plan and noting that the State entities that previously had been providing Medicaid care in the "Shreveport Area CEA," the "Monroe Area CEA," the "Bogalusa Area CEA," and the "Alexandria Area CEA" had entered into CEAs with private health care providers Biomedical Research Foundation (for Shreveport and Monroe, effective October 1, 2013), and Our Lady of Angels Hospitals (for Bogalusa, effective January 2014).  These CEAs provided that management and operation of formerly public hospitals in these areas was to be transferred to private entities that had agreed to sign CEAs with DHH.  In exchange, the private entities were to be made eligible to receive DSH payments for 100% of their uncompensated costs per year.

205.    Each and every one of these proposed State Medicaid Plan amendments was disallowed by CMS or withdrawn by the state after CMS requested more information about a

variety of serious questions and concerns the federal Government had about Louisiana's plan to privatize then-public hospitals. One of CMS's primary concerns was the expected financial impact of the proposed changes. CMS explicitly stated its concerns that: (1) the CEAs and related financial aspects of the proposed IGT arrangements would violate federal law prohibiting use of non-bona fide donations or impermissible provider-based taxes and associated hold-harmless provisions as the source of some or all of the non-federal funding the proposed programs would require; (2) payments would exceed legal UPL limits; and (3) the proposals would not promote efficiency, economy and quality of care, and would be difficult to administer. *See* Letter from CMS Administrator Marilyn Tavenner to LA DHH Medicaid Director Ruth Kennedy (May 2, 2014). CMS also explicitly expressed concern about the advance lease payments proposed by the agreements. CMS stated that such payments "are not usual and customary industry payment arrangements, and are linked to the CEA which is also linked to the increased Medicaid payments. As a result, these payments are, in effect, provider-related donations that are repaid through a hold harmless arrangement and thus are non-bona fide provider-related donations." *Id.*

206. Because these issues went to the heart of the privatization initiative being aggressively pursued in Louisiana at that time, DHH, LSU, and Defendants had to have been well aware of CMS's clearly articulated concerns about those issues, the proposed privatization plan, and how the non-federal funding of any increase in overall Medicaid financing would be secured. Despite being on notice, Defendants went ahead and implemented the kind of financial abuses of the federal fisc that Congress had explicitly tried to stop in 1991. Defendants implemented these abusive practices despite CMS spotlighting its concern about such matters in its responses to the 2013 State Medicaid Plan Amendments that Louisiana originally proffered to

64

implement its public hospital privatization effort.  Defendants also knowingly continued such practices and/or knowingly retained ill-gotten gains from engaging in such practices previously, even after CMS specifically and publicly rejected such approaches when it disallowed the proposed State Medicaid Plan Amendments after finding Louisiana's answers to its stated concerns to be inadequate and concluding that the proposed Plan arrangements would violate federal law.

207.    Having been told "no" by the federal Government for the second time, working directly with LSU and private consultants (paid during material periods on a contingent basis), without DHH's direct oversight, Defendants elected to reproduce indirectly and secretly, precisely the financial result that they, and the State, had just been told they were not permitted by law to implement directly and forthrightly.  This resulted in Defendants imposing real cost increases from increased Medicaid expenditures in Louisiana disproportionately, if not entirely, on the federal government at little or no additional real net cost to the State or local government.

208.    Upon information and belief, such unlawful arrangements exist in connection with each and every CEA that Louisiana entered into with private hospitals as part of this initiative.  Specifics currently known to Relator are further alleged below.

### 3.    Local Events in New Orleans Prior to Louisiana Children's Agreement with LSU to Lease and Operate the Interim and New Hospital Facilities FEMA Built in That City

209.    Effective November 1, 2011 and, upon information and belief, at the suggestion and/or with the help of Defendants Sisung Group and UPC, through the efforts of Sisung Group principal Lane Sisung and others, the Louisiana Children's System entered into a contract with Louisiana State University Health Sciences Center ("LSUHSC") to cover costs of providing physician services to low income and needy patients at the LSU Interim Hospital in New Orleans

("LSU-IH"). This contract terminated June 30, 2012.

210.    Immediately thereafter, effective July 1, 2012—again, at the suggestion and/or with the help of Defendants Sisung Group and UPC—the Louisiana Children's System entered into and implemented multiple contracts with LSU Health Sciences Center, Tulane University School of Medicine, and Van Meter and Associates (a group physician practice located in Harvey, Louisiana) to cover costs of providing physician services to low income and needy patients at LSU-IH.

211.    Thus, during the year ended December 31, 2012—all at the suggestion and with the help of Defendants Sisung Group and UPC—the Louisiana Children's System's then two hospitals, Children's and Touro, collaborated through the Jefferson Parish Hospital Service District Low Income and Needy Care Collaboration Agreement ("JP HSD LINCCA") with two other private, non-profit healthcare providers (believed to be Louisiana Health Sciences Center and Tulane University Hospital) (collectively, "the Hospitals") to provide, quality healthcare services to low income and needy residents in the community.  The Hospitals became members of four (and, apparently later, five) non-profit organizations: Louisiana Clinical Services, Inc. ("LCS"), Southern Louisiana Clinical Services, Inc. ("SLCS"), Eastern Louisiana Clinical Services, Inc. ("ELCS"), Natchitoches Clinical Services, Inc. ("NCS"), and later, Jefferson Clinical Services, Inc. ("JCS") (collectively, the "Non-Profits").

212.    In total, through such arrangements, in the calendar years ended December 31, 2011 and December 31, 2012, Defendant Louisiana Children's, by and through its affiliate entities, contributed approximately $1,710,000 in 2011 and $18,868,000 in 2012 for the purported purpose of providing healthcare services to low income and needy residents in the community.  These expenses were included within the "community support" line item on the

66

Louisiana Children's Medical Center System's consolidated statements of operations for those time periods.

213.    As Louisiana Children's and its co-conspirators planned and intended, as a result of these contributions, the local government entities that otherwise would have had to pay those costs out of their own funds instead used some or all of their cost savings (from not having to provide physician services for low-income and needy patients) to fund IGTs to the State for the benefit of the Louisiana Children's System.  The Louisiana Children's System's supplemental UPL Medicaid payments thus jumped from $8,662,000 in 2011 to $66,126,000 in 2012.

214.    Upon information and belief, that extraordinary UPL payment far exceeded the amount actually needed to pay Medicare rates for Medicaid patients that the Louisiana Children's System served in 2012.  Therefore, the amount of that payment was not only unlawful because the non-federal portion was self-funded by Louisiana Children's (and thus a non-bona fide provider-related donation) but also because it violated Louisiana's State Medicaid Plan (as approved by CMS), turned Medicaid into a profit center for the Louisiana Children's System for that period of time, and wrongfully diverted federal and state Medicaid resources away from other Medicaid providers in Louisiana whose actual cost of serving Medicaid patients remained unpaid.

215.    Additionally, by making excessive UPL payments to the Louisiana Children's System in 2012, Defendants were able to impose the 2012 special disaster recovery FMAP rate of 69.78% on the not-yet earned reimbursement, instead of the lower special FMAP rates that applied in subsequent years (65.51% for FFY 2013 and 62.11% for FFY 2014).

216.    Defendants' unlawful schemes to permit private hospitals like Louisiana Children's to self-fund the non-federal share of future Medicaid payments, which would triple

67

those private hospitals' investments in return, escalated from there, as further detailed below.

### 4. Fraud Relating to Louisiana Children's Agreement with LSU to Lease and Operate the Interim and New Hospital Facilities FEMA Built in New Orleans

217.    On December 18, 2012, after a substantial period of negotiations, the Louisiana

Children's System entered into a Memorandum of Understanding with the Board of Supervisors

of Louisiana State University and Agricultural and Mechanical College; the State of Louisiana

Division of Administration; the State of Louisiana, Department of Health and Hospitals; and the

Administrators of the Tulane Education Fund, with respect to a transaction whereby the

Louisiana Children's System would become the sole member of University Medical Center

Management Corporation, a Louisiana nonprofit corporation.  This transaction would be

evidenced by a CEA for a private/public collaboration whereby University Medical Center

Management Corporation would assume the responsibility for the management and operation of

the Interim Louisiana Hospital ("LSU-IH"), then owned and operated by LSU, and, upon its

completion, the new University Medical Center, then under construction in New Orleans.  At

that time, it was anticipated that, if the parties named in the MOU and CEA reached all the

needed agreements, and those agreements became effective, the Louisiana Children's System

would be required to make advance lease payments to the State of Louisiana via LSU.  However,

as of March 25, 2013, the date of the Louisiana Children's System's independent auditor's report

on the Louisiana Children's System's 2011-2012 Financial Statements, the payment amount

reportedly was not yet known.

218.    Nonetheless, the groundwork for unlawfully financing such a future arrangement

between Louisiana Children's and LSU had already begun to be laid.  As alleged above, in 2012,

supplemental UPL payments for the Louisiana Children's System's two existing hospitals

jumped from $8,662,000 in 2011 to $66,126,000 in 2012 as a result of Louisiana Children's non-bona fide donations, even though no new hospitals had yet been added to the Louisiana Children's System, and the System had not yet taken over operations of the Interim Charity Hospital.

