UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF LOUISIANA

UNITED STATES *ex rel.* JOSHUA
NEMZOFF,

                Plaintiffs,


       v.


LOUISIANA CHILDREN'S MEDICAL
CENTER, INC., ET AL.,

                Defendants.

CIVIL ACTION No. 2:19-cv-11680 c/w
19-11682

SECTION: "P" (5)

JUDGE DARREL J. PAPILLION

MAG. JUDGE MICHAEL NORTH


**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' CONSOLIDATED
MOTION TO DISMISS SECOND AMENDED COMPLAINT'S "LINCCA" CLAIMS**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND................................................4

    I.     The federal government approves and funds Louisiana's LINCCA
          programs. ................................................................................................4

          A.     Medicaid financing programs are well known to the public and
                 involve close collaboration between the federal and state
                 governments. ...............................................................................4

          B.     News outlets follow CMS's approval of collaborative programs in
                 Louisiana and other states. ...........................................................6

          C.     CMS funds LINCCA programs and approves additional public-
                 private collaborations in Louisiana following issuance of the public
                 Mann Letter....................................................................................8

          D.     CMS maintains oversight of public-private programs throughout
                 the country and its post-Mann Letter reviews of such programs
                 were widely reported......................................................................9

    II.    After extensive public dialogue around LINCCA programs, Relator filed
          suit..........................................................................................................11

STATUTORY BACKGROUND....................................................................................12

LEGAL STANDARD....................................................................................................13

ARGUMENT ................................................................................................................14

    I.     The FCA's Public Disclosure Bar requires dismissal of Relator's LINCCA
          claims. ..................................................................................................14

          A.     Essential components of Relator's allegations regarding LINCCA
                 programs were publicly disclosed in qualifying sources. ...........16

          B.     Relator's allegations are "based upon" the public disclosures. .................17

                1.     Public disclosures in news articles bar Relator's LINCCA
                       claims. ............................................................................18

                 2.     Public disclosures in Federal Reports bar Relator's
                       LINCCA claims. ............................................................21

                 3.     Public disclosures in a federal administrative proceeding
                       bar Relator's LINCCA claims. ......................................23

C.     Relator cannot avoid the public disclosure bar because he is not an original source for the SAC's allegations related to LINCCA programs. ...................................................24

     1.     Relator lacks independent knowledge that materially adds to the public disclosures..................................................25

     2.     Relator failed to make the required voluntary disclosure. ............27

II.     The SAC fails to plead an FCA Claim related to LINCCA programs..................28

A.     The SAC fails to plausibly allege a fraudulent scheme related to LINCCA programs under Rule 8(a). ..........................................................28

B.     The SAC fails to plead with particularity any fraudulent scheme related to LINCCA programs under Rule 9(b). .........................................29

     1.     The SAC does not plead with particularity either a false claim or a scheme to defraud related to LINCCA programs. ........30

     2.     Relator's generalized allegations and group pleading are insufficient to satisfy Rule 9(b) with respect to any Defendant..................................................................32

C.     The SAC fails to plead a reverse FCA claim related to LINCCA programs. .................................................................................................33

III.     The SAC fails to plead materiality as to LINCCA programs. ...............................34

IV.     The SAC fails to plead scienter in connection with LINCCA programs..............36

V.     The SAC fails to plead a conspiracy related to LINCCA programs.....................38

VI.     The State is an indispensable party to the LINCCA claims and cannot be joined...................................................................................................................38

VII.     The Court should dismiss Relator's LINCCA claims with prejudice...................40

CONCLUSION............................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allison Engine Co. v. United States ex rel. Sanders*,
553 U.S. 662 (2008)............................................................................12

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................................................................27, 28, 29

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)............................................................................13

*United States ex rel. Bennett v. Medtronic, Inc.*,
747 F. Supp. 2d 745 (S.D. Tex. 2010) ..............................................31

*United States ex rel. Black v. Health & Hospital Corp.*
494 F. App'x 285 (4th Cir. 2012)......................................................22

*United States ex rel. Colquitt v. Abbott Lab'ys*,
2015 WL 13670916 (N.D. Tex. July 24, 2015).................................26

*United States ex rel. Colquitt v. Abbott Lab'ys*,
858 F.3d 365 (5th Cir. 2017) ......................................................15, 24

*United States ex rel. Farmer v. Houston*,
523 F.3d 333 (5th Cir. 2008) ............................................................38

*United States ex rel. Frey v. Health Mgmt. Sys.*,
2023 WL 2563239 (S.D. Tex. Feb. 10, 2023) ..................................37

*United States ex rel. Fried v. W. Indep. Sch. Dist.*,
527 F.3d 439 (5th Cir. 2008) ............................................................17

*Gonzalez v. Fresenius Med. Care N. Am.*,
689 F.3d 470 (5th Cir. 2012) ............................................................12

*Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*,
559 U.S. 280 (2010)....................................................................12, 15

*United States ex rel. Graves v. ITT Tech. Inst.*,
284 F. Supp. 2d 487 (S.D. Tex. 2003) ..............................................38

*United States ex rel. Grubbs v. Kanneganti*,
565 F.3d 180 (5th. Cir. 2009) ..............................................30, 31, 33

*United States ex rel. Gudur v. Deloitte & Touche*,
2008 WL 3244000 (5th Cir. Aug. 7, 2008)............................................................12

*United States ex rel. Guth v. Roedel Parsons Koch Blache Balhoff & McCollister*,
2014 WL 7274913 (E.D. La. Dec. 18, 2014)........................................................29

*United States ex rel. Hendrickson v. Bank of Am., N.A.*,
343 F. Supp. 3d 610 (N.D. Tex. 2018), *aff'd*, 779 F. App'x 250 (5th Cir. 2019)..17, 27, 28, 37

*Herrmann Holding Ltd. v. Lucent Tech. Inc.*,
302 F.3d 552 (5th Cir. 2002) ...............................................................................40

*Hooker v. Dallas Indep. Sch. Dist.*,
2010 WL 4025776 (N.D. Tex. Sept. 13, 2010)......................................................3

*United States ex rel. Integra Med. Analytics v. Scott*,
No. 17-cv-886, 2019 WL 3713756 (W.D. Tex. Aug. 5, 2019), *aff'd*, 816 F. App'x 892 (5th Cir. 2020)...............................................................................................29

*United States ex rel. Jackson v. Ventavia Rsch. Grp.*,
2023 WL 2744394 (E.D. Tex. Mar. 31, 2023) ......................................................36

*United States ex rel. Jamison v. McKesson Corp.*,
649 F.3d 322 (5th Cir. 2011) .....................................................................17, 24, 25

*United States ex rel. Lam v. Tenet Healthcare Corp.*,
481 F. Supp. 2d 673 (W.D. Tex. 2006)...................................................................3

*Lang v. DirecTV, Inc.*,
735 F. Supp. 2d 421 (E.D. La. 2010) ...................................................................32

*Lee v. Anthony Lawrence Collection, L.L.C.*,
47 F.4th 262 (5th Cir. 2022) ....................................................................38, 39, 40

*Martin v. Tesoro Corp.*,
2012 WL 1866841 (W.D. La. May 21, 2012) .......................................................32

*United States ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*,
519 F. App'x 890 (5th Cir. 2013) .........................................................................32

*United States ex rel. O'Neill v. Gopalam*,
2023 WL 6396659 (M.D. La. Sep. 29, 2023) ..................................................34, 38

*United States ex rel. Patel v. Catholic Health Initiatives*,
792 Fed. App'x 296 (5th Cir. 2019) ......................................................................35

*United States ex rel. Petratos v. Genentech Inc.*,
855 F.3d 481 (3d Cir. 2017).................................................................................36

*United States ex rel. Porter v. HCA Health Servs. of Okla., Inc.*,
  2011 WL 4590791 (N.D. Tex. Sep. 30, 2011) ...................................................34

*United States ex. rel. Porter v. Magnolia Health Plan, Inc.*,
  810 Fed. App'x 237 (5th Cir. 2020) ..............................................................36

*United States ex rel. Rafizadeh v. Cont'l Common, Inc.*,
  553 F.3d 869 (5th Cir. 2008) .........................................................................30

*United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*,
  384 F.3d 168 (5th Cir. 2004) .........................................................................13

*Rockwell Int'l Corp. v. United States*,
  549 U.S. 457 (2007) ......................................................................................25

*Schindler Elevator Corp. v. U.S. ex rel. Kirk*,
  563 U.S. 401 (2011) ......................................................................................21

*United States ex rel. Schutte v. SuperValu Inc.*,
  143 S. Ct. 1391 (2023) ..................................................................................36

*United States ex rel. Scollick v. Narula*,
  215 F. Supp. 3d 26 (D.D.C. 2016) ................................................................33

*United States ex rel. Solomon v. Lockheed Martin Corp.*,
  878 F.3d 139 (5th Cir. 2017) .........................................................................15

*United States ex rel. Stewart v. The La. Clinic*,
  2002 WL 1066745 (E.D. La. May 28, 2002) .................................................13

*Tex. Health & Human Servs. Comm'n v. U.S. Dep't of Health & Human Servs.*,
  No. 19-cv-02857-S (N.D. Tex. Dec. 2, 2019) ...............................................10

*United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*,
  125 F.3d 899 (5th Cir. 1997) .........................................................................13

*Unimobil 84, Inc. v. Spurney*,
  797 F.2d 214 (5th Cir. 1986) .........................................................................32

*United States v. Medco Health Sols. Inc.*,
  777 F. App'x 30 (3d Cir. 2019) .....................................................................26

*United States v. Tex. Tech. Univ.*,
  171 F.3d 279 (5th Cir. 1999) .........................................................................39

*United States v. U.S. Oncology, Inc.*,
  No. 2023 WL 5831140 (E.D.N.Y. Sep. 8, 2023) ..........................................27

*Universal Health Services v. United States ex rel. Escobar*,
579 U.S. 176 (2016)..................................................................3, 34, 35, 36

*Vaughn v. Harris Cnty. Hosp. Dist.*,
2021 WL 8129737 (S.D. Tex. Aug. 4, 2021), *adopted in part by Vaughn v. Harris Cnty. Hosp. Dist.*, No. 17-cv-02749, 2022 WL 1165146 (S.D. Tex. Apr. 20, 2022).................22, 23

*Vaughn v. Harris Cnty. Hosp. Dist.*,
No. 17-cv-02749, 2022 WL 1165146 (S.D. Tex. Apr. 20, 2022)...........................3, 22, 23, 24

*Vaughn v. Harris Cnty. Hosp. Dist.*,
No. 22-20659 (5th Cir. Dec. 14, 2023) ............................................................2, 40

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens*,
529 U.S. 765 (2000)........................................................................................39

*United States ex rel. Wagda v. AT&T Corp.*,
2022 WL 2392473 (E.D. Cal. July 1, 2022) ....................................................40

*United States ex rel. Wagda v. Bank of America, NA*,
2022 WL 16551704 (E.D. Cal. Oct. 31, 2022).................................................40

*United States ex rel. Willard v. Humana Health Plan of Tex. Inc.*,
336 F.3d 375 (5th Cir. 2003) .............................................................................3

*United States ex rel. Williams v. C. Martin Co.*,
2012 WL 13014645 (E.D. La. Apr. 5, 2012) ....................................................33

*United States ex rel. Winkelman v. CVS Caremark Corp.*,
827 F. 3d 201 (1st Cir. 2016).............................................................................27

## STATUTES

31 U.S.C.
§ 3729(a)(1)(A)..........................................................................12, 36, 38
§ 3729(a)(1)(B)..........................................................................12, 36, 38
§ 3729(a)(1)(C).................................................................................38
§ 3729(a)(1)(G)................................................................................33
§ 3730(b)............................................................................................12
§ 3730(d)(2).......................................................................................12
§ 3730(e)(4)...........................................................................12, 15, 17
§ 3730(e)(4)(A).................................................................................13
§ 3730(e)(4)(B).................................................................................25

42 U.S.C.
§ 1396................................................................................................4
§ 1396b(w)(2)(B)..............................................................................5

# RULES

Fed. R. Civ. P.

