# EXHIBIT 2

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF LOUISIANA

UNITED STATES *ex rel.* JOSHUA
NEMZOFF,

        Plaintiffs,


v.


LOUISIANA CHILDREN'S MEDICAL
CENTER, INC., ET AL.,

        Defendants.

CIVIL ACTION No. 2:19-cv-11680 c/w
19-11682

SECTION: "P" (5)

JUDGE DARREL J. PAPILLION

MAG. JUDGE MICHAEL NORTH


**DECLARATION OF ABID R. QURESHI IN SUPPORT OF DEFENDANTS'
CONSOLIDATED MOTION TO DISMISS SECOND AMENDED COMPLAINT'S
"LINCCA" CLAIMS**

I, Abid R. Qureshi, submit this Declaration and have personal knowledge of the following facts:

1.      I am with the law firm of Latham & Watkins LLP, which represents Defendants Ochsner Clinic Foundation d/b/a Ochsner Health System, CHRISTUS Health Central Louisiana, MidAmerica Division, Inc.,[1] Scott Posecai, Maurice Lagarde III, Stephen Wright, Warner Thomas, Bobby Brannon, Patrick Quinlan, Michael Hulefeld, Chris Karam, Scott Merryman, Kim Kelsch and Peter November in the above-captioned action.

2.      This Declaration, Index, and the attached Exhibits relate to the arguments advanced by all Defendants in Defendants' Memorandum of Law in Support of Defendants' Consolidated Motion to Dismiss Second Amended Complaint's "LINCCA" Claims ("Defendants' Consolidated LINCCA Brief").

3.      The following Exhibits include news media, federal administrative filings, documents published by the Centers for Medicare & Medicaid Services ("CMS") and the Government Accountability Office ("GAO"), and other documents referenced in Defendants' Consolidated LINCCA Brief.

   a.      Attached as **Exhibit A** is a true and correct copy of the United States Government's Statement of Interest, *Vaughn v. Harris Cnty. Hosp. Dist.*, No. 17-cv-02749 (S.D. Tex. May 14, 2021).

   b.      Attached as **Exhibit B** is a true and correct copy of the Brief of Appellant Texas Health and Human Services Commission ("HHSC"), *Texas Health & Human Servs.*

---

[1] MidAmerica Division, Inc. is incorrectly named in the caption of this action as HCA MidAmerica Division.

*Comm'n v. Ctrs. for Medicare & Medicaid Servs.*, No. A-17-51 (U.S. Dep't of Health and Human Serv. Dep't Appeals Bd. June 1, 2017).

      c.      Attached as **Exhibit C** is a true and correct copy of a May 1, 2008 Letter from Chris Traylor, then Associate Commissioner for Texas Medicaid and CHIP, to James Frizzera, then Director of CMS's Financial Management Group, regarding Deferrals Nos. TX/2007/3/E/11/MAP, TX/2007/3/E/12/MAP, and TX/2007/4/E/15/MAP. This document was Exhibit 9 to the Brief of Appellant Texas HHSC, *Texas Health & Human Servs. Comm'n v. Ctrs. for Medicare & Medicaid Servs.*, No. A-17-51 (U.S. Dep't of Health and Human Serv. Dep't Appeals Bd. June 1, 2017).

      d.      Attached as **Exhibit D** is a true and correct copy of a November 2, 2010 Letter from Cindy Mann, then Director for the Center for Medicaid, CHIP, and Survey & Certification, to Don Gregory, then Director of the Bureau of Health Services Financing at Louisiana's Department of Health and Hospitals ("DHH"), regarding Louisiana State Plan Amendment 09-55. This document was Exhibit 21 to the Brief of Intervenors, *Texas Health & Human Servs. Comm'n v. Ctrs. for Medicare & Medicaid Servs.*, No. A-17-51 (U.S. Dep't of Health and Human Serv. Dep't Appeals Bd. June 19, 2017).

      e.      Attached as **Exhibit E** is a true and correct copy of an October 29, 2010 Letter from Bill Brooks, then Associate Regional Administrator of CMS's Division of Medicaid and Children's Health, to Don Gregory, then State Medicaid Director of Louisiana DHH, regarding Louisiana State Plan Amendment 09-56. This document was Exhibit 20 to the Brief of Intervenors, *Texas Health & Human Servs. Comm'n v. Ctrs. for Medicare & Medicaid Servs.*, No. A-17-51 (U.S. Dep't of Health and Human Serv. Dep't Appeals Bd. June 19, 2017).

