# EXHIBIT A

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES and the STATE of TEXAS, *ex rel*. KENT VAUGHN, | * * * * | |
| Plaintiffs, | * * | CIV. ACTION NO. 4:17-cv-02749 |
| v. | * * | |
| HARRIS COUNTY HOSPITAL DISTRICT d/b/a HARRIS HEALTH SYSTEM; BEN TAUB HOSPITAL; LYNDON B. JOHNSON HOSPITAL; QUENTIN MEASE COMMUNITY HOSPITAL; HARRIS COUNTY CLINICAL SERVICES, INC.; MEMORIAL HERMANN HEALTH SYSTEM; CHRISTUS HEALTH; CHRISTUS HEALTH GULF COAST; HCA HEALTHCARE.; HCA GULF COAST DIVISION INC.; ST. JOSEPH MEDICAL CENTER, HOUSTON METHODIST; TEXAS CHILDREN'S HOSPITAL; ST. LUKE'S EPISCOPAL HEALTH SYSTEM; AFFILIATED MEDICAL SERVICES; BAYLOR COLLEGE OF MEDICINE; BAYLORMEDCARE; and UT PHYSICIANS, | * * * * * * * * * * * * * * * * * * * * | |
| Defendants. | * | |

## UNITED STATES' STATEMENT OF INTEREST
## ON DEFENDANTS' JOINT MOTION TO DISMISS

The United States of America ("United States" or "Government") respectfully

submits this Statement of Interest to address the three issues raised by the Court's April

16, 2021 Order. [Doc. No. 149]. As discussed further below: (1) the action is based upon

public disclosures; (2) the relator voluntarily disclosed information to the Government; and (3) the information the relator provided did not materially add to the publicly disclosed information, but, on the current record, the United States does not have sufficient information to determine if relator's information was independent of the publicly disclosed information.

## I.     Factual and Procedural Background

On August 31, 2017, Relator Kent Vaughn ("Relator") filed a *qui tam* complaint under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733. On August 13, 2019, the Relator filed a Second Amended Complaint. [Doc. No. 29 ("SAC")]. Relator alleges that under an arrangement known as the Harris Collaborative Program, various medical schools, public hospitals, and private hospitals entered into a "three-way trade of cash and services" that violated the FCA. [SAC at ¶ 7]. Specifically, Relator alleges that under the Harris Collaborative Program, medical schools Baylor College of Medicine and UT Health Science Center-Houston provided physician and other medical services to defendant Harris County Hospital District ("Hospital District") and its subsidiary public hospitals. The medical schools never charged the Hospital District for these services; instead, according to the Relator, the services were paid for by defendant Harris County Clinical Services, Inc. ("HCCS") and its affiliated private hospitals. Relator alleges that the Hospital District used the cost savings realized from the free medical services to fund intergovernmental transfers ("IGTs") to the Texas Medicaid program. These IGTs, Relator contends, caused the private hospitals to receive supplemental Medicaid payments to which they were not entitled, because they were funded by HCCS's in-kind, non-bona fide donations of physician services. Relator further alleges that this

arrangement was tainted by above-fair market value payments from HCCS to the medical schools.

On May 20, 2019, the United States declined to intervene in Relator's *qui tam*. [Doc. No. 13]. Relator has exercised his right under the FCA to conduct the action, and there are currently several motions to dismiss pending before this Court. [Doc. Nos. 121-127]. In its April 16, 2021 Order, the Court requested that the United States address Defendants' argument that the *qui tam* should be dismissed under the FCA's public disclosure bar. [Doc. No. 149]. The Court instructed the Government to submit a Statement of Interest addressing the following three issues:

(1) Whether this action is based upon public disclosures;

(2) Whether relator voluntarily disclosed information to the Government; and

(3) If so, whether the information the relator provided was independent and/or materially added to the publicly disclosed information.

## II.    Discussion

The FCA's public disclosure bar provides that courts shall dismiss a declined *qui tam* if "substantially the same allegations or transactions" alleged in the *qui tam* were publicly disclosed in certain qualifying sources and the relator is not an "original source" of the information. 31 U.S.C. § 3730 (e)(4). The public disclosure bar is intended "both to promote private citizen involvement in fraud exposure while also 'preventing parasitic suits by opportunistic late-comers who add nothing to the exposure of fraud.'" *United States ex rel. Solomon v. Lockheed Martin Corp.*, 878 F.3d 139, 143 (5th Cir. 2017) (quoting *U.S. ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 384 F.3d 168, 174 (5th Cir. 2004)). Courts use a three-part test to determine whether the public

disclosure bar applies, asking: "(1) whether there has been a 'public disclosure' of allegations or transactions, (2) whether the qui tam action is 'based upon' such publicly disclosed allegations, and (3) if so, whether the relator is the 'original source' of the information." *Id.* The Court has asked for the United States' views on the second and third parts of this test.

