# EXHIBIT B

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**DEPARTMENTAL APPEALS BOARD**
**APPELLATE DIVISION**

| | | |
|---|---|---|
| **TEXAS HEALTH AND HUMAN SERVICES** | § | |
| **COMMISSION,** | § | |
| Appellant, | § | |
| | § | |
| v. | § | **DOCKET NO. A-17-51** |
| | § | |
| **CENTERS FOR MEDICARE &** | § | |
| **MEDICAID SERVICES,** | § | |
| Respondent. | § | |

**BRIEF OF APPELLANT**
**TEXAS HEALTH AND HUMAN SERVICES COMMISSION**

Monica Leo
Staff Counsel
Texas Health & Human Services Commission
Brown-Heatly Building
4900 N. Lamar
4th Floor, Suite 4130
Austin, Texas 78751
Mail Code: 1100
Telephone: (512) 424-6558
Facsimile: (512) 424-6586
Monica.Leo@hhsc.state.tx.us

Charles Greenberg
Director of Policy
Office of the Chief Counsel

Stephanie Tourk
Staff Counsel

# TABLE OF CONTENTS

**TABLE OF CONTENTS** ................................................................................. ii

**TABLE OF AUTHORITIES** ...................................................................... iii

**INTRODUCTION** ............................................................................................1

**STATEMENT OF THE CASE** ...................................................................... 1

*I. Regulatory background* .................................................................................. 1

*II. Factual background* ...................................................................................... 4

    A. The history of private hospital supplemental payments in Texas ........................... 4
    B. Formation of the non-profit indigent care corporations ..................................... 6
    C. CMS deferral of private hospital UPL payments in 2007 ................................... 7
    D. Conversion of UPL to uncompensated care ................................................... 8
    E. 2014 deferral of private hospital payments ................................................... 9
    F. Disallowance of TX/2016/001/MAP ......................................................... 10
    G. Request for reconsideration ...................................................................11

**ARGUMENT** ............................................................................................... 11

*I. Overview* ....................................................................................................... 11

*II. Burdens of proof* ........................................................................................ 12

*III. The state's claimed costs are allowable without reduction* ....................... 12

*IV. CMS' notice of disallowance and subsequent correspondence*
    *do not comply with federal requirements* ........................................................15

*V. The legal and factual premises on which CMS based the disallowance are erroneous* .......... 20

    A. There is no donation to a governmental entity ............................................ 20
        1. The non-profit organizations are not assuming a legal
        obligation of the hospital district ........................................................ 20
            a. Statutes......................................................................... 21
            b. Contracts...................................................................... 22
        2. The non-profit organizations are providing or paying for charity care .......... 24
    B. There is no hold-harmless arrangement ..................................................... 25
    C. CMS' discovery request reveals its lack of factual support for the disallowance .........27

*VI. CMS cannot base its disallowance on SMDL #14-004* .............................. 28

    A. SMDL #14-004 is inconsistent with 42 C.F.R. § 433.54(c) ............................ 28
    B. SMDL #14-004 is not entitled to deference ............................................... 30
    C. SMDL #14-004 does not preclude the Dallas and Tarrant County arrangements ....... 31
    D. CMS improperly promulgated a legislative rule ........................................... 32
    E. CMS' previous approval of the Dallas funding arrangement under the current,
        unchanged regulatory requirements renders SMDL #14-004 arbitrary and capricious..33

*VII. HHSC acted in reliance on CMS' previous assurances* ...........................35

**CONCLUSION** ........................................................................................... 36

# TABLE OF AUTHORITIES

**CASES**                                                                                        **PAGE(S)**

*Am. Mining Congress v. Mine Safety & Health Admin.*, 995 F.2d 1106 (D.C. Cir. 1993)......... 32
*Bank of New York v. Janowick,* 470 F.3d 264 (6th Cir. 2006) ..............................….... 31
*Battle Creek Health Sys. v. Leavitt,* 498 F.3d 401 (6th Cir. 2007) ....….……………………… 31
*Bennett v. Spear,* 520 U.S. 154 (1997)...........................................…........................... 28
*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837 (1984) ………....….... 30, 31
*Christensen v. Harris County,* 529 U.S. 576 (2000) ….....…..............…........................... 31
*Estate of Landers v. Leavitt,* 545 F.3d 98 (2d Cir. 2008) ….....…..…….......................... 31
*F.C.C. v. Fox Television Stations, Inc.,* 556 U.S. 502 (2009) .................................…....... 32, 33
*Perez v. Mortgage Bankers Ass'n,* 135 S. Ct. 1199 (2015) ...................................…….... 32, 33
*SBC Inc. v. F.C.C.*, 414 F.3d 486 (3d Cir. 2005)................................................................32
*Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87 (1995)...........................................………33
*Statesman II Apartments, Inc. v. U.S.*, 66 Fed. Cl. 608 (2005)...........................….......31
*U.S. v. Mead*, 533 U.S. 218 (2001) ..........................................................…............... 31
*U.S. v. Nixon*, 418 U.S. 683 (1974)...........................................................................33

**STATUTES**

5 U.S.C. § 706 ...........................................................................................…..28, 33
42 U.S.C. § 1396b(w) (2014) ......................................................…...... passim
Medicaid Voluntary Contribution and Provider-Specific Tax Amendments of 1991,
Public Law No. 102-234, 105 Stat. 1793 (Dec. 12, 1991) …………..................…………... 2
TEX. CONST. ART. IX, §9A ………………………………………………..………21
TEX. HEALTH & SAFETY CODE
    § 61.051, § 61.055; § 61.060(d)
    § 281.0282(a), (d); § 281.0286(a), (d)
    § 311.031(2), (7); § 311.043(b) …………………………............…………… 21, 22, 24

**REGULATIONS**

1 TEX. ADMIN. CODE § 355.8201(c)(1)(B) …………………………………………..… 13
1 TEX. ADMIN. CODE § 355.8201(f) ……………………………………………....… 26
42 C.F.R.
    § 430.42 …………………………………………………………...15, 28
    § 433.52 ………………………………………………………... 3, 20, 29
    § 433.54 …………………………………………………… 3, 25, 28, 29
    § 447.271-.272 ……………………………………………….............… 5
45 C.F.R. § 16.8(a)(2) ……………………………………………………… 12
57 Fed. Reg. 55,118 (Nov. 24, 1992) ………………………………..……... 3

**ADMINISTRATIVE SOURCES**

*California Dep't of Health Servs.,* DAB Dec. No. 159 (March 31, 1981) …………..………. 19
*California Dep't of Health Servs.*, DAB Dec. No. 244 (Dec. 31, 1981) …………………..…. 19
*Georgia Dep't of Cmty. Health*, DAB Dec. No. 1973 (April 28, 2005) ………………..…….. 2
*Hillman Rehab. Ctr.*, DAB Dec. No. 1663 (June 15, 1998) …………….................…… 14

# INTRODUCTION

In this appeal, the Texas Health and Human Services Commission (HHSC) challenges a disallowance of approximately $26.8 million in federal financial participation (FFP). The Centers for Medicare & Medicaid Services (CMS) alleges that arrangements between certain Texas hospital districts and private hospitals constitute non-bona fide provider-related donations under federal law and CMS' own guidance. This is in spite of more than a decade of CMS approval and allowance of the very same funding arrangements.

HHSC contends that (1) the state's claimed costs are allowable without reduction; (2) CMS has failed to comply with federal requirements to provide adequate notice of the basis of the disallowance or calculation of the disallowed amount; (3) the legal and factual premises on which CMS based it disallowance are erroneous because (a) there is no donation by the private hospitals to the governmental entities; and (b) the funding arrangements do not constitute hold harmless agreements; (4) CMS' reliance on a state Medicaid director letter is misplaced; and (5) HHSC acted in reliance on CMS' previous assurances and approval of these arrangements. HHSC therefore asks the Board to reverse the disallowance in its entirety.