219.    Prior to the 2012 payment, supplemental UPL funding for the Louisiana Children's System had never exceeded $16,646,000 in any year.

220.    As alleged above, Relator believes that the $66,126,000 UPL payment far exceeded the amount actually needed to pay Medicare rates for Medicaid patients served by Louisiana Children's in 2012.  Based on his understanding of the relevant events and his expertise and long-time experience in negotiating hospital sales and purchases, Relator also believes and alleges that the massively increased UPL payment that the Louisiana Children's System received in 2012 was intended in substantial part to help Louisiana Children's finance its anticipated pre-paid and future annual lease obligations to LSU if and when Louisiana Children's and the involved State entities completed the proposed transaction.

221.    Creation of such extraordinary financial reserves for the existing Louisiana Children's System could be expected by all parties to the transaction to make it easier for the Louisiana Children's System to secure needed bond financing to close the expected deal with LSU and, thereafter, also make it possible for the Louisiana Children's System to absorb and pay higher annual lease payments to LSU than would likely otherwise be economically feasible, especially in light of the high-need patient mix of the community being served and financial distress, limitations, and continued reluctance and/or political inability of Jefferson Parish and the State of Louisiana to raise general tax revenues that would otherwise be needed to pay higher non-federal shares of increased Medicaid funding.

222.    Negotiation of higher lease payments to LSU, in turn, would also open up better opportunities for LSU and the State to effectively recycle increased lease revenues paid by the Louisiana Children's System, predominantly with federal funds, into new IGTs that could be used by LSU and the State in subsequent years to draw down even more federal Medicaid UPL funding, all at no, or substantially reduced, net future cost to Louisiana state and/or local government entities.

223.    Calendar year 2013 brought additional contractual and accounting twists by these Defendants.

224.    As described above, effective May 29, 2013, Louisiana Children's entered into a CEA with a major affiliate of Louisiana State University and Agricultural and Mechanical College ("LSU"), the University Medical Center Management Corporation (of which Louisiana Children's then became the sole member), the Board of Supervisors of LSU, the State of Louisiana through the Division of Administration ("DOA"), and the State of Louisiana Department of Health and Hospitals ("DHH").  Through that agreement and a series of related agreements and transactions, Louisiana Children's assumed rights of occupancy and control over LSU's University Medical Center in New Orleans ("UMC"), including its existing "Interim Facility" hospital and LSU's then-still-under-construction "New Facility" hospital and their related properties and corporate entities located and operating in and around New Orleans.

225.    Louisiana Children's and the State knew that this CEA they signed on May 29, 2013 set forth "reimbursement rules providing total funding obligations that will be paid to UMCMC or LCMC Affiliates, defined in the CEA as 'Required Program Funding,'" and noted that "[f]ailure to pay, or a reduction in the amount of funding, could constitute a Potential Elective Withdrawal Event, as defined [within the CEA], providing LCMC an option to initiate a

70

Pre-Withdrawal Process . . . and, if applicable, effect a Member Withdrawal...." Because this "Required Program Funding" allowed Louisiana Children's with an option to withdraw if the funding it expected did not materialize, this constituted a prohibited hold harmless agreement or practice and constated a non-bona fide donation under 42 C.F.R. § 433.54(c). On or about May 29, 2013, LSU paid Louisiana Children's $284,044,000 in purported UPL payments, more than quadrupling Louisiana Children's previous-record 2012 UPL payments of $66,126,000.

226.    LSU made this payment despite the fact that the CEA between LSU and Louisiana Children's only became effective almost one month later, on June 24, 2013,[4] and thus *before* Louisiana Children's/University Medical Center Management Corporation had even begun to operate LSU's former hospital operations in New Orleans. The federal Government paid at least 65.51% of that bill and, on a weighted average between federal CHIP and normal FMAP Medicaid payments, probably significantly more.

227.    In addition, only *after* May 29, 2013, upon which LSU and Louisiana Children's signed the CEA and LSU made approximately $284 million in UPL payments to Louisiana Children's, did DHH seek CMS approval in TN 13-23, 13-25, and 13-28 of the proposed amendments to its State Medicaid Plan that would have allowed DHH to make these UPL payments which it had already made to Louisiana Children's and Lafayette General Health System, Inc.

228.    In addition to that, The Louisiana Children's System's reported income from Medicaid Disproportionate Share payments jumped from $232,000 in 2012 to $77,443,000 in 2013. However, even the reported amount did not reveal the entire amount Louisiana, at LSU's direction, actually paid Louisiana Children's in DSH payments that year.

---

[4] *See* Louisiana Children's Consolidated Financial Statements for December 31, 2013 and 2012 at 10-11, Note 1.

71

229.    Louisiana Children's Consolidated Financial Statements for December 31, 2013

and 2012 states in the "UMCMC" subsection of Note 3 that "UMCMC has included $77,433,000

for Medicaid disproportionate share revenues in net patient revenues, for the year ended

December 31, 2013." According to that Note, this was done because the $77,433,000 figure

"represents the portion of the revenues earned in relation to that portion of the revenue that is

deferred and described in Note 2 [of Louisiana Children's Consolidated Financial Statements for

December 31, 2013 and 2012]."

230.    With respect to Deferred Revenue, Note 2 of those Consolidated Financial

Statements states:

> Deferred Revenue
> In accordance with the CEA described in Note 1, Required Program Funding, as defined, *was received in advance of services associated with the Required Program Funding being provided in full* by December 31, 2013. As such, the balance attributable to services to be provided in the year ending December 31, 2014 is deferred and will be recognized as revenue ratably throughout the year ended December 31, 2014. See Note 3 and the details for UMCMC for revenue recognized in the year ended December 31, 2013.

(emphasis added). This is a non bona fide donation.

231.    Relator believes and alleges that the $77,433,000 figure ascribed by Louisiana

Children's that year to DSH payments does not reflect the true amount of DSH payments owed

for such services delivered that year. Rather, Relator believes that only a small portion of the

overall extraordinary overpayment of UPL-type funding provided to Louisiana Children's that

year would be ascribed by its accountants to Louisiana Children's in that corporation's fiscal

year ending December 31, 2013, rather than being deferred until the following fiscal year (when

services might be rendered to actually justify such payments).

232.    Instead of offering genuine transparency, the report fails to reveal the total

amount of DSH payments that Louisiana Children's was actually paid in 2013. Nor does the

report give any clear indication of what portion of such revenues received in 2013 was deferred and left unreported until it became ascribable to whatever UPL or DSH payments Louisiana Children's might genuinely earn the following year.

233.    Those massive amounts of UPL and DSH income could not possibly have been earned by Louisiana Children's at the time they were paid in May 2013, because Louisiana Children's had not yet taken over management and operation of LSU-IH.  Nor were they lawfully and verifiably earned through provision of Medicaid patient services at any other known time.

234.    The federal Government paid at least 65.51% of the cost of those inflated and unwarranted payments made for patient services not yet rendered at rates that substantially exceeded the FMAP rates it paid in subsequent years.

235.    Louisiana Children's Consolidated Financial Statements for December 31, 2013 and 2012 showed a jump in reported "Net Patient Service Revenues" from $495,941,000 as of the year ended December 31, 2012 to $887,454,000 for the year ended December 31, 2013.  The massive UPL payment of over $284 million (per the Louisiana Children's System's December 31, 2013 and 2012 Audit Report, at Note 21) is the primary reason given for this dramatic jump in revenue.

236.    Louisiana Children's 2013 profits from operations spiked accordingly.  Although the UPL program is designed to be a cost-based system, pages 75 and 76 of the audit indicate Louisiana Children's Hospital, which had a profit in 2012 of $33 million (based on expenses of $218 million), saw its Children's Hospital's profits increase 454% in 2013, to $183 million (based on expenses that increased only 2.75% to $224 million).  Overall, Louisiana Children's showed profits from operations of more than $230 million that year, nearly all of which can be

73

traced to the $284 million Louisiana Children's received that year in Medicaid UPL funding.

237.    Louisiana Children's 2013 audit report attempts to finesse the accounting treatment of Louisiana Children's prepayment in May 2013 of future lease expenses to LSU for the New Facility FEMA was completing.  Unexplained in the Consolidated Balance Sheet from the 2013 audit report is a reported increase in "Other Assets" from $3,511,000 in 2012 to $257,296,000 at year-end 2013.  Based on his substantial professional experience in hospital operations and financial accounting, Relator believes and therefore alleges that, although Defendant Louisiana Children's claims this was a prepayment of a lease in Note 18 to that report, generally accepted accounting principles would not allow the payments to be booked as a lease because no lease had been signed as of Fiscal year end.