    8..........................................................................................................3, 13, 14

    9(b)........................................................................................................... *passim*

    12(b)(6) ...............................................................................................1, 13

    12(b)(7) ....................................................................................1, 4, 38, 40

    19(a)(1)(B)(i) ................................................................................................39

    19(b)(2) ........................................................................................................40

    19(b)(4) ........................................................................................................40

# REGULATIONS

42 C.F.R.

    § 412.106......................................................................................................5

    § 430.1..........................................................................................................4

    § 430.30-430.48 ..........................................................................................4

    § 430.30(c)................................................................................................4, 6

    § 433.54......................................................................................................5

    § 433.54(c)..................................................................................................5

    § 433.74(a) ..................................................................................................6

Medicaid Fiscal Accountability Regulation, 84 Fed. Reg. 63722 (proposed Nov. 18, 2019)...1, 10

# OTHER AUTHORITIES

Seema Verma (@SeemaCMS), Twitter (Sept. 14, 2020, 4:45 PM),
    https://twitter.com/SeemaCMS/status/1305608634165010443..............................................11

Pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(7), all Defendants respectfully move to dismiss the Second Amended Complaint ("SAC") as it relates to Relator's theory of liability involving public-private Medicaid funding programs, SAC ¶¶ 33-34, §§ VI.B.3, VI.E, for failure to state a claim and failure to join an indispensable party.

## INTRODUCTION

This is a False Claims Act ("FCA") *qui tam* case related to programs created by the State of Louisiana to provide care to uninsured and underinsured patients. Over thirteen years ago, Louisiana introduced Low-Income and Needy Care Collaboration Agreement ("LINCCA") programs to enable the State and publicly-owned hospitals to collaborate with private hospitals in delivering care to indigent residents and maximize participating hospitals' receipt of Medicaid reimbursement. These programs, which Relator declares to be "fraudulent" and "unlawful," were created by the State of Louisiana and its hospitals with the approval of the federal government, the real party-in-interest in an FCA suit. LINCCA programs provide immense benefit to Louisiana hospitals, many of which were struggling to provide care following the devastation of Hurricane Katrina. The relevant federal agency, the Centers for Medicare and Medicaid Services ("CMS"), closely reviewed and repeatedly approved LINCCA programs, which were implemented through amendments to Louisiana's State Medicaid Plan approved by CMS. For the past thirteen years, CMS has engaged in an ongoing public dialogue with the State of Louisiana about the workings of these Medicaid-financing programs, and the programs have operated with uninterrupted funding from the federal government throughout this period. Indeed, in 2019, CMS released a short-lived proposed rule addressing the precise issue in Relator's complaint—the propriety of public-private collaborative programs such as LINCCA. CMS Proposed Rule, Medicaid Program; Medicaid Fiscal Accountability Regulation, 84 Fed. Reg. 63722 (proposed Nov. 18, 2019) ("CMS Proposed

Rule"). CMS subsequently withdrew the proposal and has taken no action in opposition of LINCCA programs. These facts are undisputed.

Despite mountains of public disclosures highlighting the workings of LINCCA programs and CMS's approval and continued funding of them, Relator filed this FCA action alleging that LINCCA programs are in fact a clandestine "scheme" to defraud the federal government. Relator even contends that the State of Louisiana—which coordinated directly with the federal government to develop the contractual agreements underlying LINCCA programs—took part in the alleged fraud, effectively framing the State as a non-party co-conspirator by claiming that Louisiana "work[ed] in concert" with Defendants in an effort to defraud the government. SAC ¶ 20. The federal government declined to intervene in this *qui tam* suit. ECF No. 34.

Relator's theory related to LINCCA programs fails and the SAC should be dismissed with prejudice on several independent grounds. First, Relator's FCA claims are barred by the statute's public disclosure bar, which prohibits a non-intervened *qui tam* lawsuit from proceeding when it is "substantially similar" to publicly disclosed information. Here, Relator filed his LINCCA claims after **ten years of disclosures** that publicized all essential elements of LINCCA programs and highlighted CMS's extensive knowledge of these programs. In fact, on December 14, 2023, the Fifth Circuit Court of Appeals affirmed dismissal with prejudice of nearly identical FCA claims, based on a near-identical collaborative program, under the public disclosure bar. *See* Ex. 1, *Vaughn v. Harris Cnty. Hosp. Dist.*, No. 22-20659 (5th Cir. Dec. 14, 2023). Consistent with the federal government's Statement of Interest filed in the district court and supporting dismissal under the public disclosure bar,[1] the Fifth Circuit held that news articles and other public disclosures

---

[1] The federal government filed its Statement of Interest in *Vaughn* six months before Relator filed his SAC. The *Vaughn* Relator—represented by the same lawyers representing Relator here—challenged a collaborative program in Texas as fraudulent under the FCA. Like the Fifth Circuit, the federal government reasoned that news articles and numerous other disclosures made public "the critical elements of the fraud"

made the "potentially fraudulent scheme" alleged "readily identifiable" and the FCA "complaint was substantially the same as allegations publicly disclosed." Ex. 1 at 9, 7. Fatally for Relator's claims, many of those same public disclosures, as well as several additional ones, similarly made his theory "readily identifiable."[2] His claims related to LINCCA should be dismissed in their entirety on this ground alone. *See* Argument § I.

Relator's case suffers from additional flaws requiring dismissal. To start, Relator describes the workings of LINCCA programs and the regulatory framework around Medicaid financing, and then, in conclusory fashion, casts Defendants' collective conduct as fraud. This pleading approach fails to state a plausible fraud, false claim, or reverse false claim under Federal Rule of Civil Procedure 8, much less with the specificity required by Rule 9(b). *See* Argument § II. The SAC fails to plead materiality, as required by the U.S. Supreme Court's decision in *Universal Health Services v. United States ex rel. Escobar*, 579 U.S. 176 (2016), in the face of CMS's (1) knowledge of LINCCA programs, (2) withdrawal of a proposed rule addressing the exact issues underlying Relator's suit, and (3) continued payments to hospitals participating in these programs. *See* Argument § II. The SAC also fails to plead that any Defendant knowingly defrauded the government by participating in programs known and approved by CMS. *See* Argument § IV. In

---

alleged, which were "that the defendant private hospitals paid for medical services provided at the [public] hospitals in order to free up funds for the [public entity] to use as IGTs to Texas Medicaid, resulting in the private hospitals receiving additional supplemental Medicaid funding." Ex. A, Statement of Interest, *Vaughn v. Harris Cnty. Hosp. Dist.*, No. 17-cv-02749 (S.D. Tex. May 14, 2021). The district court agreed and dismissed the relator's post-2010 FCA claims with prejudice. *Vaughn v. Harris Cnty. Hosp. Dist.*, 2022 WL 1165146, at *4 (S.D. Tex. Apr. 20, 2022) (Eskridge, J.), *aff'd Vaughn v. Harris Cnty. Hosp. Dist.*, No. 22-20659 (5th Cir. Dec. 14, 2023).

[2] The public sources cited in this Motion are referenced in the SAC or are public records subject to judicial notice. *United States ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 379 (5th Cir. 2003) ("In deciding a motion to dismiss the court may consider documents attached to or incorporated in the complaint and matters of which judicial notice may be taken."); *Hooker v. Dallas Indep. Sch. Dist.*, 2010 WL 4025776, at *10 (N.D. Tex. Sept. 13, 2010) (taking judicial notice of administrative agency opinion); *United States ex rel. Lam v. Tenet Healthcare Corp.*, 481 F. Supp. 2d 673, 680 (W.D. Tex. 2006) ("Courts have the power to take judicial notice of the coverage and existence of newspaper and magazine articles.").

addition, the SAC's FCA conspiracy count requires dismissal as it is devoid of factual allegations to support the claim. *See* Argument § V. And the SAC also fails under Rule 12(b)(7). Relator casts the State of Louisiana as a co-conspirator, essentially characterizing the State as a necessary and indispensable party to his action. But Relator cannot join the State to this action in light of the sovereign immunity protection Louisiana enjoys. *See* Argument § VI. For any or all of these reasons, the Court should dismiss with prejudice SAC Counts I-IV relating to LINCCA programs.

## FACTUAL AND PROCEDURAL BACKGROUND

**I.      The federal government approves and funds Louisiana's LINCCA programs.**

Detailed below is an overview of (A) Medicaid financing programs, (B) the establishment of LINCCA programs with CMS approval, (C) CMS's role in funding LINCCA programs, and (D) CMS's role in overseeing public-private programs throughout the country.

### A.      Medicaid financing programs are well known to the public and involve close collaboration between the federal and state governments.

State Medicaid programs, which provide healthcare coverage to millions of low-income Americans, are jointly funded by state and federal governments. *See* SAC ¶ 3; 42 C.F.R. § 430.30(c), 42 U.S.C. § 1396. CMS matches state contributions to the Medicaid program at a predetermined statutory rate. *See* SAC ¶ 3. The federal government's portion of a state's Medicaid program is called Federal Financial Participation ("FFP"). SAC ¶ 101 (citing 42 C.F.R. § 430.1). CMS must approve amendments to state Medicaid Plans, and it can defer or disallow FFP when it determines that a Medicaid program does not comply with federal law. 42 C.F.R. § 430.30-430.48.

In most states, including Louisiana, the amount of reimbursement healthcare providers receive is insufficient to cover the costs of providing care to Medicaid patients. *See* SAC ¶ 92. States narrow this gap by creating supplemental payment programs funded through a variety of financing mechanisms, including direct transfers of funds from local governments to the state

(referred to as intergovernmental transfers or "IGTs"). *See id.* ¶¶ 103, 105. One such program, the "UPL Program," allows states to make supplemental payments to participating providers that, together with federal matching funds, reimburse providers up to the "upper payment limit" ("UPL"), a federally established ceiling based on the amount that Medicare would pay for comparable services. *See id.* ¶¶ 93, 96-97. Another program, available for "Disproportionate Share Hospitals" ("DSH")—hospitals that treat a "significantly disproportionate" share of low-income Medicare or Medicaid patients—also permits supplemental reimbursement of qualifying providers' Medicaid and other uncompensated care costs. *See id.* ¶ 117; 42 C.F.R. § 412.106.

CMS governs how states may fund their share of supplemental Medicaid payments. *See* SAC ¶ 101. CMS regulations provide that the state may not fund its share of supplemental payments through "non-bona fide" donations from private Medicaid providers. *See* SAC ¶ 106. Bona fide donations are donations made to the state that have no direct or indirect relationship to Medicaid payments made to the provider donating the funds. 42 U.S.C. § 1396b(w)(2)(B). Donations are unrelated to a Medicaid payment if those donations are not returned to the donor or its affiliate under a hold harmless arrangement. 42 C.F.R. § 433.54. Non-bona fide donations, on the other hand, are those that are returned to the donating provider or a related entity "under a hold harmless provision or practice" as defined by the CMS regulations. *Id.*[3]

Each quarter, states report their Medicaid costs to the federal government on CMS Form 64. *See* SAC ¶ 101. Schedules to the CMS Form 64 contain fields where the state can list non-bona fide provider donations made to the state or local unit of government—including the state or

---

[3] A "hold harmless" practice exists if there is a "positive correlation" between the non-Medicaid payment and provider donation, the payment is "conditional" on receipt of a donation, or where the State "directly or indirectly guarantees" to return a provider's donation in the form of a Medicaid payment. 42 C.F.R. § 433.54(c).

local government's receipt of taxes and donations from healthcare providers. 42 C.F.R. §§ 430.30(c), 433.74(a). In calculating FFP, CMS can exclude provider donations determined to be non-bona fide or otherwise ineligible for matching FFP funds. *See* SAC ¶ 106.