f.     Attached as **Exhibit F** is a true and correct copy of a November 2, 2010 Letter from Cindy Mann, then Director for the Center for Medicaid, CHIP, and Survey & Certification, to Don Gregory, then Director of the Bureau of Health Services Financing at Louisiana DHH, regarding Louisiana State Plan Amendment 10-26.  This document was Exhibit 22 to the Brief of Intervenors, *Texas Health & Human Servs. Comm'n v. Ctrs. for Medicare & Medicaid Servs.*, No. A-17-51 (U.S. Dep't of Health and Human Serv. Dep't Appeals Bd. June 19, 2017).

g.     Attached as **Exhibit G** is a true and correct copy of a news article by Marsha Shuler, entitled *Official Touts Initiative for Hospital Funding*, published in The Advocate on February 2, 2011.

h.     Attached as **Exhibit H** is a true and correct copy of a news article by Clancy DuBos, entitled *Heitmeier Plan Scores Big for Local Hospitals*, published in The Advocate on March 14, 2011.

i.     Attached as **Exhibit I** is a true and correct copy of a news article entitled *Governor Jindal Announces $83 Million in Payments to Hospitals*, published in the States News Service on March 29, 2011.

j.     Attached as **Exhibit J** is a true and correct copy of a news article by Jan Moller, entitled *Private Hospitals Get Extra Money; Jindal Touts Medicaid Innovation*, published in the Times-Picayune on March 30, 2011.

k.     Attached as **Exhibit K** is a true and correct copy of a news article by Richard Rainey and Alan Powell III, entitled *State 'Blazing New Trails' in Health Costs; Program Helps Hospitals Plug Losses*, published in the Times-Picayune on April 20, 2011.

l.      Attached as **Exhibit L** is a true and correct copy of a news article by Marsha Shuler, entitled *More Medicaid Woes on Horizon For La.*, published in The Advocate on May 13, 2014.

m.      Attached as **Exhibit M** is a true and correct copy of a news article by Marsha Shuler, entitled *La. Hospitals Watch Texas Funding Issue*, published in The Advocate on October 18, 2014.

n.      Attached as **Exhibit N** is a true and correct copy of a May 9, 2014 Letter from Cindy Mann, then Director of the Center for Medicaid and State Operations, to State Medicaid Directors, SMDL No. 14-004, regarding Accountability #2: Financing and Donations.  This document was Exhibit 1 to the Brief of Appellant Texas HHSC, *Texas Health & Human Servs. Comm'n v. Ctrs. for Medicare & Medicaid Servs.*, No. A-17-51 (U.S. Dep't of Health and Human Serv. Dep't Appeals Bd. June 1, 2017).

o.      Attached as **Exhibit O** is a true and correct copy of U.S. Gov't Accountability Off., GAO-14-627, Medicaid Financing: States' Increased Reliance on Funds from Health Care Providers and Local Governments Warrants Improved CMS Data Collection (2014).

p.      Attached as **Exhibit P** is a true and correct copy of the Brief of Intervenors, *Texas Health & Human Servs. Comm'n v. Ctrs. for Medicare & Medicaid Servs.*, No. A-17-51 (U.S. Dept. of Health and Human Serv. Dep't Appeals Bd. June 19, 2017).

q.      Attached as **Exhibit Q** is a true and correct copy of an August 20, 2010 Letter from Don Gregory, then Medicaid Director for the Louisiana DHH to Bill Brooks, then Associate Regional Administrator for CMS, regarding Amendments to Louisiana State Plan for Medical Assistance LA 09-55 and LA 09-56.  This document was Exhibit

19 to the Brief of Intervenors, *Texas Health & Human Servs. Comm'n v. Ctrs. for Medicare & Medicaid Servs.*, No. A-17-51 (U.S. Dept. of Health and Human Serv. Dep't Appeals Bd. June 19, 2017).

r.      Attached as **Exhibit R** is a true and correct copy of Louisiana DHH's June 17, 2014 Responses to Informal Requests for Additional Information. This document was Exhibit 28 to the Brief of Intervenors, *Texas Health & Human Servs. Comm'n v. Ctrs. for Medicare & Medicaid Servs.*, No. A-17-51 (U.S. Dept. of Health and Human Serv. Dep't Appeals Bd. June 19, 2017).