## A.  The *Qui Tam* Action Is Based Upon Public Disclosures

Under both the pre and post-2010 versions of the public disclosure bar, the *qui tam* is "based upon" public disclosures, because the allegations in the Complaint are substantially similar to the public disclosures. *See United States ex rel. Hendrickson v. Bank of Am., N.A.*, 343 F. Supp. 3d 610, 623-24 (N.D. Tex. 2018), *aff'd,* 779 F. App'x 250 (5th Cir. 2019) ("[The 2010 amendment] has no real impact, as courts considering the term 'based upon' interpreted it to mean 'substantially the same.'"); *see also Stennett v. Premier Rehab., LLC*, 479 F. App'x 631, 634-35 (5th Cir. 2012) ("The claims alleged in a qui tam suit are deemed 'based upon' the publicly disclosed allegations when both sets of allegations are substantially similar."). In particular, the allegations in the *qui tam* are substantially similar to the public disclosures contained in the news articles and the federal administrative proceeding identified by Defendants.

### 1.  The Allegations in the *Qui Tam* Are Substantially Similar to Disclosures in Public News Articles

In support of their motion to dismiss, Defendants cite six news articles from 2007 to 2016. These news articles describe hospital arrangements in Texas, including the Harris Collaborative Program, in which private hospitals pay for certain healthcare services, in order to free up money for local governments or hospital districts to fund

IGTs to Texas Medicaid. The articles explain the "quid pro quo" central to the fraud scheme alleged by the Relator. For example:

- A July 2008 article in the *Valley Morning Star* disclosed that local taxing entities in Texas agreed to set aside funds for Medicaid and that "[i]n return, the hospitals, often through a nonprofit organization, take over paying bills for the county's indigent residents." [Doc. No. 121-3 (Ex. G) at 3].

- An October 2014 article in *The Advocate* disclosed that, "Under the deals, a private company agrees to provide the health care services that had been provided by a public entity. The arrangement frees the government dollars that had been spent by the public entity. The public funds are directed to Medicaid coffers to increase the state's match, which in turn brings more federal funds. The private company then receives supplemental payments from Medicaid." [Doc. No. 121-3 (Ex. I) at 12].

- A September 7, 2016 article in the *Texas Tribune* disclosed that, "In this arrangement, a group of private hospitals indirectly assumed financial responsibilities once held by the local governments and, in exchange, received payments under the Medicaid Program." [Doc. No. 121-3 (Ex. J) at 15].

Significantly, these articles not only disclosed the mechanics of the hospital arrangements, but also the Center for Medicare and Medicaid Services' ("CMS") concerns about them. As early as 2007, public news articles disclosed federal probes related to the private-public hospital partnerships. [Doc. No. 121-2 (Ex. F) at 135

("Federal officials are questioning the financial arrangements that allowed the private hospital to claim the supplemental funds . . . .)]. More specifically, the articles disclosed that the federal probes were focused on the same legal theory as the *qui tam*—that "[i]f hospitals expect to get something in return for their 'donations,' that could be a potentially illegal quid pro quo." [Doc. No. 121-3 (Ex. H) at 7; *see also* Doc. No. 121-3 (Ex. I) at 12 (quoting letter from CMS that the arrangements may involve "the unallowable use of provider-related donations to draw down federal funds.")].

Although these news articles do not explicitly mention any Defendants, one of them specifically mentions Houston, the location of the Harris Collaborative Program. [Doc. No. 121-2 (Ex. F) at 136 ("In all, private hospitals in 25 communities throughout the state, including Dallas, *Houston*, San Antonio, Austin, and El Paso, were able to generate $264 million in local matching funds over the last six months to get the federal dollars.") (emphasis added)]. "[P]ublic disclosures need not name particular defendants so long as they 'alerted the government to the industry-wide nature of the fraud and enabled the government to readily identify wrongdoers through an investigation.'" *U.S. ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 329 (5th Cir. 2011) (quoting *In re Natural Gas Royalties,* 562 F.3d 1032, 1039 (10th Cir. 2009)). Here, in addition to the reference to the Houston arrangement, other news articles disclosed that similar hospitals arrangements were in place across the state and that CMS's concerns were statewide. *See* Doc. No. 121-3 (Ex. H) at 8 ("They're looking at most of the state, but singled out four of the 20 regions because CMS has staff based in those areas."); Doc. No. 121-3 (Ex. I) at 12 ("Texas officials fear that the federal decision made after spot audits could expand to include arrangements for hospitals across that state."). The news articles were sufficiently

detailed and the range of potential defendants within the Texas communities sufficiently narrow to "set the government on the trail" of the fraud alleged in the *qui tam*. *Jamison*, 649 F.3d at 329.