# STATEMENT OF THE CASE

## I.     Regulatory Background

The disallowance is based on section 1903(w)(1)(A) of the Social Security Act (the Act), which requires that the total expenditures for medical assistance in which a state claims Federal Financial Participation (FFP) be reduced by the sum of any revenues received by the state in the form of certain provider-related donations and taxes.[1] Also relevant to the disallowance is section 1903(w)(6) of the Act, which forbids CMS from restricting intergovernmental transfers (IGTs),

---

[1] 42 U.S.C. § 1396b(w)(1)(A) (2014).

funds derived from state or local taxes "transferred from or certified by units of government within a State as the non-Federal share of expenditures under this title, regardless of whether the unit of government is also a health care provider, …unless the transferred funds are derived by the unit of government from donations or taxes that would not otherwise be recognized as the non-Federal share under this section."[2]

The purpose behind section 1903(w) of the Act, which was enacted as part of the Medicaid Voluntary Contribution and Provider-Specific Tax Amendments of 1991, Public Law No. 102-234, 105 Stat. 1793 (Dec. 12, 1991), was twofold: to prohibit conditional donations from Medicaid providers "as a funding source for the non-federal share when the donations are tied to the amount of reimbursement" received by the providers, while protecting "existing funding practices by which a state could spread the cost of its Medicaid program among its various state and local governmental units."[3] Section 1903(w)(6) of the Act recognizes that states finance their Medicaid programs with state and local taxes, and states do not experience cost savings "simply because those permissible state and local tax funds are transferred to the state Medicaid agency from other state agencies and local governments, even where the other state agencies and local governments are providers of Medicaid services."[4]

Congress defined "provider-related donation" in section 1903(w)(2)(A) of the Act as any donation or other voluntary payment (whether in-cash or in-kind) made directly or indirectly to a state or unit of local government by a health care provider, an entity related to a health care provider, or an entity providing goods or services under the state plan and paid as administrative expenses.[5] Under section 1903(w)(1)(A), a state may receive provider-related donations without

---

[2] 42 U.S.C. § 1396b(w)(6).
[3] *Georgia Dep't of Cmty. Health*, DAB Dec. No. 1973 at 1-2 (April 28, 2005).
[4] *Id.* at 5.
[5] 42 U.S.C. § 1396b(w)(2)(A).

a reduction in FFP if the statutory requirements pertaining to bona fide donations are met.[6] A "bona fide provider-related donation" is defined as a provider-related donation that has no direct or indirect relationship to payments made under title XIX to that provider, to providers furnishing the same class of items and services as that provider, or to any related entity.[7]

CMS' predecessor, the Health Care Financing Administration (HCFA), implemented Public Law No. 102-234 first through an interim rule in 1992, then through a final rule in 1993.[8] Incorporating the statutory definition of the term, provider-related donations were defined at 42 C.F.R. § 433.52. Under the rule, donations made by a health care provider to an organization, which in turn donates money to the state, may be considered indirect donations to the state by the health care provider. At 42 C.F.R. § 433.54(a), the HCFA defined bona fide donations in accordance with section 1903(w)(2)(B) of the Act: a bona fide donation is a provider-related donation that has no direct or indirect relationship to Medicaid payments to that provider, to providers furnishing the same class of items and services as that provider, or to any related entity as established by the state to the satisfaction of the Secretary. Provider-related donations are determined to have no direct or indirect relationship to Medicaid payments if the donations are not returned to the individual provider, provider class, or related entity under a hold harmless provision or practice.[9] Under § 433.54(c), a hold harmless practice exists if any of the following applies:

> (1) The State (or other unit of government) provides for a direct or indirect non-Medicaid payment to those providers or others making, or responsible for, the donation, and the payment amount is positively correlated to the donation. A positive correlation includes any positive relationship between these variables, even if not consistent over time.

---

[6] 42 U.S.C. § 1396b(w)(1)(A).
[7] 42 U.S.C. § 1396b(w)(2)(B).
[8] 57 Fed. Reg. 55,118 (Nov. 24, 1992); 58 Fed. Reg. 43,156 (Aug. 13, 1993).
[9] 42 C.F.R. § 433.54(b).

(2) All or any portion of the Medicaid payment to the donor, provider class, or related entity, varies based only on the amount of the donation, including where Medicaid payment is conditional on receipt of the donation.

(3) The State (or other unit of government) receiving the donation provides for any direct or indirect payment, offset, or waiver such that the provision of that payment, offset, or waiver directly or indirectly guarantees to return any portion of the donation to the provider (or other parties responsible for the donation).

On May 9, 2014, CMS issued State Medicaid Director Letter (SMDL) #14-004 to provide guidance related to the "allowable and unallowable use of provider-related donations" and to address the use of certain types of public-private arrangements.[10] The letter stated that "[g]overnment entities are free to enter into agreements with private entities; however such agreements *may* affect the allowability of Medicaid funding if there is a hold harmless provision or practice."[11] CMS offered two examples of public-private partnerships that may constitute non-bona fide provider-related donations: a lease agreement at an amount greater than fair market value; and the provision by a private hospital of services that, historically, have been performed by a governmental entity.[12] CMS concluded that such arrangements would be considered hold harmless arrangements.[13] Further, when such an arrangement is tied "*in any way*," directly or indirectly, to Medicaid reimbursement under the Medicaid state plan, the donation would not be considered bona fide.[14]

## II.     Factual Background

### A.     *The history of private hospital supplemental payments in Texas*

For most hospitals enrolled in Medicaid in Texas, the direct payments for services provided to Medicaid-enrolled patients do not cover the hospitals' costs of providing those

---

[10] Ex. 1, SMDL (May 9, 2014).
[11] *Id*. at 1 (emphasis added).
[12] *Id*. at 4.
[13] *Id*.
[14] *Id*. (emphasis added).

services.[15] Federal law permits states to supplement a Medicaid agency's direct payments for inpatient services provided by hospitals, nursing facilities and intermediate care facilities for individuals with intellectual disabilities up to an "upper payment limit" (UPL) on the amount of payments the state may make in the aggregate to three categories of providers by ownership type, including providers that are "[p]rivately-owned and operated."[16]

In 2005, HHSC submitted a state plan amendment (SPA) to CMS proposing the private-hospital UPL supplemental funding program. Under this program, private hospitals and local governmental entities (hospital districts, hospital authorities, or counties) would affiliate with the goal of sustaining and enhancing access to care for Medicaid and uninsured individuals in the community in which the hospitals and governmental entities are located.[17] By collaborating in the provision of services, the public and private entities hoped to ensure the continued viability of the community's public and private Medicaid providers.[18] To reduce the financial burden on the public entity, the private hospitals would fund an expenditure that had previously been borne by the public entity but was not the legal obligation of the public entity (such as paying for indigent care or paying physician groups to staff hospital departments). The public entity might, at its discretion, transfer some of its tax-generated and other public funds to the state as the non-federal share of supplemental payments to the hospitals, if such funds were available and if the transfer was approved by the board of the public entity. [19]

During discussions with CMS concerning the approval of this SPA, CMS was fully informed of the existence of the affiliations, the fact that private hospitals would provide services

---

[15] The non-federal share of direct Medicaid payments are funded by state general revenue appropriated to HHSC.
[16] 42 C.F.R. § 447.271-272.
[17] *See, e.g.*, Ex. 2, Dallas County Indigent Care Affiliation Agreement, effective September 1, 2006.
[18] *Id.* at 1, Recital E.
[19] *Id.* at 7, paragraph 5.3.

to indigent patients that in some cases a governmental entity previously provided, and that such service provision could result in savings to the local governmental entity.[20] Those extra funds then could be used, at the complete discretion of the local governmental entity, to fund the Medicaid program. For example, HHSC disclosed to CMS in its June 30, 2006, response to CMS' Request for Additional Information:

> An indigent care agreement is the agreement between the Local [Governmental] Entity and a group of local private hospitals ("Affiliated Hospitals") to develop a plan for the Affiliated Hospitals to alleviate the Local Entity's tax burden by providing care to the indigent, thereby allowing the Local Entity to utilize its ad valorem tax revenue to fund the Medicaid program.[21]

The SPA was approved by CMS in 2006.[22]

### B.    *Formation of the non-profit indigent care corporations*

In July 2007, some private hospitals or hospital systems located in Dallas County formed the Dallas County Indigent Care Corporation (DCICC), described in the entity's bylaws as a charitable and scientific organization within the meaning of section 501(c)(3) of the Internal Revenue Code of 1986.[23] The purpose of the DCICC was "to provide or arrange for healthcare of Dallas County's indigent population."[24] In August 2007, private hospitals in Tarrant County formed the Tarrant County Indigent Care Corporation (TCICC), with the same stated purpose as that of the DCICC.[25]

---

[20] *See* Ex. 3, Letter from HHSC to Andrew A. Frederickson, CMS, responding to Request for Additional Information at 4 (June 30, 2006).
[21] *Id.*
[22] *See* Ex. 4, Letter from CMS to Chris Traylor, Associate Commissioner for Medicaid & CHIP, HHSC, approving State Plan Amendment 05-011 (Sept. 5, 2006).
[23] Ex. 5, Bylaws of Dallas County Indigent Care Corporation (July 12, 2007).
[24] *Id.*
[25] Ex. 6, Certificate of Formation, Nonprofit Corporation (Aug. 2, 2007).

C.      *CMS deferral of private hospital UPL payments in 2007*

In October 2007, CMS issued deferrals of UPL payments to private hospitals in Texas based on concerns that private hospitals were either donating funds or returning a share of Medicaid payments to the governmental entities that funded the non-federal share of the UPL payments.[26] Arrangements in Dallas County were among those questioned by CMS.