238.    Pursuant to the 2013 CEA, Louisiana Children's/University Medical Center Management Corporation paid the State of Louisiana $253,000,000 in May 2013 in advance rent payment on the UMC lease.  That payment was made nine months before the terms of the deals were finalized, the final documents were signed, and the deal was closed.  Such an approach to a massive payment on a deal like this makes no business sense because it risks the reasonable possibility that the payment will be made for a deal that never actually closes.  In Relator's more than forty years of experience in such transactions, he has never witnessed or known of another deal wherein a party funded any substantial portion of a transaction at any time other than closing.  Additionally, without the unprecedented and unwarranted pre-payment of $284,044,000 in UPL funds that LSU had previously advanced to Louisiana Children's, Louisiana Children's almost certainly could not have secured financing to make such a pre-payment on leases prior to closing, as investors would be loath to fund such an unusual, premature and high-risk financial commitment.

74

239.    Of that total, under the terms of the Amended and Restated Master Hospital [triple net] Lease, effective May 29, 2013, $110,000,000 served as a prepayment on a portion of the New Facility (with the exception of the New Facility's Ambulatory Care Building and Garage) to be credited over twenty years toward annual rent payable to LSU once that facility was completed and ready for use.  Such annual rent rates started at $69,409,750 per year, and could be escalated annually (within fair market value testing limits that could be done every twenty years thereafter).  Annual facility rent totals are payable in equal quarterly installments, with a reduction made each quarter-year of the first twenty-years of payments for a portion of the $110 million that Louisiana Children's pre-paid in December 2013.

240.    The remaining $143,000,000 of the December 2013 advance rent payment was attributed to a complete pre-payment for the first forty years' use of the New Facility's Ambulatory Care Building and Garage.

241.    A separate Equipment Lease was also entered into and charged to Louisiana Children's by LSU at the same time that the Master Hospital Lease became effective on May 29, 2013.

242.    After Louisiana Children's/University Medical Center Management Corporation paid LSU $253,000,000 in May 2013 in advance rent payment on the UMC lease, Louisiana Children's System's Upper Payment Limit payments fell back down to $66,940,000 (Audit Report Note 21), but its DSH payments exploded to $194,782,000 (Audit Report Note 3).

243.    The "Prepaid Expenses and Other Assets" section of Note 2 in Louisiana Children's Consolidated Financial Statements as of and for the Years Ended December 31, 2014 and 2013 (released April 20, 2015) confirms the circumstances and arrangements alleged above. That section states, at page 12 of the audit report:

75

Prepaid Expenses and Other Assets
In accordance with the CEA mentioned in Notes 1 and 18, advance rent
payments, in the amount of $253,000,000, were made on the UMC lease. Of this
total, $110,000,000 represents a prepayment of a portion of the future UMC
facility, with the exception of its Ambulatory Care Center and its Garage, while
$143,000,000 represents all future rent payments for the Ambulatory Care
Building and Garage. Due to the notes payable, described in Note 8, being
directly related to funding the advance rent payments, the System deferred the
recognition of interest payments made through December 31, 2014. As described
in Note 18, these advance payments together with the interest payments will be
applied to the annual rental requirements of UMC once operations have
transitioned to the new facility, which is expected to occur in 2015.

As of December 31, 2014 and 2013, the amounts classified as current were
approximately $3,124,000 and $-0-, respectively, and are included within prepaid
expenses on the consolidated balance sheets. As of December 31, 2014 and 2013,
the amounts classified as non-current were approximately $262,795,000 and
$254,560,000, respectively, and are included within other assets on the
consolidated balance sheets.

244.    The "Deferred Revenue" portion of the same December 31, 2014 and 2013 audit

report note confirms, at page 13: "The System, through UMCMC, received payments from the

State for UMCMC providing healthcare services to the medically indigent and high risk

Medicaid, *in advance of UMCMC providing those services.* The System recognizes revenue

ratably as services are provided. The balance of funds received in excess of services provided, as

measured, is recognized as deferred revenue on the consolidated balance sheets." (Emphasis

added).

245.    Thus, the Louisiana Children's System, through UMCMC, requested and received

hundreds of millions of pre-paid UPL and DSH supplemental funding. In doing so, it at the end

of each calendar year from 2013 through 2016, it retained as between $91.5 M and $48.6 M in

this prepaid Medicaid funding that never became earned income in the fiscal year in which it was

received.

246.    UMCMC and Louisiana Children's initially accounted for these arrangements by

76

classifying the pre-paid reimbursement in their accounting system as "Deferred Revenue" and, thereafter, reclassifying those funds as "Patient Services Revenue," pro rata, as Medicaid-reimbursable services are later provided.

247.    From 2013 through 2016, Louisiana prepaid Louisiana Children's $275,232,000 dollars in UPL and DSH payments, for Medicaid and indigent care that Louisiana Children's did not render until the next calendar year (and potentially would not become earned revenue by the LCMC System until even later than that, or not at all).

248.    From 2013 through 2016, Louisiana Children's booked as deferred revenue these amounts remaining at the end of the calendar year: $91,593,000 in 2013, $63,232,000 in 2014, $71,795,000 in 2015, and $48,612,000 in 2016.

249.    This constituted yet another way in which the LCMC System engaged in knowing, improper, and unlawful retention of Medicaid overpayments in violation of the False Claims Act, and of the Medicaid program integrity requirements regarding return of overpayments, 42 U.S.C. § 1320a-7k(d)(1)-(3).

250.    Since 2015, the Louisiana Children's System's Medicaid DSH payments have ranged from a low of $236,249,000 in 2018 to a high of $267,148,000 (Note 3 to Louisiana Children's Consolidated Financial Statements as of and for the Years Ended December 31, 2016 and 2015) in 2015, while its UPL payments have ranged from a low of $149,768,000 (Note 22) in 2015 to a high of $156,626,000 in 2016.  Total supplemental Medicaid DSH and UPL payments received by the Louisiana Children's System thus exceeded $400 million dollars every year during that span except 2018, when such payments fell from a 2016 peak of $418,802,000 to a total of $389,742,000 in 2018.  In Relator's experience and expert opinion, the financial transactions described above would make no logical or beneficial business sense for Defendants

77

and/or LSU to enter into had it not been part of their overall plan from the beginning of the endeavor to manipulate federal Medicaid reimbursement programs into funding more than the statutorily permitted portion (and sometimes even all) of those program's escalating investments in Louisiana healthcare.

251.    In addition, the total fair market value of the transactions that led to Louisiana Children's assumption of long-term control over the operations of the Interim and New Facilities is highly dubious.  Proper fair market valuation of such arrangements depends very much on legitimate and sustainable sources and amounts of revenues in relation to patient case mix, costs of providing services, and local economic outlook of the community being served.  In addition, fair market pricing for a private entity to run a hospital must leave room for the corporate entity that leases the facilities and equipment to make a reasonable return on its investment.

252.    Viewed in isolation, leasing the hospital to Louisiana Children's and charging rent of $69 million per year might be considered Fair Market Value, since UMC is a hospital that was brand new in 2014 and built by FEMA at a cost of approximately $1.5 billion.  However, LSU paying Louisiana Children's $284 million in fraudulent supplemental Medicaid payments so that Louisiana Children's could afford to pre-pay $253 million of that amount back to LSU for future rent (absent a signed lease agreement in place at the time) negates any such argument.  LSU gave Louisiana Children's use of a $1.5 billion medical complex (paid for by FEMA) in large part for free and the remainder of the leased facilities at a highly discounted price that included an illusory pre-paid component of the purported forty-year "cost" of the overall lease.  Thus, what the deal actually cost Louisiana Children's does not approach fair market value.

253.    In addition, based on currently known facts, Relator does not believe that the rates paid to Louisiana Children's in this situation were negotiated transparently, in good faith, or in a

good faith effort to comply with known State and federal law.

254.    The CEAs were negotiated without meaningful oversight and thus presented ample opportunity for gamesmanship. According to a January 3, 2014 Letter from Louisiana's DHH and LSU to CMS, the leases of LSU's facilities and equipment to its partners were negotiated by LSU and those private parties alone. There was no involvement or oversight by Louisiana's Department of Health and Hospitals. DHH did not participate in any lease negotiations, appraisal processes, or determinations of rental rates.

255.    LSU and Defendants knew, within the meaning of the False Claims Act, that prepayment by Medicaid of costs for care to be provided at some future time was not lawful and that Louisiana Children's could not retain such a known overpayment. A series of proposed amendments to Louisiana's State Medicaid Plan was submitted to CMS on June 27, 2013 (proposed State Plan Amendments 13-23, 13-25, and 13-28)—approximately one month after LSU made its hugely excessive $284 million UPL payment to Louisiana Children's. These amendments sought authorization from CMS for DHH to pay private hospitals that were taking over LSU hospitals their full current-year uncompensated care costs for such patients. By September 5, 2013, CMS had already publicly challenged those proposed State Plan Amendments out of stated concern that such payments to private hospitals that were assuming control over previously public hospitals would violate federal law regarding the amount of such payments, the potential funding of the non-federal share of such payments, and the financial efficiency and economy of such proposed arrangements. Letter from CMS Associate Regional Administrator Bill Brooks to DHH Medicaid Director Ruth Kennedy (Sept. 5, 2013). In addition, by December 23, 2014, CMS affirmatively rejected even those proposed amendments to pay only such hospitals' current-year uncompensated care costs, based on its conclusion that

unlawful hold-harmless arrangements between the State and the private hospitals (distinct and apart from than those alleged herein) had already occurred.  Letter from CMS Associate Regional Administrator Bill Brooks to DHH Medicaid Director Ruth Kennedy (Dec. 23, 2014).