**B.    News outlets follow CMS's approval of collaborative programs in Louisiana and other states.**

Because of the growing gap between Medicaid costs and the reimbursement available to healthcare providers, states have long worked with CMS to explore solutions to fund their Medicaid programs to provide quality care to low-income residents. *See id.* ¶ 333. As one example, in 2006, CMS approved the creation of public-private collaborations in Texas, allowing participating private hospitals to provide care for indigent patients in public facilities and thereby alleviate a cost burden on local public hospitals, which, in turn, enabled the participating public entities to transfer funds—through an IGT—to the state for the benefit of the private hospitals. *See* Ex B at 5-6. Both before and after approving these types of collaborative programs in Texas, CMS conducted comprehensive reviews of these programs' operations and compliance with federal laws regarding provider donations. *See id.* at 5-6, 7-8. In May 2008, Texas and CMS jointly developed a set of criteria, called the Conditions of Participation, to prospectively govern participation in collaborative programs statewide. *See id.* at 8; *see also* Ex. C at HHSC000147.

In 2009, the Louisiana Department of Health ("LDH" or "Louisiana") implemented its own public-private collaborations. *See* SAC ¶ 118. To do so, Louisiana proposed amendments to its State Medicaid Plan ("State Plan Amendments" or "SPAs") that would allow private hospitals in Louisiana to enter into a LINCCA with local public hospitals (or the affiliated governmental entity) to provide physician services to indigent patients at the public facilities. The LINCCA would make available for the participating private hospitals greater supplemental Medicaid reimbursement, funded in part by the money public hospitals saved by no longer providing indigent

care.  *See id.* ¶ 120; Exs. D-F, State Plan Amendments 09-55, 09-56, 10-26.  Louisiana expressly proposed to fund the State share of supplemental Medicaid payments with IGTs from public entities participating in LINCCA programs and agreed to provide certifications from the transferring governmental entities that the IGTs were voluntary.  *See* Exs. D-F.

In the ensuing months, Louisiana communicated directly and transparently with CMS about the purpose and operations of the proposed LINCCA programs.  *See* Ex. Q at 1.  Louisiana explained that the proposed LINCCA program model is "substantially similar to the one approved by CMS for Texas," meaning it would adhere to the CMS-approved Conditions of Participation. *Id*.  In its communications with CMS, Louisiana explained that through a LINCCA, "a governmental entity [] and a group of non-state and non-public hospitals" would "develop a plan for the Private Hospitals to reduce or alleviate the need for the governmental entity to provide care to the low income and needy patients . . . thereby allowing the governmental entity to utilize its public funds to increase support to the Medicaid program."  *Id.* at 2.  Following extensive discussions between Louisiana and CMS about LINCCA programs and Louisiana's detailed explanation of program mechanics, CMS approved the SPAs in October and November 2010, authorizing the very LINCCA programs that Relator challenges as "fraudulent" in the SAC. *See* SAC ¶ 118; Exs. D-F.

The press widely reported on the implementation of LINCCA programs, hailing them as a solution to the post-Katrina healthcare crisis that would provide residents' "increased and continued access to care" and offset the operating losses suffered by public and private hospitals throughout the State.  For example, in March 2011, Louisiana Governor Bobby Jindal announced LINCCA programs in a press release, stating that "[u]nder the LINCCA program, a public entity . . . partners with a private entity to take over the costs of providing services to low income

and needy patients," which "saves dollars for the public entity while also ensuring continued and improved access to care for the uninsured and Medicaid patients."  Ex. I (noting this program "free[d] up local and state funding" that could be "used to maximize available federal matching funds").  Various news outlets, including *The Advocate* and *Times-Picayune* published articles detailing the purpose, operations, and benefits of the programs.  *See, e.g.*, Exs. G-J.

> ### C. CMS funds LINCCA programs and approves additional public-private collaborations in Louisiana following issuance of the public Mann Letter.

LINCCA programs have operated throughout the State without interruption since CMS's approvals of Louisiana's SPAs in 2010.  *See* SAC ¶ 34; Ex. K.  According to public reporting, CMS conducted on-site reviews of LINCCA programs in 2012 without noting any concerns. Ex. L.  In 2014, CMS issued a letter by the then-Director of the Center for Medicaid and State Operations to all state Medicaid Directors questioning certain public-private collaborative programs.  *See* SAC ¶¶ 147-48; Ex. N, Cindy Mann, CMS State Medicaid Director Letter, SMDL No. 14-004 (May 9, 2014) ("Mann Letter").  The Mann Letter constitutes sub-regulatory guidance and was never codified in regulation or even proposed as a regulation.  Nevertheless, the contents of the Mann Letter confirmed that CMS understood how collaborative arrangements like Louisiana's LINCCA programs operated.  The Mann Letter reflected CMS's acute awareness as to how those programs complied with CMS regulations regarding provider donations. Specifically, the Mann Letter stated that "[g]overnment entities are free to enter into agreements with private entities," but that "such agreements *may* affect the allowability of Medicaid funding *if* there is a hold harmless provision or practice."  *Id.* at 1, 5 (emphasis added) (further stating that CMS would not "approve any SPAs or [Medicaid] waivers that include" non-bona fide provider donations).  News outlets across Louisiana reported on the significance and potential impact of the Mann Letter on LINCCA programs, as community stakeholders worried that CMS's concerns

about collaborative arrangements and provider donations could bring an end to LINCCA programs. *See, e.g.,* Ex. L. Similarly, the U.S. Government Accountability Office ("GAO") issued a 2014 report examining states' financing of the non-federal share of Medicaid and expressing "concerns" about such "financing arrangements." Ex. O (the "GAO Report").

Following the Mann Letter and Congress's express concerns about collaborative programs, Louisiana explained again to CMS the mechanics of LINCCA programs and why these programs do not run afoul of CMS regulations prohibiting non-bona fide provider donations. *See* Ex. R. CMS did not contest Louisiana's position. In fact, following its receipt of Louisiana's explanation, CMS continued its FFP payments to the State to help fund supplemental Medicaid payments for participating private hospitals. *See* Ex. B at 16.

In 2014 and 2016, CMS approved additional amendments to Louisiana's State Medicaid Plan, authorizing DSH payments to private hospitals that, similar to LINCCA programs, "provid[ed] services that were previously delivered and terminated or reduced by a state owned or operated facility." *See* Ex. S at 5. These additional amendments expressly provided for the continuation of LINCCA programs implemented in connection with the 2010 SPAs. *See e.g.,* Ex. S at 5 (authorizing Medicaid payments to hospitals "providing services [] previously delivered and terminated or reduced by a state owned and operated facility").

D.    **CMS maintains oversight of public-private programs throughout the country and its post-Mann Letter reviews of such programs were widely reported.**

Consistent with its federal regulatory authority, CMS oversees public-private programs across the United States. While CMS has never challenged LINCCA programs that are the predicate for Relator's suit, CMS has since 2017 been engaged in an administrative dispute with Texas regarding certain of its collaborative programs. *See* SAC ¶¶ 335-37. After CMS issued a disallowance in 2016 based on the collaborative programs in just two counties, Texas appealed

CMS's decision to the Departmental Appeals Board ("DAB") of the United States Department of Health and Human Services. *See* SAC ¶ 337. Key filings in the DAB proceeding further illustrate CMS's knowledge and approval of LINCCA programs. For example, in its appeal, Texas explained that CMS reviewed and approved the collaborative programs with full knowledge of their operations and insisted that they complied with federal law. *See* Ex. B at 34. Texas, as well as private hospitals who participated in the collaborative programs, further argued that CMS had taken inconsistent positions on the legality of the public-private collaborations, with the private hospitals citing CMS's continued approval of LINCCA programs as an example. *See id.* at 35-36. In response to the arguments about CMS's continued approval of LINCCA programs, CMS stated that "CMS [has] not made findings that the other states' programs are in violation of § 1903(w)." *See* Ex. T at 35. In August 2018, the DAB affirmed CMS's 2016 disallowance. SAC ¶ 335. Texas appealed and the matter is still pending. Compl., *Tex. Health & Human Servs. Comm'n v. U.S. Dep't of Health & Human Servs.*, No. 19-cv-02857-S (N.D. Tex. Dec. 2, 2019).

In the midst of this dispute, CMS released a proposed rule on the issues underlying the SAC: provider-related donations and the funding of UPL and DSH payments. CMS Proposed Rule, 84 Fed. Reg. 63722. According to CMS, the Proposed Rule was necessary to "clarify[] the regulatory language" that "could benefit from additional specificity," and "provide more clarity on allowable financing arrangements." CMS Proposed Rule. Hospitals, healthcare providers and associations, and state and local governmental entities—including Louisiana's Medicaid agency—collectively submitted over 4,000 comments in opposition to the CMS Proposed Rule, challenging the Proposed Rule as a departure from CMS's historical policy and practice of approving collaborative programs.

In September 2020, then-CMS Administrator Seema Verma announced that CMS was "withdrawing the [Proposed Rule] from the regulatory agenda," citing the concerns of state and private stakeholders. Seema Verma (@SeemaCMS), TWITTER (Sept. 14, 2020, 4:45 PM), https://twitter.com/SeemaCMS/status/1305608634165010443 ("We've listened closely to concerns that have been raised by our state and provider partners about potential unintended consequences of the proposed rule, which require further study."). In the over three years since CMS's withdrawal of its Proposed Rule, CMS has made no further attempts to "clarify" the regulatory framework underlying the SAC's LINCCA allegations and it has continued to fund LINCCA programs.

## II.     After extensive public dialogue around LINCCA programs, Relator filed suit.

On July 15, 2019, Relator filed this FCA suit purportedly on behalf of the federal government. Filed against just a handful of Defendants named in the SAC, Relator's original complaint focused on advance payments to lease healthcare facilities from Louisiana State University ("LSU"), which he alleged were improperly used by LSU to fund IGTs to the State. *See* ECF No. 1. Relator's First Amended Complaint ("FAC"), filed on October 31, 2019, introduced a handful of allegations against mostly unspecified "Doe" defendants relating to LINCCA programs. *See* FAC ¶¶ 14-15, 31-32, 112-26, 276-84. Two years later, on November 22, 2021, Relator filed this SAC, adding 19 new defendants. *See* SAC ¶ 1. While the SAC continues to focus on lease payments (*id.* ¶¶ 217-312) (addressed in a separate motion to dismiss), it additionally theorizes that LINCCA programs constitute an unlawful scheme to increase Medicaid payments to participating private hospitals. *See id.* ¶¶ 313-43. Significantly, Relator concedes that he "is not aware of the specific details" underlying his allegations related to LINCCA programs. *Id.* ¶ 323.

On July 19, 2023, the United States declined to intervene, and the case was unsealed. *See* ECF Nos. 34, 35. Relator nonetheless decided to proceed with this action, even though the federal government has, in administrative litigation and in FCA suits, acknowledged its extensive knowledge of and familiarity with LINCCA and other collaborative programs.

## STATUTORY BACKGROUND

The FCA imposes liability on individuals who defraud the Government by submitting "a false or fraudulent claim for payment or approval" of government funds or make a "false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)-(B). The FCA requires a relator to plead sufficiently four elements: "(1) whether there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim)." *Gonzalez v. Fresenius Med. Care N. Am.*, 689 F.3d 470, 475 (5th Cir. 2012) (citation omitted). The FCA is not "an all-purpose antifraud statute," *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 672 (2008), and it is "not the appropriate vehicle for policing regulatory compliance." *United States ex rel. Gudur v. Deloitte & Touche*, 2008 WL 3244000, at *2 (5th Cir. Aug. 7, 2008).