s.      Attached as **Exhibit S** is a true and correct copy of a November 30, 2016 Letter from Kristin Fan, then Director of CMS to Jen Steele, then Director of the Bureau of Health Services Financing in the Louisiana DHH. This document was Exhibit 29 to the Brief of Intervenors, *Texas Health & Human Servs. Comm'n v. Ctrs. for Medicare & Medicaid Servs.*, No. A-17-51 (U.S. Dept. of Health and Human Serv. Dep't Appeals Bd. June 19, 2017).

t.      Attached as **Exhibit T** is a true and correct copy of the Response Brief of Appellee, *Texas Health & Human Servs. Comm'n v. Ctrs. for Medicare & Medicaid Servs.*, No. A-17-51 (U.S. Dept. of Health and Human Serv. Dep't Appeals Bd. August 25, 2017).


I declare under penalty of perjury that the foregoing information is true and correct. Executed this 20th day of December, 2023.

*/s/ Abid R. Qureshi*
 Abid R. Qureshi

# INDEX OF PUBLIC DISCLOSURE EXHIBITS

| Exhibit | Date of Public Disclosure | Document | Key Disclosures |
|---|---|---|---|
| | | **NEWS MEDIA** | |
| G | 02/02/2011 | Marsha Shuler, *Official Touts Initiative for Hospital Funding*, The Advocate, Feb. 2, 2011 | "Under the program, **non-profit coalitions of private hospitals agree to take over certain health-care services previously paid for totally with state or local public service district hospital tax dollars. The arrangements free up state and local health-care dollars that then can be used to bring in several times the amount in additional federal dollars through Medicaid . . . .**" p. 1 (emphasis added).<br><br>"The participating hospitals individually have signed **Low Income and Needy Care Collaboration Agreements.** Louisiana Medicaid is required to make quarterly payments to the hospitals that have agreements with the public entities." *Id.* (emphasis added).<br><br>"The payments come through what is known as **the 'upper payment limit.'** Called **UPL**, the program reimburses hospitals for care for which they would otherwise have been ineligible. UPL is the difference between what the state Medicaid program reimburses and the higher paying Medicare rate." *Id.* (emphasis added).<br><br>"The **LHA and the Jindal administration are promoting the program** as a way for hospitals to offset more than $200 million in Medicaid cuts during the last two years." *Id.* (emphasis added).<br><br>"With **federal approval of the plan late last year**, Greenstein said **$27 million went out to participating hospitals . . . .**" *Id.* (emphasis added). |

| Exhibit | Date of Public Disclosure | Document | Key Disclosures |
|---------|---------------------------|----------|-----------------|
| H | 03/14/2011 | Clancy DuBos, *Heitmeier Plan Scores Big for Local Hospitals*, The Advocate, Mar. 14, 2011 | "The first tier taps into the federal UPL program by **allowing private hospitals to form joint nonprofits that provide health care services to low-income citizens - services otherwise provided by the state.** Many private hospitals already provide care for the poor, but those services either are uncompensated or undercompensated by the feds. Heitmeier's plan allows them to tap the federal **UPL program** and become fully compensated. Louisiana became the second state (after Texas) to tap into the **UPL program** under a bill Heitmeier introduced and passed two years ago." p. 2 (emphasis added).<br><br>"Both phases of Heitmeier's plan require complex approvals at the state and federal levels, but potentially the state can realize more than $700 million a year in savings, he says. 'Louisiana is eligible for $250 million a year in the general UPL program, but the state has not realized that potential because it did not have matching dollars available,' Heitmeier says. '**Now we're doing it by allowing the private nonprofits to perform services previously provided by the state, which frees up state general fund dollars for the match. Both the state and the hospitals benefit from this.**'" *Id.* (emphasis added).<br><br>"Potentially, the general **UPL,** which is $250 million this year, could provide Louisiana with $700 million a year using an additional $450 million in federal Disproportionate Share funds, which is another pool of reimbursements. And next year our share of the general **UPL** could be $350 million." pp. 2-3 (emphasis added). |
| I | 03/29/2011 | *Governor Jindal Announces $83 Million in Payments to Hospitals*, | "**LINCCA agreements between private hospitals and public state and local hospitals and hospital districts allow private hospitals to take on services for low-income and needy patients with federal funds, which frees up local and state funding.** The money can be used to **maximize available federal** |