### 2.   The Allegations in the *Qui Tam* Are Substantially Similar to Disclosures in the Departmental Appeals Board Proceeding

For many of the same reasons, the *qui tam* is also based upon the Departmental Appeals Board ("DAB") proceeding cited by the Defendants. The DAB proceeding resulted from the dispute between Texas and CMS chronicled in the news articles. In the DAB proceeding, Texas appealed CMS's determination that certain hospital arrangements in Dallas and Tarrant Counties involved non-bona fide provider donations. Texas filed its appeal in February 2017 and its supporting brief in June 2017, both before the *qui tam* was filed.[1] The arrangements in Dallas and Tarrant Counties were substantially similar to the Harris Collaborative Program.

Both Texas's Notice of Appeal and its subsequent brief described: (1) the Dallas and Tarrant County hospital arrangements; and (2) CMS's concerns that they involved non-bona fide donations. Specifically, the Notice of Appeal stated that in CMS's view, the "arrangements between certain Texas hospital districts and private hospitals constitute non-bona-fide provider donations under federal law and under guidance issued by CMS . . . ." [Doc. No. 121-4 (Ex. O) at 183]. The Notice of Appeal went on to describe the design of the arrangements, in which "private hospitals volunteer to fund an expenditure that may have previously been borne by the public entity," in order to "reduce the financial burden on the hospital district." [*Id.* at 183-184]. Texas's

---

[1] CMS prevailed in the DAB proceeding, and Texas is currently appealing the decision in federal district court. *Texas Health and Human Services Commission v. U.S. Department of Health and Human Services*, 3:19-cv-02857 (N.D. Tex.).

subsequent brief disclosed the arrangements and the underlying dispute in more detail,

describing how, in CMS's view, private hospitals in Dallas and Tarrant counties had

created non-profit corporations to funnel non-bona fide donations to the local hospital

districts. [Doc. No. 121-5 (Ex. S) at 50-51].

The disallowance in the DAB proceeding only involved hospitals in Dallas and

Tarrant County, and not Harris County. As a result, most of the discussion in Texas's

brief relates to just Dallas and Tarrant County hospitals. But, taken together with the

news articles, as well as the correspondence between CMS and Texas attached to the

brief, it was apparent from the public disclosures that Dallas and Tarrant Counties were

not the only localities with these types of private-public hospital arrangements and that

CMS's concerns extended throughout the state. Exhibits presented in the proceeding, for

instance, showed discussions between CMS and Texas about the statewide arrangements,

including the Harris County program. *See* Doc. 121-6 (Ex. V) at 13 (February 2008 letter

from Texas to CMS noting that "the private hospital UPL program in Texas is built on

the premise that private hospitals may provide charity care to indigent patients in a way

that relieves local government entities from incurring expenses for such care that they

might otherwise incur"); Doc. No. 121-5 (Ex. Q) at 6 (October 2016 letter from Texas to

CMS stating that "the current funding arrangements have been in place across Texas

since 2005"); Doc. No. 121-7 (Ex. Y) at 2 (May 2015 email exchange between

representatives of Texas and CMS naming the private hospitals in Harris County

involved in the County's collaborative program, including the private hospital defendants

in this case). The DAB proceeding thus did not just "set the government on the trail of

the alleged fraud," it showed that "the government was still *in fact* on th[e] trail" of the

alleged fraud. *United States ex rel. Maur v. Hage-Korban*, 981 F.3d 516, 529 (6th Cir. 2020).

### 3.   The Non-Public Allegations in the *Qui Tam* Are Not Critical

Relator contends that certain details about the Harris Collaborative Program were not included in the public disclosures. These include allegations that the private hospitals serviced non-indigent patients as part of the arrangements and also that the private hospitals paid the medical schools above-fair market value. These additional details do not prevent the Complaint from being "based upon" the public disclosures, since they are not critical to the alleged fraud scheme. "The language of the FCA conveys congressional intent to prohibit *qui tam* actions 'when either the allegation of fraud *or* the critical elements of the fraudulent transaction themselves were in the public domain.'" *Solomon*, 878 F.3d 139 at 145 (quoting *U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 654 (D.C. Cir. 1994)). "The critical elements have been sufficiently disclosed if the disclosures, taken together, would enable the government to draw an inference of fraud." *U.S. ex rel. Colquitt v. Abbott Lab'ys*, 864 F. Supp. 2d 499, 519 (N.D. Tex. 2012).