In resolving the deferrals, HHSC worked closely with CMS and provided comprehensive disclosures regarding its funding sources. For example, HHSC described the private hospital UPL program to CMS in a February 4, 2008, letter as follows:

> The private hospital UPL program in Texas is built on the premise that private hospitals may provide charity care to indigent patients in a way that relieves local government entities from incurring expenses for such care that they might otherwise incur… [and] thus relieved, are able to contribute toward the support of Medicaid providers in their communities.[27]

HHSC also explained that private hospitals' decision to pay for indigent care the governmental entity previously provided did not result in the hospitals assuming a legal obligation of the governmental entity, stating:

> These [governmental entity] contracts were terminated, after which the private hospitals… entered into new contracts with the providers … with the money no longer being spent under the terminated contracts, the district was able to make an IGT to fund increased Medicaid payments.[28]

HHSC also implemented Conditions of Participation that prohibit any linkage between the indigent care private hospitals provide and any payments to the hospitals that participated in the UPL program, and they specifically prohibit the assignment of contractual or statutory

---

[26] *See, e.g.*, Ex. 7, Letter from Bill Brooks, CMS Acting Associate Regional Admin., to Chris Traylor, HHSC Associate Commissioner for Medicaid and CHIP (Oct. 5, 2007).
[27] Ex. 8, Letter from Chris Traylor to Bill Brooks, CMS at 2 (Feb. 4, 2008).
[28] *Id.* at 5.

obligations of the governmental entity to private hospitals.[29]  The Conditions of Participation also explicitly authorize private hospitals to provide indigent care by entering into their own arrangements with healthcare providers that had previously provided services to the governmental entity.[30]

After extensive review by CMS of materials documenting and describing the funding relationships, and after working with Texas to develop the Conditions of Participation, CMS lifted the deferral.[31] CMS' action constituted approval that so long as public-private partnerships adhere to the disclosures to CMS, they are in compliance with federal law. The arrangements in Dallas and Tarrant Counties continue to operate in accordance with the Conditions of Participation and other terms of the disclosures to CMS.

> D.       Conversion of UPL to uncompensated care

In 2011, HHSC negotiated a five year section 1115 demonstration waiver with CMS that, among other things, established funding for uncompensated care (UC) costs.[32] Under the 1115 waiver, the UPL program was effectively converted to the UC program. Payments to private hospitals under the UC program are funded using the same funding mechanisms as were used under the former UPL program and under the same Conditions of Participation. Again, CMS was aware that UC payments would be financed using those same funding mechanisms.[33]

---

[29] Ex. 9, *Prospective Conditions of Participation in the Texas Private Hospital Upper Payment Limit Supplemental Reimbursement Program*, attachment to Letter from Chris Traylor to James Frizzera, Director, Financial Management Group, CMS at 1 (May 1, 2008).

[30] *Id.*

[31] Ex. 10, Email from Jim Frizzera to Billy Bob Farrell, CMS, directing Farrell to begin the process of releasing the two Texas private UPL deferrals (May 19, 2008).

[32] Ex. 11, CMS Special Terms and Conditions for the Texas Healthcare Transformation and Quality Improvement Program section 1115(a) Medicaid demonstration, Number 11-W-00278/6, STC #44 (pertinent pages included).

[33] *See id.,* STC #44(a)(i)(C)(I)(requiring that "[p]rivate providers must have an executed indigent care affiliation agreement on file with HHSC").

E.      *2014 deferral of private hospital payments*

In June 2014, CMS began conducting a financial management review of payments to private hospitals in three areas of the state, including Dallas and Tarrant Counties. CMS stated that they were relying on guidance in SMDL #14-004 to analyze Texas funding arrangements.[34]

As a result of the financial review team findings, CMS sent Texas a letter deferring expenditures of $126 million total computable, $74 million FFP, for UC payments made to private hospitals while it further investigated the source of the non-federal share of the payments.[35] After discussions between HHSC and CMS, and CMS' review of additional requested documents from the private hospitals, CMS released the 2014 deferral.[36] CMS stated that release of the deferral did not constitute CMS' acceptance of the financing arrangements, but that CMS was willing to work with the state before making a final determination.[37]

In May 2015, HHSC and CMS began a series of focused discussions evaluating the private hospital funding issue. During that process, CMS agreed that if changes to private hospital funding were required by CMS following the discussions, the state would have until September 1, 2017, to transition to other funding mechanisms without risk of disallowance on the same grounds as the 2014 deferral.[38]

---

[34] *See* Ex. 12, Email from Sivan Silver, HHSC, to Lisa Kirsch and others at HHSC, and to Rene Spencer and others at CMS (May 27, 2014). SMDL #14-004 was transmitted for discussion in the context of the Financial Management Review entrance conference.

[35] See Ex. 13, Letter from Bill Brooks to Kay Ghahremani, Director, HHSC (Sept. 30, 2014).

[36] *See* Ex. 14, Letter from Timothy Hill to Kay Ghahremani, Director, HHSC (Jan. 7, 2015).

[37] *Id.*

[38] *See* Ex. 15, Email from Tim Hill to Monica Leo Re: Private Hospital funding -- confirmation of transition schedule (June 9, 2015).

Over the following months, HHSC provided CMS with substantial documentation and information in support of the questioned private hospital funding arrangements.[39] Discussions concluded in September 2015, at which time HHSC anticipated receiving from CMS an evaluation of the allowability of the funding model used in Dallas and Tarrant Counties. That did not happen. Prior to the disallowance being issued on September 1, 2016, HHSC never received notice from CMS that a final determination had been made.

F.     Disallowance TX/2016/001/MAP

On September 1, 2016, CMS notified the state that CMS had disallowed the federal share of expenditures related to UC payments to private hospitals in Dallas and Tarrant counties.[40] The amount of the disallowance is $26,844,551.[41] The reason given by CMS for the disallowance was that arrangements between the hospital districts and private hospitals constitute non-bona fide provider-related donations under federal law and under the new guidance issued by CMS in May 2014 in the form of SMDL #14-004.[42] More specifically, CMS stated that:

- Dallas and Tarrant Counties[43] and private hospitals in those counties coordinated to create non-profit corporations funded by the private hospitals.
- The DCICC and TCICC were created to fund contracts previously held by the local governments that provide faculty staff within the Counties' medical facilities.
- Through this arrangement, the private hospitals indirectly assumed financial responsibilities once held by the local governments.
- The contract to provide services is an in-kind provider-related donation.
- The donated services augment Dallas and Tarrant Counties' funds and the Counties then transfer funds to the state Medicaid agency.
- The Medicaid agency uses funds derived from the donation-based transfers as the non-federal share to draw federal matching funds to make additional Medicaid

---

[39] *See, e.g.* Ex. 16, Email from Monica Leo to Kristin Fan transmitting Excel spreadsheets evaluating private hospital affiliations (May 28, 2015).
[40] *See* Ex. 17, Letter notifying HHSC of Disallowance TX/2016/001/MAP (Sept. 1, 2016).
[41] *Id.*
[42] *Id.*
[43] CMS repeatedly refers to the governmental entities that transferred funds to the state as "counties" when they are actually hospital districts -- units of government separate from the counties in which they are located and with separate taxing authority and statutory responsibilities. This distinction is pertinent to the discussion in Section V of this brief regarding the state statutory obligations of hospital districts.

payments under the state plan or a section 1115 demonstration waiver to the same private hospitals that fund the non-profit organizations.

- The receipt of the additional payments is the return of some or all of the provider donation and, as such, constitutes a hold harmless arrangement.
- The May 9, 2014, SMDL #14-004 specified that this type of arrangement is a non-bona fide donation prohibited by statute and regulations.[44]

G.     *Request for reconsideration*

By letter dated October 28, 2016, pursuant to Section 1116(e)(1) of the Act, HHSC asked CMS' Administrator to reconsider and reverse the disallowance decision.[45] By email dated December 29, 2016, CMS notified the state that the disallowance was affirmed.[46] This appeal by HHSC follows.

## ARGUMENT

## I.     Overview

The Board should reject CMS' action and reverse the disallowance on the following grounds: (1) the state's claimed costs are allowable without reduction; (2) CMS has failed to comply with federal requirements to provide adequate notice of the basis of the disallowance or calculation of the disallowed amount; (3) the legal and factual premises on which CMS based it disallowance are erroneous because (a) there is no donation by the private hospitals to the governmental entities; and (b) the funding arrangements do not constitute hold harmless agreements; (4) CMS' reliance on a state Medicaid director letter is misplaced; and (5) HHSC acted in reliance on CMS' previous assurances and approval of these arrangements.

---

[44] Ex. 17.
[45] *See* Ex. 18, Letter to Bill Brooks, Associate Regional Administrator, CMS, Dallas Regional Office, from Jami Snyder, HHSC Associate Commissioner for Medicaid/CHIP Services (Oct. 28, 2016).
[46] *See* Ex. 19, Email from Jeoffrey A. Branch to Monica Leo, and letter attached thereto, responding to Texas request for reconsideration (Dec. 29, 2016).