256.    On October 1, 2014, the LSU Board of Supervisors approved amendments to the CEA that Louisiana Children's had agreed to in 2013, as well as to four similar CEAs that LSU had entered into with four other private entities within the prior year to occupy and operate five other formerly LSU-run hospitals and related facilities located elsewhere in the state.[5]

257.    Upon information and belief, each of these other transactions followed a pattern of contracts and financial conduct very similar to that of LSU's contracts and conduct with Louisiana Children's.  Thus, these deals very likely involve fraudulent UPL and DSH payment and federal and non-federal share funding arrangements similar to those alleged herein with respect to the Louisiana Children's System and its business partners.

258.    The amendments to the Louisiana Children's CEA (and each of the other CEAs listed in footnote 5 to this Complaint) that were approved on October 1, 2014 became necessary because CMS had objected to Louisiana's proposed plan to amend its State Medicaid Plan to permit Louisiana to make Medicaid funds previously available only to LSU available to LSU's new private hospital partners.  CMS had denied Louisiana's request to make that change to the extent that it overlapped with contractual obligations the State had already entered into with its

---

[5] Between May 2013 and January 2014, LSU also entered into: (1) a CEA signed on May 17, 2013 with Lafayette General Health System, Inc. (relating to management and operation of the University Medical Center at Lafayette, LA); (2) a CEA signed on June 24, 2013 with Southwest Louisiana Hospital Association D/B/A Lake Charles Memorial Hospital (relating to management and operation of Dr. Walter O. Moss Regional Medical Center in Houma, LA); (3) a CEA signed on January 14, 2014 with Our Lady of Angels, a nonprofit affiliate of the Franciscan Missionaries of Our Lady Health System (relating to management and operation of Washington St. Tammany Medical Center D/B/A as Bogalusa Medical Center in Bogalusa, LA); and (4) a CEA signed on September 30, 2013 with Biomedical Research Foundation of Northwest Louisiana and BRF Hospital Holdings, L.L.C. (relating to management and operation of LSU Medical Center-Shreveport in Shreveport, LA and E.A. Conway Medical Center, in Monroe, LA).

80

CEA private partners that required DHH to make such payments to those private partners as part of their agreement to lease and operate hospitals formerly operated by LSU. CMS explained that the tie between state receipt of lease payments from the private providers and the State's investment of additional non-federal Medicaid supplemental payments to the same private entities would constitute an unlawful "hold harmless" arrangement requiring a reduction in federal financial participation in associated Medicaid payments.

259.    Defendant consultants' solution to the issue was to rewrite the CEAs to remove DHH as a party and to make "discretionary" all future State participation in increased supplemental Medicaid payments to the private hospitals that had previously been explicitly required under the originally executed CEAs.

260.    The latter change, however, was associated with a further amendment to the CEAs to permit the private entities to withdraw from the CEAs on very short notice, if lack of State financial support ever undermined the financial viability of those private entities' continued operation of the former LSU hospitals.

261.    The understood and intended effect of these connected amendments was to create economic interdependence and leverage points in the agreements such that, while DHH was no longer explicitly required to make non-federal UPL and/or DSH payments on behalf of the private hospitals, if it ever failed to do so, the private hospitals could quickly shift responsibility for such patients back onto LSU or other State entities. Thus, in practice and effect, the modified arrangement effectively guaranteed the same outcome as the formerly explicit CEA terms had mandated. This was Defendants' understanding of the amendments and their precise intention.

262.    If DHH ever failed to fulfill its part of this bargain, the affected private provider would be free simply to withdraw from the arrangement on short notice, cut its losses, and dump

responsibility for those patients back on LSU, a threat of mutual harm that practically guaranteed mutual performance of these indispensable components of the arrangement.

### C.    Fraudulent Medicaid Funding Payments and Initiatives Associated with Louisiana Children's Agreement to Lease and Operate West Jefferson Medical Center Beginning October 1, 2015

263.    On February 19, 2014, the Jefferson Parish Council awarded Relator's company, Nemzoff & Company LLC, a contract to review and audit competing bids that had been submitted to Jefferson Parish Hospital District 3 ("District 3") for the lease of West Jefferson Medical Center ("West Jefferson") and East Jefferson General Hospital ("East Jefferson"). District 3, which was comprised of 50% members from the West Jefferson Advisory Board and 50% from the East Jefferson Advisory Board, had been working cooperatively for more than a year in an effort to privatize those two public hospital systems, and the original idea was to lease both hospitals to the same Lessee.

264.    Under Relator's leadership, Nemzoff & Company was to analyze and submit a report on bids that had been submitted by Louisiana Children's, Ochsner Health, and HCA. Relator and his company's job was not to make recommendations as to which bid the Districts should select, but merely to provide the Districts with analysis of financial and other considerations that would help the Districts make better-informed decisions.

265.    That task was complicated, however, by the fact that a conflict had erupted between Chris Roberts, the Chairman of District 1's Advisory Board, and HCA, which had offered the most money in its bid. As a result of highly publicized accusations against HCA by Mr. Roberts, on February 20, 2014—the day after Nemzoff & Company was retained—HCA withdrew its bid to lease West Jefferson and East Jefferson's facilities and assume control of their operations.

82

266.    However, in the hope that the dispute between Roberts and HCA might resolve and HCA might reconsider its withdrawal, the Jefferson Parish Council asked Relator and his company to go forward with his original assignment of analyzing, auditing and issuing a report on all three original proposals for both District 1 & 2.

267.    Relator and his company did so, and on April 2, 2014, Relator submitted his report, which, as always intended, included no recommendation as to which company the Districts should choose.  His presentation of that report concluded his first contract with the Jefferson Parish Council.

268.    HCA had not reconsidered its decision to withdraw from consideration by District 3 by that point.

269.    Soon thereafter, the Advisory Board for District 1 recommended that Louisiana Children's be chosen by District 1 to assume operation of West Jefferson, but the Advisory Board for District 2 recommended that HCA be chosen to assume operation of East Jefferson. The difference between the Districts' choices threw a wrench into the workings of the plan for both hospitals to transition to the same private hospital chain.  Ultimately, the disagreement could not be bridged, and the Districts decided to abandon their common effort and to make further efforts separately.

270.    Thereafter, East Jefferson and HCA never successfully negotiated a letter of intent to enter into a CEA and Hospital Master Lease.  East Jefferson remains a public hospital owned and operated by District 2.

271.    Meanwhile, Relator and his company were hired again, this time by District 1 in June 2014, so that Relator could serve as Project Director and Lead Negotiator in District 1's efforts to sign a long-term lease for West Jefferson's properties and equipment with Louisiana

83

Children's and to transition West Jefferson's operations from the District to Louisiana Children's and West Jefferson Holdings.

272.    On July 14, 2014, District 1 and Louisiana Children's signed a letter of intent that set forth all the major financial and other terms of the deal. In material part, that letter of intent called for a $225 million lease prepayment by Louisiana Children's to District 1 for rights of occupancy and use of all the buildings and equipment that then were part of West Jefferson and its affiliated enterprises.

273.    Over the following months District 1 and Louisiana Children's began drafting the CEA they would enter, and planning and preparing all other paperwork and details necessary to complete the deal and facilitate transition of operations.

274.    District 1 and Louisiana Children's ran into a complication. While a public hospital owned and operated by a local government entity, West Jefferson was lawfully permitted to self-fund the non-federal share of UPL payments that would go back to West Jefferson. But once West Jefferson was operated by Louisiana Children's, it could no longer do so. Therefore, in order for West Jefferson to continue to draw down full UPL payments, District 1 needed to continue to send non-federal funding to the State of Louisiana each year via IGT. District 1 did not wish to fund the non-federal share of these payments once the hospital was privately operated. Therefore, Defendants Louisiana Children's, West Jefferson Holdings, UPC, and Sisung Group explored direct ways to allow Louisiana Children's to self-fund the non-federal portion of UPL payments that would go to West Jefferson and ultimately concocted the following scheme.

275.    Under the final executed CEA and Master Hospital Lease, Louisiana Children's was required to pay the full $225 million pre-paid lease amount as had been originally agreed.

84

However, Mr. Sisung and his company affiliates added to Section 3.3 of the CEA's

Consideration and Payments terms a new "Performance Consideration" provision (Section

3.3(d)). That provision provided that, in each of the first three years that the signed CEA was in

effect (each so-called "Performance Year"), West Jefferson Holdings and/or Louisiana

Children's would make an extra payment of $6,667,000 to District 1 (up to $20 million total) if

West Jefferson "performed better" than Louisiana Children's originally projected.