In order to incentivize "whistle-blowing insiders with genuinely valuable information" to come forward, Congress authorized certain individuals—relators—to file civil actions under the FCA on behalf of the federal government, and to keep up to thirty percent of any damages awarded. *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 294 (2010); 31 U.S.C. § 3730(b), (d)(2). However, Congress did not want to reward "opportunistic plaintiffs who [fail] to contribute meaningfully," *Graham County*, 559 U.S. at 294, and so it enacted the FCA's public disclosure bar, which prevents individuals from pursuing *qui tam* actions where the basic allegations underlying the complaint are already known. 31 U.S.C. § 3730(e)(4).

That bar requires courts to dismiss any action where the relator's core allegations were previously publicly disclosed and the relator is not an "original source" of those allegations.

## LEGAL STANDARD

Under Federal Rules of Civil Procedure 12(b)(6) and 8, a court must dismiss a complaint that fails to "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6), Fed. R. Civ. P. 8. To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is not plausible if there is an "obvious alternative explanation." *Id.* at 567. While well-pleaded facts are accepted as true for the purpose of deciding a motion to dismiss, "conclusory allegations" of illegal conduct are insufficient. *Id.* at 565.

FCA claims are additionally subject to Rule 9(b)'s heightened pleading standard, which requires that the fraud giving rise to FCA liability be stated with "particularity." *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997). FCA pleadings containing "allegations that lump all defendants together, failing to segregate the alleged wrongdoing of one from those of another, do not satisfy [Rule 9(b)]," because such pleadings "do not state with particularity what representations each defendant made." *United States ex rel. Stewart v. The La. Clinic*, 2002 WL 1066745, at *2 (E.D. La. May 28, 2002) (citations and quotations omitted).

An FCA claim is further subject to dismissal if it fails under the public disclosure bar. 31 U.S.C. § 3730(e)(4)(A). The Court should address Defendants' public disclosure bar argument as a Rule 12(b)(6) motion, but it may elect to treat it as a motion for summary judgment. *See, e.g.*, *United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 384 F.3d 168, 173 (5th Cir. 2004) (public disclosure bar argument is "'necessarily intertwined with the merits'" and can be treated as a motion for summary judgment (citation omitted)).

**ARGUMENT**

Relator's LINCCA allegations simply describe the workings of a publicly disclosed public-private collaborative program. The SAC fails to set forth an actionable FCA claim for several independent reasons. *First*, the FCA public disclosure bar prohibits Relator's LINCCA claims, which are substantially similar to—and in fact expressly mimic—qualifying disclosures in myriad public sources. The Fifth Circuit's recent on-point decision in *Vaughn*, along with other FCA public disclosure precedent, strongly militate in favor of dismissal of Relator's claims as barred. *See* Argument § I. *Second*, Relator does not plead a plausible fraudulent claim or scheme to commit fraud by any Defendant related to LINCCA programs under Rule 8 or the more exacting standard of Rule 9(b)—Relator does not identify a single claim (false or otherwise) submitted to the government or how such claim would theoretically be submitted in connection with LINCCA programs. *See* Argument § II. *Third*, Relator cannot plead materiality given CMS's knowledge and repeated approval of LINCCA programs and continuous, uninterrupted payments to LINCCA program participants. *See* Argument § III. *Fourth*, Relator fails to plausibly allege that any Defendant knowingly submitted a false claim, caused a false claim to be submitted, or participated in a scheme to submit false claims related to LINCCA. *See* Argument § IV. *Fifth*, Relator's conspiracy claim should be dismissed because Relator has not alleged any plausible FCA violation or the required elements of a conspiracy. *See* Argument § V. *Finally,* Relator fails to join the state of Louisiana, an indispensable party in this suit. *See* Argument § VI. Counts I-IV, as they relate to Defendants' participation in LINCCA programs, should be dismissed.

**I.      The FCA's Public Disclosure Bar requires dismissal of Relator's LINCCA claims.**

As a threshold matter, the public disclosure bar requires dismissal of Relator's claims regarding "unlawful" LINCCA programs premised on non-bona fide provider donations because qualifying sources disclose "substantially the same allegations or transactions" alleged in the SAC

and Relator is not an "original source" of the information. 31 U.S.C. § 3730(e)(4). Relator is the exact kind of "opportunistic late-comer" that the public disclosure bar is designed to ward off. *United States ex rel. Solomon v. Lockheed Martin Corp.*, 878 F.3d 139, 143 (5th Cir. 2017) (public disclosure bar "promote[s] private citizen involvement in fraud exposure while also preventing parasitic suits by opportunistic late-comers who add nothing to the exposure of fraud" (citation omitted)); *Graham Cnty.*, 559 U.S. at 295 (2010) (public disclosure bar "strike[s] a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits").

The Fifth Circuit utilizes a three-part test to determine whether the public disclosure bar applies: (1) whether there has been a public disclosure of the factual allegations or transactions, (2) whether the *qui tam* action is based upon such publicly disclosed allegations or transactions, and (3) if so, whether the relator is the original source of the information. *United States ex rel. Colquitt v. Abbott Lab'ys* (*Colquitt I*), 858 F.3d 365, 373 (5th Cir. 2017). The SAC's claims related to LINCCA programs fail each prong.

Applying this same three-part test, the Fifth Circuit recently affirmed dismissal of nearly-identical FCA claims—brought by the same relator's counsel—on public disclosure grounds. Ex. 1. As here, the relator in *Vaughn* alleged FCA violations based on a public-private collaborative program widely reported and known to the federal government. The Fifth Circuit, district court, and federal government all agreed that the alleged "scheme" to "collect[] payments deemed to be 'donations,' from private hospitals and submit[] that payment as being entitled . . . to receive federal matching funds," Ex. 1 at 2, was publicly disclosed, and "[n]one of the purportedly non-public information alleged by [relator] 'materially adds' to the publicly disclosed allegations." *Id.* at 10. As in *Vaughn*, news articles, federal reports, and administrative proceedings long ago

15

publicly disclosed Relator's LINCCA allegations. And because Relator does not have "independent" knowledge that "materially adds" to the public information, his claims are barred.

A. **Essential components of Relator's allegations regarding LINCCA programs were publicly disclosed in qualifying sources.**

Relator's apparent theory of liability contends that, in some unspecified way, Defendants' participation in LINCCA programs resulted in "the use of non-bona fide provider donations" to fund supplemental Medicaid payments to participating private hospitals. SAC VI.E. Rather than explain why LINCCA programs are supposedly unlawful or how these programs result in non-bona fide provider donations, Relator merely describes the workings of LINCCA programs, SAC ¶¶ 33, 317-18, summarizes CMS's concerns about collaborative programs in other states, *id.* ¶ 313, and peppers his pleadings with generalized references to "donations," *see id.* ¶¶ 315-320 (referring to "donating private hospitals" and "donating private healthcare providers").

But, for more than a decade, public information about LINCCA programs and their objective of "freeing up" local governmental funds to increase the non-federal share of UPL payments for participating hospitals has remained widespread. Since at least 2010, numerous public sources have detailed the purpose and operations of LINCCA programs, as well as CMS's repeated review and approval of these programs. Critically, these sources disclosed that CMS was evaluating similar programs in Texas to consider whether they involved non-bona fide provider donations—effectively reporting Relator's exact theory of fraud.

Attached as Exhibits G-T are the myriad qualifying disclosures of Relator's allegations about LINCCA programs and the possibility that they involve non-bona fide donations: (1) news articles detailing the implementation of LINCCA programs in Louisiana and CMS's concerns regarding similar programs in Texas; (2) federal reports describing collaborative arrangements and the government's concerns about such arrangements and possible non bona-fide donations; and

(3) filings in the federal administrative proceeding before the DAB, which include CMS's continued support of LINCCA programs. This extensive body of information constitutes qualifying public disclosures as enumerated in the statute. *See* 31 U.S.C. § 3730(e)(4) (barring claims publicly disclosed in "the news media," a "congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation," or "[f]ederal criminal, civil, or administrative hearing in which the Government or its agent is a party").

**B.  Relator's allegations are "based upon" the public disclosures.**

Relator's allegations pertaining to LINCCA programs are "based upon"—or substantially similar to—the public disclosures indexed at Exhibits G-T. *See United States ex rel. Hendrickson v. Bank of Am., N.A.,* 343 F. Supp. 3d 610, 623 (N.D. Tex. 2018) ("[C]ourts considering the term 'based upon' interpreted it to mean 'substantially the same.'" (citation omitted)). For purposes of this element of the public disclosure bar, the public information need not disclose each of Relator's allegations or facts supporting his fraud theory—Relator's claims fail if they are "even partly based upon public allegations or transactions." *United States ex rel. Fried v. W. Indep. Sch. Dist.*, 527 F.3d 439, 442 (5th Cir. 2008) (relator's suit was "based on publicly disclosed information," because "[e]ven if [the relator] uncovered some nuggets of new, *i.e.*, non-public, information, his claims of fraud are based at least in part on allegations already publicly disclosed"). Indeed, so long as the public information is sufficient to "'set the [G]overnment on the trail of the fraud' and ensure that the [G]overnment will not 'need to comb through myriad transactions performed by various types of entities in search of potential fraud,'" Relator's claims are barred. *United States ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 329 (5th Cir. 2011) (citation omitted).

This standard is easily satisfied here. Relator's essential allegations related to LINCCA programs were disclosed in public news reporting, federal reports, and the DAB proceeding long before Relator filed these claims. *See* Exs. G-T.

1. **Public disclosures in news articles bar Relator's LINCCA claims.**

Relator's core allegation that, through LINCCA programs, private hospitals "***took over***" expenses previously borne by neighboring public hospital[s]" and "the public entities used the ***freed up*** hospital funds" to maximize private hospitals' Medicaid UPL payments, SAC ¶ 33, was widely known years before Relator brought these claims. Public news articles dating back to 2011, more than eight years before Relator first filed this lawsuit, detail this essential function of LINCCA programs, that private and public hospitals, consultants, and non-profit entities were involved, and the possibility that these programs could implicate CMS regulations on provider donations. *See* Index to the Declaration of Abid R. Qureshi (listing public disclosures). For example, using near-identical language to the SAC, a March 2011 article in *States News Service* reported on Governor Jindal's press release related to LINCCA, stating that "LINCCA agreements between private hospitals and public state and local hospitals and hospital districts allow private hospitals to ***take on services*** for low-income and needy patients with federal funds, which ***frees up local and state funding***. The money can be used to ***maximize available federal matching funds through the Upper Payment Limit (UPL) program*** in Medicaid." Ex. I (emphasis added). Numerous other articles from 2011 repeated the same language. *See* Ex. G at 1 ("Under the [LINCCA] program, non-profit coalitions of private hospitals agree to ***take over*** certain health care services ***previously paid for*** totally with state or local . . . dollars" and "[t]he arrangements ***free up*** state and local health-care dollars that then can be used to bring in several times the amount in additional federal dollars." (emphasis added)); Ex. H at 2 (LINCCA "allow[s] the private nonprofits to perform services ***previously provided by the state***, which ***frees up*** general fund dollars for the [FFP] match." (emphasis added)).