| Exhibit | Date of Public Disclosure | Document | Key Disclosures |
|---------|---------------------------|----------|-----------------|
| | | States News Service, Mar. 29, 2011 | **matching funds through the Upper Payment Limit (UPL) program** in Medicaid or to help fund the Medicaid program." p. 1 (emphasis added).<br><br>"Under the **LINCCA program, a public entity, such as a local hospital district, an LSU hospital or even DHH, partners with a private entity to take over the costs of providing services to low income and needy patients.** Those **collaborations** can include **paying for physician services at an LSU Hospital emergency room that cares for low income and needy patients or behavioral health services provided through the DHH Office of Behavioral Health.** This **saves dollars for the public entity** while also **ensuring continued and improved access to care for the uninsured and Medicaid patients.**" *Id.* (emphasis added). |
| J | 03/30/2011 | Jan Moller, *Private Hospitals Get Extra Money; Jindal Touts Medicaid Innovation*, Times-Picayune, Mar. 30, 2011 | "**Under the Low-Income and Needy Care Collaboration Agreement program, private hospitals agree to cover the costs of providing care to low-income and needy populations that are now served by public entities such as local public hospital districts or the Department of Health and Hospitals. The financing arrangement saves money that the public institutions would otherwise have to spend, and makes the hospitals eligible to receive federal Medicaid matching funds that exceed the cost of the care they cover.**" p. 1 (emphasis added).<br><br>"**Louisiana** is the second state, **after Texas,** to get a waiver from the federal **Centers for Medicare and Medicaid Services to operate such collaborations.**" *Id.* (emphasis added).<br><br>"While the **first round of payments flowed mainly to hospitals in the New Orleans area**, including East Jefferson General Hospital and West Jefferson |

| Exhibit | Date of Public Disclosure | Document | Key Disclosures |
|---------|---------------------------|----------|-----------------|
| | | | Medical Center, the latest payments are being spread around the state, with about $4.5 million going to hospitals in the region." *Id.* (emphasis added). |
| K | 04/20/2011 | Richard Rainey and Alan Powell III, *State 'Blazing New Trails' in Health Costs; Program Helps Hospitals Plug Losses*, Times-Picayune, April 20, 2011 | "The first of these programs, called the **Low-Income and Needy Care Collaboration Agreement**, asks **private companies to pay the costs of services for low-income patients that public hospitals or the state once covered. The money saved by public hospitals can then be used by the state to leverage for more financing from the federal government, which is funneled back to the private and public hospitals.**" p. 1 (emphasis added).<br><br>"Ultimately, it **allows health care providers to receive larger payments** that more accurately reflect the true cost to provide care, Heitmeier said." *Id.* (emphasis added).<br><br>"The Parish Council has hired **United Professionals Company, an affiliate of the Sisung Group, to create and manage the private Upper Payment Limit program at both Jefferson public hospitals. Basing their work on similar programs in Texas, United Professionals and the parish have partnered with the Texas law firm Gjerset & Lorenz.**" p. 2 (emphasis added). |
| L | 05/13/2014 | Marsha Shuler, *More Medicaid Woes on Horizon For La.*, The Advocate, May 13, 2014 | "Now, the federal **Centers for Medicare and Medicaid Services said such deals will be scrutinized to determine if they are improper and not donations by bona fide providers.**" p. 1 (emphasis added).<br><br>"In a letter to state Medicaid directors, Cindy Mann, director of the federal CMS, wrote that a **'hold harmless' provision** is not allowed in the arrangements." *Id.* (emphasis added).<br><br>"Kliebert said **Louisiana's low income needy program was approved by the current CMS administration** and has operated with federal approval for |