Here, the critical elements of the fraud are that the defendant private hospitals paid for medical services provided at the Hospital District hospitals in order to free up funds for the Hospital District to use as IGTs to Texas Medicaid, resulting in the private hospitals receiving additional supplemental Medicaid funding. *See, e.g.*, SAC at ¶ 18 ("Defendants fraudulently conspired to make improper, non-bona fide donations of physician and other provider services to the Harris County Hospital District in exchange for increased Medicaid supplemental payments from the federal government"); Doc. No. 130 (Relator's Resp. to Cons. Mot. To Dismiss) at 13-14 ("The crux of the SAC is that

the Program's illegal purpose was to tie the private hospitals' donations to IGTs that would trigger the federal government's payment of supplemental Medicaid funds back to the private hospitals . . . ."). These critical elements were publicly disclosed.

Whether the private hospitals paid above-fair market value is not a critical or necessary element to establish the alleged fraud scheme. Notably, the alleged above-fair market value payments were paid to the defendant medical schools, and not the Hospital District. Thus, any above-fair market value payments did not increase the amount of funds available for the Hospital District to transfer to Texas Medicaid. Likewise, whether the private hospitals paid for indigent or non-indigent care is also non-critical. As the Complaint notes, even if the hospital only paid for indigent care, it still would constitute a non-bona fide donation. [SAC ¶ 152 ("Indigent care agreements are also prohibited hold harmless agreements when they relieve the governmental entity from its legal obligation to pay for indigent care services . . . .")].

**B.  The Relator Voluntarily Disclosed Information to the United States**

The Court also requested that the United States address whether the Relator voluntarily disclosed information to the United States, which is necessary to qualify as an original source under 31 U.S.C. 3730(e)(4)(B). On July 19, 2017, before Relator filed his Complaint, Relator's counsel voluntarily provided the United States with a draft of the complaint in this action.

**C.  Relator's Information Did Not Materially Add to the Public Disclosures, but the United States Is Unable to Determine if It Was Independent of Those Disclosures**

Last, the Court asked the United States to address whether the information the Relator provided was independent and/or materially added to the publicly disclosed

10

information. This question implicates both the pre and post-2010 versions of the FCA. The 2010 Amendments to the FCA public disclosure bar were not retroactive, so the pre-2010 version applies to allegations based on conduct that occurred prior to March 23, 2010, and the post-2010 version applies to allegations based on conduct occurring on or after that date. *Hendrickson*, 343 F. Supp. 3d at 622.[2]

For conduct prior to March 23, 2010, to be an original source, a relator must have "direct and independent knowledge" of the allegations in the *qui tam* action. 31 U.S.C § 3730(e)(4)(B) (1986). For conduct after March 23, 2010, where the relator provides information to the government following the public disclosure, to be an original source, a relator must have "knowledge that is independent of *and* materially adds to the publicly disclosed allegations." 31 U.S.C § 3730(e)(4)(B) (2010) (emphasis added).[3] It is thus possible for a relator to qualify as an original source under one version of the statute but not the other. In addition to focusing on the independence of the relator's information apart from the public disclosure, the amended, post-2010 original source requirement also demands an assessment of the value contributed by the relator. *See U.S. ex rel. Davis v. D.C.*, 679 F.3d 832, 839 n.4 (D.C. Cir. 2012) (noting that the amended original source requirement is intended to "provide incentives to only those relators whose information adds value.").

Under both the pre and post-2010 versions of the FCA applicable here, to be an original source, the relator's information must be "independent." To be independent, the

---

[2] Relator has alleged conduct both before and after the 2010 amendments
[3] The post-2010 original source provision also permits an individual to qualify as an original source if he or she voluntarily disclosed his or her information to the Government before there was a public disclosure. Relator did not disclose his information to the government before the public disclosures and so this prong of the current original source requirement does not apply. 31 U.S.C. § 3730(e)(4)(B).

relator's knowledge must not be derived from the public disclosures. *Reagan*, 384 F.3d at 177. The relator must "do more than apply his knowledge, experience, or investigation to publicly disclosed information." *United States ex rel. Fisher v. Ocwen Loan Servicing, LLC*, No. 4:12-CV-461, 2016 WL 3031713, at *6 (E.D. Tex. May 25, 2016).