## II.     Burdens of Proof

In a proceeding before the Board, it is the appellant's responsibility to explain "why the respondent's final decision is wrong."[47] In the Appellate Division Practice Manual, the Board specifically addresses burdens of proof in disallowance cases.[48] The appellant has a general burden of proof of identifying, documenting, and justifying its claimed costs.[49] The federal agency has the burden to articulate clearly the basis of the disallowance and to include in the disallowance letter enough detail to enable the appellant to understand the issues and the respondent's position.[50] The federal agency also has an obligation to provide information showing how it calculated the disallowance, particularly where the amount is not identifiable in appellant's records as a discrete category of costs.[51]

## III.     The state's claimed costs are allowable without reduction.

CMS does not allege that the state's claimed costs are unallowable. The private hospitals in Dallas and Tarrant Counties provided covered services to Medicaid-eligible recipients, the hospitals met the criteria to qualify for payments through the UC program that is part of the state's section 1115 demonstration waiver, and, generally, the state's claims for expenditures through the UC program are allowable. The issue here is whether the state's claim for expenditures must be reduced on the grounds cited by CMS -- that is, that the state used funds derived from impermissible donation-based transfers as the non-federal share of the UC payments. However, unless CMS provides evidence that an impermissible donation occurred, all of the state's claimed expenditures are allowable without reduction.

---

[47] 45 C.F.R. §16.8(a)(2).
[48] *See* "Who has the burden of proof in a case before the Board?" Appellate Division Practice Manual (June 19, 2015) https://www.hhs.gov/about/agencies/dab/different-appeals-at-dab/appeals-to-board/practice-manual/index.html#18.
[49] *Id.*
[50] *Id.*
[51] *Id.*

As noted above, in 2008, HHSC implemented Conditions of Participation that prohibit any linkage between indigent care provided or paid for by private hospitals and the Medicaid payments received by those hospitals.[52] The same principles continue in the UC program through administrative rule requirements for private hospital participation.

Privately-operated hospitals are required to certify, among other things, that no part of any payment to the hospital will be returned or reimbursed to a governmental entity that agrees to transfer funds to the state on behalf of the private hospital.[53] Each privately-operated hospital located in Dallas and Tarrant County that received a UC payment during the period relevant to the appealed disallowance has a certification on file with HHSC.[54]

Additionally, a governmental entity that agrees to transfer funds to the state on behalf of a private hospital must certify that it has not received and has no agreement to receive any portion of the payments made to that hospital.[55] The Dallas and Tarrant County Hospital Districts each have a certification on file with HHSC.[56]

The certification forms for both the hospitals and the governmental entities track the language of the federal regulations in providing assurances that no prohibited donations are occurring. In addition to certifying that no funds received by a hospital will be returned or reimbursed to a transferring governmental entity, each hospital and governmental entity further certifies that:

- No other funds have been used to reimburse the governmental entity in consideration of any supplemental funds paid to the hospital;

[52] *See* Ex. 9.
[53] *See* 1 Tex. Admin. Code §355.8201(c)(1)(B)(i)(II).
[54] *See, e.g.,* Ex. 20, Certification of Hospital Participation, Texas Health Harris Methodist Hospital Fort Worth (Oct. 19, 2012).
[55] *See* 1 Tex. Admin. Code §355.8201(c)(1)(B)(ii)(I).
[56] *See, e.g.,* Ex. 21, Certification of Governmental Entity Participation for Hospital Affiliates, Tarrant County Hospital District (Oct. 24, 2012).

- There are no agreements to condition the amount of funds transferred by the governmental entity to the state or the amount of supplemental payments received by the hospital on the amount of indigent care provided;
- The hospital's indigent care obligation is not conditioned on the amount of public funds transferred to the state or the amount of supplemental payments received;
- Neither the hospital nor a related entity has made or agrees to make cash or in-kind transfers to the governmental entity unless --
  - they are unrelated to the administration of the waiver program or the delivery of indigent care services; or
  - they constitute fair market value for goods or services rendered or provided; or
  - they represent independent, bona fide transactions negotiated at arms-length in the ordinary course of business;
- Neither the hospital nor a related entity has taken an assignment of a contractual or statutory obligation of the governmental entity.[57]

Each governmental entity further certifies that:

All transfers of Public Funds by the Governmental Entity to HHSC to support the Supplemental Payments to the Affiliated Hospitals under the Waiver Program comply with . . . [t]he applicable regulations that govern provider-related donations codified at section 1903(w) of the Social Security Act (42 U.S.C. §1396b(w)), and Title 42, Code of Federal Regulations, Part 433, subpart B, sections 433.52 and 433.54.[58]

These certifications establish prima facie evidence that (1) there is no donation from the private hospital to the governmental entity; (2) there is no hold harmless agreement between a private hospital receiving a UC payment and the governmental entity that transfers funds to the state; and (3) the transferred public funds comply with all applicable federal laws and regulations. Absent evidence to contradict the certifications, HHSC has met its burden of establishing that all of its claimed expenditures are allowable without reduction.[59] The burden shifts to CMS to present evidence that impermissible provider-related donations took place, as well as the amounts of the donations, before the state's claimed expenditures can be reduced by

---

[57] *See* Exs. 20 and 21.
[58] *See* Ex. 21 at 4.
[59] *See Hillman Rehab. Ctr.,* DAB Decision No. 1663 (June 15, 1998)("A prima facie case does not amount to an irrebuttable presumption, but rather to evidence sufficient to support a decision in a party's favor, absent contrary evidence.").

disallowance. CMS has failed to do that, either in its disallowance notice or in response to subsequent requests from HHSC.

## IV.    CMS' notice of disallowance and subsequent correspondence do not comply with federal requirements.

The federal regulation governing a disallowance of claims for federal financial participation requires that CMS include the following in a notice of disallowance:

- A statement of the manner in which the disallowed amount was computed; and
- Findings of fact on which the disallowance determination is based or a reference to other documents previously furnished to the State containing the findings of fact on which the disallowance determination is based.[60]

The purpose of this requirement seems clear -- to provide the state with the information necessary to evaluate the validity of the disallowance determination and, when appropriate, to enable the state to dispute CMS' findings.

The September 1, 2016, letter from CMS notifying HHSC of Disallowance Number TX/2016/001/MAP does not contain these required elements. The letter states only that the amount is "based on the projected value of in-kind donations" to Dallas and Tarrant County hospital districts and that the basis is "the estimated quarterly value of various contracts" by two organizations funded by private hospitals.[61] In a footnote, the letter contains a table purporting to show the estimated value of contract donation amounts to each of the non-profit organizations, the quarterly equivalent of the donations, and the federal matching funds at risk.[62] CMS did not explain in the letter how it "estimated" the value of contract donation amounts and did not identify the "various contracts" or provide copies of those documents. No findings of fact were provided, nor did CMS reference documents previously furnished to the state containing the

---

[60] 42 C.F.R. § 430.42.
[61] Ex. 17.
[62] *Id*. at 4, footnote 1.

15

findings of fact on which the disallowance determination is based. In short, the letter does not provide sufficient information to enable HHSC to determine the validity of the disallowance, to understand how CMS calculated the disallowance amount, or otherwise to be able to fully respond to the disallowance action.

On September 16, 2016, HHSC sent a letter requesting that CMS provide the information required by § 430.42.[63] On September 22, 2016, CMS provided this additional information:

> In this case, the total imputed revenue received by the county governments is equivalent to the value of the in-kind contributions (services) funded by TCICC and DCICC through their assumption of certain medical service contracts. As noted in the disallowance, CMS estimated the value of the in-kind contributions provided during the quarter at issue. CMS's estimates were based on its review of contracts, tax returns, and other financial documents issued by the state, counties, indigent care corporations, and private hospitals.[64]

This response still did not comply with the regulatory requirements in that it failed to provide findings of fact or even identify the "contracts, tax returns, and other financial documents issued by the state, counties, indigent care corporations, and private hospitals" on which CMS' determination and "estimates" were based. HHSC again asked CMS to comply with the federal regulatory requirements.[65] The next day, CMS responded by email:

> CMS determined that the value of the services funded by the private hospitals, through TCICC and DCICC, would be approximately $45,308,000 for Tarrant Count and $142,646,144 for Dallas County, in FFY 2016. The two figures were derived from Tarrant County Hospital District's audited financial statements and the Financial Schedules attached to the DCICC Services Agreement.[66]

CMS attached three documents totaling 175+ pages to the email: an independent auditor's report and financial statements of the Tarrant County Hospital District for the periods

---

[63] Ex. 22, Letter from Monica Leo to Dorothy Ferguson (Sept. 16, 2016).
[64] Ex. 23, Email from Dan Wolfe to Monica Leo (Sept. 22, 2016). HHCS disputes that there was an assumption of contracts previously held by the hospital districts as they were terminated. *See infra* Section V.A.1.b.
[65] Ex. 24, Email from Monica Leo to Dan Wolfe (Sept. 26, 2016).
[66] Ex. 25, Email from Dan Wolfe to Monica Leo, including attachments thereto (Sept. 27, 2016).

ending September 30, 2014, and September 30, 2015; a contract between the DCICC and the

University of Texas Southwestern Medical Center for the period October 1, 2015, through

September 30, 2016; and some of the schedules that are referenced in the contract.[67] Neither the

email nor the attached documents support the disallowance for the following reasons:

- CMS fails to explain how it "derived" the value of services funded by private hospitals during federal fiscal year 2016 from Tarrant County Hospital District's audited financial statements for periods ending *before FFY 2016 began* (i.e., for periods ending September 30, 2014, and 2015).
- Notwithstanding the periods covered by the documents, the email does not say how CMS derived "the value of services funded by the private hospitals" from those documents.
- CMS does not identify or provide any other "contracts, tax returns, and other financial documents issued by the state, counties, indigent care corporations, and private hospitals" that it said it used in developing the "estimates."
- CMS does not explain why "the total imputed revenue received by the county governments is equivalent" to those values.
- CMS does not explain how the documents relate to the state's claimed expenditures for the quarter ending December 31, 2015.