276. According to these provisions, such amounts were due to be paid in full for each

of the three Performance Years that the newly reconstituted West Jefferson produced an annual

"Operating EBIDA"[6] of 7.5% or higher. If, in any of the Performance Years, Operating EBIDA

fell below 7.5%, West Jefferson Holdings and/or Louisiana Children's had sole discretion to

offset that year's Performance Consideration against the hospital's "Indigent Costs for such

Performance Year," provided that any such total offsets could not exceed the $20,000,000 total

extra payments that might otherwise become due to be paid in those years.

277. Relator believes and alleges that the real reason Mr. Sisung, Sisung Group and

UPC invented this provision was to create an economic payback incentive that would convince

District 1 to make annual IGT transfers for the benefit of West Jefferson, Louisiana Children's,

and West Jefferson Holdings for at least the first three years that Louisiana Children's ran that

hospital.

278. Defendants Sisung Group, UPC, Louisiana Children's and West Jefferson

Holdings all hoped that District 1 would anticipate that, through IGTs of approximately $6.67

million, West Jefferson would likely attain its 7.5% "Operating EBIDA" target. This number

was not arbitrary. IGT transfers of that amount would result in total annual UPL supplemental

---

[6] EBIDA refers to earnings before interest, depreciation, and amortization.

payments to West Jefferson of nearly $20 million.

279.    Defendants Sisung Group's, UPC's, Louisiana Children's and West Jefferson Holdings' shared goal was to enter into an unlawful implied agreement and/or an unlawful pattern of practice that would violate federal law regarding use of non-bona fide donations or impermissible health care related taxes to fund the non-federal share of the UPL payments those Defendants sought to obtain.

280.    Moreover, even if they fell short of 7.5% in a given year, Louisiana Children's and West Jefferson Holdings certainly were capable of showing that level of performance on West Jefferson's books, if it proved in their best longer-term financial interest to do so. Those Defendants had already demonstrated through their accounting maneuvers with respect to the downtown New Orleans Interim and New Facility transactions that they could and would take any steps needed to secure increased federal Medicaid funding at no (or greatly reduced) State or local government cost. In each of the three Performance Years, as long as Louisiana Children's and West Jefferson Holdings received more in additional UPL supplemental funding than the $6,667,000 that they had promised to return to District 1, Louisiana Children's and West Jefferson Holdings would still come out financially ahead.

281.    Thus, the incentive for Louisiana Children's and West Jefferson Holdings to cheat on West Jefferson's books certainly existed with this transaction, just as it had with respect to Louisiana Children's Deferred Revenue accounting manipulations with respect to UPL payments it received in relationship to its assumption of operations at New Orleans' Interim and New Facilities.

282.    Under the hoped-for scenario at West Jefferson, Defendants Louisiana Children's and West Jefferson Holdings would get about $60 million dollars of UPL funding over three

86

years with a maximum countervailing debt increase to District 1 of only $20 million total for those three years. In such a scenario, District 1 would break even, or at least get a partial discount on the amount of money local government entities are required to pay for the non-federal share of supplemental Medicaid payments to hospitals.

283.    To Relator's belief, however, District 1 did not cooperate by reading between the lines and voluntarily making the annual IGTs on behalf of West Jefferson that Defendants Sisung Group, UPC, Louisiana Children's and West Jefferson Holdings tried to advance. Relator believes this is likely because neither he nor, to his knowledge, anyone at political levels in District 1 had a good understanding of how UPL programs or IGTs worked, and, by this time, they had all become highly suspicious of anything that Mr. Sisung told them.

284.    Following through with Mr. Sisung's plan would have resulted in a violation of federal law against using non-bona fide donations and/or impermissible health care related taxes to fund or repay the non-federal share of Medicaid payments.

285.    That is because the contractual requirement that Defendants Sisung Group, UPC, Louisiana Children's and West Jefferson Holdings conspired to add to the CEA created a mandatory payment provision that would have required West Jefferson Holdings and Louisiana Children's to pay District 1 $6,667,000 for each of three years in which the target Operating EBIDA was met. Such an arrangement meets the statutory definition of a prohibited health care related tax, as set forth above. Moreover, any discretionary payment made if the Operating EBIDA target was not met would be a non-bona fide donation in violation of the same statute.

286.    Defendants Louisiana Children's and West Jefferson Holdings have also demonstrated by their past accounting conduct that they are ready and willing to manipulate company books and defer received revenue when it benefits corporate cost-saving objectives.

87

287.    Defendants Sisung Group's, UPC's, Louisiana Children's and West Jefferson Holdings' deceitful intent is demonstrated in part by their purposeful misrepresentations to Relator and District 1 about the true scope of their interests in securing IGTs from District 1.  By stating to Relator and District 1 only how much non-federal money was sought for transfer and equating that to the income those Defendants would split between them, those Defendants understated by approximately two-thirds how much they each stood to gain if they could get Relator and District 1 to buy into their scheme.

**D.    Damages to the United States Caused by Defendants Sisung Group, UPC, Louisiana Children's and West Jefferson Holdings Fraudulently Causing District 1's CEO to Make an Unauthorized Medicaid UPL IGT That Benefitted Those Defendants and Caused District 1 to Demand and Receive Repayment from Louisiana Children's and West Jefferson Holdings of the IGT Funds That Were Not Lawfully Authorized**

288.    While Relator believes that the United States was not ultimately overcharged as a result of District 1 and the Louisiana Children's System's "Performance Consideration" provision of the CEA discussed above, the United States was improperly charged and should have been refunded by Louisiana Children's, West Jefferson Holdings, Sisung Group and/or UPC approximately $9,044,834 million in federal UPL payments made in the FFY 2016, at the very beginning of which West Jefferson transitioned from being a public hospital to a private one operated by Louisiana Children's and West Jefferson Holdings.  Defendants Louisiana Children's, West Jefferson Holdings, Sisung Group, and UPC shared in the unlawful windfall.

289.    On September 30, 2015, Louisiana Children's, West Jefferson Holdings and District 1 closed on the hospital lease they had long been negotiating, and District 1 ended its operations of West Jefferson as a public hospital.

290.    October 1, 2015 (the first day of FFY 2016) was the first day that West Jefferson operated as a private hospital under the control of Louisiana Children's and West Jefferson

88

Holdings.

291.    On August 31, 2015, Nancy Cassagne, who was then still employed as the CEO of West Jefferson by the Board of District 1 (but who had already negotiated a multi-million-dollar contract with Louisiana Children's to become CEO of West Jefferson Holdings once it assumed ownership and control of West Jefferson on October 1, 2015) conspired with Mr. Sisung and, through him, Defendants Sisung Group and UPC to direct that an IGT be made to Louisiana's DHH in order to fund the non-federal share of monthly UPL payments that would be made to West Jefferson (whatever its ownership) from July 1, 2015 through June 30, 2016 (Louisiana's 2016 State Fiscal Year or "SFY").

292.    Ms. Cassagne undertook this task without notice to the Board of District 1 and without seeking the Board's approval to spend millions of dollars of District 1's funds to the ultimate benefit of West Jefferson Holdings and Louisiana Children's.

293.    Ms. Cassagne's hospital operations advisory board, Mr. Sisung, Louisiana Children's CEO Mr. Feirn, and Suzanne Haggard, the CFO of Louisiana Children's, were also aware of her actions.

294.    By sending $7,324,837 by IGT to DHH in August 2015, Ms. Cassagne secured UPL payments to West Jefferson for the three months in SFY 2016 that District 1 would continue to operate West Jefferson. More significantly, she also ensured that such supplemental payments would continue to be paid on a monthly basis to her future employers, West Jefferson Holdings and Louisiana Children's, for services rendered at West Jefferson from October 1, 2015 through June 30, 2016 (the remainder of that SFY).

295.    District 1, however, had never been asked to authorize use of its funds in that way. Further, by failing to record any portion of those transactions before the hospital

89

transitioned from ownership by District 1 to ownership by West Jefferson Holdings and Louisiana Children's, Ms. Cassagne, Mr. Sisung (who had devised the scheme for capturing those funds for Louisiana Children's), and others with knowledge of the plan concealed these transactions from the Board of District 1 and Relator.

296.    In doing so, they defrauded District 1 and usurped its opportunity to determine for itself whether or not to support Louisiana Children's financially in such a fashion.

297.    Nor did Ms. Cassagne, Louisiana Children's, or West Jefferson Holdings reveal any of these financial dealings in the year-end financial and accounting reports prepared for District 1 with respect to its operation of West Jefferson.

298.    At the time the $7,324,837 IGT transfer was made, no record of the transfer was recorded in West Jefferson's books.  Nor was any record made of the monthly UPL payments the hospital received as result.  Nor was this transaction booked at the time the lease closed, transferring control of West Jefferson's operations from District 1 to West Jefferson Holdings and Louisiana Children's.