Similarly well-publicized was the fact that Louisiana's LINCCA programs were "substantially influenced by, or patterned closely after, similar programs . . . introduced in Texas

and other states," SAC ¶ 333, and that CMS had challenged the similar public-private arrangements in Texas, *id.* ¶ 335. Just as Relator asserts that CMS's challenges to collaborative programs in Texas and elsewhere "put[] Defendants on actual and/or fair constructive notice that the United States regards [LINCCA programs] as unlawful and fraudulent," public news articles questioned whether CMS's actions against other states' collaborative programs jeopardized LINCCA programs. For example, an October 2014 article in *The Advocate* echoed Relator's allegation that CMS's administrative actions against collaborative programs in Texas could implicate LINCCA programs. *See* Ex. M at 1-2 ("The federal [G]overnment postponed Medicaid payments to 57 Texas hospitals over questions about a financial scheme **similar to one that Louisiana adopted**. . . Under the federal microscope is an arrangement Texas uses, **which is similar to Louisiana's $400 million Low Income and Needy Care Collaboration Agreements**." (emphasis added)). Additionally, a May 2014 article in *The Advocate* questioned whether the Mann Letter, which set forth CMS's concerns that certain public-private collaborations could constitute improper non-bona fide provider donations, portended the end of LINCCA programs. *See* Ex. L at 1-2 ("CMS outlined what states shouldn't be doing and threatened to demand the repayment of dollars where warranted. In a nutshell, Louisiana did many of the things warned against by CMS, possibly foreshadowing another pricey unpinning of the state's financial structures for health care programs."). Accordingly, numerous public news articles dating back to 2011 disclose both the essential elements of LINCCA programs alleged as problematic in the SAC, as well as the possibility that LINCCA programs might be subject to CMS's challenges in light of the CMS's scrutiny of other similar collaborative programs.

These same articles additionally disclosed Defendants' participation in LINCCA programs. Defendants are New Orleans- and Baton Rouge-area private hospitals and their employees, a

consulting group (Defendant United Professionals Company, LLC or "UPC"), and a law firm (Gjerset & Lorenz LLP or "Gjerset") alleged to have helped establish and administer LINCCA programs. A March 2011 *Times Picayune* article disclosed that the "first round" of UPL payments arising from LINCCA programs "flowed mainly to hospitals in the New Orleans area" while "the latest payments [we]re being spread around the [S]tate." Ex. J at 1. Another March 2011 article in *The Advocate* referenced Defendants Ochsner and Louisiana Children's by name, stating that they received approximately $8 million each in initial UPL payments as part of the program. *See* Ex. H at 3; *see also* Ex. I (reporting Governor Bobby Jindal's March 2011 press release about LINCCA programs and quoting Defendant Pat Quinlan). In April 2011, yet another *Times Picayune* article reported the involvement of Defendants UPC and Gjerset, explaining that "[t]he Parish Council has hired United Professionals Company, an affiliate of the Sisung Group, to create and manage the private Upper Payment Limit program at both Jefferson public hospitals. Basing their work on similar programs in Texas, United Professionals and the parish have partnered with the Texas law firm Gjerset & Lorenz." Ex. K at 2.

Together, these news articles readily satisfy the "substantially similar" test. They collectively disclose: (1) the mechanics of LINCCA programs, *i.e.,* that private hospitals provide services to low income patients and thereby "free[] up some funds being spent (by public entities) so they could be transferred to Medicaid and used for match," (2) that LINCCA programs are "patterned after" collaborative programs in Texas, (3) that programs like LINCCA "will be scrutinized to determine if they are improper and not donations by bona fide providers," and (4) with LINCCA programs, "Louisiana did many of the things warned against by CMS." *See* Ex. L. Moreover, these articles identify several Defendants by name and disclose that a LINCCA program was in place in New Orleans and throughout the State.

The Fifth Circuit affirmed dismissal of the analogous *Vaughn* suit—which alleged FCA violations related to a nearly identical collaborative program in Texas—based on similar public news articles. The Fifth Circuit held that "the information publicly available prior to Vaughn's FCA complaint was sufficient to set the government on the trail of fraud" where, as here, news articles disclosed (1) how collaborative programs generally operate, (2) that such programs existed throughout Texas, and (3) that the government questioned the legality of certain programs based on the relator's same theory of fraud. Ex. 1 at 7-9. Rejecting the relator's argument that the disclosures need to allege "the way in which the [d]efendants perpetrated the fraud," the Fifth Circuit held that the complaint was "barred by the public disclosure bar" because it was "substantially the same" as the information in the public domain. *Id.* at 7.

### 2. Public disclosures in Federal Reports bar Relator's LINCCA claims.

Federal reports also disclosed the federal government's concerns about LINCCA programs. First, the notion that LINCCA programs might involve non-bona fide provider donations and a quid pro quo arrangement was detailed in the Mann Letter years before Relator filed suit. *See Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 563 U.S. 401, 407-08 (2011) (holding that a federal report is broadly defined as "something that gives information"). The Mann Letter sets forth the federal government's position and awareness of programs similar to LINCCA, "where governmental entities and private entities enter into agreements or relationships," which CMS believed might "constitute non-bona fide provider-related donations, in which private entities provide a governmental entity with funds or other consideration and receive in return additional Medicaid payments typically in the form of a supplemental payment." Ex. N at 1. Relator's theory of fraud is based on the notion that CMS had concerns regarding the legality of LINCCA programs. *See, e.g.*, SAC ¶ 341. Problematically for Relator, the Mann Letter made public these precise CMS concerns:

> A hold harmless practice exists if there is a positive correlation between the agreement and the Medicaid payments, Medicaid payments are conditioned upon receipt of a donation from a private entity, or if there is a guarantee that the private entity will see a return of some, or all, of that donation through a Medicaid payment[.]

*Id.* ¶ 147 (quoting the Mann Letter). Relator's pleading in fact quotes the Mann Letter, making clear that it is not only "substantially similar to," but in fact "*based upon*" this public disclosure.

A second federal report, issued by the GAO in July 2014, echoes Relator's contention that public-private collaborations allow the state to "shift large shares of Medicaid costs to health care providers and local governments." Ex. O at 2. It further confirmed that Louisiana was increasingly relying on programs like LINCCA to fund the State's share of Medicaid. *Id.* at 24.

Courts have dismissed other *qui tam* cases based on analogous public disclosures. For example, the Magistrate Judge in *Vaughn* found that the Mann Letter constituted a public disclosure and contributed to the "very essence" of the FCA allegations regarding the collaborative program being "in the public domain." *Vaughn v. Harris Cnty. Hosp. Dist.*, 2021 WL 8129737, at *11 (S.D. Tex. Aug. 4, 2021) (citation omitted), adopted by 2022 WL 1165146. Additionally, in *United States ex rel. Black v. Health & Hospital Corporation*, the Fourth Circuit affirmed dismissal of a *qui tam* complaint alleging FCA liability based on Indiana's alleged use of a certain set of "loopholes" to increase its Medicaid reimbursements from the federal government. 494 F. App'x 285, 293-97 (4th Cir. 2012). The court emphasized that the "robust public discussion about the propriety of the UPL/IGT mechanism" adequately "put the Federal Government on notice of a potential fraud," and the relator's allegations of impropriety about the funding mechanism tracked disclosures in government documents and the record of a proposed rule that would have curtailed the states' use of the scheme alleged in the complaint. *Id.* at 294-97 (rejecting argument that "general observations about Medicaid reimbursement made by the GAO and Congress" were insufficient compared to the "highly specific allegations" in relator's complaint (citation omitted)).

### 3. Public disclosures in a federal administrative proceeding bar Relator's LINCCA claims.

As described above, the Mann Letter and CMS's subsequent disallowance of funds in two Texas counties triggered a years-long dispute between CMS and Texas regarding the legality of the collaborative programs upon which LINCCA programs were modeled. In 2017, Texas initiated a federal administrative proceeding before the DAB to contest CMS's 2016 disallowance of funds paid to private hospitals in two Texas counties. The DAB proceeding—which Relator cites to allege fraud as to LINCCA programs—provides yet another set of qualifying public disclosures. *See* SAC ¶ 335 ("CMS has already challenged one such arrangement of precisely this nature, set up by public and private hospitals in Dallas. CMS's invalidation of such a plan has been confirmed by the [DAB]."); *id.* ¶¶ 336-337, 340.

The extensive record in the administrative DAB proceeding provides a comprehensive history of collaborative programs in Texas and Louisiana, and details CMS's concerns about impermissible provider donations arising from public-private collaborations. *See, e.g.*, Ex. P at 16 ("The Louisiana programs CMS authorized in 2010 are still operating today, after CMS performed substantial onsite auditing of the programs in 2012."); *id.* ("CMS also reapproved the Louisiana 2010 SPAs in December 2014 . . . after specifically asking Louisiana about the impact of the [Mann Letter] on those 2010 programs.").

In *Vaughn*, the government acknowledged that similar FCA allegations about near-identical collaborative programs were "based upon" filings in the *same* DAB proceeding. *See* 2022 WL 1165146, at *2. Though the disallowance at issue in the DAB proceeding related to a different collaborative program than the one at issue in *Vaughn*, the government noted that the administrative record reflected CMS's far-reaching concerns, which extended to similar collaborative programs beyond those in the DAB proceeding. *See* Ex. A; *Vaughn v. Harris Cnty.*

*Hosp. Dist.*, 2021 WL 8129737 at \*11, adopted in part by *Vaughn*, 2022 WL 1165146 ("The [DAB] proceedings generated significant disclosures relevant to the [collaborative p]rogram."). In this case, the disclosures from the DAB proceeding—which describe the mechanics of LINCCA programs and detail CMS's review and continued approval of LINCCA programs, including in the years following the Mann Letter—similarly require dismissal of Relator's LINCCA claims. *See Vaughn*, 2022 WL 1165146, at \*4.

In sum, myriad qualifying public disclosures related to the workings of LINCCA programs suffice to "set the [G]overnment on the trail of fraud" here. *Jamison*, 649 F.3d at 239 (citation omitted) (relator's complaint was "based upon" or substantially similar to public disclosures that "provided specific details about the fraudulent scheme and the types of actors involved in it" (citation omitted)). Even the SAC's details regarding the specific names of non-profits involved in LINCCA programs and an assumption of cost of specific services (SAC ¶¶ 316, 318, 323), were already disclosed. *See, e.g.*, Ex. G at 1 ("[N]on-profit coalitions of private hospitals agree to take over certain health-care services previously paid for totally with state or local public . . . dollars."); Ex. Q at 2 ("Hospitals will enter into their own arrangements (contractual or otherwise) with the individuals or entities who provide care directly to low income and needy patients, including individuals or entities that had previously provided low income and needy care services to the governmental entity."). Case law makes clear that "[c]ontributing more of the same does not change the public character of relator's allegations." *Colquitt I*, 858 F.3d at 374 (dismissing relator's claim under the public disclosure bar).

### C. Relator cannot avoid the public disclosure bar because he is not an original source for the SAC's allegations related to LINCCA programs.

Because Relator's allegations related to LINCCA mimic extensive disclosures already in the public domain, he can only avoid dismissal if he qualifies as an original source of the

information in the SAC. There are two alternative tests for qualifying as an original source: (1) the relator must have voluntarily disclosed the information on which the publicly disclosed allegations are based "to the Government" "***prior to a public disclosure,***" or (2) the relator must "ha[ve] knowledge that is ***independent of and materially adds*** to the publicly disclosed allegations or transactions" ***and*** "has voluntarily provided the information to the Government ***before filing an action***." 31 U.S.C. § 3730(e)(4)(B) (emphasis added).

Given that the public disclosures at Exhibits G-T (and described in Argument Sections I.A and I.B) all predate Relator's claims related to LINCCA—most by several years—Relator cannot show that he voluntarily disclosed the information "prior to a public disclosure." 31 U.S.C. § 3730(e)(4)(B). Accordingly, Relator can only qualify as an original source if he demonstrates he "has knowledge that is independent of and materially adds to" the public disclosures of LINCCA programs ***and*** he voluntarily provided such information to the government before he filed his LINCCA claims. Relator fails on both fronts and his claims must be dismissed.