| Exhibit | Date of Public Disclosure | Document | Key Disclosures |
|---------|---------------------------|----------|-----------------|
| | | | several years.  Also, in 2012 CMS conducted a review of the program and did not indicate any concerns . . . **Most of the state agreements have been with private hospitals** – more than two dozen located around the state **when the program began in 2011.**" p. 2 (emphasis added).<br><br>"Many hospitals have used the **LINCCA** arrangements and the new CMS stances certainly could create some issues." *Id.* (emphasis added).<br><br>"CMS outlined what states shouldn't be doing and threatened to demand the repayment of dollars where warranted.  In a nutshell, Louisiana did many of the things warned against by CMS, possibly foreshadowing another pricey unpinning of the state's financial structures for health care programs." p. 1.<br><br>"'It **frees up some funds being spent (by public entities) so they could be transferred to Medicaid and used for match**,' Gregory said. 'CMS would rather the states increase what Medicaid would have paid for the services.'" p. 2  (emphasis added).<br><br>"'**They may have taken on a contract from LSU for $1 million.  All of a sudden LSU transfers $1 million to Medicaid** and Medicaid **draws down** 62 percent **in federal funds** on it,' Gregory said. 'Medicaid gets a 15 percent handling fee.'" *Id.* (emphasis added).<br><br>"The [Mann] letter talks about cooperative endeavor agreements and **LINCCA** which are specific to Louisiana." *Id.* (emphasis added). |
| **M** | 10/18/2014 | Marsha Shuler, *La. Hospitals Watch Texas Funding Issue*, | "The federal government postponed Medicaid payments to 57 Texas hospitals over questions about a financial scheme **similar to one that Louisiana adopted.**" p. 1 (emphasis added). |

| Exhibit | Date of Public Disclosure | Document | Key Disclosures |
|---------|---------------------------|----------|-----------------|
| | | The Advocate, Oct. 18, 2014 | "Under the federal microscope is an **arrangement Texas uses**, which is similar to **Louisiana's** $400 million **Low Income and Needy Care Collaboration Agreements**." *Id.* (emphasis added).<br><br>"**Louisiana's LINCCA program** has been used to get extra funding to public LSU hospitals . . . as well as other community facilities across the state . . . **Under the deals, a private company agrees to provide the health care services that had been provided by a public entity. The arrangement frees the government dollars that had been spent by the public entity. The public funds are directed to Medicaid coffers to increase the state's match, which in turn brings more federal funds. The private company then receives supplemental payments from Medicaid.**" pp. 1-2 (emphasis added).<br><br>"Bill Brooks, the associate regional administrator for CMS, wrote Sept. 30: 'CMS would like to explore further our understanding of the financing mechanism being utilized' . . . 'It appears that the **intergovernmental transfer (local match) may be derived from funds that the government entity previously would have spent on providing the services that are now being provided/funded by the private entity** and or direct payments made to the governmental entity from private entities' . . . That would constitute the **unallowable use of provider-related donations to draw down federal funds**." *Id.* (emphasis added). |
| | | **FEDERAL REPORTS** | |
| N | 05/09/2014 | Letter from Cindy Mann, CMS State Medicaid Director, | "It provides guidance to states concerning Federal statute and regulations related to the allowable and unallowable use of **provider-related donations** and also addresses the use of certain types of **public-private arrangements; such as Low-Income and Needy Care Collaboration Agreements (LINCCAs)**, Collaborative Endeavor Agreements (CEAs), and Public-Private |

| Exhibit | Date of Public Disclosure | Document | Key Disclosures |
|---------|---------------------------|----------|-----------------|
|  |  | SMDL No. 14-004 (May 9, 2014) | Partnerships. These arrangements generally involve **Medicaid supplemental payments** or special add-ons to the base payment rate that are contingent upon or **otherwise related to agreements between government and private entities under which the private entities assume obligations to provide donated services or other transfers of value as directed in the arrangements**." p. 1 (emphasis added).<br><br>"As explained in more detail below, these arrangements raise issues relating to **private donations** and could potentially result in a **hold harmless arrangement** under which the donations are returned in full or in part to the provider or provider class. Donations that occur under such **arrangements are not considered bona fide**, and, as explained further below, the Centers for Medicare & Medicaid Services (CMS) will not approve SPAs **that include non-bona fide donations as a portion**, or all, of the non-Federal share of the Medicaid payments." p. 2 (emphasis added).<br><br>"A public-private partnership arrangement is a relationship between a private entity and a government entity in which the private entity agrees, in some form, to provide a service or some other in-kind transfer of value to further the purposes of the government entity. In the context of the Medicaid program, some public-private arrangements also include provisions that the **government entity will make an intergovernmental transfer (IGT)** to the Medicaid agency, and the private providers that have signed, or otherwise entered into, an agreement would then become eligible for a Medicaid supplemental payment or special add-on to the base payment rate that may be funded by the IGT from the government entity under the same agreement. In some cases, the **IGT is derived from funds that the government entity previously would have spent on providing the services that are now being provided by the private entity**. These funds would not be available if not for the public-private partnership agreements. As described in further detail below, **this type of** |