On the current record, the United States is unable to determine whether Relator's information derived from the public disclosures. Unlike some relators who have been found not to have independent knowledge, here, the Relator did work at one of the named-defendants. *See, e.g.*, *Jamison*, 649 F.3d at 331 (non-employee relator who "describe[d] a general scheme of fraud and then list[ed] arbitrarily a large group of possible perpetrators" was not an original source). According to the Complaint, as an employee of the Hospital District, the Relator "came to understand" the non-bona fide donation arrangement. [SAC ¶ 128]. And the Complaint includes a diagram that the Relator drew in 2010, depicting what he is now alleging to be the impermissible flow of funds among the Defendants. [Doc. No. 29-3]. The Relator, however, only began working at the Hospital District in 2010, several years after the arrangement was implemented and the first public disclosures were published. [SAC ¶ 25]. And he was not directly involved in negotiating or drafting the underlying agreements. [*Id.* at ¶ 130-131].

Tellingly, many of the cases cited by both the Defendants and Relator on the question of "independent" knowledge were decided on summary judgment and thus presumably after discovery that focused on the source of the relator's knowledge. *See, e.g.*, *Reagan*, 384 F.3d 168 (5th Cir. 2004); *United States ex rel. Colquitt v. Abbott Lab'ys*, No. 3:06-CV-1769-M, 2015 WL 13670916 (N.D. Tex. July 24, 2015); *see also United States* ex rel. *Lam v. Tenet Healthcare Corp.*, 287 Fed. Appx. 396 (5th Cir. 2008)

(finding on summary judgment that relators were barred by the public disclosure bar after previously denying defendants' motion to dismiss, because "there was an issue of fact" on whether relators were original sources). And the decisions relied on testimony of the relator about when and how the relator came to learn about the alleged fraud. *See, e.g.*, *Reagan*, 384 F.3d at 178 (granting summary judgment where relator admitted her information was based on public records). Given the limited record available at this stage of the proceeding, and the factual issues surrounding Relator's knowledge, the United States does not have sufficient information to opine on whether the Relator's knowledge was independent of the publicly disclosed information.

For the post-2010 version of the FCA, however, the relator's knowledge must not only be independent of, but also must materially add to, the publicly disclosed allegations. Here, Relator's knowledge does not materially add to the publicly disclosed allegations about the underlying conduct. The non-public allegations in the Complaint are not, "sufficiently significant or essential so as to fall into the narrow category of information that materially adds to what has already been revealed through public disclosures." *Green v. AmerisourceBergen Corp.*, No. 4:15-CV-379, 2017 WL 1209909, at *9 (S.D. Tex. Mar. 31, 2017) (quoting *United States ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 211 (1st Cir. 2016)). They "merely add[] detail or color to previously disclosed elements of an alleged scheme." *Winkelman*, 827 F.3d at 213. As discussed above, the non-public allegations in the Complaint, such as above-fair market value payments and services for non-indigent patients, do not materially add to the publicly disclosed information and are merely ancillary to the fraud. The essence of the alleged fraud scheme is that Defendants' in-kind non-bona fide donations to the Hospital

District caused the federal government to pay the private hospitals federal matching funds

they were not entitled to. The non-public allegations in the Complaint do not materially

add to the already-public information about this scheme.

Dated: May 14, 2021                     Respectfully Submitted,

                                        BRIAN M. BOYNTON
                                        Acting Assistant Attorney General

                                        JENNIFER B. LOWERY
                                        Acting U.S. Attorney, Southern District of
                                        Texas

                                         /s/ Jill O. Venezia
                                        JILL O. VENEZIA
                                        Assistant United States Attorney
                                        Texas Bar # 24010764
                                        Southern District of Texas Bar No. 31305
                                        1000 Louisiana, Suite 2300
                                        Houston, Texas  77002
                                        Telephone: (713) 567-9511
                                        Facsimile: (713) 718-3309
                                        Email: Jill.Venezia@usdoj.gov

                                         /s/ Jill O. Venezia by permission
                                        JAMIE ANN YAVELBERG
                                        ROBERT MCAULIFFE
                                        JONATHAN T. THROPE
                                        Attorneys
                                        United States Department of Justice
                                        Civil Division, Fraud Section
                                        P.O. Box 261
                                        Ben Franklin Station
                                        Washington, DC 20004
                                        Telephone: (202) 305-3716
                                        Facsimile: (202) 616-3085
                                        Email: jonathan.t.thrope@usdoj.gov

                                        **ATTORNEYS FOR THE
                                        UNITED STATES OF AMERICA**

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 14, 2021, a true and correct copy of this document was

served electronically by the Court's CM/ECF system to all counsel of record.

  /s/ Jill O. Venezia

JILL O. VENEZIA