In short, CMS failed to show how the documents support its determination that private

hospitals made impermissible donations to the hospital districts that transferred funds to the state

for the hospitals' Medicaid payments. CMS has not provided any other documentation in support

of its disallowance action.

Further, the cornerstone of CMS' disallowance of federal financial participation is the

allegation that DCICC and TCICC "fund[ed] contracts previously held by the local governments

that provide faculty staff within the Counties' medical facilities [and the] donated services

augmented Dallas and Tarrant Counties' funds."[68] CMS has completely failed, however, to

identify which DCICC and TCICC services that form the basis of the disallowed funding had

been previously provided by local governments.

---

[67] *See id.*
[68] Ex. 17.

As noted above, in support of its Dallas arrangement calculation, CMS only offered a DCICC contract for services and its accompanying schedules that were effective October 1, 2015, through September 30, 2016. Based on the disallowance letter and supporting documentation, the state is left to assume CMS is arguing that the services offered by DCICC under the October 1, 2015, contract are the same services as those offered by the Dallas County Hospital District prior to 2007, when DCICC began providing services. However, CMS' position is undermined by the fact that DCICC's services have changed since the initial agreement with the University of Texas Southwestern Medical Center. For example, since its first agreement to offer services in 2007, DCICC has both expanded its services (*e.g.*, increased its number of FTE hospitalists from 8 to 60, expanded bilingual neuropsychology services, increased cardiovascular thoracic surgery services levels, etc.) and added new services (*e.g.*, neonatal resuscitation team, pediatric ophthalmologist, multiple clinical service lines, etc.).[69] Therefore, not all services provided by DCICC were previously provided by the Dallas County Hospital District, and CMS has not provided sufficient findings of fact with respect to which of the DCICC services CMS considered when computing the disallowance.[70]

CMS' failure to comply with the requirements of § 430.42 in its disallowance letter or to subsequently provide the state with the basic facts supporting the disallowance and calculation of the disallowed amount deprives the state of adequate notice of the basis of CMS' determination and of the opportunity to fully defend its claimed expenditures or challenge the agency's action.

In previous appeals, this Board has reversed disallowances issued by CMS and its predecessor agency, the HCFA, when the agency failed to establish at a minimum the details

---

[69] *See, e.g.,* Ex. 25, Schedule 3.3(b).
[70] *See* further discussion in Section V.A.1.a. *infra* of flexibility of hospital districts in providing services to indigent residents and contracting with physicians.

supporting the disallowance. For example, in DAB Decision No. 159, the Board considered an appeal by the State of California of a disallowance in the amount of $215,602. HCFA's decision to disallow was based on its determination that the state had not refunded that amount out of the total federal share of an overpayment identified in an audit. However, nowhere in the audit report is the amount of the disallowance separately identified or related to specific audit exceptions. The Board found HCFA's failure to explain how the $215,602 relates to specific findings in the audit fatal to its disallowance action:

> HCFA has presented no evidence to show that the $215,602 disallowed relates to the grounds listed in the HEW Audit Report rather than to [a] rate issue. . . .In view of the lack of specificity in HCFA's findings, the uncertainty as to whether these payments violated Federal or State plan requirements, and the fact that the . . . auditors' findings are disputed . . . we cannot say, based on the record before us, that the State claimed $215,602 in FFP for payments to the County for unallowable costs. . . . For the reasons stated above, we reverse the disallowance.[71]

In DAB Decision No. 244, the Board also found that HCFA had failed to establish a sufficient basis for the appealed disallowance:

> [W]hile Respondent ultimately cited some authority for determining that the disallowed amounts related to unallowable costs, Respondent has never provided us with a sufficient analysis of the relationship of those authorities to the time periods and amounts involved here.
> . . .
> [We] conclude that the disallowance here should be reversed because there is not sufficient support in the record for a determination that the disallowed amount actually represents costs which were unallowable under applicable federal requirements.[72]

Likewise, in the instant case, despite the state's efforts to obtain the information, CMS has never provided a sufficient analysis of the relationship between the alleged donations and the time periods or amounts of the disallowance. As it did in those appeals, the Board should reverse

---

[71] *California Dep't of Health Servs*., DAB Dec. No. 159 (March 31, 1981).
[72] *California Dep't of Health Servs*., DAB Dec. No. 244 (Dec. 31, 1981).

the disallowance on the grounds that the record does not contain sufficient support for the donation determination or the disallowed amount.

## V. The legal and factual premises on which CMS based the disallowance are erroneous.

### A. *There is no donation to a governmental entity.*

Federal law defines a provider-related donation as: (1) a donation or other voluntary payment (whether in cash or in kind); (2) made (directly or indirectly) to a state or unit of local government; (3) by a health care provider or related entity.[73] CMS does not allege that a *cash* payment was made directly or indirectly to the hospital districts, or that an in-kind payment was made *directly* to the hospital districts. Instead, CMS contends that the private hospitals made indirect in-kind donations to the districts when the non-profit organizations "assumed financial responsibilities once held by the local governments."[74] The "financial responsibilities," according to CMS, are "contracts previously held by the local governments that provide faculty staff within the [hospital districts'] facilities."[75] CMS' assertions fail because, as explained below, under Texas state law, the non-profit organizations are not assuming any legal obligation of the hospital districts, but instead are providing a benefit to the individuals in need of indigent or charity care, resulting in savings to the hospital districts. There is no transfer of value from the private hospitals to the hospital districts and, consequently, there is no donation.

### 1. The non-profit organizations are not assuming a legal obligation of the hospital districts.

As an initial matter, CMS does not explain how "assuming financial responsibilities" once held by local governments creates an in-kind provider-related donation. CMS has not cited

---

[73] 42 U.S.C. § 1396b(w)(2)(A) (2014); 42 C.F.R.§ 433.52 (2014).

[74] Ex. 17 at 2; *see also* Ex. 23 ("[T]he total imputed revenue received by the county governments is equivalent to the value of the in-kind contributions (services) funded by TCICC and DCICC through their assumption of certain medical service contracts.").

[75] Ex. 17 at 2.

any authority for this statement. If CMS is alleging that the hospitals have assumed a *legal* financial obligation of the districts, CMS has not said so and has not identified the source of the legal obligation on the districts.

HHSC does not agree that the hospitals are assuming a financial responsibility of the districts, but even if they were, that is not enough in and of itself to create a provider donation. Instead, to rise to the level of an in-kind provider donation, private hospitals would have to assume a financial obligation that the local government is *legally required to fulfill*.

In Texas, there are two sources of legal obligations for hospital districts: statutes and contracts. The private hospitals and non-profit organizations in Dallas and Tarrant Counties have not assumed a legal obligation of the hospital districts arising from either source.

a.      Statutes

Hospital districts have certain obligations under the Texas Constitution to provide health care to indigent residents; but the state constitution permits the Texas Legislature to determine by statute the scope of these obligations.[76] Pursuant to this authority, the Legislature enacted the Indigent Health Care and Treatment Act (IHCTA).[77] Under this law, hospital districts have flexibility with respect to the specific health care services they choose to provide to indigent residents and with respect to how they provide those services. For example, with regard to basic health care services, the statute provides:

> (a)  Except as provided by Subsection (b), a hospital district shall *endeavor to provide* the basic health care services a county is required to provide under Section 61.028, together with any other services required under the Texas Constitution and the statute creating the district.

---

[76] TEX. CONST. art. IX, §9A ("The legislature by law may determine the health care services a hospital district is required to provide, the requirements a resident must meet to qualify for services, and any other relevant provisions necessary to regulate the provision of health care to residents.").

[77] TEX. HEALTH & SAFETY CODE § 61.051 *et seq.*, relating to Persons Who Reside in an Area Served by a Public Hospital or Hospital District.