299.    Upon information and belief, this course of concealment occurred in part because Ms. Cassagne, Mr. Sisung, and their Louisiana Children's System co-conspirators understood that District 1 would not have agreed to a request by Louisiana Children's and West Jefferson Holdings to such an arrangement, at least in part because doing so would have been yet another way that Louisiana Children's could effectively lower the negotiated price of the long-term lease that they agreed originally to.

300.    The failure to properly record receivables due to District 1 for the portion of the $7,324,837 IGT payment that District 1 was entitled to be repaid, was also done in part to conceal from the State that the UPL payments made to West Jefferson Holdings from October

90

2015 to June 2016 would have to be repaid to District 1 if District 1 discovered the fraud. Such repayment would be necessary, if demanded by District 1, in order to hold the District harmless for the cost it never approved and unknowingly paid so that Defendants could wrongfully secure UPL payments for West Jefferson Holdings and its parent company, Louisiana Children's.

301.    West Jefferson Holdings and Louisiana Children's ultimately collected $14,572,876 in UPL payments made to West Jefferson from October 1, 2015 through June 30, 2016, in fulfillment of the co-conspirators' plan.

302.    By October of 2016, with the assistance of the Fraud and Forensic Division of Ernst & Young, LLP, Relator and his negotiating team discovered that Ms. Cassagne had paid the State, yet that she never told the Board of District 1 or booked a receivable that should have been done at the time those events occurred. It is extremely unlikely that she, Louisiana Children's, West Jefferson Holdings, Mr. Sisung, Sisung Group, UPC or anyone else with knowledge of this fraud against District 1 and the federal Government would have ever divulged the truth had it not been discovered by Relator, Ernst & Young, and District 1 authorities on their own accord based on their own investigative efforts.

303.    When confronted with these facts, Louisiana Children's and West Jefferson Holdings agreed to not only book the receivable retroactively as required by generally accepted accounting standards, but ultimately also to repay the District in excess of $10 million, out of the more than $19 million in UPL funds Louisiana Children's and West Jefferson Holdings had received from the State.

304.    These funds were paid only after the District demanded the money and successfully claimed that these funds, totaling $10 million, should have been recorded in District 1's books as a receivable due to be repaid to the District as of closing of the lease with West

Jefferson Holdings and Louisiana Children's.

305.    Defendants West Jefferson Holdings and Louisiana Children's ultimately repaid that amount to District 1 only after first trying to preserve more of their ill-gotten gains. At first, Defendants West Jefferson Holdings and Louisiana Children's and their executives sought to convince District 1 to accept repayment of only the net-effect their fraud had on net working capital that was to be returned to District 1 at the September 30, 2015 closing of the deal between District 1 and the Louisiana Children's System. Defendants Louisiana Children's and West Jefferson Holdings tried to sell that plan to District 1 because the smaller refund to District 1 that such an approach would require would preserve for themselves, Mr. Sisung, and Sisung Group, a larger portion of the federal overpayment those Defendants had reaped from engaging in the fraud in the first place. In that fashion, Defendants asked that District 1 effectively pay the full cost of the $234,529 consulting fee that Mr. Sisung and his firm gleaned by pulling off this scam secretly while purporting to work as a consultant hired by District 1 to look out for its interests.

306.    A total of $19,301,284 in Medicaid UPL payments were paid to the operators of West Jefferson in SFY 2016 as a result of Defendants' fraudulent scheme. Of that total, $14,572,876 related to the period in which West Jefferson was under the control and operation of Defendants West Jefferson Holdings and Louisiana Children's. In the absence of Defendants' fraud, West Jefferson Holdings and Louisiana Children's would not have received any part of that amount. According to West Jefferson Holdings and Louisiana Children's own calculations, $9,055,834 of the amount West Jefferson Holdings and Louisiana Children's received after assuming control of West Jefferson consisted of federal funding.

307.    District 1 saw through Defendants' ploy to the extent it would not make District 1 truly whole for the fraud and breach of fiduciary duties that the above-noted Defendants caused

it through this scam. While District 1 has now been fully repaid for the funds that were dishonestly taken from it, the Louisiana Children's and Sisung Group-related Defendants continue to retain the $9,044,834 federally funded component of those payments.

308.    Upon information and belief, Sisung Group, UPC and/or Mr. Sisung also continue to retain the $234,529 consulting fee that Sisung Group was paid to develop and implement this scam.[7]

309.    The mandated repayment to District 1 of funds fraudulently taken from it to fund an IGT contribution that benefited Defendants constitutes an impermissible "health care related tax" that (justly) held District 1 harmless for the UPL payments that Defendants embezzled from the District to benefit themselves.

310.    Alternatively, if Defendants argue that such refunds were not "mandated" because they were payments voluntarily made to resolve a dispute between themselves and District 1, then the refunds are non-bona fide donations that are equally ineligible to be used to match and retain federal funding for which no legitimate non-federal share was paid.

311.    In either circumstance, no non-federal funds ultimately remained devoted to the supplemental payment Louisiana Children's retained, the United States alone ultimately contributed to the funds Louisiana Children's retained and thus was damaged, and the United States is owed a refund in order to right the ledger between what eligible non-federal consideration ultimately was invested and what supplemental Medicaid payments Defendants unlawfully received.

---

[7] Upon information and belief, this fee may represent a contingent fee in which those Defendants were compensated based on how much additional federal revenue their schemes generated for their clients. By its own admission, Sisung Group uses such arrangements in at least some of its engagements of this nature. Because UPC and Mr. Sisung are Sisung Group affiliates who advertised a specialty in this kind of consulting, it is likely that the admission applies to them specifically as well as to Sisung Group generally.

312.    Under such circumstances, failure to repay the United States its losses from an unwound fraudulent transaction—or even to notify the United States of the relevant refund of the non-federal share of such supplemental payments—constitutes, within the meaning of the FCA, "knowing concealment or knowing and improper avoidance of an obligation to pay or transmit money to the [United States] Government." Defendants' duty to repay the United States constitutes a statutorily established duty arising from Defendants' knowing retention of an overpayment that the United States made to them because of those Defendants' fraudulent manipulation of Medicaid's supplemental UPL program.

**E.**    **Since at Least November 2010, Defendants UPC and Sisung Group Have Conspired with Gjerset and with Other Defendant Public and Private Hospitals in and Around New Orleans to Use Non-Bona Fide Provider Donations to Fund the Non-Federal Share of Medicaid UPL Payments to Private Hospitals**

313.    Beginning at an unknown time prior to November 2010, and continuing at least through 2014 (and likely as long as any of their public hospital co-conspirators remained publicly owned), Defendants UPC and Sisung Group entered into agreements with Gjerset and with a number of private hospitals in and around New Orleans to help those hospitals enter into and run unlawful private UPL programs with public Louisiana hospitals and/or those public hospitals' local government entity owners and operators.

314.    UPC, Sisung Group and/or their co-conspirators developed and/or implemented these schemes specifically to achieve indirectly, through artifice and concealment of the parties' shared intent, precisely what they knew federal law precluded—the capturing of increased federal Medicaid UPL funding for private hospitals without any real investment of the non-federal share of such expenditures by State or local government entities.

315.    In December 2010, Defendants Ochsner Health, Louisiana Children's, Baton Rouge, HCA, and Christus collaborated with Gjerset, District 1, and District 2, as well as with

Natchitoches Hospital District 1 d/b/a/ Natchitoches Regional Medical Center ("Natchitoches RMC"), and Jefferson Parish Human Services Authority ("JP Human Services") to form five non-profit organizations through which the above-mentioned <u>private</u> health care providers would donate funds in order to assume costs that the <u>public</u> health care entities (District 1, District 2, Natchitoches, and JP Human Services) previously bore.

316.    The five non-profit organizations that the private hospitals funded and authorized to assume costs previously borne by the public healthcare collaborators include: Louisiana Clinical Services, Inc. ("LCS"), Southern Louisiana Clinical Services, Inc. ("SLCS"), Eastern Louisiana Clinical Services, Inc. ("ELCS"), Natchitoches Clinical Services, Inc. ("NCS"), and Jefferson Clinical Services, Inc. ("JCS").

317.    The collaborating private hospitals' financial reason for forming these non-profit entities and funding them was to enable the collaborating public healthcare entities (District 1, District 2, Natchitoches, and JP Human Services) to increase their funding of the non-federal share of Medicaid UPL payments, for the benefit of the donating private hospitals and/or their affiliated private healthcare entities.

318.    Upon information and belief Defendants Ochsner Health, HCA, Christus, and Baton Rouge also participated in the creation of—and/or benefitted from the deliberate and pre meditated obfuscation created by the creation and use by their consultant co-conspirators—of twenty-six pass-through entities for the purpose of enabling collaborating public healthcare entities to increase their funding of the non-federal share of Medicaid UPL payments, for the benefit of the donating private hospitals and/or their affiliated private healthcare entities. Defendants used these pass-throughs to funnel money to the public healthcare entities, and through which to contract with physicians and providers in order to provide for medical services

rendered at the public healthcare facilities.