### 1.    Relator lacks independent knowledge that materially adds to the public disclosures.

Relator lacks independent knowledge about LINCCA programs that materially adds to public disclosures. Knowledge is "independent" if "not derived from the public disclosure." *Jamison*, 649 F.3d at 332 (citation omitted). Relator must be the original source—and therefore must have independent knowledge—of *every* claim he brings, not just certain allegations against certain defendants. *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 476 (2007). Here, Relator's lack of independent knowledge is evident. Relator admits that he "is not aware of the specific details relating to most of the transactions that resulted from" LINCCA programs, (SAC ¶ 323), and fails to allege a single interaction with any Defendant (or other program participant) relating to LINCCA programs. Relator acknowledges that as an independent contractor for

Jefferson Parish, his responsibilities were limited to "review[ing] and audit[ing] competing bids" to lease two public hospitals—which has nothing to do with LINCCA programs. SAC ¶ 263. What's more, this limited role began in 2014, years after LINCCA programs were approved by CMS, disclosed in multiple news articles, and reviewed by CMS in 2012. *Id*. (acknowledging he was hired in February 2014). Nothing in Relator's description of his roles indicate that Relator would have any first-hand experience with LINCCA programs—much less the knowing submission of a false record, false statement, or false claim related to LINCCA. *See, e.g.*, *United States ex rel. Colquitt v. Abbott Lab'ys* (*Colquitt II*), 2015 WL 13670916, at *6 (N.D. Tex. July 24, 2015) (relator "fails to point to evidence in the record of his direct and independent knowledge of off-label promotion before his employment"); *United States v. Medco Health Sols. Inc.*, 777 F. App'x 30, 34 (3d Cir. 2019) (affirming that relator was not an original source because he "does not allege that he took part in negotiating agreements . . . that produced the allegedly fraudulent discount arrangement at issue in this case"). Relator's lack of independent knowledge dooms his claims.

Relator also does not "materially add" to the information in the qualifying public disclosures, which contain the mechanics of LINCCA programs, describe Defendants participation in LINCCA programs, and identify that CMS has repeatedly reviewed and approved these programs since 2010. *See* Exs. G-T. Any particular details of the LINCCA "scheme" pleaded in the SAC—such as the use of specific entities or the specifics of a single contract assumed by unspecified Defendants—would not materially add to the publicly disclosed information. These allegations do not reveal anything essential about how LINCCA programs are allegedly fraudulent and fail to "materially add" to the information in the public domain. *See* Ex. 1 at 11-12 (relator's theory as to how the defendants administered their collaborative program did not "materially add"

to the public disclosures); *United States ex rel. Winkelman v. CVS Caremark Corp.*, 827 F. 3d 201, 212 (1st Cir. 2016) ("[o]ffering specific examples of [the allegedly fraudulent] conduct does not provide any significant new information where the underlying conduct already has been publicly disclosed"). Moreover, the fact that private hospitals used various entities as part of LINCCA programs and that they contracted with physician groups who previously provided services to public hospitals or the State, was disclosed years before Relator accepted his limited role, much less filed his LINCCA claims. *See* Exs. G; Q; *Hendrickson,* 343 F. Supp. 3d at 630 ("Relator's knowledge does not materially add to the publicly disclosed transactions" because his allegations were "merely the product and outgrowth of publicly disclosed information," and not "qualitatively different information than what had already been [disclosed]." (citation omitted)).

### 2. Relator failed to make the required voluntary disclosure.

Relator broadly states that he "has voluntarily provided the information to the government before filing this case," but Relator's core LINCCA allegations—and all of his LINCCA allegations regarding the 19 defendants named for the first time in the SAC—were not even in Relator's original complaint.[4] Because Relator offers no particulars as to when he made this supposed disclosure and what exactly he disclosed, his vague and conclusory assertions amount to "a legal conclusion, which is insufficient." *United States v. U.S. Oncology, Inc.*, 2023 WL 5831140, at *4 (E.D.N.Y. Sep. 8, 2023) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 680-81 (2009)) (dismissing under the public disclosure bar and holding that relator's conclusory assertion that s/he "voluntarily" disclosed its allegations to the government "do[es]not meet the post-amendment

---

[4] Relator's original complaint alleged that Louisiana Children's was involved in a LINCCA program with two non-defendant hospitals to "provide quality healthcare services to low income and needy residents" at an LSU Hospital in 2011 and 2012. *See* ECF 1 ¶¶ 121-28; SAC ¶¶ 209-16. But Relator did not allege an FCA violation related to those contextual allegations.

original source exception's first avenue").  This failure dooms Relator's case, as "whether or not the relator provides information voluntarily is dispositive." *Hendrickson*, 343 F. Supp. 3d at 630 ("The Court finds that Relator's disclosure was not voluntary.  As such, Relator cannot be an original source."), *aff'd*, 779 F. App'x 250 (5th Cir. 2019).

In sum, Relator does not qualify as an original source on two independent grounds: he lacks independent knowledge that materially adds to the publicly disclosed facts, and he failed to voluntarily provide information related to LINCCA programs to the government prior to filing.

## II.     The SAC fails to plead an FCA Claim related to LINCCA programs.

The SAC should be dismissed for the independent reason that it fails to allege a plausible FCA claim relating to LINCCA programs, let alone with the particularity required by Rule 9(b). Relator concedes that he "is not aware of"—and therefore cannot plead—"the specific details" of LINCCA programs challenged in the SAC.  *See* SAC ¶ 323.  He offers instead a generalized description of LINCCA programs and conclusory allegations of Defendants committing fraud simply by participating in the programs.  These allegations do not state a plausible claim for fraud against any Defendant under Rule 8—much less under the more stringent Rule 9(b) standard.  The SAC's claims relating to LINCCA programs should be dismissed pursuant to Rule 12(b)(6).

### A.     The SAC fails to plausibly allege a fraudulent scheme related to LINCCA programs under Rule 8(a).

If a plaintiff's allegations are "merely consistent with" an alleged fraudulent scheme, or if there is an "obvious alternative explanation" suggesting that the conduct at issue was lawful, then a plaintiff cannot state a plausible claim for relief.  *Iqbal*, 556 U.S. at 678, 682 (citation omitted). The "obvious alternative explanation" here is that Defendants did not knowingly collaborate to defraud the federal government—they participated in programs reviewed and approved by state and federal government entities.  While the SAC includes myriad references to a "fraudulent

scheme" related to LINCCA, this Court is not required to accept as true allegations that are contradicted, or "legal conclusions couched as factual allegations." *United States ex rel. Guth v. Roedel Parsons Koch Blache Balhoff & McCollister*, 2014 WL 7274913, at *2 (E.D. La. Dec. 18, 2014); *Iqbal*, 556 U.S. at 678 (courts need not accept "legal conclusions couched as factual allegations" (citation omitted)). Entering into a well-known collaborative arrangement—even one designed to increase federal Medicaid payments—"is neither fraudulent, nor improper." *United States ex rel. Integra Med. Analytics v. Scott*, 2019 WL 3713756, at *4-5 (W.D. Tex. Aug. 5, 2019) ("[T]he mere fact that Defendants took targeted steps to . . . increase hospital revenues is neither fraudulent, nor improper per se."), *aff'd*, 816 F. App'x 892 (5th Cir. 2020).

Relator's own allegations render his theory of fraud implausible. The SAC acknowledges LINCCA programs were created and supported by a third-party consultant and a law firm familiar with "the broadly-worded federal statutes and regulations that prohibit use of non-bona fide donations." SAC ¶ 330. The SAC contains no allegations of administrative action by CMS to defer or disallow Medicaid funds to LINCCA programs. *Id*. ¶ 335. Perhaps most significantly, the SAC acknowledges CMS's continued payment of FFP in connection with LINCCA programs. *Id*. ¶ 34. The fact of continued payment suggests that "CMS takes the opposite view as Plaintiff" regarding the illegality of the scheme and Relator's FCA claim is not plausible. *See Integra*, 2019 WL 3713756, at *4 (finding lack of plausibility where CMS was aware of alleged conduct and "supported th[e] practice").

### B. The SAC fails to plead with particularity any fraudulent scheme related to LINCCA programs under Rule 9(b).

The SAC's scant allegations related to LINCCA programs fail to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). As discussed below, Relator (1) fails

to allege the existence of a false claim or fraudulent scheme with the requisite "particular details," and (2) fails to set forth particularized allegations against each Defendant.

        **1.**      **The SAC does not plead with particularity either a false claim or a scheme to defraud related to LINCCA programs.**

To survive dismissal, the Fifth Circuit requires an FCA complaint to allege either "the details of an actually submitted false claim" or "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190-91 (5th. Cir. 2009). Relator does not satisfy either test.

*First*, Relator does not identify any details whatsoever related to a false claim. Relator baldly asserts in an isolated paragraph that all conduct alleged in the SAC caused Louisiana to submit unspecified "false claims" "for approval and payment of FFP funds." SAC ¶ 34. But nothing in the SAC indicates how a false claim would be submitted in the specific context of the purported LINCCA scheme, let alone "details" an "actually submitted false claim" related to LINCCA. The SAC references CMS Forms 64, but only describes the general process by which states use CMS Forms 64 to report quarterly Medicaid expenditures and the sources of state funding for the Medicaid program. *Id.* ¶ 101. Relator provides no link between CMS Forms 64 and LINCCA programs, much less any specific misrepresentation contained in a CMS Form 64 that the State submitted to CMS. Moreover, by Relator's own admission, the State submits its claims to CMS and the SAC lacks any allegations that Defendants know or control the contents of those submissions. Relator's allegations therefore fall far short of pleading the requisite "details" of even one false claim submitted or caused to be submitted to CMS related to LINCCA programs, much less the other particulars required by Rule 9(b). *See United States ex rel. Rafizadeh v. Cont'l Common, Inc.*, 553 F.3d 869, 873 (5th Cir. 2008) ("Because the linchpin of an FCA claim is a false

claim, the time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what that person obtained thereby must be stated in a complaint alleging violation of the FCA in order to satisfy Rule 9(b)." (citation omitted)).

*Second*, Relator's allegations regarding a "scheme" fare no better. Relator's allegations that (1) consultants and a law firm created and managed LINCCA programs, *see* SAC ¶¶ 329–334, (2) various entities effectuated private hospitals' provision of indigent care, *see id.* ¶ 334, and (3) hospitals received Medicaid UPL payments, *see id.* ¶¶ 213, 321, do not amount to "details" of a fraudulent scheme. These allegations merely recount the administration of lawful LINCCA programs consistent with the SPAs approved by CMS over a decade ago. *See United States ex rel. Bennett v. Medtronic, Inc.*, 747 F. Supp. 2d 745, 783 (S.D. Tex. 2010) (encouraging hospitals to pursue an opportunity for legitimate profits does not create a reasonable inference that physicians and hospitals knowingly submitted false claims).

Relator's barebones allegations about LINCCA programs are a far cry from those upheld in *Grubbs*, which "describe[d] in detail . . . the date, place, and participants" of the meeting where relator discovered the fraud, "allege[d] [relator's] first-hand experience of the scheme unfolding," and specified two defendants' false records in furtherance of the fraudulent scheme. 565 F.3d at 191-92. In fact, Relator concedes that he "is not aware of the specific details relating to most of the transactions" in LINCCA programs. SAC ¶ 323.