| Exhibit | Date of Public Disclosure | Document | Key Disclosures |
|---|---|---|---|
| | | | **arrangement would not be considered a bona fide donation** under Medicaid requirements." p. 3 (emphasis added). |
| O | July 2014 | U.S. Gov't Accountability Off., GAO-14-627, Medicaid Financing: States' Increased Reliance on Funds from Health Care Providers and Local Governments Warrants Improved CMS Data Collection (2014) | "The **percentage of the nonfederal share of Medicaid supplemental payments financed with funds from health care providers and local governments** varied significantly in state fiscal year 2012 among states that reported using funds from these sources to finance supplemental payments. **Several states relied on health care providers and local governments for the entire nonfederal share of their supplemental payments** . . . .<br><br>• For **non-DSH supplemental payments**, the percentage of these funds ranged from 10.3 percent in **Louisiana** to 100 percent in seven states— Alabama, Idaho, Illinois, Nebraska, Nevada, North Carolina, and Wyoming. The amount of funds supplied by health care providers and local governments in these seven states totaled $1.9 billion." p. 24 (emphasis added).<br><br>"**We and others have raised concerns in the past about financing arrangements involving Medicaid supplemental payments**, which states often make through large, lump-sum payments to a relatively small number of providers." pp. 24-25 (emphasis added). |
| | | **FEDERAL ADMINISTRATIVE PROCEEDING** | |
| P | 6/19/2017 | Brief of Intervenors, *Texas Health & Human Services Commission v. Centers for Medicare* | "Facing issues similar to Texas related to low Medicaid reimbursement and increasing uninsured indigent population, **Louisiana** submitted its own SPAs to operate Medicaid supplemental payment programs in which the **State of Louisiana 'joined with private safety-net hospitals to design a collaborative program substantially similar to the one approved by CMS for Texas.'** |

| Exhibit | Date of Public Disclosure | Document | Key Disclosures |
|---------|---------------------------|----------|-----------------|
| | | *& Medicaid Services*, Docket No. A-17-51 (June 19, 2017) | During the SPA review process, Louisiana provided CMS clear disclosure of the collaborative: **'The Private Hospitals will enter into their own arrangements (contractual or otherwise) with the individuals or entities who provide care directly to low income and needy patients, including individuals or entities that had previously provided low income and needy care services to the governmental entity.'** p. 12 (emphasis added).<br><br>"To further illustrate how the hospitals would expand their charity care, **Louisiana provided examples of 'the types of low income and needy care services the Private Hospitals may provide, that were previously provided or paid for by a governmental entity'** and clarified that the provision of these example services **'will result in the alleviation of the expense of the public funds the governmental entity previously expended on this care.'** Consistent with the law and all prior action, CMS approved the Louisiana SPAs shortly thereafter on October 29, 2010 and November 2, 2010." pp. 12-13 (emphasis added).<br><br>"On three occasions after issuing SMDL #14-004, **CMS approved arrangements in Louisiana that are similar to the Texas public/private collaborative arrangements.** On December 23, 2014—six months after releasing SMDL #14-004—CMS approved a Louisiana SPA wherein Louisiana private hospitals agree to expand their charity services by taking over all services previously paid for and/or furnished by the State. In return, the State agreed to pay each hospital 100% of their Medicaid Disproportionate Share Hospital (Medicaid DSH) cap. In November 2016, CMS approved a second SPA, reaffirming Louisiana's 2014 SPA, whereby private hospitals would **increase their 'Medicaid and uninsured services by providing services that were previously delivered and terminated or reduced by a state owned or** |