(b) A hospital district shall coordinate the delivery of basic health care services to eligible residents and may provide any basic health care services the district was not providing on January 1, 1999, but *only to the extent the district is financially able to do so.*[78]

The statute creating the Dallas and Tarrant County hospital districts is Chapter 281 of the Health and Safety Code, which applies to hospital districts in counties of at least 190,000.[79] Chapter 281 provides that the Dallas and Tarrant County hospital districts "*may* appoint, contract for, or employ physicians."[80] The language is permissive, not mandatory, and the authority to employ physicians is limited "only as necessary for the district to fulfill the district's statutory mandate to provide medical and dental care for the indigent and needy residents of the district."[81] As with the Indigent Health Care and Treatment Act, this language does not impose on the Dallas and Tarrant County hospital districts a legal obligation to contract for or employ physicians.

As HHSC stated during discussions concerning the 2007 deferral, "[t]he scope of the local government entity's obligation is…to provide or pay for indigent care that someone else is not providing or paying for."[82] The private hospitals are not assuming a financial obligation the hospital districts are legally required to fulfill.

b.   Contracts

The hospital districts are not parties to the current contracts that CMS alleges comprise the impermissible donations. CMS recognizes that, to the extent the hospital districts had preexisting contractual obligations to third parties, such as physician groups, those contracts

---

[78] *Id.* at § 61.055 (emphasis added).
[79] *See* TEX. HEALTH & SAFETY CODE § 281.001 *et seq.*
[80] § 281.0282(a)(Dallas County) and § 281.0286(a)(Tarrant County)(emphasis added).
[81] *Id.* at § 281.0282(d); *see also id.* at § 281.0286(d).
[82] Ex. 8 at 3.

were terminated.[83] The effect of this was to extinguish altogether the hospital districts' contractual obligations.

The past practice of a governmental entity electing to pay for certain services does not create a legal obligation for the governmental entity to continue to do so in the future. The only way to characterize the Dallas and Tarrant County arrangements as resulting in a provider donation is if the prior provision of, or payment for, care by the public entity in and of itself creates an ongoing legal obligation for the government to continue to provide or pay for these services in perpetuity. When private entities contract for services in the community at their sole discretion, even when similar contracts were previously held by a governmental entity, there is no donation.

If the provider donation rules were interpreted to infer a donation when any private hospital action has incidental benefit to a governmental entity, this would deter private entities from undertaking a broad range of activities that would help the community. For example, an expansion of a private hospital charity care policy could be construed as a donation to a public hospital, since it could result in fewer patients for the public hospital. An interpretation that would deter private hospitals from providing charity care cannot be the one intended by CMS.

The legal structure of the Dallas County arrangement has not changed in any significant way from the one described in documents submitted to CMS in 2007 and 2008. One of the documents provided to CMS was a memorandum describing the funding model.[84] Another document submitted to CMS in 2008 was a letter explaining why there is no assumption of

---

[83] *See, e.g.,* Ex. 17 at 2 ("the DCICC and TCICC . . . fund contracts *previously* held by the local governments") (emphasis added); *see also* Ex. 1 at 4 ("the local government entity would terminate its existing contract with the non-profit organization").

[84] *See* Ex. 26, Memorandum to James Frizzera, CMS, and Daniel Aibel, HHS Office of General Counsel (Aug, 21, 2007).

obligations of the local governmental entity.[85] These documents (along with many others provided to CMS in 2007-2008) explain why these longstanding relationships do not create a legal obligation for the governmental entity.[86]

        2.      The non-profit organizations are providing or paying for indigent or charity care to individuals, not providing a donation to a governmental entity.

Under Texas law, "charity care" means the unreimbursed cost of:

(a) providing, funding, or otherwise financially supporting health care services on an inpatient or outpatient basis to a person classified by the hospital as "financially indigent" or "medically indigent"; and/or

(b) providing, funding, or otherwise financially supporting health care services provided to financially indigent persons through other nonprofit or public outpatient clinics, hospitals, or health care organizations.[87]

A person is "financially indigent" if the person is uninsured or underinsured and is accepted for care with "no obligation or a discounted obligation to pay for the services rendered based on the hospital's eligibility system."[88]

By financially supporting the non-profit health care organizations that contract to provide non-hospital services (*i.e.,* physician services) to financially indigent persons, the private hospitals in Dallas and Tarrant Counties are providing charity care consistent with these definitions. Charity care provides a benefit to the financially indigent individual and does not relieve the hospital districts of any obligation under Texas law.

---

[85] *See Ex. 8.*
[86] The Tarrant County arrangement was not in existence at the time of the Private Hospital UPL program deferral, but was and is structured consistent with the Dallas County model and the Conditions of Participation.
[87] Tex. Health & Safety Code § 311.031(2).
[88] *Id.* at § 311.031(7).

In recognition of the unreimbursed costs of providing charity care, Texas confers on non-profit organizations, including non-profit private hospitals, eligibility for tax-exempt status.[89] Due to this benefit conferred by the state for providing charity care, no legal payment obligation ever arises for another person or governmental entity to pay for charitable health care services rendered to financially indigent persons.

Significantly, the definition of provider-related donation in the Medicaid statute requires a "donation … to a State or unit of local government." Because the hospitals are providing charity care to individual indigent persons, the hospitals are not providing a donation that meets the statutory definition. Services are being provided to individuals, not governmental entities.

B.     *There is no hold harmless arrangement.*

Not only has CMS failed to establish that a donation occurred, they have failed to identify any hold harmless agreement between the hospitals and the hospital districts. While 42 C.F.R. § 433.54(c) is clear that any of the three arrangements listed constitute a hold harmless practice, CMS was not clear when it issued its disallowance letter which practice (or practices) it found applicable to the Texas arrangement.[90] The disallowance letter states: "FFP is not available… when there is a 'hold harmless arrangement' under which providers (or the provider class) could be effectively repaid for a provider-related tax or donation through any direct or indirect payment, offset, or waiver."[91] The last part of this sentence seems to indicate that CMS is considering § 433.54(c)(3). However, the next sentence notes that "[a] hold harmless

---

[89] *See id.* at § 311.043(b) ("In order to qualify as a charitable organization under Sections 11.18(d)(1), 151.310(a)(2) and (e), and 171.063(a)(1), Tax Code, and to satisfy the requirements of this subchapter, a nonprofit hospital shall provide community benefits, which include charity care and government-sponsored indigent health care.").

[90] *See* Ex. 17 at 1.

[91] *Id.*

arrangement is defined to include circumstances in which an increased Medicaid payment is conditional on the receipt of a donation," referring to § 433.54(c)(2).[92]

Not only does one have to guess which impermissible arrangement CMS found, it appears that CMS did not fully find *any* of these arrangements. The arrangement described in § 433.54(c)(1) does not apply because there is no non-Medicaid payment to private hospitals that is positively correlated to the alleged donation. Neither can the arrangement described in § 433.54(c)(2) be said to apply because the private hospitals' Medicaid payments at issue (i.e., UC payments) do not vary based only on the amount of any alleged donation. As described in the administrative rule governing the UC program, payments to private hospitals may vary based on a number of factors, including the private hospitals' allowable UC costs in proportion to those of other providers and available federal and non-federal funds.[93] Payment amounts do not vary, however, on the basis of the value of third-party contracts held by the hospitals or their related parties.

If CMS was likening the Texas arrangement to § 433.54(c)(3), it only found half of what is required. Under § 433.54(c)(3), the state or local government receiving the donation must not only provide a direct or indirect payment, offset, or waiver, but the provision of that payment, offset, or waiver also directly or indirectly guarantees to return a portion of the donation to the provider or others responsible for the donation. The disallowance letter issued by CMS does not discuss how, or even mention if, the alleged payment, offset, or waiver guarantees to return a portion of the alleged donation. This may be because the local governments that IGT on behalf of private hospitals in no way (directly or indirectly) guarantee a return of the alleged donation.

---

[92] *Id.*
[93] *See* 1 TEX. ADMIN. CODE § 355.8201(f).

In fact, the Conditions of Participation that remain in effect require the participants in the UC program to ensure, among other things, that no such guarantee exists.[94]

Not only did CMS' notice of disallowance fail to identify a provider-related donation, CMS also failed to identify any practices that violate the hold harmless provision. Since CMS has not shown that a hold harmless exists, as defined by federal regulation, there is no basis for the disallowance.