319.     For example, in Defendant Ochsner Health's Annual Financial Information Disclosure for its fiscal year ended December 31, 2012, regarding "Net Patient Service Revenue," Ochsner Health's participation in these "collaborations" was acknowledged under the caption "Upper Payment Limit Program." There, Ochsner Health's financial information disclosure further explained: "These collaborations enable the governmental entities to increase support for the state Medicaid program up to federal Medicaid Upper Payment Limits (UPL)." *See* Ochsner Health System Annual Financial Information Disclosure for the 12 Months Ended December 31, 2012 at Note 11.

320.     More to the point, the entities entered these collaborations at Gjerset's, UPC's, and/or Sisung Group's bidding so that, at no net cost to themselves, the public entities could then use some or all of their cost savings from the private hospital's assumption of the public entities' costs to make IGTs on behalf of the donating private healthcare providers.

321.     Thus, for the involved private hospitals, substantial amounts of potential federal funding were at stake, as Defendant Ochsner Health's financial disclosure demonstrate. For example, according to Defendant Ochsner Health's 2012 Annual Financial Disclosure, this series of collaborations regarding the UPL Program went into effect on December 1, 2010. *Id.* In calendar years 2012 and 2011, Ochsner Health recognized $18,444,000 and $25,733,000, respectively, in "Medicaid net revenue related to the Program…." *Id.* For the same periods, Ochsner Health also recorded deferred revenue from the UPL Program of approximately $4,866,000 (in 2012) and $2,629,000 (in 2011). (Ochsner Health's reporting of deferred revenue was necessary because "UPL Program" fiscal years run from December 1 to November 31 each calendar year, whereas Ochsner Health's own fiscal years run from January 1 to December 31).

96

322.    According to Jefferson Parish Council Resolution No. 116606 (as adopted by the Parish Council on April 6, 2011), after Gjerset had convinced various private hospitals to retain its services in the creation and operation of various Private UPL Programs, "in order for the public Parish Hospitals to participate in a Private UPL Program with these private hospitals (the Parish Hospital UPL Programs), East Jefferson and West Jefferson were required to separately enter into joint legal representation agreements with [Gjerset] and the private hospitals [already] represented [by Gjerset]."

323.    Relator is not aware of the specific details relating to most of the transactions that resulted from the conspiracy described above.  He is aware, however, of the contract that Southern Louisiana Clinical Services ("SLCS") entered into with Crescent City Anesthesia Services, LLC ("CCAS"), a physician group of anesthesiologists, effective February 1, 2011. Under this contract, SLCS assumed the following costs that had previously been paid directly to CCAS by District 1 d/b/a West Jefferson:  Medical Director costs, 24/7 staffing requirement costs, and the costs associated with guaranteeing that CCAS's monthly Net Patient Collections income at West Jefferson would meet or exceed CCAS's actual cost of providing anesthesia services at West Jefferson.  The physicians at CCAS entered into this agreement with SLCS to receive millions of dollars in payments despite the fact that SLCS was in fact a paper corporation and had no assets with which to pay.  Based on Relator's many years of experience, it was incomprehensible to him that a sophisticated group of physicians would sign such a large financial contract with an organization that had no money when their individual livelihoods were dependent on the agreement.  The initial deal was to remain in effect for two years and 11 months beyond the effective date, and could thereafter be renewed.

324.    A primary purpose (if not the sole purpose) for cancellation of West Jefferson's

97

previously-existing contract with CCAS and its replacement with this contract, was to relieve West Jefferson of the costs taken up by SLCS, in the expectation, based on prior discussions and assurances, that West Jefferson would use some or all of its cost savings from this arrangement to make future IGT transfers to Louisiana's DHH for use in securing additional Medicaid UPL payments for the private hospitals that made "donations" to fund SLCS's mission. All parties to this collaborative effort anticipated, and explicitly or implicitly agreed, that the increased UPL payments to the "donating" hospitals would ultimately result in these private healthcare providers receiving substantially more UPL income as a result of the arrangement than they would have received in the absence of the arrangement.

325.    Indeed, the SLCS contract with CCAS provided a quick-trigger escape clause for SLCS should District 1 fail to make the increased UPL payments that the collaboration with the private hospitals was intended to achieve. Section 4.06 of the contract gave SLCS and/or CCAS the right to assign SLCS's rights and obligations under the contract to West Jefferson with seven days' written notice to the other contracting party, thereby releasing SLCS from any and all of its future obligations to CCAS under the contract.

326.    Thus, if West Jefferson failed to fund increased IGT transfers for the benefit of the private hospitals that funded SLCS, those private hospitals could quickly re-impose on West Jefferson the costs the contract was intended to spare District 1 and its hospital and revoke any future obligation the private hospitals otherwise would have to ensure that SLCS was funded adequately to pay expenses on West Jefferson's behalf. This provision parallels the financial binds created by terms like those included in CEAs described above at paragraphs 143-157. As described above, when confronted with these sorts of arrangements, CMS noted that these sorts of financial provisions, which effectively created hold-harmless arrangements, violated federal

law.  As explained more fully below, these arrangements were likely master-minded or inspired

by the same consultants, Defendants Sisung Group and UPC.

327.     Gjerset is listed in the contract's "Miscellaneous Provisions" section as counsel

who should receive a written copy of "[a]ll communications, notices, demands of any kind in

which either Party may be required or desire to give or serve the other Party."  This is because of

that law firm's leadership role in initiating, implementing, and overseeing the carrying out of the

scheme it designed.

328.     Upon information and belief, Defendant UPC and/or Defendant Sisung Group

brought Gjerset into the process they initiated with respect to planning and implementing

"Private UPL Program" schemes throughout Louisiana.  Relator therefore believes and alleges

that Defendants UPC, Sisung Group, and Doe Defendants who entered into conspiracies with

UPC, Sisung Group and/or Gjerset, have engaged in numerous variations of the fraudulent

Private UPL Programs alleged herein elsewhere in New Orleans and throughout the State of

Louisiana.

**F.     Defendants Sisung Group and UPC Have Engaged and Conspired with Other Louisiana Defendant Public and Private Hospitals and Non-Hospital Healthcare Providers Outside of New Orleans to Plan, Implement and Perpetuate Similar Frauds Elsewhere in the State of Louisiana**

329.     On March 7, 2017, Newell Normand, the former Chairman of the Board of East

Jefferson General Hospital ("EJGH"), forwarded to Relator an autobiographical summary of

Sisung Group's and UPC's history of involvement as lobbyists and consultants working with and

on behalf of Louisiana Parishes, public and private hospitals, physician groups, and other

healthcare providers to develop, implement, and maintain creative initiatives to draw down

additional federal funds from Medicaid programs into the hands of Louisiana health care

providers for services provided to poor and indigent patients.

330.    A substantial portion of Sisung Group's and UPC's efforts, as described in that summary, have been aimed at developing and implementing ways for State and/or local government entities, and public and private health care providers, to work around the broadly worded federal statutes and regulations that prohibit use of non-bona fide donations and impermissible health care related taxes to fund the required non-federal portion of Medicaid expenditures.

331.    Defendant Sisung Group and UPC's goal in this respect has been to seek out or create loopholes that they can argue permit their clients and them to achieve precisely the situations and abuses that Congress's 1991 bans on non-bona fide donations and impermissible health care related taxes were explicitly intended to end.  As a result, Defendants Sisung Group and UPC have wrought the damages those prohibitions sought to avoid: imposition of increased Medicaid costs on the federal government without genuine investment by State and/or local governments in the Medicaid spending that their actions imposed on the federal treasury.

332.    When compared to a plain reading of the statute, it is apparent that many of the schemes being devised and implemented are clearly inconsistent with both the letter and the intent of the law, and to proceed and continue with such schemes requires at least reckless disregard or willful blindness to the law.

333.    Further, several of Sisung Group's and UPC's initiatives appear substantially influenced by, or patterned closely after, similar programs the Gjerset law firm is known to have introduced in Texas and other states.  Gjerset's so-called "Texas Model" includes use of Low Income and Needy Care Collaboration Agreements ("LINCCAs") between private and public hospitals operating in metropolitan areas, in which the private hospitals create and annually fund a non-profit corporation that uses those funds to pay expenses previously borne by participating

public hospitals as part of their normal business expenses.  This frees up funds that those public hospitals can then use to fund IGTs on behalf of the "donating" private hospitals in rough accordance with the level of those private hospitals' funding of the "charitable" corporation they created.

334.    Such funding, for example, includes schemes very similar to the SLCS/CCAS arrangement. The scheme works generally as follows.  Public hospitals terminate their contracts with the physician groups that staffed their hospitals with hospitalists, call duty physicians, and/or medical directors. The physician groups that provided these services immediately enter similar contracts with private charitable corporations funded by private hospitals.  The public hospitals or their local government owners then use the savings generated to IGT funds to State governments to pay the non-federal share of increased Medicaid funding.  Depending on the FMAP percentage in the State in which the hospital does business, the combined federal and non-federal funds that ultimately are returned to the donating private hospitals in the form of supplemental UPL Medicaid payments total two to four times what that hospital initially invested in the "donations" it made to its charitable partner corporation.