In short, rather than pleading facts with particularity showing that a fraud actually occurred or a fraudulent scheme actually existed, Relator relies on entirely conclusory allegations of "fraud." *See* SAC ¶ 313 ("Defendants UPC and Sisung Group entered into agreements with Gjerset and with a number of private hospitals in and around New Orleans to help those hospitals enter into and run unlawful private UPL programs with public Louisiana hospitals . . . ."); *id.* ¶ 340

("All involved Defendants knew that the schemes were designed specifically to achieve a financial result that Congress has prohibited."). This approach to pleading cannot survive dismissal. *United States ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*, 519 F. App'x 890, 895 (5th Cir. 2013) (affirming dismissal of FCA case where "allegations of a scheme to submit fraudulent claims are entirely conclusory, do not offer factual information with sufficient indicia of reliability, and do not demonstrate a strong inference that the claims were presented to the Government").

### 2. Relator's generalized allegations and group pleading are insufficient to satisfy Rule 9(b) with respect to any Defendant.

Relator fails to satisfy another requirement under Rule 9(b): setting forth specific allegations regarding the role of each Defendant. *See Unimobil 84, Inc. v. Spurney*, 797 F.2d 214, 217 (5th Cir. 1986) (plaintiff must "allege with particularity the defendant's acts which the plaintiff contends amount to fraud"). Allegations of fraud "may not group the defendants together," as Relator "must plead specific facts as to each defendants for each of the 9(b) requirements." *Lang v. DirecTV, Inc.*, 735 F. Supp. 2d 421, 437 (E.D. La. 2010); *Martin v. Tesoro Corp.*, 2012 WL 1866841, at *4 (W.D. La. May 21, 2012) ("Rule 9(b) requires plaintiffs to distinguish among each defendant . . . and set forth each defendant's responsibility for the allegedly fraudulent activities.").

Relator fails to plead any Defendant's individualized role in an alleged fraudulent scheme related to LINCCA programs. While Relator makes broad, sweeping statements about the defendant consultant, law firm, and private hospitals' creation, administration, and participation in LINCCA programs generally, he never identifies a single act by any of these Defendants to make or facilitate a false statement or record. Worse yet, Relator does not even bother to allege a single act by any individual Defendant to contribute to or participate in LINCCA programs—lawfully or otherwise. The only allegations Relator offers as to each of the 14 individual Defendants related to LINCCA are that these individuals allegedly served at some unspecified time as directors of

entities that played some unspecified role in the operation of unspecified LINCCA programs. Nothing in the SAC details fraudulent "pass-through" conduct by these entities, and, notably the individual Defendants are not mentioned in connection with LINCCA anywhere other than Section III of the SAC (identifying all parties). Relator cannot link these Defendants to any alleged fraud based solely on such superficial, nondescript allegations, and his "logical acrobat[ics] do not meet the standards required under Rule 9(b)." *United States ex rel. Williams v. C. Martin Co.*, 2012 WL 13014645, *4 (E.D. La. Apr. 5, 2012) (rejecting respondent's "attempts to bundle" an individual into a fraudulent scheme where "there are no factual allegations that tie" the individual to fraud). Without particularized allegations of each Defendant's specific acts in furtherance of the alleged fraud related to LINCCA, the SAC fails. *See Grubbs*, 565 F.3d at 190.

### C.      The SAC fails to plead a reverse FCA claim related to LINCCA programs.

Relator fails to plead that Defendants violated the reverse false claim provision of the FCA, and Count IV should be dismissed. To sufficiently allege a reverse FCA violation, the SAC must contain well-pleaded allegations that Defendants: (1) had an obligation to "pay or transmit money or property to the Government," and (2) made a false record or statement material to, or concealed and/or improperly avoided or decreased any such obligation. 31 U.S.C. § 3729(a)(1)(G). While Relator baldly asserts that UPL payments to one Defendant "far exceeded the amount" it was due, (SAC ¶ 214), there is no allegation that a Defendant had any obligation as part of LINCCA programs to pay funds to the government and avoided doing so. Relator's theory of reverse FCA liability merely echoes the allegations supporting the affirmative counts. *See, e.g.*, *id.* ¶ 23 (defendants "obtain[ed] and retain[ed] federal Medicaid funds). That tactic fails. *See United States ex rel. Scollick v. Narula*, 215 F. Supp. 3d 26, 44 (D.D.C. 2016) (rejecting reverse false claim based on "assertion that the defendants retained government funds that they knew were obtained as a result of fraud" because "plaintiff-relator may not argue that an obligation to pay the

Government arose solely [out] of the concealment of fraudulent activity"); *United States ex rel. Porter v. HCA Health Servs. of Okla., Inc.*, 2011 WL 4590791, at *8 (N.D. Tex. Sep. 30, 2011) (rejecting as "redundant" reverse false claim "essentially alleging that Defendants failed to refund the false claims the [G]overnment paid," and thus was "merely recasting" his direct claims). Count IV, as it relates to LINCCA programs, should be dismissed.

## III.    The SAC fails to plead materiality as to LINCCA programs.

Relator does not plead that any alleged fraud related to LINCCA was material to the federal government, and binding precedent demonstrates that he cannot plead this required FCA element here. The U.S. Supreme Court has held that FCA's materiality requirement is "rigorous" and "demanding," and should be strictly enforced because the FCA is not "an all-purpose antifraud statute" nor "a vehicle for punishing garden-variety . . . regulatory violations." *Escobar*, 579 U.S. at 194 (citation omitted); *see also id.* at 195 n.6 (rejecting assertion that "materiality is too fact intensive for courts to dismiss [FCA] cases on a motion to dismiss"). Relator does not even attempt to plead materiality—he offers only conclusory allegations or bare recitations of materiality elements without any well-pleaded facts that any statement by Defendants related to LINCCA was material.[5] This alone is fatal to Relator's claims. *United States ex rel. O'Neill v. Gopalam*, 2023 WL 6396659, at *25 (M.D. La. Sep. 29, 2023) (granting motion to dismiss where "Relator has not plead any facts as to materiality").

Nor could Relator properly plead materiality in this case. The SAC does not allege, for example, that the purported fraud related to the LINCAA programs is tied to the government's

---

[5] The CMS Form 64, which contains fields where states report quarterly Medicaid expenditures and the sources of the states' Medicaid funding, cannot establish materiality. In July 2014, the GAO reported that CMS confirmed that state reporting of provider donations does not affect its FFP payment decisions, and instead the Forms 64 are "for informational purposes only." Ex. O at 34.

"consistent[] refus[al] to pay claims in the mine run of cases based on noncompliance with the particular . . . requirement." *Escobar*, 579 U.S. at 194-5 (identifying materiality factors). Just the opposite. Relator acknowledges that CMS "has made, and continues to make" payments to the Louisiana Medicaid program, including in connection with LINCCA programs. SAC ¶ 34. The government's payments to LINCCA programs in Louisiana have continued for years, even in the wake of CMS's 2014 Mann Letter identifying potential regulatory violations by collaborative programs generally, repeated media coverage and public statements, CMS's ongoing administrative disputes challenging collaborative programs in Texas since 2016, and CMS's 2019 proposal and subsequent withdrawal of a rule addressing the thrust of Relator's LINCCA allegations—the propriety of collaborative arrangements like LINNCA programs and their compliance with provider donation laws. *See supra* Sections C-D (Factual and Procedural Background). Notably, the SAC, though filed more than two years after Relator first alleged FCA violations related to LINCCA, does not plead any remedial actions that CMS has taken in connection with LINCCA programs in response to Relator's allegations.

Relator pleads no facts to overcome this "strong evidence" of lack of materiality, and his claims must be dismissed under U.S. Supreme Court and Fifth Circuit precedent. *Escobar*, 579 U.S. at 194-95 ("[I]f the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material."); *United States ex rel. Patel v. Catholic Health Initiatives*, 792 Fed. App'x 296, 301 (5th Cir. 2019) (affirming dismissal for failure to plead materiality and holding that "crucially, 'if the Government regularly pays a particular type of claim despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.'" (citation omitted)).

In *United States ex rel. Porter v. Magnolia Health Plan, Inc.*, the Fifth Circuit affirmed dismissal for failure to plead materiality where, as here, the government declined to intervene in the case, continued its payments to the defendant, and renewed its contract with defendant after learning of the relator's allegations. 810 Fed. App'x. 237, 242 (5th Cir. 2020). In the more than four years since Relator first filed his LINCCA claims, the government has continued to pay FFP to participants in LINCCA programs without interruption. SAC ¶ 34. The federal government's actions foreclose the materiality of Relator's theory of fraud and his claims must be dismissed. *See United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 490 (3d Cir. 2017) (affirming dismissal of FCA claim where the government failed to stop payment and declined to intervene); *United States ex rel. Jackson v. Ventavia Rsch. Grp.*, 2023 WL 2744394, at *20 (E.D. Tex. Mar. 31, 2023) (dismissing complaint because "[t]he Government's unbroken chain of authorization and payments in the face of [the plaintiff's] allegations does not support an inference that the alleged misrepresentations were material").

**IV.     The SAC fails to plead scienter in connection with LINCCA programs.**

Relator's pleadings related to LINCCA programs do not sufficiently allege that any Defendant violated the FCA with the requisite scienter. The FCA imposes liability on those who act "knowingly" in "present[ing] or caus[ing] to be presented a false or fraudulent claim" or making "or caus[ing] to be made . . . a false record or statement[.]" 31 U.S.C. § 3729(a)(1)(A)-(B). The U.S. Supreme Court has emphasized that courts must strictly enforce the FCA's scienter requirement. *See Escobar*, 579 U.S. at 192 (describing the scienter requirement as "rigorous" and urging its "strict enforcement"). As is particularly relevant here, "[w]hat matters for an FCA case is whether the defendant knew the claim was false." *United States ex rel. Schutte v. SuperValu Inc.*, 143 S. Ct. 1391, 1396 (2023).

To avoid dismissal, Relators must plead factual allegations to plausibly allege that each Defendant knowingly submitted or caused the State of Louisiana to submit a false statement or claim for payment. He has not done so. There are no allegations as to who knowingly caused the State to submit false claims to the government as part of a fraudulent scheme. Instead, Relator concludes that Defendants *must have known* that LINCCA programs violate the law because CMS challenged collaborative programs in different states. *See, e.g.*, SAC ¶¶ 337, 340. But the fact that CMS did not similarly challenge LINCCA programs undermines Relator's contention. Moreover, bald assertions of what Defendants *should* or *must have known* falls far short of pleading Defendants' subjective knowledge as required in *SuperValu.* Relator's broad brush allegation fails to allege any facts about Defendants' knowledge or beliefs as to the particular programs at issue here. Nor could he, given that Relator did not work for any of the Defendants and does not even allege any interactions with the Defendants around LINCCA programs. The SAC falls far short of alleging the required knowledge of a false claim. *See, e.g.*, *United States ex rel. Frey v. Health Mgmt. Sys.*, 2023 WL 2563239, at *10 (S.D. Tex. Feb. 10, 2023) (dismissing FCA case for failure to plead scienter because "conclusory allegation[s]" are "not a substitute for pleading facts supporting an inference of fraud").

Relator's scienter allegations fail on the additional ground that the SAC employs a group pleading approach consistently rejected by the courts. *See, e.g., Hendrickson,* 343 F. Supp. 3d at 635-36 (dismissing FCA case because relator's "vague group pleading approach cripples his ability to establish scienter"). To adequately plead scienter, a relator must allege facts that "support an individualized finding of scienter" against each defendant. *Id.* at 636. The SAC fails to do so, and instead lumps Defendants together via collective allegations that they acted knowingly.

*See, e.g.*, SAC ¶ 340 ("All involved Defendants knew that the schemes were designed specifically to achieve a financial result that Congress has prohibited.").  The SAC should be dismissed.