| Exhibit | Date of Public Disclosure | Document | Key Disclosures |
|---|---|---|---|
| | | | **operated facility.'** CMS issued the November 2016 SPA approval two months after disallowing funds in Texas." pp. 15-16 (emphasis added). |
| Q | 6/19/2017 | Brief of Intervenors, Ex. 19, (Letter from Don Gregory, Medicaid Director, to Bill Brooks Associate Regional Administrator, CMS, Amendments to Louisiana State Plan for Medical Assistance LA 09-55 and LA 09-56 (Aug. 20, 2010)), *Texas Health & Human Services Commission v. Centers for Medicare & Medicaid Services*, Docket No. A-17-51 (June 19, 2017) | "Each of these State Plan Amendments ('SPA') authorizes Medicaid supplemental payments to hospitals that have entered into a **Low Income and Needy Care Collaboration Agreement** with a state or local governmental entity, including inpatient Medicaid supplemental payments (LA 09-55), and outpatient Medicaid supplemental payments (LA 09-56)." p. 1 (emphasis added).<br><br>"In light of the growing gap between the cost of care and reimbursement, the **State of Louisiana joined with private safety-net hospitals to design a collaborative program substantially similar to the one approved by CMS for Texas**, in Texas SPAs TX 05-01 and TX 05-11, to more fully fund the Medicaid program under current law and ensure the availability of quality healthcare services for the low income and needy population." pp. 1-2 (emphasis added).<br><br>"Generally, **a Low Income and Needy Care Collaboration Agreement is the agreement between a governmental entity** (State or local governmental entity) and **a group of non-state and non-public hospitals** ('Private Hospitals') to develop a plan for the Private Hospitals to **reduce or alleviate the need for the governmental entity to provide care to the low income and needy patients** that do not qualify for Medicaid benefits, thereby **allowing the governmental entity to utilize its public funds to increase support to the Medicaid program.** The **Private Hospitals will enter into their own arrangements (contractual or otherwise) with the individuals or entities who provide care** directly to low income and needy patients, including **individuals or entities that had previously provided low income and needy care services to the governmental entity**. The Private Hospitals may consider |

| Exhibit | Date of Public Disclosure | Document | Key Disclosures |
|---|---|---|---|
| | | | the amount of supplemental payments they expect to receive in deciding whether, and to what degree, they will provide charity services to the low income and needy patients consistent with the CoPs.  As part of this collaboration with the Private Hospitals, the governmental entity may contribute resources to the provision of services to low income and needy individuals by, for example, contributing facility space for the treatment of these patients, operational management services or medical malpractice coverage to ensure that patients receive adequate quality care." p. 2 (emphasis added).  "Examples of the types of **low income and needy care services the Private Hospitals may provide, that were previously provided or paid for by a governmental entity**, include but are not limited to . . . **primary and specialty physician services** . . . ." pp. 2-3 (emphasis added).  "The provision of the low income and needy services by the Private Hospitals directly to patients **will result in the alleviation of the expense of the public funds the governmental entity previously expended on this care.**" p. 3 (emphasis added).  "Hospital Service Districts will be the entities that **IGT funds**.  Currently, the Department is working with **West Jefferson** regarding potential IGT's, but there are ten other Hospital Service Districts that could agree to voluntarily IGT funds." p. 5 (emphasis added). |

| Exhibit | Date of Public Disclosure | Document | Key Disclosures |
|---------|---------------------------|----------|-----------------|
| **R** | 06/19/2017 | Brief of Intervenors, Ex. 28, (LDH Responses to Informal Request for Additional Information (June 17, 2014)), *Texas Health & Human Services Commission v. Centers for Medicare & Medicaid Services*, Docket No. A-17-51 (June 19, 2017) | "As pointed out in the State Medicaid Director's Letter #14-004, and in accordance with federal regulations at 42 CFR 433.52, a **provider related donation** is a donation or other voluntary payment made directly, or indirectly, to a state or unit of local government by, or on behalf of, a health care provider, an entity related to such a health care provider, or an entity providing goods or services to the state for administration of the state's Medicaid plan. The letter also properly pointed out the definition of a **bona fide donation** as established at 42 CFR 433.54. The key element of such a donation is that it must not have a direct or indirect relationship to Medicaid payments made to a health care provider, any related entity providing health care items or services or other providers furnishing the same class of items or services as the provider or entity. A final key element is that any such payments must not establish a **'hold harmless'** arrangement as defined by federal regulations." p. 4 (emphasis added).<br><br>"According to Louisiana's currently approved Medicaid State Plan, a hospital may qualify for receipt of **Disproportionate Share Hospital (DSH)** payments by satisfying certain criteria specified therein. One such qualifying criteria includes, among other criteria, that a hospital, for dates of service on or after January 21, 2010, **be participating in the Low Income and Needy Care Collaboration Agreement (LINCCA).** In order to participate in this program, the hospital must make certain representations and warranties. **These representation and warranties are specifically designed to prevent and avoid the situations described in the State Medicaid Director's letter.** For example, the participating hospital must guarantee that they have not made, and will not make, any payments to the Governmental Entity with which they are collaborating in order to fund Medicaid supplemental payments. The hospital must also guarantee that it has not entered into any fee arrangement under which the hospital's fee is a percentage of the hospital's payments funded by the |