C.      *CMS' discovery request reveals its lack of factual support for the disallowance.*

On May 19, 2017 -- 10 business days before the state's brief is due to the Board -- CMS sent HHSC a document request listing 27 separate categories of documents for the state to produce in this appeal.[95] The requests are far-ranging and broad in scope, including multiple requests for financial statements for private and public entities for up to a two year period; multiple non-specific requests for "all correspondence;" and a request for all contracts, MOUs, and letters of agreement between TCICC and all provider groups, hospitals, and governmental units.[96]

It is clear from CMS' document request that it did not have documentation to support its determination of an impermissible donation *before* it issued the disallowance. The request is a desperate and late attempt to find factual support for its finding that an impermissible donation in fact occurred and for the amount of the donation. CMS should not be allowed to search at this point in the process for documentation to back-fill the gaps in its evidence at the expense of the

---

[94] *See* Ex. 20 and Ex. 21 (Certifications).
[95] Ex. 27, Letter from Daniel Wolfe to Charles Greenberg and Monica Leo, May 19, 2017. At the time of this submission, HHSC is in the process of gathering responsive documents in its possession or control and will endeavor to negotiate with CMS to narrow the scope of the document request.
[96] *Id.*

state.[97] As discussed above, federal regulation requires the disallowance notice to include the findings of fact on which the disallowance determination is based; it does not contemplate the federal agency issuing the disallowance and *subsequently* developing the factual record to support the action.[98]

## VI. CMS cannot base its disallowance on SMDL #14-004.

In the September 1, 2016, disallowance letter, CMS states that the private hospital funding arrangement in Texas "constitutes a non-bona fide donations [sic] as described in the May 9, 2014 guidance."[99] HHSC does not agree that the arrangements in Dallas and Tarrant Counties necessarily coincide with the fact situation described in SMDL #14-004. More importantly, to the extent that CMS relies on the letter for the disallowance, such reliance is misplaced because SMDL #14-004: articulates a policy that is inconsistent with the controlling CMS regulation; is not entitled to deference; does not preclude the Dallas and Tarrant County arrangements; is an improperly promulgated legislative rule; and is arbitrary and capricious in light of CMS' prior approval of the Texas funding arrangements.[100]

### A. SMDL #14-004 is inconsistent with 42 C.F.R. § 433.54(c).

SMDL #14-004 states that government entities are free to enter into agreements with private entities, but Medicaid payments may be in jeopardy if a hold harmless provision or practice exists.[101] The guidance describes two sets of circumstances under which a public-private

---

[97] The state would be harmed by this tactic because interest is accruing on the disallowance amount during the pendency of the appeal. Additionally, the disallowance action has created uncertainty regarding the future of private hospital funding in the state.

[98] *See* 42 C.F.R. § 430.42.

[99] Ex. 17.

[100] SMDL #14-004 is subject to review under the Administrative Procedure Act because it constitutes "final agency action" within the meaning of 5 U.S.C. § 704. First, SMDL #14-004 represents "the 'consummation' of the agency's decisionmaking process" because CMS uses affirmative and definitive language when discussing its future approval of SPAs and disallowances. *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). Second, CMS clearly intends that "legal consequences will flow" from SMDL #14-004, as evidenced by CMS' reliance on the letter as its basis for the current disallowance. *See id.* at 178.

[101] Ex. 1 at 1; *see* regulatory description of a hold harmless provision or practice *supra*.

partnership arrangement results in a non-bona fide donation: arrangements that obligate a private hospital to assume the programmatic responsibility of a unit of government; and arrangements that obligate a private hospital to sign lease agreements at an amount greater than fair market value.[102] CMS does not, however, attempt to explain how these arrangements constitute hold harmless practices under 42 C.F.R. § 433.54(c).

On page four of SMDL #14-004, CMS describes the circumstances of the partnership arrangement where non-Medicaid services are delivered to non-Medicaid eligible individuals, but CMS does not attempt to apply § 433.54(c) to these circumstances, leaving it to the states to determine which hold harmless practice is implicated. The existence of § 433.54(c)(1) can be easily dismissed given that the supplemental payments to private hospitals described in the arrangement are Medicaid payments, and § 433.54(c)(1) applies to non-Medicaid payments. A hold harmless practice under § 433.54(c)(3) can also be dismissed because the letter says nothing of the state guaranteeing to return a portion of the donation to the private hospitals. The existence of § 433.54(c)(2), however, is less clear. While the Medicaid payment to the donor in the arrangement described in SMDL #14-004 may in the broadest sense be considered conditional on receipt of the donation, the letter is silent as to whether the Medicaid payment to the donor "varies based *only* on the amount" of the donation.[103] CMS' conclusion that a hold harmless arrangement exists because there is a provider-related donation (a contract to provide services) and the receipt of supplemental payments "is the return of some, or all, of the donation" is much broader than § 433.54(c)(2).[104]

---

[102] Ex. 1 at 4. According to the SMDL, the first arrangement was one of many proposed partnerships CMS examined, but it did not say in what context. CMS *may* have meant in the course of drafting the letter, but it seems possible it may have meant in the context of SPAs, deferrals, or financial management reviews. This information would have been useful to understand the process by which CMS came to write the letter and the extent to which the letter is a departure from previous CMS actions.

[103] 42 C.F.R. § 433.54(b) (emphasis added); *see id.*

[104] Ex. 1 at 4.

In the absence of the necessary legal analysis, CMS mixes up the three distinct types of hold harmless practices laid out in the regulation and distills them down to the following conclusion: *any* arrangement such as those described in the guidance (not the regulation) would be considered a hold harmless arrangement, and the donation "would not be considered bona fide when such arrangements are *tied in any way*, directly or indirectly, to Medicaid reimbursement under the Medicaid state plan."[105] The result is that the relationship between the donation and the Medicaid reimbursement described in SMDL #14-004 is far more general than the relationship of these two elements in § 433.54(c).

SMDL #14-004 also strays from the regulation by focusing only on the existence of a hold harmless provision or practice, which assumes the existence of a provider-related donation. As discussed above, HHSC does not believe that the funding arrangement in question results in a provider-related donation as defined in the statute and regulations, and thus the hold harmless analysis is unnecessary. For these reasons, the policy espoused by SMDL #14-004 is inconsistent with and goes well beyond the Act and CMS' regulations.

B.      *SMDL #14-004 is not entitled to deference.*

When a court reviews an agency's construction of a statute and finds that Congress has not directly addressed the precise question at issue, it should defer to the agency's interpretation if it is based on a permissible construction of the statute.[106] This is known as *Chevron* deference, and it applies to judicial review of agency regulations. By contrast, agency interpretations of regulations, "such as those in opinion letters--like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law--do not warrant

---

[105] *See id.* (emphasis added).
[106] *See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).

*Chevron*-style deference" by a reviewing court.[107] Rather, "[i]nterpretive guidance from administrative agencies that is not the product of formal, notice-and-comment rulemaking is entitled to respect 'to the extent that the interpretations have the power to persuade.'"[108] Factors that give an interpretation power to persuade include the thoroughness evident in the agency's consideration, the validity of its reasoning, and its consistency with earlier and later pronouncements.[109]

As previously discussed, the SMDL lacks a competent legal analysis of the regulation at issue, relying instead on a brief summary of the two funding arrangements CMS opposes. Without attempting to distinguish these prohibited arrangements from previously-approved ones, CMS developed inconsistent guidance. CMS did not acknowledge the inconsistency, let alone discuss the process by which it came to issue SMDL #14-004, a factor that diminishes its persuasiveness. Moreover, the inconsistency of SMDL #14-004 with CMS' prior treatment of the Dallas funding arrangement significantly reduces the letter's power to persuade.[110] This lack of persuasiveness means that the letter CMS now cites as the basis for its disallowance would not be entitled to deference by a reviewing court.

C. *SMDL #14-004 does not preclude the Dallas and Tarrant County arrangements.*

HHSC understands that some states have attempted to implement private hospital funding mechanisms similar to those in Dallas and Tarrant Counties but without the safeguards that prevent the arrangements from resulting in impermissible provider-donations.[111] SMDL #14-004

---

[107] *Christensen v. Harris County*, 529 U.S. 576, 587 (2000).
[108] *Battle Creek Health Sys. v. Leavitt*, 498 F.3d 401, 409 (6th Cir. 2007)(quoting *Bank of New York v. Janowick*, 470 F.3d 264, 269 (6th Cir. 2006)).
[109] *Estate of Landers v. Leavitt*, 545 F.3d 98, 107 (2d Cir. 2008), as revised (Jan. 15, 2009)(citing *U.S. v. Mead*, 533 U.S. 218, 228 (2001)).
[110] *See, e.g., Statesman II Apartments, Inc. v. U.S.*, 66 Fed. C1. 608, 623 (2005) (holding that HUD's statutory interpretation was not entitled to *Skidmore* deference in part because it was inconsistent with HUD's various earlier interpretations of the statute).
[111] *See, e.g.,* Ex. 9 (Conditions of Participation) and Exs. 20 and 21 (Certifications).

may fairly be read to caution states and stakeholders that they must carefully adhere to federal law in structuring their public-private partnerships so that (1) the payment for services to indigent populations by private entities is not done pursuant to an agreement guaranteeing a return of funds to the private entity; and (2) the IGT by a governmental entity is not conditioned on the provision of or payment for indigent or other services by the private entities. Such a reading of SMDL #14-004 makes sense, but should not be misconstrued to preclude arrangements where no such agreements exist -- that is, arrangements that adhere to federal law.

CMS has not provided evidence of an agreement between Dallas and Tarrant County hospital districts and private hospitals that contradicts the regulations or CMS' prior approvals. It is not enough for CMS to say the arrangements are like those described in SMDL #14-004; the Board should require that CMS do what they have so far failed to do: come forward with evidence that the arrangements do not comply with federal law.