335.    CMS has already challenged one such arrangement of precisely this nature, set up by public and private hospitals in Dallas.  CMS's invalidation of such a plan has been confirmed by the United States Department of Health and Human Services ("HHS") Department Appeals Board in Decision No. 2886, issued on August 7, 2018.

336.    In arguing that such arrangements should be permitted, the State of Texas represented that the private hospitals in that program were paying only for services that doctors stationed at the public hospitals were providing to Medicaid patients, and not for any services rendered to non-Medicaid patients.  The HHS decision assumed that representation was true for

purposes of its analysis but concluded that the arrangement was nonetheless clearly inconsistent with the plain meaning of Congress's ban on the use of non-bona fide donations to fund the non-federal share of Medicaid.

337.    Such plans are clearly inconsistent with the law, as HHS and its Appeal Board concluded.  Even prior to the date of that decision, previous federal False Claims Act lawsuits involving similar schemes by private hospitals and county governments in New Mexico have been joined in, litigated, settled, and/or publicly reported by CMS and the United States Department of Justice, thus putting Defendants on actual and/or fair constructive notice that the United States regards the arrangements that Defendants have continued to develop, implement, and sustain as unlawful and fraudulent.

338.    Moreover, Defendants know that the schemes Sisung Group, UPC, and Mr. Sisung described in their own summary of their work do not support even the factual contention that the arrangements they have set up cover only costs public hospitals would otherwise spend on poor and indigent patient care, as Texas unsuccessfully argued in its attempt to justify the Dallas scheme.  The Sisung-related Defendants' own autobiographic presentation lists physician call services as one example of the types of care those programs may cover.  However, a physician on-call for a hospital would normally be required to be available as needed to help *any* patient with any kind of insurance in need of urgent care.  Nor would it be consistent with Medicare and Medicaid requirements that care be provided for federally insured patients in a reasonable and cost-effective manner for hospitals to staff separate call services for Medicaid patients and pay other physicians to be on call for all other patients who are insured by anyone other than Medicaid.

339.    Similarly, any LINCCA arrangements that relieve public hospitals for costs of

102

paying physicians needed as medical directors or any other hospital-wide duties, such as

hospitalist staff, are in actual fact donations to the public hospitals with respect to all non-

Medicaid patients, even if a genuine legal argument could be made that only paying for services

for Medicaid patients was an acceptable way to evade Congress's intent to stop schemes that

impose higher costs on the federal Government at no real financial cost to State and local

governments.

340.    All involved Defendants knew that the schemes were designed specifically to

achieve a financial result that Congress has prohibited.  Defendants also knew, or should have

known, that the schemes were of a type previously challenged by CMS and the Department of

Justice.

341.    All Defendants knowingly pretended that unlawful agreements and practices of

the type described herein did not exist when they knew that, in fact, such agreements did exist—

orally, in practice, and by shared intent.  Defendants knew that such agreements and practices

could not be acknowledged publicly without creating substantial risk that CMS would learn of

the fraud and pursue remedies to stop it and recoup the overpayment of federal funds that

resulted.

342.    Between May 2013 and January 2014, in addition to the CEA it entered into with

Louisiana Children's, LSU also entered into: (1) a CEA signed on May 17, 2013 with Lafayette

General Health System, Inc. (relating to management and operation of the University Medical

Center at Lafayette, LA);  (2) a CEA signed on June 24, 2013 with Southwest Louisiana Hospital

Association D/B/A Lake Charles Memorial Hospital (relating to management and operation of

Dr. Walter O. Moss Regional Medical Center in Houma, LA); (3) a CEA signed on January 14,

2014 with Our Lady of Angels, a nonprofit affiliate of the Franciscan Missionaries of Our Lady

Health System (relating to management and operation of Washington St. Tammany Medical Center D/B/A as Bogalusa Medical Center in Bogalusa, LA); and (4) a CEA signed on September 30, 2013 with Biomedical Research Foundation of Northwest Louisiana and BRF Hospital Holdings, L.L.C. (relating to management and operation of LSU Medical Center-Shreveport in Shreveport, LA and E.A. Conway Medical Center, in Monroe, LA).

343.    To the extent Sisung Group, UPC or Gjerset played any role whatsoever in consulting about or putting together any of those deals, Relator believes and alleges, based on his knowledge of the events in New Orleans and Sisung Group, UPC, and Gjerset's accounts of their involvement in such arrangements, that the above entities are among those who will prove to be co-conspirators with those consulting entities.

## VII.    CAUSES OF ACTION

### COUNT I
### False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)

344.    Relator re-alleges and incorporates by reference the allegations contained in all paragraphs 1 – 343 above as if fully set forth herein.

345.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729-33, as amended.

346.    By virtue of the acts described above, all Defendants knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval.

347.    The United States, unaware of the falsity of the claims made or caused to be made by Defendants, has paid such false or fraudulent claims that would not have been paid but for Defendants' illegal conduct.

348.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

349.    Additionally, the United States is entitled to the maximum penalty for each and every violation alleged herein.

**COUNT II**
**False Claims Act**
**31 U.S.C. § 3729(a)(1)(B)**

350.    Relator re-alleges and incorporates by reference the allegations contained in paragraphs 1 – 343 above as though fully set forth herein.

351.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729-33, as amended.

352.    By virtue of the acts described above, all Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims.

353.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

354.    Additionally, the United States is entitled to the maximum penalty for each and every violation alleged herein.

**COUNT III**
**False Claims Act**
**31 U.S.C. § 3729(a)(1)(C)**

355.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1-343 above as though fully set forth herein.

356.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729-33, as amended.

105

357.     By virtue of the acts described above, all Defendants knowingly conspired to commit violations of 31 U.S.C. § 3729(a)(1)(A), (B), and (G), in violation of 31 U.S.C. § 3729(a)(1)(C), and took multiple steps individually and collectively to advance and execute the objectives of that conspiracy.

358.     Unaware of the conspiracy or the steps each Defendant took individually or collectively to advance and execute the conspiracy, the United States has relied on such false statements, records and statements to pay and approve false or fraudulent claims that would not have been paid or approved but for Defendants' illegal conduct.

359.     By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

360.     Additionally, the United States is entitled to the maximum penalty for each and every violation alleged herein.

## COUNT VI
### False Claims Act
### 31 U.S.C. § 3729(a)(1)(G)

361.     Relator re-alleges and incorporates by reference the allegations contained in paragraphs 1 – 343 above as though fully set forth herein.

362.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729-33, as amended.

363.     By virtue of the acts described above, Defendants knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

364.     Unaware of Defendants' misconduct, the Government did not collect from the

Defendants all the money it would have collected but for the Defendants' illegal conduct.

365.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

366.    Additionally, the United States is entitled to the maximum penalty for each and every violation alleged herein.

## **PRAYER**

WHEREFORE, Relator Joshua Nemzoff prays for judgment against Defendants as follows:

367.    That Defendants cease and desist from violating 31 U.S.C. § 3729 *et seq.*;

368.    That, to the extent the United States collect(s) ill-gotten federal or state funds that stem from the allegations alleged in this action from the State of Louisiana or any other State entity, this Court consider such recovery an alternate remedy under 31 U.S.C. § 3730(c)(5);

369.    That this Court enter judgment jointly and severally against each of the Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus the maximum civil penalty permitted for each violation of the Federal False Claims Act;

370.    That Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the Federal False Claims Act;

371.    That Relator be awarded all costs of this action, including all recoverable attorneys' fees and expenses; and

372.    That the United States and Relator recover such other and further relief as the Court deems just and proper.

107

## VIII.  **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Dated:  November 12, 2021

Respectfully submitted,


Melissa D. Fuller (La. Bar No. 33093)
melissa.fuller@formanwatkins.com
Chelsea E. Gaudin (La. Bar No. 37692)
cheslea.gaudin@formanwatkins.com
Forman Watkins & Krutz, LLP
201 St. Charles Ave., Suite 2100
New Orleans, LA  70170
Telephone: (504) 799-4383
Facsimile: (504) 799-4384

And

Peter W. Chatfield (admitted *Pro Hac Vice*)
peter@phillipsandcohen.com
John W. Tremblay (admitted *Pro Hac Vice*)
jtremblav@phillipsandcohen.com
PHILLIPS & COHEN LLP
2000 Massachusetts Avenue, NW
Washington, DC 20036
Tel: (202) 833-4567
Fax: (202) 833-1815

And

Emily Stabile (admitted *Pro Hac Vice*)
estabile@phillipsandcohen.com
PHILLIPS & COHEN LLP
100 The Embarcadero, Suite 300
San Francisco, CA 94105
Tel: (415) 836-9000
Fax: (415) 836-9001

*Attorneys for Relator*
Joshua Nemzoff

## CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2021, a copy of the above and foregoing pleading has been served upon all known counsel of parties to this proceeding via hand delivery, facsimile, electronic mail, and/or Federal Express or First Class U.S. mail, properly addressed and postage prepaid.

_MELISSA D. FULLER_

MELISSA D. FULLER

600624.1