## V.      The SAC fails to plead a conspiracy related to LINCCA programs.

Relator's conspiracy allegations must be dismissed for the fundamental reason that the SAC fails to allege any substantive violation of the FCA, as detailed in Argument Sections II–V. *Gopalam*, 2023 WL 6396659, at *11 ("Since Relator fails to plead adequate claims under 31 U.S.C. § 3729(a)(1)(A) and 31 U.S.C. § 3729(a)(1)(B), Relator's conspiracy claim . . . inherently fails as well, as liability under 31 U.S.C. § 3729(a)(1)(C) is dependent upon liability under 31 U.S.C. § 3729(a)(1)(A) or 31 U.S.C. § 3729(a)(1)(B)."); *see also United States ex rel. Graves v. ITT Tech. Inst.*, 284 F. Supp. 2d 487, 509 (S.D. Tex. 2003) (relator's conspiracy claim "fails as a matter of law" where "none of the [FCA] claims against [Defendants] state a cause of action").

Even if Relator had pleaded an underlying violation of the FCA, the SAC fails to plead, as required by Rule 9(b), both "the existence of an unlawful agreement between [D]efendants to get a false or fraudulent claim allowed or paid by [the Government]" and at least one act performed in furtherance of the conspiracy.  *United States ex rel. Farmer v. Houston*, 523 F.3d 333, 343 (5th Cir. 2008).  Relator repeatedly refers to Defendants as "co-conspirators" and asserts in a conclusory manner that a conspiracy related to LINCCA exists, *e.g.*, SAC ¶¶ 313-14, but fails to detail when or how any alleged conspiracy arose, who agreed with whom, the workings of the alleged scheme, or what was done to effect the conspiracy.  The Court should dismiss Count III.

## VI.     The State is an indispensable party to the LINCCA claims and cannot be joined.

Rule 12(b)(7) authorizes courts to dismiss a complaint if a person who is a "required party" under Rule 19(a) cannot be joined and "in equity and good conscience" the case should not proceed without them.  *Lee v. Anthony Lawrence Collection, L.L.C.*, 47 F.4th 262, 265–66 (5th Cir. 2022).

The State of Louisiana is a "required party" because Relator repeatedly casts Louisiana as Defendants' co-conspirator, *see, e.g.,* SAC ¶ 20, and Relator's claims are predicated on the supposed illegality of LINCCA programs, which were created by the State and central to the State's Medicaid program. Any judgment in Relator's favor would require a determination that the non-federal share of Louisiana's Medicaid program is ineligible for FFP to the extent it was funded indirectly by cost savings arising from LINCCA programs. Louisiana has a necessary "interest" in that determination. Resolving Relator's claims in the State's absence would "as a practical matter impair" the State's interest because a judgment for Relator would imperil programs crucial to funding Louisiana's Medicaid system. Fed. R. Civ. P. 19(a)(1)(B)(i); *Lee*, 47 F.4th at 266–67 (state university was "required party" to trademark suit against its licensees because the case was "ultimately about" whether the university owned the mark, and "[a] loss . . . in its absence[] could put pressure on the University" to "halt [its] use of the mark").

But it is not feasible to join Louisiana as a party to this case, as it is not a "person" subject to liability under the FCA. *See Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 778–88 (2000). And sovereign immunity would have shielded Louisiana from this suit in any event. *See United States v. Tex. Tech. Univ.*, 171 F.3d 279, 294 (5th Cir. 1999) (dismissing FCA claims filed against Texas as sovereign immunity protects states from *qui tam* FCA suits). The impracticability of joinder here "is enough to require dismissal" of Relator's LINCCA claims. *Lee*, 47 F.4th at 268. But the Rule 19(b) factors also favor dismissal. The Defendants' interests in defending their own conduct "overlap" but are not "identical" with the State's interests in defending the LINCCA program as a whole. *Id.* at 269 (citations omitted). There is no way to shape the judgment or relief to avoid prejudicing the State because its "interest in this suit [is] 'implicated not only by potential judgment or the form of relief, but by the necessary inquiry into

[the legality of LINCCA programs]." *Id.* at 269-70 (citing Fed. R. Civ. P. 19(b)(2)). And the government, which is the real party-in-interest, has a remedy available should it want to claw back any alleged overpayments from the State—something it has since 2010 declined to do. *See United States ex rel. Wagda v. Bank of America, NA*, 2022 WL 16551704, at *3 (E.D. Cal. Oct. 31, 2022). (citing Fed. R. Civ. P. 19(b)(4)). Weighing these factors, Relator's claims should be dismissed because Louisiana is an indispensable party and cannot be joined. *See id.* at *2-3 (dismissing FCA complaint because California, "which relator allege[d] is a co-conspirator," was indispensable to claims alleging defendants unlawfully escheated federal property to the State); *accord United States ex rel. Wagda v. AT&T Corp.*, 2022 WL 2392473 (E.D. Cal. July 1, 2022).

**VII.    The Court should dismiss Relator's LINCCA claims with prejudice.**

Both the FCA's public disclosure bar and Rule 12(b)(7) foreclose Relator's LINCCA allegations and are not surmountable by amendment, and Relator has already had two attempts to re-plead his claims. The Court should dismiss the SAC with prejudice as it relates to LINCCA programs. *See, e.g.*, *Vaughn v. Harris Cnty Hosp. Dist.*, No. 22-20659 at 12 (5th Cir. Dec. 14, 2023) (affirming court's dismissal of claims related to collaborative programs with prejudice as barred by the public disclosure bar); *Herrmann Holding Ltd. v. Lucent Tech. Inc.*, 302 F.3d 552, 567 (5th Cir. 2002) (affirming dismissal with prejudice where "plaintiffs have already twice amended their complaint").

**CONCLUSION**

Relator's allegations related to Louisiana's LINCCA programs run afoul of the FCA's public disclosure bar and allege no actionable conduct under the FCA. Additionally, the State of Louisiana is an indispensable party under Rule 19 but cannot be joined in this action. Accordingly, the Court should dismiss the Relator's theory of liability related to LINCCA with prejudice.

[SIGNATURE PAGES FOLLOW]

Dated: December 20, 2023                         Respectfully submitted,

/s/ W. Scott Keaty
W. Scott Keaty (La. Bar. No. 23151)
Julie M. McCall (La. Bar No. 29992)
BUTLER SNOW LLP
445 North Boulevard, Suite 300
Baton Rouge, Louisiana 70802
Tel: (225) 325-8700
Fax: (225) 325-8800
scott.keaty@butlersnow.com
julie.mccall@butlersnow.com

*Attorneys for General Health System, Baton Rouge General Medical Center, Kendall Johnson and Dionne Viator*


/s/ Brian Capitelli
Brian Capitelli (La. Bar No. 27398)
T.C. Wicker, IV (La. Bar No. 37955)
Capitelli & Wicker
1100 Poydras Street, Ste. 2950
New Orleans, Louisiana 70163
Tel: (504) 582-2425
Fax: (504) 582 2422
brian@capitelliandwicker.com
twicker@capitelliandwicker.com


Bradley A. Klein (admitted *pro hac vice*)
Paul A. Solomon (admitted *pro hac vice*)
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Ave., N.W.
Washington, D.C. 20005-2111
Tel: (202) 371-7000
Fax: (202) 393-5760
bradley.klein@skadden.com
paul.solomon@skadden.com

*Attorneys for United Professionals Company, LLC*

/s/ Catherine M. Maraist
Catherine M. Maraist (La. Bar No. 25781)
BREAZEALE, SACHSE & WILSON, L.L.P.
One American Place, 23rd Floor
301 Main Street
Post Office Box 3197
Baton Rouge, Louisiana 70821-3197
Tel: (225) 387-4000
Fax (225) 381-8029
catherine.maraist@bswllp.com

/s/ Abid R. Qureshi
Alice S. Fisher (admitted *pro hac vice*)
Abid R. Qureshi (T.A., admitted *pro hac vice*)
Anne W. Robinson (admitted *pro hac vice*)
Natalie Hardwick Rao (admitted *pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
alice.fisher@lw.com
abid.qureshi@lw.com
anne.robinson@.w.com
natalie.rao@lw.com

*Attorneys for Ochsner Health System, CHRISTUS Health Central Louisiana, MidAmerica Division, Inc., Scott Posecai, Maurice Lagarde III, Stephen Wright, Warner Thomas, Bobby Brannon, Patrick Quinlan, Michael Hulefeld, Chris Karam, Scott Merryman, Kim Kelsch and Peter November*


/s/ Peter J. Rotolo III
Peter J. Rotolo III (La. Bar No. 21848)
Amy L. McIntire (La. Bar No. 35241)
A. Elyce Ieyoub (La. Bar. No. 39918)
CHAFFE MCCALL, L.L.P.
1100 Poydras Street, Suite 2300
New Orleans, Louisiana 70163
Tel: (504) 585-7000

/s/ Matthew S. Chester
Matthew S. Chester (La. Bar No. 36411)
Emily Olivier Kesler (La. Bar No. 37747)
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana 70170
Tel: (504) 566-5200
Fax: (504) 636-4000
mchester@bakerdonelson.com
ekesler@bakerdonelson.com

/s/ Kirk Ogrosky
Kirk Ogrosky (admitted *pro hac vice*)
Ilene Albala (admitted *pro hac vice*)
Jordan L. Moran (admitted *pro hac vice*)
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20036
Tel: +1 202 346 4000
Fax: +1 202 346 4444
KOgrosky@goodwinlaw.com
IAlbala@goodwinlaw.com
JordanMoran@goodwinlaw.com

*Attorneys for Gjerset & Lorenz, LLP*

/s/ Peter J. Butler, Jr.
Peter J. Butler, Jr. (La. Bar No. 18522)
Richard G. Passler (La. Bar No. 21006)
Catherine M. Maraist (La. Bar No. 25781)
BREAZEALE, SACHSE &WILSON, L.L.P.
909 Poydras Street, Suite 1500
New Orleans, Louisiana 70112
Tel: (504) 584-5454
Fax: (504) 584-5452
peter.butler.jr@bswllp.com
richard.passler@bswllp.com
catherine.maraist@bswllp.com

*Attorneys for Nancy Cassagne*

Fax: (504) 544-6089
rotolo@chaffe.com
mcintire@chaffe.com
ieyoub@chaffe.com

Heather M. O'Shea (admitted *pro hac vice*)
Elizabeth Marino (*pro hac vice* forthcoming)
JONES DAY
110 North Wacker Drive, Suite 4800
Chicago, Illinois 60601
Tel: (312) 782-3939
Fax: (312) 782-8585
hoshea@jonesday.com
ejmarino@jonesday.com

Rajeev Muttreja (admitted *pro hac vice*)
JONES DAY
250 Vesey Street
New York, New York 10281
Phone: (212) 326-3939
Fax:      (212) 755-7306
rmuttreja@jonesday.com

Ryan Harmanis (admitted *pro hac vice*)
JONES DAY
325 John H. McConnell Blvd., Suite 600
Columbus, OH 43215
Phone: (614) 469-3939
Fax:      (614) 461-4198
rharmanis@jonesday.com

Taylor A. Goodspeed (admitted *pro hac vice*)
JONES DAY
250 Vesey Street
New York, New York 10281
Tel: (212) 326-3939
Fax: (212) 755-7306
tgoodspeed@jonesday.com

*Attorneys for Louisiana Children's Medical
Center, Inc. and West Jefferson Holdings, LLC*

**CERTIFICATE OF SERVICE**

I do hereby certify that on this 20th day of December, 2023, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent by operation of the court's electronic filing system to all parties entitled to notice by electronic notification.

*/s/ Abid R. Qureshi*
Abid R. Qureshi