| Exhibit | Date of Public Disclosure | Document | Key Disclosures |
|---------|---------------------------|----------|-----------------|
| | | | Governmental Entity. Finally, the hospital warrants that its agreement with the Governmental Entity complies with any applicable provider related donation regulations." p. 4 (emphasis added).<br><br>"In addition to the representations and warranties, via a separate certification, the hospital provider must certify that it has not entered any agreement which would condition either the amount of any public funds transferred by the Government Entity or the amount of Medicaid supplemental payments the hospital receives on the amount of low income and needy care the hospital has provided or will provide. The purpose of this certification, and its effect, is to expressly have the hospital and Government Entity understand that a **'hold harmless'** must not exist. **Thus, it is crystal clear that the hospital is not guaranteed to receive any funding directly or indirectly correlated to the services it may provide**." pp. 4-5 (emphasis added).<br><br>"As part of this certification, the provider also certifies that it has not made, nor will it make, any cash or in-kind transfers to the Governmental Entity other than transfers and transactions that are unrelated to the Supplemental Payment Program, transfers involving fair market value transactions, or transactions that represent independent, bona fide transactions negotiated at arms-length and in the ordinary course of business. The effect of this certification is to ensure that **a provider related donation has not occurred** and that all entities remain in compliance with the federal regulations mentioned in the above referenced State Medicaid Directors letter. The Government Entity has entered into a similar certification which further guarantees compliance with federal donation rules and ensures that all non-federal share funds are purely state dollars eligible for federal match." p. 5 (emphasis added).<br><br>"Thus, at the very outset, **DHH does not believe that the LINCCA arrangement mentioned in the currently approved State Plan involves a** |

| Exhibit | Date of Public Disclosure | Document | Key Disclosures |
|---------|---------------------------|----------|-----------------|
| | | | **provider related donation**. The participating hospital has voluntarily decided to take steps to ensure that low income and needy patients have access to, and receive, high quality hospital services. The amount of any Medicaid supplemental payment is not tied directly or indirectly to a specific amount or level of financial commitment. The Government Entity is not, in any way, forced to transfer any level or amount of purely public funds to Louisiana DHH. Thus, it is clear that federal **'hold harmless' provisions are not triggered** in that the hospital does not have any direct or indirect guarantee that it will receive any level of Medicaid supplemental payment." *Id.* (emphasis added).<br><br>"After approval of this State Plan Amendment and after the program was in effect, CMS conducted an audit of **Louisiana's LINCCA** program. To the best of DHH's knowledge, CMS did not find any violations of federal regulations in the administration of this program." *Id.* (emphasis added). |
| S | 06/19/2017 | Brief of Intervenors, Ex. 29, (Letter from Kristin Fan, CMS Director, to Jen Steele, LDH, (Nov. 30, 2016)), *Texas Health & Human Services Commission v. Centers for Medicare & Medicaid Services*, Docket No. A-17-51, (June 19, 2017) | "[A] hospital may qualify for this category [of DSH payments] by 1. Being a private acute general hospital that . . . increases its provision of inpatient Medicaid and uninsured services by **providing services that were previously delivered and terminated or reduced by a state owned and operated facility . . . .**" p. 5 (emphasis added). |

| Exhibit | Date of Public Disclosure | Document | Key Disclosures |
|---------|---------------------------|----------|-----------------|
| T | 08/25/2017 | Respondent's Brief in Support of Disallowance, *Texas Health & Human Services Commission v. Centers for Medicare & Medicaid Services*, Docket No. A-17-51 (Aug. 25, 2017) | "**CMS Approval of State Plan Amendments in** Nevada and **Louisiana** Does Not Relieve Texas of Its Responsibility to Demonstrate Compliance"  p. 35 (emphasis added).<br><br>"CMS has not barred public-private collaborations and does not automatically assume that such relationship include donations . . .  As noted in SMDL #14-04, 'nothing in this letter is intended to limit the ability of governments and businesses to establish these normal and important business relationships.' . . . CMS [has] not made findings that the other states' programs are in violation of §1903(w). . . ." *Id.* |