      D.      *CMS improperly promulgated a legislative rule.*

If CMS still believes that SMDL #14-004 precludes the Dallas and Tarrant County arrangements, it nonetheless may not rely on the letter to support the disallowance. The Administrative Procedure Act (APA) distinguishes between two types of agency rules: "legislative rules" that are issued through formal rulemaking procedures and have the force and effect of law; and "interpretive rules" that advise the public of how an agency construes the statutes and regulations it administers and do not have the force and effect of law.[112] One of the questions that must be answered in determining whether an agency rule is legislative or interpretative is "whether the rule effectively amends a prior legislative rule."[113] If a second rule

---

[112] *Perez v. Mortgage Bankers Ass'n*, 135 S.Ct. 1199, 1203-04 (2015).
[113] *SBC Inc. v. F.C.C.*, 414 F.3d 486, 498 (3d Cir. 2005)(*Am. Mining Congress v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993)).

is inconsistent with a prior legislative rule, then the second rule must be an amendment of the first; and an amendment to a legislative rule must also be legislative.[114] Because SMDL #14-004 is inconsistent with CMS' controlling regulation, it is an improperly promulgated "legislative" rule, and CMS may not rely on the letter to support the disallowance.

     E.     *CMS' previous approval of the Dallas funding arrangement under the current, unchanged regulatory requirements renders SMDL #14-004 arbitrary and capricious.*

An agency is not required to use notice-and-comment procedures to issue an initial interpretive rule or to amend or repeal that rule.[115] However, in *Perez v. Mortgage Bankers Association*, the Supreme Court noted that the APA provides recourse to regulated entities when agency decisions skirt the notice-and-comment provisions by placing a variety of constraints on agency decision making, the arbitrary and capricious standard chief among them.[116] To begin, agencies may not "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books."[117] Moreover, when an agency's new policy rests upon factual findings that contradict those which underlay its prior policy, or when its prior policy "has engendered serious reliance interests that must be taken into account," it would be arbitrary and capricious for the agency to ignore such matters.[118] According to the Court, "[i]n such cases it is not that further

---

[114] *Id.* at 497(citations omitted); *see also Shalala v. Guernsey Mem'l Hosp.,* 514 U.S. 87, 100 (1995) ("We can agree that APA rulemaking would still be required if [the Medicare Provider Reimbursement Manual] § 233 adopted a new position inconsistent with any of the Secretary's existing regulations.").

[115] *See Perez*, 135 S.Ct. at 1206-07 (citing 5 U.S.C. § 553(b)(A) to reject the doctrine that agencies must use notice-and-comment procedures when issuing a new interpretation of a regulation, i.e., an interpretive rule).

[116] *Id.* at 1209 (referring to 5 U.S.C. § 706). Petitioners in *Perez* only argued the Department of Labor's rule was an invalid change in interpretation due to a lack of notice-and-comment rulemaking, and the court held that interpretive rules do not require formal rulemaking. While *Perez* acknowledged the arbitrary and capricious standard as a constraint on agency action, the Court did not consider whether the Department of Labor's interpretive rule was in fact arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law because the Petitioners did not raise that argument. The Court also did not address whether the change in policy was actually a legislative rule masquerading as an interpretive rule because Petitioners waived this argument.

[117] *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (citing *U.S. v. Nixon*, 418 U.S. 683, 694-96 (1974)).

[118] *Perez*, 135 S.Ct. at 1209 (citing *Fox Television Stations, Inc.*, 556 U.S. at 515).

justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy."[119]

As previously stated, SMDL #14-004 marks a departure from the provisions set forth in Section 1903(w) of the Social Security Act, CMS' existing regulations regarding provider-related donations, and CMS' prior approvals of the Texas program. In 2006, CMS approved the private-hospital UPL state plan amendment after being fully informed and provided with sample contracts showing that private hospitals would provide indigent services that could result in extra funds available to local governmental entities that could be used to fund the Medicaid program.[120] In 2008, CMS lifted the private hospital UPL deferral with knowledge of the funding arrangements in Dallas County and elsewhere. In 2012, CMS approved payments to private hospitals under the UC program knowing that they are funded using the same funding mechanisms as were used under the former UPL program and under the same Conditions of Participation.

In other words, for more than 11 years—consistent with the Social Security Act and federal regulations—CMS has knowingly approved and allowed the arrangement in Dallas County to continue. The Dallas and Tarrant County funding arrangements remain compliant with the multiple disclosures to CMS as well as the Conditions of Participation; the only thing that has changed since the prior CMS approvals is SMDL #14-004. CMS has not provided an explanation or justification for its change in policy, nor has it acknowledged (let alone addressed) its

---

[119] *Fox Television Stations, Inc.*, 556 U.S. at 515-16.
[120] *See, e.g.,* Ex. 3 at 4-5, explaining that "Affiliated Hospitals . . . alleviate the Local Taxing Entity's tax burden by providing care to the indigent, thereby allowing the Local Taxing Entity to utilize its ad valorem tax revenue to fund the Medicaid program," and stating that "the State is attaching a copy of the indigent care agreement . . . for every region that currently plans to operate a Medicaid supplemental payment program" under the state plan.

inconsistency with CMS' past approvals. Given the serious reliance interests engendered by CMS' previous policy and its approvals in accordance therewith, it would be arbitrary and capricious to disallow federal funds on the basis of the new policy announced in SMDL #14-004.

## VII.  HHSC acted in reliance on CMS' previous assurances.

By issuing the disallowance, CMS is acting contrary to two specific statements made by CMS to the state. First, in its letter to HHSC releasing the 2014 deferral, CMS stated that "to the extent CMS determines that any financing structure within Texas' Medicaid program violates federal statute and regulation, we would expect Texas to make necessary adjustments by December 2015."[121] CMS did *not* subsequently notify HHSC that it had determined that the financing structure in Dallas and Tarrant Counties violates federal statute and regulation. CMS then disallowed federal matching funds for expenditures made before December 2015.

More importantly, CMS agreed that Texas would have until September 1, 2017, to make changes to the funding arrangements, if required following the discussions between CMS and HHSC during the summer of 2015.[122] CMS confirmed to HHSC that current funding arrangements would be allowed to continue for payments through August 2017, without risk of disallowance on the same grounds questioned in the 2014 deferral.[123]

CMS' agreement to provide time for transitioning to other funding models, should that be necessary, was reasonable and recognized several important facts and considerations:

- Private hospital participation in providing care to the Medicaid and uninsured populations is critical to the healthcare safety net in Texas;
- Unplanned disruptions to the safety net jeopardize the ability of these vulnerable populations to access needed care;
- The current funding arrangements have been in place across Texas since 2005 and in Dallas and Tarrant Counties since March 2007 and May 2009 respectively, with the knowledge and approval of CMS;

---

[121] *See* Ex. 14.
[122] *See* Ex. 15.
[123] *Id.*

- Unwinding the long-standing funding mechanisms, including the public process for local governmental entities to revise or adopt budgets, takes time;
- Identifying and implementing alternative funding sources for private hospital payments may require state legislative action;
- The Texas legislature meets every two years and, at that time, was not scheduled to be in session again until January 2017; and
- Notice and comment rulemaking by HHSC may be necessary to implement legislative directives.

Following the conclusion of the discussions during the summer of 2015, HHSC believed that CMS would notify HHSC of its final determination after reviewing all of the information and documentation provided to CMS by the state.[124] CMS never notified HHSC of a final decision on the funding arrangements. HHSC and hospital stakeholders acted in good faith in response to the financial review of private hospital payments, the deferral, and the series of discussions during the summer of 2015. In reliance on CMS' written assurances that payments were not at risk of disallowance, HHSC continued making payments to private hospitals while waiting for a decision from CMS.

In making the UC payments now at issue, HHSC acted in reliance on multiple CMS statements. However, CMS (1) disallowed federal funds they previously stated were not at risk; and (2) did not live up to the terms of the agreement extending until September 1, 2017, the date for Texas to make changes to private hospital funding arrangements. In order to effectively run as large and complicated of a program as Medicaid, HHSC must be able to rely on CMS' statements.

## CONCLUSION

Based on the foregoing, Appellant Texas Health and Human Services Commission respectfully requests that the Board reverse CMS' disallowance in its entirety.

---

[124] *See, e.g.,* Ex. 28, Email from Kristin Fan, CMS, to Monica Leo Re: Private Hospital funding -- topics for discussion (Sept. 15, 2015)("We have received all of the information and I don't think we have any other questions that need to be answered. We are working with our leadership to discuss next steps.").

Respectfully Submitted,

_Monica Leo_ _____

Monica Leo
Staff Counsel
Texas Health & Human Services Commission
Brown-Heatly Building
4900 N. Lamar
4th Floor, Suite 4130
Austin, Texas 78751
Mail Code: 1100
Telephone: (512) 424-6558
Facsimile: (512) 424-6586
Monica.Leo@hhsc.state.tx.us


Charles Greenberg
Director of Policy
Office of the Chief Counsel


Stephanie Tourk
Staff Counsel