# EXHIBIT O



**July 2014**

# MEDICAID FINANCING

# States' Increased Reliance on Funds from Health Care Providers and Local Governments Warrants Improved CMS Data Collection

On March 13, 2015, GAO reissued this report in conjunction with the release of an e-supplement that provides more detailed and state-level data on sources of funds used by states to finance the nonfederal share of their Medicaid programs. This data was collected through a questionnaire completed by all 50 states and the District of Columbia. The report was revised to add links to the e-supplement on the highlights page and pages 4 and 42. The reissued report also includes a revision on page 14 to the amount of total nonfederal share of Medicaid payments from sources other than health care providers and local governments and revisions on pages 49, 50, and 52 on the number of provider taxes in effect from 2008 through 2012.



# Highlights

Highlights of GAO-14-627, a report to congressional requesters

# MEDICAID FINANCING

## States' Increased Reliance on Funds from Health Care Providers and Local Governments Warrants Improved CMS Data Collection

## Why GAO Did This Study

Medicaid, a jointly financed federal-state program, cost $432 billion in 2012. States use various sources of funds to finance the nonfederal share, such as state funds and funds from health care providers and local governments. Concerns have been raised about increased Medicaid payments that are financed with funds from providers receiving the Medicaid payments. Although such financing arrangements are allowed under certain conditions, they can also result in shifting costs to the federal government with limited benefits to providers and beneficiaries.

GAO was asked to review states' financing of the nonfederal share of Medicaid. GAO examined the extent to which (1) states have relied on funds from health care providers and local governments to finance the nonfederal share; (2) this reliance has changed in recent years, and any implications of changes; and (3) CMS collects data to oversee states' sources of funds. GAO administered a questionnaire to all state Medicaid agencies, examined effects of financing changes in a nongeneralizable sample of three states selected in part based on Medicaid spending and geographic diversity, and met with CMS officials.

## What GAO Recommends

GAO recommends that CMS take steps to ensure states report accurate and complete data on all sources of funds to finance the nonfederal share. CMS did not concur with GAO's recommendation but stated that it will examine efforts to improve data collection for oversight. As discussed in the report, GAO believes its recommendation is valid.

View GAO-14-627. To view the e-supplement, click on GAO-15-227SP. For more information, contact Katherine M. Iritani at (202) 512-7114 or iritanik@gao.gov.

## What GAO Found

GAO found, based on a questionnaire sent to state Medicaid agencies, that states financed 26 percent, or over $46 billion, of the nonfederal share of Medicaid expenditures with funds from health care providers and local governments in state fiscal year 2012. State funds were most of the remaining nonfederal share.

Nationally, states increasingly relied on funds from providers and local governments in recent years to finance the nonfederal share, based on GAO's analysis (see figure). In the three selected states this increase resulted in cost shifts to the federal government. While the total amount of funds from all sources, including state funds, increased during state fiscal years 2008 through 2012, funds from providers and local governments increased as a percentage of the nonfederal share, while state funds decreased. GAO's review of selected financing arrangements in California, Illinois, and New York illustrates how the use of funds from providers and local governments can shift costs to the federal government. For example, in Illinois, a $220 million payment increase for nursing facilities funded by a tax on nursing facilities resulted in an estimated $110 million increase in federal matching funds and no increase in state general funds, and a net payment increase to the facilities, after paying the taxes, of $105 million.

Amount of the Nonfederal Share of Medicaid Payments from Health Care Providers and Local Governments, State Fiscal Years 2008 through 2012



Source: GAO. | GAO-14-627

The Centers for Medicare & Medicaid Services (CMS)—the federal agency that oversees Medicaid—has not ensured the data on state Medicaid financing are accurate and complete, and while new initiatives to improve reporting have begun, data gaps remain. More reliable data to effectively monitor the program would allow CMS and others to identify net provider payments and assess the effects of the payments on providers, beneficiaries, and the federal government. GAO has found that as currently designed, two CMS initiatives to improve data collection have data gaps that will limit their effectiveness for CMS's oversight.

_____

# Contents

| | | |
|---|---|---|
| Letter | | 1 |
| | Background | 5 |
| | States Relied on Funds from Health Care Providers and Local Governments to Finance 26 Percent of the Nonfederal Share in 2012, with Percentages Varying Significantly among States | 14 |
| | States' Reliance on Funds from Providers and Local Governments Has Increased, and Financing Arrangements in Three Selected States Illustrate Cost Shifts to the Federal Government | 18 |
| | CMS Has Not Ensured Its Data on Sources of Funds States Use to Finance Medicaid Are Accurate and Complete, and New Reporting Initiatives Fall Short of What Is Needed for Oversight | 34 |
| | Conclusions | 38 |
| | Recommendation for Executive Action | 39 |
| | Agency Comments and Our Evaluation | 40 |
| Appendix I | Scope and Methodology of State Questionnaire and Analysis of Changes in Medicaid Financing in Three Selected States | 42 |
| Appendix II | Medicaid Financing Arrangements Used to Generate Federal Payments and Actions to Address Them | 46 |
| Appendix III | Percentage and Amount of the Nonfederal Share of Medicaid from Providers and Local Governments in 2012 | 47 |
| Appendix IV | Provider Tax Analysis | 49 |
| Appendix V | Changes in Percentage and Amount of the Nonfederal Share of Medicaid from Providers and Local Governments | 54 |
| Appendix VI | Comments from the Department of Health and Human Services | 56 |

| Appendix VII | GAO Contact and Staff Acknowledgments | 59 |

| Related GAO Products | | 60 |

Tables

| | Table 1: Federal Statutory and Regulatory Requirements Governing Use and Reporting for Health Care Provider Taxes, Provider Donations, Intergovernmental Transfers, and Certified Public Expenditures | 11 |
| | Table 2: The Amount and Percentage of the Nonfederal Share of Medicaid Payments States Financed with Funds from Health Care Providers and Local Governments, State Funds, and Other Sources of Funds in California, Illinois, and New York in State Fiscal Years 2008 and 2012 | 33 |
| | Table 3: The Percentage and Amount of the Nonfederal Share of Medicaid Payments from Health Care Providers and Local Governments in State Fiscal Year 2012, by State | 47 |
| | Table 4: Changes in the Percentage and Amount of the Nonfederal Share of Medicaid Payments from Health Care Providers and Local Governments, State Fiscal Years 2008 through 2012, by State | 54 |

Figures

| | Figure 1: The Percentage and Amount of the Nonfederal Share of Medicaid Payments from Health Care Providers, Local Governments, State Funds, and Other Sources of Funds in State Fiscal Year 2012 | 15 |
| | Figure 2: The Percentage and Amount of the Nonfederal Share of Medicaid Payments from Health Care Providers and Local Governments in State Fiscal Year 2012, by State | 17 |
| | Figure 3: Amount of the Nonfederal Share of Medicaid Payments from Health Care Providers and Local Governments, State Fiscal Years 2008 through 2012 | 19 |
| | Figure 4: Changes in the Percentage and Amount of the Nonfederal Share of Medicaid Payments from Health Care Providers and Local Governments, State Fiscal Years 2008 through 2012, by State | 21 |

Figure 5: Percentage of Nonfederal Share of Medicaid Payments from Health Care Providers and Local Governments, State Funds, and Other Sources of Funds, State Fiscal Years 2008 through 2012, by Medicaid Payment Type                                         23
Figure 6: Estimated Effect of Increased Medicaid Payments and Changes to Provider Tax on Federal and Nonfederal Share of Total Regular Medicaid Payments and on Net Medicaid Payments to Skilled Nursing Facilities in California in State Fiscal Year 2011                          27
Figure 7: Estimated Effect of Increased Medicaid Payments and New Provider Tax on Federal and Nonfederal Share of Total Regular Medicaid Payments and on Net Medicaid Payments to Nursing Facilities in Illinois in State Fiscal Year 2012                                          29
Figure 8: The Effect of Increased Medicaid Supplemental Payments and Amounts of Intergovernmental Transfers on Federal and Nonfederal Share of Total Medicaid Payments and on Medicaid Payments Net of Intergovernmental Transfers for Inpatient Services to Two Hospitals in New York from State Fiscal Years 2008 to 2009                                          32
Figure 9: Federal Provider Tax Threshold and State Provider Tax Rates for Taxes Levied as a Percentage of Net Patient Service Revenue from 2008 through 2012                          51

**Abbreviations**

| | |
|---|---|
| CMS | Centers for Medicare & Medicaid Services |
| CPE | certified public expenditure |
| DSH | Disproportionate Share Hospital |
| FMAP | federal medical assistance percentage |
| HCFA | Health Care Financing Administration |
| IGT | intergovernmental transfer |
| MACPAC | Medicaid and CHIP Payment and Access Commission |
| Recovery Act | American Recovery and Reinvestment Act of 2009 |
| T-MSIS | Transformed Medicaid Statistical Information System |
| UPL | Upper Payment Limit |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

# GAO

U.S. GOVERNMENT ACCOUNTABILITY OFFICE

441 G St. N.W.
Washington, DC 20548

July 29, 2014

The Honorable Darrell E. Issa
Chairman
Committee on Oversight and Government Reform
House of Representatives

The Honorable James Lankford
Chairman
Subcommittee on Energy Policy, Health Care and Entitlements,
Committee on Oversight and Government Reform
House of Representatives

The Medicaid program involves significant and growing expenditures for
the federal government and states, and states have used various sources
of funds to help finance their share of the program.[1] In 2012, Medicaid
provided health care coverage for 58 million low-income individuals at a
cost of $432 billion.[2] The federal government matches each state's
Medicaid expenditures for services according to a state's federal medical
assistance percentage (FMAP).[3] On average, the federal share of
Medicaid service expenditures is about 57 percent. States finance the
nonfederal share in large part through state general funds and depend on
other sources of funds, such as taxes on health care providers and funds
from local governments, to finance the remainder. In accordance with
federal requirements, states have the flexibility to set payment rates for
covered services and generally administer the Medicaid program, subject
to the approval and oversight of the Centers for Medicare & Medicaid
Services (CMS).

---

[1]For purposes of this report, sources of funds are the means (e.g., taxes) by which funds
are supplied by entities (e.g., providers) to the state to be used to finance the nonfederal
share of Medicaid; we do not use the term to refer to the entities themselves.

[2]See Department of Health and Human Services, *2013 Actuarial Report on the Financial
Outlook for Medicaid* (Washington, D.C.: 2013).The number of individuals covered is the
average enrollment over the course of the year.

[3]The FMAP is based on a formula established by law under which the federal share of a
state's Medicaid expenditures for services generally may range from 50 to 83 percent.
States with lower per capita income receive a higher FMAP for services.

Our past work has found that flexibility in federal requirements regarding states' calculations of Medicaid provider payments and financing of the nonfederal share has enabled states to create various financing arrangements that have affected the share supplied by the federal and state governments and the amounts paid to providers.[4] Although these types of arrangements are permissible under certain conditions, they have resulted in states being able to maximize federal matching funds and rely less on state general funds. Specifically, states have been able to shift large shares of Medicaid costs to health care providers[5] and local governments by taxing health care providers or by requiring local governments to supply funds to be used for Medicaid payments.[6] In addition, states have made large supplemental payments—payments that are separate from the regular payments states make based on claims submitted for services rendered—to providers that supplied funds to finance the nonfederal share of the payments, for purposes of obtaining billions of dollars in additional federal matching funds without a commensurate increase in state funds used to finance the nonfederal share of these Medicaid expenditures. Such arrangements have the effect of shifting costs to the federal government because the federal government then pays its share of the new payments.

We and others have raised concerns about these financing arrangements and whether data reported by states are sufficient for CMS to determine that these arrangements are in compliance with applicable federal requirements.[7] CMS plays an important role in ensuring the fiscal integrity of Medicaid. Its responsibilities include ensuring that federal Medicaid matching funds are provided for eligible expenditures and that the federal

---

[4]A list of related GAO products appears at the end of this report.

[5]For purposes of this report, health care providers include both private providers, such as hospitals and nursing homes, that serve Medicaid beneficiaries and state- or county-owned or -operated providers, including hospitals and nursing homes.

[6]Local government funds can come from local government entities, such as counties, cities, and local hospital districts, as well as directly from local-government-owned or -operated providers, such as county hospitals. For purposes of this report, local government refers to both local government entities and local-government-owned or -operated providers.

[7]See Medicaid and CHIP Payment and Access Commission, *Report to the Congress on Medicaid and CHIP* (Washington, D.C.: March 2014). See GAO, *Medicaid: More Transparency of and Accountability for Supplemental Payments Are Needed*, GAO-13-48 (Washington, D.C.: Nov. 26, 2012).

government and states share in the financing of the Medicaid program as established by law. But we have reported that CMS has lacked data on large Medicaid payments made to government providers and on financing arrangements states have used for these Medicaid payments.[8] Supplemental payments totaled at least $43 billion in federal fiscal year 2011, up from $32 billion federal fiscal year 2010 and at least $23 billion in federal fiscal year 2006. Because supplemental payments are typically not paid through states' Medicaid claims systems, the payments are not captured in federal data systems and therefore lack transparency for oversight purposes.[9] In 2003, we designated Medicaid as a high-risk program, in part because of concerns related to oversight of these Medicaid payment and financing arrangements.[10]

You asked us to study how states are financing the nonfederal share of their Medicaid programs and whether states' financing has changed in recent years. This report provides information on (1) the extent to which states have relied on funds from health care providers and local governments to finance the nonfederal share of Medicaid; (2) the extent to which states have changed their reliance on health care providers and local governments to help finance the nonfederal share of Medicaid in recent years, and implications, if any, of these changes; and (3) the extent to which CMS collects data to oversee states' use of various sources of funds.

To determine the extent to which states have relied on funds from health care providers and local governments to finance the nonfederal share of Medicaid, we sent a questionnaire to all states and the District of Columbia.[11] We fielded the questionnaire from July 2013 through November 2013 and received responses from all states. The questionnaire collected information on each state's use of funds from health care providers and local governments, state general funds, and

---

[8]See GAO-13-48 and GAO, *Medicaid: Improved Federal Oversight of State Financing Schemes Is Needed*, GAO-04-228 (Washington, D.C.: Feb. 13, 2004).

[9]Since 2010 CMS has required states to report supplemental payments when reporting quarterly expenditures for purposes of claiming federal Medicaid matching funds; however, payments are reported in the aggregate and not on a provider-specific basis.

[10]See GAO, *High Risk Series: An Update*, GAO-13-283 (Washington, D.C.: February 2013).

[11]For purposes of this report, "states" refers to the 50 states and the District of Columbia.

other sources to finance the nonfederal share of Medicaid from state fiscal year 2008 through state fiscal year 2012, and the type of Medicaid payments—for example, regular or supplemental—to which the funds were applied.[12] States reported both actual amounts and estimated amounts based on the information available to them.[13] We did not independently verify the data reported by states in the questionnaire; however, we reviewed published data submitted by state Medicaid programs to CMS and to outside researchers to assess the reasonableness of the data reported. We believe the data are reliable for our purposes. Assessing whether states were compliant with federal requirements related to nonfederal sources of funds for Medicaid payments was not within the scope of this review. For additional questionnaire results reproduced as an e-supplement, see GAO-15-227SP.

To determine the extent to which states have changed their reliance on funds from health care providers and local governments to help finance the nonfederal share of Medicaid in recent years, and what the implications have been, if any, of these changes, we analyzed questionnaire responses and obtained more in-depth information on any implications of changes in reliance on funds from health care providers and local governments from a nongeneralizable sample of three states. These states—California, Illinois, and New York—were selected on the basis of having large Medicaid programs, based on spending for Medicaid services; making large amounts of certain supplemental payments to providers; having made changes in sources of funds to finance the nonfederal share and in Medicaid payment rates from 2008 through 2011; and geographic diversity. In these three states, we obtained and analyzed Medicaid payment data from before and after an increase in funds from health care providers or local governments that occurred during state

---

[12]For purposes of this report, state funds refers to state general funds and intra-agency funds, which are intra-agency payments, intra-agency transfers, and intra-agency certified public expenditures. Other sources of funds include tobacco settlement funds and state trust funds. Taxes on health care services, or the provision or payment for these services, are being reported separately as health care provider taxes.

States' fiscal years are set by states and do not necessarily align with the federal fiscal year. Most state fiscal years start July 1 and end June 30.

[13]States were asked to report sources of funds used to finance the nonfederal share of four types of Medicaid payments. See app. I for information about the four types of Medicaid payments.

fiscal years 2008 through 2012 to determine the effect of the change on the amounts of Medicaid payments states made to providers and on the amounts of state general funds, funds from local governments, and federal funds used to finance these payments. We also conducted interviews with Medicaid department officials in these states. (See app. I for more detail on the scope and methodology used to determine the extent to which states have relied on funds from health care providers and local government to finance the nonfederal share of Medicaid and to select the nongeneralizable sample of three states.) We also interviewed CMS officials, including representatives from regional offices, regarding states' use of various sources of funds to finance the nonfederal share of Medicaid and CMS oversight. Assessing whether sources of funds, such as provider taxes, complied with applicable federal requirements was not within the scope of our review. We determined that the questionnaire responses states provided were sufficiently reliable for our purposes by contacting state Medicaid department officials and clarifying conflicting, unclear, or incomplete information. We determined that the data from California, Illinois, and New York were sufficiently reliable for our purposes by checking the data for discrepancies and omissions and interviewing state officials to resolve any identified discrepancies. Findings from these three states are not generalizable to other states.

To determine the extent to which CMS collects data to oversee states' use of various sources of funds, we asked CMS officials about the data they collect, the reliability of the data, and their oversight of state financing of the nonfederal share. We also reviewed relevant federal laws, regulations, and guidance. As discussed in the report, we identified a number of concerns with the accuracy and completeness of CMS's data.

We conducted this performance audit from January 2013 to July 2014 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

# Background

Within broad federal requirements under Title XIX of the Social Security Act, each state administers and operates its Medicaid program in accordance with a state Medicaid plan, which must be approved by CMS. A state Medicaid plan describes the groups of individuals to be covered;

the methods for calculating payments to providers, including which types of providers are eligible to receive payments; and the categories of services covered, such as inpatient hospital services, nursing facility services, and physician services. Any changes a state wishes to make in its Medicaid plan, such as establishing new Medicaid payments to providers or changing methodologies for payment rates for services, must be submitted to CMS for review and approval as a state plan amendment. CMS informs states about Medicaid program requirements through federal regulations, a published State Medicaid Manual, standard letters issued to all state Medicaid directors, and technical guidance manuals on particular topics.

## Federal Funds and State Medicaid Payments

To obtain federal matching funds for their Medicaid payments to providers, states submit their estimated payments to CMS each quarter for an upcoming quarter. After CMS has approved the estimate, it makes federal matching funds available to the state for the purpose of making Medicaid payments during the quarter. States typically make Medicaid payments to providers with a combination of nonfederal funds and federal funds. After each quarter, states submit a quarterly payment report.[14]

Federal matching funds are available to states for different types of payments that states make, including payments directly to providers for services rendered, capitation payments to managed care organizations,[15] and supplemental payments. States make payments directly to providers under a fee-for-service delivery system. Providers render services to beneficiaries and then submit bills to the state to receive payment; states pay the providers based on established payment rates for the services provided. States also make capitation payments to managed care organizations that contract with the state to provide or arrange for medical services for Medicaid beneficiaries enrolled with the managed care organization. States make payments to managed care organizations, and the organizations pay the providers. Most states use both fee-for-service and managed care delivery systems, with some beneficiaries receiving

---

[14]CMS reconciles the amount of federal funds advanced to the state at the beginning of the quarter with the amount of federal funds claimed for payments made during the quarter to finalize the federal funding provided to the state. This results in a reconciliation adjustment to finalize the federal reimbursement to the state for the quarter.

[15]A capitation payment is a fixed monthly payment per enrollee that a state prospectively pays to a managed care organization.

services through fee-for-service and other beneficiaries receiving services through managed care. Supplemental payments are generally made monthly, quarterly, or annually as lump sum payments. States have some flexibility in determining to whom they make supplemental payments. Supplemental payments include Disproportionate Share Hospital (DSH) payments, which states are required by federal law to make to hospitals that serve large numbers of Medicaid and uninsured low-income individuals. Many states also make other supplemental payments that are not required under federal law. For purposes of this report, we refer to these payments as non-DSH supplemental payments. These payments include Medicaid Upper Payment Limit (UPL) supplemental payments[16] and payments made to hospitals and other providers authorized under Medicaid demonstrations.[17]

## Nonfederal Sources of Funds for State Medicaid Payments

States have a significant amount of flexibility in determining which sources of funds to use to finance their nonfederal share, although federal law does impose certain limits on the financing of overall Medicaid expenditures. For example, states must use state funds to finance at least 40 percent of the nonfederal share of total Medicaid expenditures each year. States finance the nonfederal share primarily with state funds, particularly state general funds appropriated directly to the state Medicaid agency, but also with intra-agency funds, whereby other state agencies that receive state appropriations, such as state mental health agencies, supply funds to finance the nonfederal share of Medicaid services they may provide. States may also receive funds to finance the nonfederal share of Medicaid payments from health care providers, such as hospitals or nursing facilities, and local governments, including government-owned

---

[16]UPL payments are Medicaid payments that are above the standard Medicaid payment rates, but within the upper payment limit, defined as the estimated amount that Medicare would pay for comparable services. This limit is not applied to payments to individual providers and instead applies to payments to all providers rendering specific services within an ownership class, such as state government-owned or -operated facilities that provide inpatient services. Although these payments generally do not have a specified statutory or regulatory purpose, they must be made for allowable Medicaid expenditures and must comply with applicable federal requirements, such as being economical, efficient and ensuring access to care.

[17]Under section 1115 of the Social Security Act, states may apply to and receive approval from CMS for a demonstration that allows states to deviate from their traditional Medicaid programs. Authorities under the demonstrations provide states with the ability to claim Medicaid funds for new types of expenditures, including the costs of making additional payments to providers from funding pools authorized under such demonstrations.

or -operated providers. Health care providers and local governments can supply funds to be used to finance the nonfederal share through several sources. For example:

- A state may levy taxes on health care providers to generate revenues to finance the nonfederal share of Medicaid payments.[18] Provider taxes are typically imposed on private health care providers. States may tax a wide range of services, and health care providers may be subject to more than one tax during a year.[19] In addition, states may receive donations from providers. Generally, provider taxes and donations produce revenues that flow into state treasuries and are then directly appropriated to the state Medicaid agency.

- A state may obtain funds from local governments (e.g., counties or cities), or from hospitals or other providers that are owned or operated by local governments, via fund transfers to the state—known as intergovernmental transfers (IGT)—that can be used to finance the nonfederal share of Medicaid payments. Under agency policy, CMS requires that IGTs occur before the state makes a Medicaid payment to the provider and that the amount of the transfer cannot be greater than the nonfederal share of the Medicaid payment amount. CMS took this action to curtail states' ability to claim federal matching funds on large Medicaid payments made to certain government providers that were then returned to the state in the form of IGTs.

- A state may obtain funds from local governments (e.g., counties or cities), or from hospitals or other providers that are owned or operated by local governments, via certifications of spending—known as certified public expenditures (CPE)—that can be used to document state Medicaid spending in order to obtain federal matching funds. CPEs do not involve the transfer of money to be used to finance the nonfederal share; rather, the local government provider or entity certifies to the state an amount that it has expended for Medicaid-

---

[18]For purposes of this report, we use the terms provider taxes and health care provider taxes interchangeably. Provider taxes are defined as a licensing fee, assessment, or some other mandatory payment that is related to a health care service, the provision of or authority to provide the service, or the payment for the service. These taxes qualify as health care related if at least 85 percent of the burden falls on health care providers.

[19]Under federal regulations, there are 18 defined categories of services on which provider taxes may be imposed, which include inpatient and outpatient hospital services, nursing facility services, physician services, and services provided through managed care organizations.

covered services provided to Medicaid beneficiaries. A CPE represents the total costs (both the federal and the nonfederal share) incurred for the Medicaid services. The state has the flexibility to send the federal matching funds it receives to the local government or local government provider that certified the expenditure or may retain some or all of those funds.

State funds that may be used to meet the requirement that at least 40 percent of the nonfederal share of Medicaid be derived from state funds include state general funds, health care provider taxes imposed by the state, provider donations received by the state, and intra-agency funds from non-Medicaid state agencies. The remaining 60 percent of the nonfederal share for total annual Medicaid expenditures can be derived from local governments. For example, local governments (such as counties and cities) may contribute up to 60 percent of the nonfederal share through IGTs and CPEs.[20] The limit on the percentage of the nonfederal share that may be financed by local governments is applied on the basis of each state's total annual Medicaid expenditures and not on individual payments or types of payments.

Although use of provider taxes and local-government-provided IGTs and CPEs to finance Medicaid, including increasing provider payments is allowed under federal law, their use has raised concerns about states' ability to shift costs to the federal government. In the late 1980s, some states began to establish financing arrangements that maximized federal Medicaid matching funds, for example, by making new payments to the same providers that were subject to taxes that states used to finance the nonfederal share of those payments.[21] In response to these financing arrangements, Congress established federal requirements in the early 1990s to limit states' ability to rely on provider taxes and donations. After federal requirements were established to limit provider taxes and donations, some states implemented similar arrangements involving IGTs

[20]Local governments may also impose health care provider taxes or receive provider donations that may be used for the nonfederal share if they are in compliance with federal requirements. Revenue from these sources is generally transferred from the local government to the state through an IGT.

[21]Starting in the mid-1980s and early 1990s, states also began to rely on providers to make large donations as part of financing arrangements to maximize federal matching funds. States would then return the donations by making large Medicaid payments to the providers that donated the funds, and the states would claim federal matching funds on those payments.

from local government providers and DSH and UPL payments to the same providers. We found that the outcome was the same in that states maximized federal matching funds by making large payments—significantly above providers' costs of providing services—to providers that were financing the nonfederal share.[22] Congress and CMS also took certain actions to curtail some of the practices involving excessive DSH and UPL payments. However, Congress did not impose requirements upon states' use of IGTs and CPEs from local governments to finance the nonfederal share in the same manner as it did for provider taxes and donations. (See app. II for more details on the history of these Medicaid financing arrangements used to generate federal payments and the federal response to restrict them.)

Certain limits and reporting requirements exist for provider taxes and donations and other sources of funds. For example, when levying a provider tax, states must not hold providers harmless (e.g., must not provide a direct or indirect guarantee that providers will receive their money back). Table 1 provides a summary of federal statutory and regulatory requirements for health care provider taxes, provider donations, IGTs, and CPEs.

---

[22]See GAO, *Medicaid Financing: Long-standing Concerns about Inappropriate State Arrangements Support Need for Improved Federal Oversight*, GAO-08-650T (Washington, D.C.: Apr. 3, 2008).

**Table 1: Federal Statutory and Regulatory Requirements Governing Use and Reporting for Health Care Provider Taxes, Provider Donations, Intergovernmental Transfers, and Certified Public Expenditures**

| Source of funds | Federal requirements governing use | Federal reporting requirements |
|---|---|---|
| Health care provider taxes[a] | • Tax (1) must be broad-based (i.e., imposed on all nonfederal, nonpublic providers within a category of services in the state); (2) must be uniformly imposed (e.g., the tax is the same amount for all providers furnishing the services within the same category);[b] and (3) must not hold providers harmless (e.g., must not provide a direct or indirect guarantee that providers will receive all or a portion of tax payments back)<br><br>• Taxes that are at or below 6 percent of the individual provider's net patient service revenues are considered not to have provided an indirect guarantee that providers will receive their tax payments back[c] | • States must submit a request if seeking a waiver of the broad-based and uniform requirement<br><br>• States must report their revenues from provider taxes on a quarterly basis |
| Provider donations[d] | • Donations must be bona fide. To be bona fide, the donor must not be held harmless.[e]<br><br>• If the donations do not exceed $5,000 for individual provider or $50,000 for health care organization per year, they are deemed to be bona fide. However, donations may not have a hold-harmless provision that would return the funds, in all or part, to the donor. | • States must report their revenues from provider donations on a quarterly basis |
| Intergovernmental transfer (IGT)[f] | • Federal law does not restrict states' use of funds when funds are transferred from local governments.[g] | • None |
| Medicaid certified public expenditure | • Federal law does not restrict states' use of funds when funds are certified as matchable expenditures by local governments. | • None |

Source: GAO analysis of federal laws and regulations. | GAO-14-627

Note: Centers for Medicare & Medicaid Services (CMS) officials stated that they also request that states provide additional information on the sources of the nonfederal share in certain circumstances. For example under a 2013 policy, states must annually report on provider payments to demonstrate compliance with the UPL. As part of this reporting, CMS asks states to identify the sources of the nonfederal share for these payments which may include provider taxes, provider donations, IGTs and CPEs.

[a]42 U.S.C. § 1396b(w), 42 C.F.R. § 433.55-.74. If a tax is imposed by a local government, the tax must extend to all services or providers within a category in the area over which the local government has jurisdiction.

[b]States may seek CMS approval of a waiver of either the broad-based or uniformly imposed requirements. CMS may waive these requirements only if the net impact of the tax is generally redistributive and not directly correlated with Medicaid payments to the providers subject to the tax.

[c]Taxes at or below the 6 percent threshold are automatically determined to comply with the indirect guarantee test, which is one of the three tests required for the hold-harmless requirement. Specifically, the indirect guarantee test ensures that states do not provide a direct or indirect guarantee that providers will receive their tax payments back. However, states still must comply with the remaining hold-harmless provisions. The positive correlation test is violated if a provider paying the tax received a payment that is positively correlated to the tax amount or the difference between the provider's Medicaid payment and the tax amount. The Medicaid payment test is violated if all or any portion of the Medicaid payment to the provider varies based only on the amount of the total tax payment.

[d]42 U.S.C. § 1396b(w), 42 C.F.R. § 433.54-.74.

[e]CMS recently issued guidance explaining an application of this requirement. In May 2014, CMS issued a State Medicaid Director Letter that identified arrangements that CMS would find unallowable because under the arrangement, the provider is held harmless for its donation (e.g., provided a direct or indirect guarantee that the provider will receive all or a portion of the donation back).

[f]42 U.S.C. § 1396b(w)(6).

[9]States are prohibited from using IGTs as the nonfederal share if the funds transferred by the local government were derived from provider taxes or provider-related donations that did not meet federal requirements. 42 U.S.C. § 1396b(w)(6).

In recent years a number of proposals have been made to further curtail states' ability to tax providers for purposes of financing the nonfederal share of Medicaid payments. These proposals have sought to lower the tax rate threshold over which the tax is considered to provide a direct or indirect guarantee that providers will receive their tax payments back. The threshold is currently 6 percent of net patient service revenues.[23] The proposals estimated federal savings in the tens of billions of dollars. The basis for the savings is that as a result of reducing the threshold, states would have less tax revenue to finance the nonfederal share, and if states were unable to replace this reduction with funds from other sources of the nonfederal share, then states would reduce Medicaid payments. For example:

- The President's 2013 budget included a proposal for a phased reduction of the health care provider tax threshold from 6 percent of net patient revenues in 2014 to 3.5 percent in 2017 and beyond.[24] It was estimated that the proposal would result in federal Medicaid savings of $21.8 billion from 2015 through 2022.

- In 2010 the National Commission on Fiscal Responsibility and Reform issued a series of deficit reduction proposals, including a proposal to curtail and eventually eliminate health care provider taxes. The commission estimated that the proposal would result in federal Medicaid savings of $5 billion in 2015 and $44 billion from 2012 through 2020.[25]

[23]The Tax Relief and Health Care Act of 2006 lowered the threshold from 6 percent to 5.5 percent, from January 1, 2008, to September 30, 2011. The Congressional Budget Office estimated that this reduction in the threshold would reduce federal Medicaid spending by $260 million over this period. The threshold returned to 6 percent on October 1, 2011. Pub. L. No. 109-432, § 403, 120 Stat. 2922, 2994-5 (2006).

[24]See Office of Management and Budget, *Fiscal Year 2013 Budget of the U.S. Government* (Washington, D.C.: 2012).

[25]See National Commission on Fiscal Responsibility and Reform, *The Moment of Truth* (Washington, D.C.: 2010).

- In 2008 the Congressional Budget Office issued a report on various budget-saving proposals that included a proposal for a phased reduction of the health care provider tax threshold from 6 percent to 3 percent, from 2010 through 2014. The Congressional Budget Office estimated that this proposal would result in federal Medicaid savings of $17 billion from 2010 through 2014 and $48 billion over the 9-year period from 2010 through 2019.[26]

---

[26]See Congressional Budget Office, *Budget Options Volume I: Health Care* (Washington, D.C.: 2008).

## States Relied on Funds from Health Care Providers and Local Governments to Finance 26 Percent of the Nonfederal Share in 2012, with Percentages Varying Significantly among States

### States Collectively Financed 26 Percent, or Over $46 Billion, of the Nonfederal Share with Funds from Providers and Local Governments in 2012

According to our analysis of data reported by states in our questionnaire, states financed 26 percent, or over $46 billion, of the about $180 billion in the total nonfederal share of Medicaid payments with funds from health care providers and local governments in state fiscal year 2012. Health care provider taxes were the largest single source of funds, followed by transfers of funds from local governments. Of the over $46 billion, states received $18.8 billion from health care providers (which includes $72 million from provider donations) and $27.9 billion from local governments ($18.1 billion from IGTs and $9.7 billion from CPEs).[27] The source of funds for most of the remaining $133.4 billion in the nonfederal share was state funds ($113.2 billion, or 62.9 percent, from state general funds and $11.9 billion, or 6.6 percent, from intra-agency funds),[28] while other sources of funds, for example, tobacco settlement funds and state trust funds, totaled $8.3 billion, or 4.6 percent. (See fig. 1.)

---

[27]The sum of the IGTs and CPEs does not equal the total for local governments because of rounding.

[28]These intra-agency funds include contributions from other state agencies, such as state departments of mental health, that pay Medicaid providers, for example, through an intra-agency agreement; a transfer of funds to the state Medicaid agency from a state government entity that has been appropriated state general funds; or a certification of expenditures for Medicaid-covered services provided to a Medicaid beneficiary from a state government entity that has been appropriated state general funds.

**Figure 1: The Percentage and Amount of the Nonfederal Share of Medicaid Payments from Health Care Providers, Local Governments, State Funds, and Other Sources of Funds in State Fiscal Year 2012**



Dollars in billions

4.6%
Other sources of funds
($8.3)

10.4%

Health care providers
($18.8)

15.5%

Local governments
($27.9)

69.5%

State funds
($125.1)

<0.1%
Provider donations
($0.1)

10.4%
Provider taxes
($18.7)

5.4%
Certified public expenditures
($9.7)

10.1%
Intergovernmental transfers
($18.1)

6.6%
Intra-agency funds
($11.9)

62.9%
State general funds
($113.2)

Source: GAO.  |  GAO-14-627

Notes: Provider donations totaled $72 million in 2012. The sum of the intergovernmental transfers and certified public expenditures does not equal the total for local governments because of rounding.

## The Nonfederal Share Financed with Funds from Providers and Local Governments Varied Significantly among States in 2012

The percentage and amount of funds from health care providers and local governments that states used to finance the nonfederal share of Medicaid payments varied significantly among states in state fiscal year 2012, based on our analysis of state questionnaire responses. In the 48 states that reported using funds from health providers and local governments, the percentage of funds from providers and local governments ranged from less than 1 percent in South Dakota and Virginia to 53 percent in Missouri. The amount of funds from health care providers and local governments also varied significantly in the 48 states, from $1 million in

GAO-14-627  State Medicaid Financing Methods

South Dakota to over $10 billion in California and New York. (See fig. 2 and app. III.)

**Figure 2: The Percentage and Amount of the Nonfederal Share of Medicaid Payments from Health Care Providers and Local Governments in State Fiscal Year 2012, by State**



The percentage of the nonfederal share from health care providers and local governments

- No funds from health care providers and local governments
- Less than 1 percent to 9.9 percent
- 10 to 24.9 percent
- 25 percent to 49.9 percent
- 50 percent or more

Sources: GAO; Map Resources (map). | GAO-14-627

# States' Reliance on Funds from Providers and Local Governments Has Increased, and Financing Arrangements in Three Selected States Illustrate Cost Shifts to the Federal Government

## The Percentage of the Nonfederal Share Financed with Funds from Providers and Local Governments Increased by Over 21 Percent from 2008 through 2012

Nationally, states' reliance on funds from health care providers and local governments to finance the nonfederal share of Medicaid payments increased by over 21 percent from state fiscal year 2008 through state fiscal year 2012, based on our analysis of state questionnaire responses. In large part this increase was due to increases in revenues from health care provider taxes. While the total amount of funds from all sources, including state funds, increased from 2008 through 2012, funds from providers and local governments increased as a percentage of the nonfederal share, while state funds decreased. The percentage of funds from health care providers and local governments that states used to finance the nonfederal share increased from 21 percent in 2008 to 26 percent in 2012. Overall, this increase of 5 percentage points represents an over 21 percent increase in the percentage of the nonfederal share financed with funds from health care providers and local governments over the 5-year period. During the same period, the amount of funds from health care providers and local governments increased from $31.0 billion to $46.6 billion, for an increase of about $15.6 billion.[29]

Health care provider taxes represented the largest share of the $15.6 billion increase, with an increase of $9.0 billion, from $9.7 billion in

---

[29]The amount of state funds used to finance the nonfederal share increased from $109.0 billion in 2008 to $125.1 billion in 2012, for an increase of $16.1 billion.

2008 to $18.7 billion in 2012.[30] Provider taxes were typically levied on institutional providers, such as inpatient hospitals and nursing facilities. (See app. IV for more information about states' use of provider taxes to finance the nonfederal share.) The amount of funds transferred from local governments through IGTs and CPEs increased by $6.6 billion, from $21.3 billion in 2008 to $27.9 billion in 2012. (See fig. 3.)

**Figure 3: Amount of the Nonfederal Share of Medicaid Payments from Health Care Providers and Local Governments, State Fiscal Years 2008 through 2012**



Dollar amount in billions

Sources of funds from health care providers to finance the nonfederal share:

■ Provider taxes (taxes states levy on providers, such as hospitals)[a]

Sources of funds from local governments to finance the nonfederal share:

■ Intergovernmental transfers (transfers of funds to the state Medicaid agency)

■ Certified public expenditures (certifications that document Medicaid spending)

Source: GAO. | GAO-14-627

[a]For purposes of this report, we use the term health care provider tax or provider tax to refer to health care provider taxes, fees, or assessments. The amounts of provider taxes reported include provider donations. Provider donations totaled $17 million in 2008, $16 million in 2009, $78 million in 2010, $69 million in 2011, and $72 million in 2012.

[30]In addition to provider taxes, states reported a much smaller but growing amount of funds from provider donations. Provider donations increased by $55 million, from $17 million in 2008 to $72 million in 2012.

The extent to which states' reliance on health care providers and local governments changed during state fiscal years 2008 through 2012 varied, with most states reporting an increased reliance on health care providers and local governments and a few states reporting a decrease. (See fig. 4 and app. V.) Specifically, 37 states reported an increase in the percentage of the nonfederal share financed with funds from health care providers and local governments, 11 states reported a decrease in the percentage from health care providers and local governments, and 3 states reported no use of funds from health care providers and local governments from 2008 through 2012.[31] Reported increases ranged from about 1 percent in Pennsylvania, which relied on health care providers and local governments for 14.4 percent of the nonfederal share in 2008 and 14.5 percent in 2012, to over 5,000 percent in Idaho, which increased its reliance on health care providers and local governments from less than 1 percent in 2008 to 19 percent in 2012.[32] Of the 11 states that reported a decrease in the percentage of funds from health care providers and local governments used to finance the nonfederal share, 6 states—Kentucky, Minnesota, Missouri, Nevada, North Dakota, and Texas—had a smaller increase in funds from health care providers and local governments relative to increases in the amount of funds from state funds and other sources of funds. The other 5 states—Kansas, Montana, New Hampshire, North Carolina, and West Virginia—reported a decrease in the total amount of funds from health care providers and local governments from 2008 through 2012, for example, because one state ended several of its provider taxes and another discontinued using funds from local governments to finance the nonfederal share of certain Medicaid payments.

---

[31]The three states are Alaska, Delaware, and Hawaii.

[32]Idaho's increased reliance on health care providers and local governments was due in part to implementing a provider tax on inpatient and outpatient hospitals in 2009 and on nursing facilities in 2010 and discontinuing using state general funds as a source of the nonfederal share of DSH payments beginning in 2010.

Figure 4: Changes in the Percentage and Amount of the Nonfederal Share of Medicaid Payments from Health Care Providers and Local Governments, State Fiscal Years 2008 through 2012, by State



## For Supplemental Payments, the Percentage of the Nonfederal Share Financed with Funds from Providers and Local Governments Increased from Over Half to Almost Three-Quarters during 2008 through 2012

Based on our analysis of questionnaire responses, the percentage of the nonfederal share financed with funds from health care providers and local governments for supplemental payments—both DSH and non-DSH—has been relatively high and increasing. In particular, the percentage of the nonfederal share of supplemental payments financed with funds from providers and local governments increased from 57 percent in state fiscal year 2008 to 70 percent in state fiscal year 2012. Overall, this increase of 13 percentage points represents a 24 percent increase in the percentage of the nonfederal share of Medicaid supplemental payments financed with funds from providers and local governments over the 5-year period.

In addition, the percentage of the nonfederal share of supplemental payments financed with funds from providers and local governments was significantly higher than for regular Medicaid payments in each year from state fiscal year 2008 through state fiscal year 2012. For example, as illustrated in figure 5, providers and local governments supplied 59 percent (or $4.2 billion) of the nonfederal share of non-DSH supplemental payments in 2008 and 74 percent (or $9.2 billion) of the nonfederal share of these payments in 2012.[33] Providers and local governments supplied 18 percent (or $18.8 billion) of the nonfederal share of fee-for-service Medicaid payments in 2008 and 23 percent (or $25.8 billion) of the nonfederal share of fee-for-service Medicaid payments in 2012.

---

[33]Federal law requires that no more than 60 percent of the nonfederal share is financed by local governments. However, this requirement is applied on the basis of total annual Medicaid program spending and not on individual payments or types of payments.

**Figure 5: Percentage of Nonfederal Share of Medicaid Payments from Health Care Providers and Local Governments, State Funds, and Other Sources of Funds, State Fiscal Years 2008 through 2012, by Medicaid Payment Type**

**Non-Disproportionate Share Hospital (DSH) supplemental payments**



**DSH supplemental payments**



**Fee-for-service Medicaid payments**



**Capitation payments to managed care organizations**



—■— Health care providers and local governments

– – – State funds[a]

- - - Other sources of funds[b]

Source: GAO.  |  GAO-14-627

[a]"State funds" includes state general funds and intra-agency funds.

[b]"Other sources of funds" includes tobacco settlement funds and state trust funds.

The percentage of the nonfederal share of Medicaid supplemental payments financed with funds from health care providers and local governments varied significantly in state fiscal year 2012 among states that reported using funds from these sources to finance supplemental payments. Several states relied on health care providers and local governments for the entire nonfederal share of their supplemental payments.[34]

- For DSH payments, the percentage of these funds ranged from less than 1 percent in South Dakota to 100 percent in seven states— Colorado, Florida, Idaho, Mississippi, Nevada, South Carolina, and Tennessee.[35] The amount of funds supplied by health care providers and local governments in these seven states totaled $507 million.

- For non-DSH supplemental payments, the percentage of these funds ranged from 10.3 percent in Louisiana to 100 percent in seven states—Alabama, Idaho, Illinois, Nebraska, Nevada, North Carolina, and Wyoming.[36] The amount of funds supplied by health care providers and local governments in these seven states totaled $1.9 billion.

We and others have raised concerns in the past about financing arrangements involving Medicaid supplemental payments, which states often make through large, lump-sum payments to a relatively small

---

[34]Federal law requires that no more than 60 percent of the nonfederal share is financed by local governments. However, this requirement is applied on the basis of total annual Medicaid program spending and not on individual payments or types of payments.

[35]Thirty-five states reported making DSH payments and using funds from health care providers and local governments to finance these payments; 15 states reported making DSH payments, but did not report using funds from health care providers and local governments to finance these payments; and 1 state did not report making DSH payments in 2012.

[36]Thirty-seven states reported making non-DSH payments and using funds from health care providers and local governments to finance these payments; 10 states reported making non-DSH payments, but did not report using funds from health care providers and local governments to finance these payments; and 4 states did not report making non-DSH payments in 2012.

number of providers.[37] Non-DSH supplemental payments are not typically reported by states on a provider-specific basis. As a result, it makes it difficult to closely assess and oversee states' payments made to individual providers, including those providers that may be supplying funds through IGTs or other sources that states use to finance the nonfederal share of the payments.

## Recent Changes in How the Nonfederal Share Was Financed in the Three Selected States Illustrate How Costs Can Shift to the Federal Government

Our analysis of one large financing arrangement involving financing of the nonfederal share of Medicaid payments with funds from provider taxes or IGTs in each of three selected states (California, Illinois, and New York) illustrates how Medicaid costs can be shifted from the state to the federal government, and to a lesser extent, to health care providers and local governments. For example, by increasing providers' Medicaid payments, and requiring providers receiving the payments to supply all or most of the nonfederal share, states claimed an increase in federal matching funds without a commensurate increase in state general funds.

### California

During state fiscal year 2011, changes California made to Medicaid payment amounts to nursing facilities and to the financing of these payments had the effect of shifting costs to the federal government and providers.[38] In 2011, California increased regular Medicaid payments for services provided by skilled nursing facilities and increased the existing provider tax rate levied on skilled nursing facilities that became effective in August 2010. As part of the change to the provider tax, CMS approved the state's request for a waiver of the requirements that the tax be broad-based and uniformly imposed. The state requested this waiver because it sought to exempt certain types of nursing facilities from paying the provider tax, such as long-term care facilities that provide a broad range of services, including both skilled nursing services and nonnursing

---

[37]See GAO-13-48 and Department of Health and Human Services, Office of the Inspector General, Audit of Oregon's Medicaid Upper Payment Limits for Non-State Government Nursing Facilities for State Fiscal Years 2002 and 2003, A-09-03-00055 (Washington, D.C.: 2005); Adequacy of Tennessee's Medicaid Payments to Nashville Metropolitan Bordeaux Hospital, Long-Term-Care Unit, A-04-03-03023 (Washington, D.C.: 2005); and Adequacy of Washington State's Medicaid Payments to Newport Community Hospital, Long-Term-Care Unit, A-10-04-00001 (Washington, D.C.: 2005).

[38]State fiscal year 2011 was from July 1, 2010, through June 30, 2011.

services, and to levy a different tax rate based on the size of the facility as measured by the number of patient days.[39]

By increasing both the regular skilled nursing facility Medicaid payments and the taxes facilities paid, skilled nursing facility Medicaid payments totaled $2.94 billion, federal matching payments totaled $1.73 billion, and the nonfederal share totaled $1.20 billion ($811 million in state general funds and $393 million in provider tax funds). According to our estimates based on 2010 and 2011 Medicaid payment data, had the increased payment and tax changes not gone into effect, skilled nursing facility Medicaid payments would have totaled $2.80 billion, federal matching payments would have totaled $1.65 billion, and the nonfederal share would have totaled $1.15 billion ($822 million in state general funds and $327 million from the unchanged provider tax). (See fig. 6.) The increased regular Medicaid payment and provider tax changes had the effect of increasing federal matching payments by $80 million. The overall increase in net provider payments—that is, the increase in total Medicaid payments ($136 million) minus the increase in provider taxes ($66 million)—was $69 million.[40] The state supplied $11 million less in state general funds than it would have paid had the increased payment and provider tax changes not gone into effect.

---

[39]The state changed the methodology for calculating the existing provider tax and established two provider tax rates. The state also levied the tax on nursing facilities that were previously exempted from the tax, specifically, certain multilevel facilities. However, some facilities were still exempted from the tax.

[40]The difference between the increase in total Medicaid payments and the increase in provider taxes does not equal $69 million because of rounding.

**Figure 6: Estimated Effect of Increased Medicaid Payments and Changes to Provider Tax on Federal and Nonfederal Share of Total Regular Medicaid Payments and on Net Medicaid Payments to Skilled Nursing Facilities in California in State Fiscal Year 2011**



Source: GAO. | GAO-14-627

Notes: Under the American Recovery and Reinvestment Act of 2009, states received an increased federal medical assistance percentage (FMAP) from October 1, 2008, through December 31, 2010, extended by subsequent legislation through June 30, 2011. Generally, from October 1, 2008, through December 31, 2010, the increase across the states was at least 6.2 percentage points plus additional federal funds targeted to states with significant increases in unemployment, with a lower increase available from January through June 2011. For purposes of this report, we have estimated that California's FMAP in state fiscal year 2011 was 59.0 percent. The sum of the federal government, state government, and provider tax dollars may not equal total Medicaid payments because of rounding. Net payment to skilled nursing facilities does not equal total Medicaid payments minus provider taxes because of rounding.

| Illinois | In state fiscal year 2012, changes Illinois made to Medicaid payment amounts to nursing facilities and the financing of these payments had the effect of shifting costs to the federal government and providers.[41] In state fiscal year 2012, both an increase in regular Medicaid payments for nursing facilities and a new provider tax levied on nursing facilities were in effect.[42] These two actions lessened the effect the loss of the enhanced FMAP would have had on the state in 2012. Under the American Recovery and Reinvestment Act of 2009 (Recovery Act), Illinois's enhanced FMAP was phased out in 2012.[43] The state did not request a waiver of the requirements that the tax be broad-based and uniformly imposed, and CMS found that the tax was permissible and approved the state plan amendment for the payment change. |
|---|---|

By increasing regular nursing facility Medicaid payments and implementing an additional provider tax on nursing facilities in 2012, total nursing facility Medicaid payments increased to $1.74 billion, federal matching payments totaled $871 million, and the nonfederal share totaled $869 million ($706 million in state general funds and $163 million in provider tax funds). According to our estimates based on 2011 and 2012 Medicaid payment data, had the increased payment and tax not gone into effect, nursing facility Medicaid payments would have totaled $1.52 billion, federal matching payments would have totaled $761 million, and the nonfederal share would have totaled $760 million ($712 million in state general funds and $48 million from an existing provider tax). (See fig. 7.) The increased regular Medicaid payment and new provider tax had the effect of increasing federal matching payments by $110 million. The overall increase in net provider payments—that is, the increase in total Medicaid payments ($220 million) minus the total cost of provider tax ($115 million)—was $105 million. The state supplied $5 million less in state general funds than it would have paid had the increased payment and new provider tax not gone into effect.

---

[41]State fiscal year 2012 was from July 1, 2011, through June 30, 2012.

[42]The increase in regular Medicaid payments for nursing facilities took effect on May 1, 2011, and the new provider tax levied on nursing facilities took effect on July 1, 2011.

[43]Under the Recovery Act, states received an increased FMAP from October 1, 2008, through December 31, 2010, extended by subsequent legislation through June 30, 2011. Generally, from October 1, 2008, through December 31, 2010, the increase across the states was at least 6.2 percentage points plus additional federal funds targeted to states with significant increases in unemployment, with a lower increase available from January through June 2011.

**Figure 7: Estimated Effect of Increased Medicaid Payments and New Provider Tax on Federal and Nonfederal Share of Total Regular Medicaid Payments and on Net Medicaid Payments to Nursing Facilities in Illinois in State Fiscal Year 2012**



Source: GAO.  |  GAO-14-627

Notes: Under the American Recovery and Reinvestment Act of 2009, states received an increased federal medical assistance percentage (FMAP) from October 1, 2008, through December 31, 2010, extended by subsequent legislation through June 30, 2011. Generally, from October 1, 2008, through December 31, 2010, the increase across the states was at least 6.2 percentage points plus additional federal funds targeted to states with significant increases in unemployment, with a lower increase available from January through June 2011. For purposes of this report, we have estimated that Illinois's FMAP in state fiscal year 2012 was 50.1 percent. In state fiscal year 2012, the FMAPs in effect in Illinois were 50.2 percent from July 1, 2011, through September 30, 2011, and 50.0 percent from October 1, 2011, through June 30, 2012.

New York

In state fiscal year 2009, changes New York made to Medicaid payments for inpatient hospital services and increases in the amount of IGTs from a local government had the effect of shifting costs for new Medicaid payments to the federal government and local government.[44] At the same time, the FMAP increased under the Recovery Act. For state fiscal year 2009, New York reduced its regular Medicaid payment rates for inpatient hospital services. In state fiscal year 2009, the state increased the amount of non-DSH supplemental payments it made for inpatient services, which resulted in increased payments to two local government hospitals. The state financed the nonfederal share of these payments with IGTs from the local government that owns and operates the two hospitals. In 2008, state regular payments to the two hospitals totaled $105 million and supplemental payments totaled $218 million. In 2009, state regular payments to the two hospitals totaled $124 million and supplemental payments totaled $356 million to the two hospitals. As illustrated in figure 8, as a result of these actions[45]:

- Total Medicaid payments to the two local government hospitals for inpatient services increased by $157 million, from $322 million in 2008 to $480 million in 2009.[46]

- Provider payments net the amount of IGTs increased by $119 million, from $199 million in 2008 to $318 million in 2009.

- Federal matching funds for regular Medicaid payments and non-DSH supplemental payments increased by $118 million, from $175 million in 2008 to $294 million in 2009.[47] An estimated $33 million of the increase is attributable to an increase in the FMAP under the Recovery Act.

---

[44]State fiscal year 2009 was from April 1, 2009, through March 31, 2010.

[45]The amount of non-DSH supplemental payments the state can make to local government hospitals is based on the difference between the state's regular Medicaid payments and the upper limit on what the federal government will pay as its share of Medicaid payments, which is based on what Medicare would pay for comparable services. As a result, by lowering regular Medicaid payment rates, the state was able to increase the amount of non-DSH supplemental payments it could make.

[46]The difference between the total Medicaid payments in 2008 and 2012 does not equal $157 million because of rounding.

[47]The difference between the federal matching funds in 2008 and 2012 does not equal $118 million because of rounding.

- State general funds for regular Medicaid payments did not change, totaling $24 million in both 2008 and 2009.[48]

---

[48]State general funds were not used to finance the nonfederal share of non-DSH supplemental payments in 2008 or 2009.

**Figure 8: The Effect of Increased Medicaid Supplemental Payments and Amounts of Intergovernmental Transfers on Federal and Nonfederal Share of Total Medicaid Payments and on Medicaid Payments Net of Intergovernmental Transfers for Inpatient Services to Two Hospitals in New York from State Fiscal Years 2008 to 2009**



Dollars in millions

- ■ Federal government
- □ Federal share of payments from increased federal medical assistance percentage from 2008 to 2009
- ■ State government
- ■ Intergovernmental transfers

Source: GAO. | GAO-14-627

Notes: Under the American Recovery and Reinvestment Act of 2009, states received an increased federal medical assistance percentage (FMAP) from October 1, 2008, through December 31, 2010, extended by subsequent legislation through June 30, 2011. Generally, from October 1, 2008, through December 31, 2010, the increase across the states was at least 6.2 percentage points plus additional federal funds targeted to states with significant increases in unemployment, with a lower increase available from January through June 2011. For purposes of this report, we have estimated that New York's FMAP in state fiscal year 2009 was 61.2 percent.

In total, our analysis of states' questionnaire responses shows that all three states relied on funds from health care providers and local governments to finance billions of dollars of the nonfederal share of

Medicaid. As illustrated in table 2, in California, Illinois, and New York the amount of funds from health care providers and local governments increased from state fiscal year 2008 through state fiscal year 2012. For California and Illinois, the state's reliance on funds from providers and local governments to finance the nonfederal share increased as the percentage of the nonfederal share that states financed with funds from them increased. In New York, while reliance on providers and local governments remained about the same, the state received more than one-third of funds to finance the nonfederal share from health care providers and local governments in 2008 and 2012.

**Table 2: The Amount and Percentage of the Nonfederal Share of Medicaid Payments States Financed with Funds from Health Care Providers and Local Governments, State Funds, and Other Sources of Funds in California, Illinois, and New York in State Fiscal Years 2008 and 2012**

Dollars in billions

| State | Funds from | 2008 Dollars (percentage of nonfederal share) | 2012 Dollars (percentage of nonfederal share) |
|-------|-----------|-----------------------------------------------|-----------------------------------------------|
| California | Health care providers and local governments[a] | $6.3 (33%) | $10.4 (41%) |
| | State funds[b] | 12.5 (67) | 14.8 (59) |
| | Other sources of funds[c] | 0.0 (0) | 0.0 (0) |
| | **Total nonfederal share** | **18.8 (100)** | **25.2 (100)** |
| Illinois | Health care providers and local governments | 0.8 (13) | 1.9 (31) |
| | State funds | 4.8 (76) | 3.9 (63) |
| | Other sources of funds | 0.7 (11) | 0.4 (6) |
| | **Total nonfederal share** | **6.3 (100)** | **6.2 (100)** |
| New York | Health care providers and local governments | 8.1 (35) | 10.3 (36) |
| | State funds | 15.3 (65) | 18.4 (64) |
| | Other sources of funds | 0.0 (0) | 0.0 (0) |
| | **Total nonfederal share** | **23.4 (100)** | **28.6 (100)** |

Source: GAO. | GAO-14-627

Note: Dollars may not equal totals because of rounding.

[a]"Health care providers and local governments" includes funds from health care providers though provider taxes and provider donations and from local governments through intergovernmental transfers and certified public expenditures.

[b]"State funds" includes state general funds and intra-agency funds.

[c]"Other sources of funds" includes tobacco settlement funds and state trust funds.

**GAO-14-627 State Medicaid Financing Methods**

# CMS Has Not Ensured Its Data on Sources of Funds States Use to Finance Medicaid Are Accurate and Complete, and New Reporting Initiatives Fall Short of What Is Needed for Oversight

## CMS Has Not Ensured Its Data to Oversee States' Use of Provider Taxes and Funds from Local Governments Are Accurate and Complete

CMS has not assessed the accuracy and completeness of data it collects from states on the amount of health care provider taxes and provider donations states use to finance the nonfederal share of Medicaid payments. Since 1992, states have been required to report the amount of funds collected from health care provider taxes and provider donations.[49] Under federal regulations, CMS has the authority to withhold federal matching funds for states that do not comply with these reporting requirements. In March 2014, CMS officials said that the agency could not attest to the accuracy of data that states reported on their use of provider taxes and donations, but that states were likely underreporting their use of these sources of funds. CMS officials also said that the agency has not withheld federal matching funds when it identified that a state's reporting of the amount of funds collected from health care provider taxes and provider donations was incomplete because the data are reported for informational purposes only and not to enable the state to claim federal matching funds. Instead, CMS would inform the state that it is obligated to report these data. CMS officials stated that the agency does not have a systematic process for identifying when data are accurate and complete, but that the agency may identify inaccurate or incomplete reporting when conducting other review activities, such as financial management reviews, which may include an assessment of

---

[49]States are required to submit information on taxes collected and donations received on the quarterly CMS 64 expenditure report.

provider taxes.[50] When we compared the provider tax data reported to CMS in 2012 with state responses to our questionnaire, we found evidence of incomplete reporting. Specifically, 6 of the 47 states[51] that reported in our questionnaire that they had at least one health care provider tax or provider donation in effect that year did not report a tax or donation to CMS in 2012.[52]

CMS also does not collect complete data from all states on the amount of local government funds—IGTs and CPEs—used to finance the nonfederal share of total annual Medicaid expenditures. Although federal requirements limit the percentage of the nonfederal share that states may finance with IGTs and CPEs, states are not required to submit data on the amount of funds from these sources.[53] CMS does regularly ask states to provide general information on funds from these sources when a state proposes a change to Medicaid payments to providers. Specifically, when a state proposes a state plan amendment to change payments to providers, it is required to answer standard CMS questions, including a question asking states to describe the sources of the nonfederal share used to finance the Medicaid payments. The information provided varies by state, but CMS officials reported that states are not required to identify the amount of funds provided by or on behalf of any specific providers and the amount of total Medicaid payments made to the providers.

---

[50]Financial management reviews typically look at specific Medicaid service expenditures and are useful in identifying where additional policy clarification or oversight may be needed. In 2012, CMS conducted financial management reviews on health care provider taxes in four states. In 2010 and 2011, CMS did not conduct any financial management reviews on health care provider taxes.

[51]Four states—Alaska, Delaware, Hawaii, and New Mexico—reported in our questionnaire that they did not have any health care provider tax, fee, and/or assessment or provider donation in effect during state fiscal year 2012 and therefore would not have reported information about these sources of the nonfederal share to CMS.

[52]Six states—Arizona, the District of Columbia, New Jersey, South Dakota, Utah, and Virginia—did not report to CMS any health care provider taxes and provider donations as the nonfederal share of Medicaid expenditures. However, these states reported to us that they levied provider taxes in state fiscal year 2012.

[53]Unlike for provider taxes, federal law does not require states to report amounts of IGTs and CPEs used to finance the nonfederal share of Medicaid.

According to federal internal control standards, federal agencies should collect accurate and complete data to monitor programs they oversee.[54] CMS's ability to oversee the Medicaid program is limited because the agency does not collect accurate and complete data on the amount of funds supplied by health care providers and local governments to states to finance the nonfederal share of Medicaid. For example, CMS is unable to identify the extent to which increasing federal funds are a result of state Medicaid payments that are financed with funds supplied by health care providers and how such financing arrangements affect beneficiary access to care.

## CMS Has Begun Two Initiatives to Require Improved Reporting of the Nonfederal Share of Medicaid Payments, but Gaps in Needed Data Remain

CMS and others have recognized the need for better data from states on the nonfederal share of Medicaid. In March 2013, CMS issued a State Medicaid Director Letter describing the need for better data and more frequent analysis of Medicaid data, including the sources of nonfederal share of Medicaid payments, to monitor program integrity.[55] CMS noted that states have considerable discretion in the manner in which they operate their programs, but should always employ that flexibility in ways that enhance care, promote overall program effectiveness and efficiency, and safeguard dollars expended, whether originating from federal or state sources. Others have also recognized the need for improved payment and financing information. In particular, the Medicaid and CHIP Payment and Access Commission (MACPAC)—the commission created by Congress to study Medicaid payment and access—reported in March 2014 the need for improved data on the sources of funds used by states to finance the nonfederal share. MACPAC noted the need to identify net Medicaid payments—the amount of Medicaid payment that providers receive less the amount that providers supply toward the nonfederal share of Medicaid—to assess whether payments are set at appropriate levels and to assess the effects of the payments on providers and beneficiaries. MACPAC found that there are insufficient data at the federal level to do this, however, because data regarding sources of the

---

[54]See GAO, *Standards for Internal Control in the Federal Government*, GAO/AIMD-00-21.3.1 (Washington, D.C.: November 1999).

[55]See Centers for Medicare & Medicaid Services, *Re: Federal and State Oversight of Medicaid Expenditures* (SMD#13-003) (Baltimore, Md.: Mar. 18, 2013).

nonfederal share are not reported to the federal government at the provider level in a readily usable format.[56]

CMS has begun implementing two initiatives that may improve the agency's ability to oversee states' financing of Medicaid payments; however, based on our analysis, as the initiatives are currently designed, data gaps will limit their effectiveness in CMS's oversight of the Medicaid program. CMS's first initiative—to improve oversight of certain Medicaid supplemental payments—requires states to report data more frequently, but gaps in reporting remain. The initiative does not ensure that CMS will have data to allow it and others to assess net payments to providers, particularly to institutional providers that in total receive billions of dollars in Medicaid payments annually. The initiative, which began in June 2013, requires states to, among other actions, report annually on the source of funds for the nonfederal share of Medicaid payments made to hospitals, nursing facilities, and other institutional providers. However, in May 2014, CMS officials said that state reporting of funds from providers for these Medicaid payments would not be required on a facility-specific basis. As a result, CMS will not have information to determine net payments to institutional providers, once provider taxes, IGTs, CPEs, and other sources of funds are considered in view of total payments the provider received.

CMS's second initiative—to enhance its Medicaid claims data system—is expected to collect information on the source of funds for the nonfederal share of Medicaid payments in some, but not all, cases, and has faced implementation delays. CMS is currently developing an enhanced Medicaid claims data system—called the Transformed Medicaid Statistical Information System (T-MSIS)—which it has cited as a key tool for providing the federal government and states with better information with which to manage and monitor Medicaid program integrity, including identifying waste, fraud, and abuse.[57] T-MSIS will require states to report to CMS information not currently collected on individual Medicaid payments, including provider-specific supplemental payments, and sources of funds for the nonfederal share of all Medicaid payments by

---

[56]See Medicaid and CHIP Payment and Access Commission, *Report to the Congress on Medicaid and CHIP* (Washington, D.C.: March 2014).

[57]See Centers for Medicare & Medicaid Services, *Re: Transformed Medicaid Statistical Information System (T-MSIS) Data (SMD#13-004)* (Baltimore, Md.: Aug. 23, 2013).

provider.[58] States will report payment data more frequently than they are now required to, reporting to CMS monthly instead of quarterly. However, we found that the information on sources of funds for the nonfederal share will be limited. Specifically, in cases where a state used more than one source to finance the nonfederal share of a Medicaid payment (such as a combination of state general funds and IGTs), T-MSIS as currently planned limits the state to reporting one source of the nonfederal share, even if multiple sources are used. CMS officials also noted that states are not likely to submit information on sources of funds for the nonfederal share because most of the states have had difficulties collecting this information at a provider-specific level. In addition, CMS officials said that it is unlikely that T-MSIS will provide complete information for oversight for some time. In February 2014, CMS officials reported that CMS would be able to accept T-MSIS state data files beginning in July 2014. However, CMS officials said that complete reporting from all states is not expected in July and they were uncertain when all states would be capable of reporting all of the new information required under T-MSIS. CMS stated, however, that the agency has informed states of their expectation that all states will be transitioned to T-MSIS by January 2015.

## Conclusions

Medicaid represents significant and growing expenditures for the federal government and states. States have increasingly turned to sources of funds other than state general funds to finance the nonfederal share of their Medicaid programs. These sources include levying taxes on health care providers and receiving funding transfers from local governments and local government providers to help finance the nonfederal share of Medicaid. These financing arrangements can have the effect of shifting costs of Medicaid from states to the federal government, while benefits to providers, which may be financing a large share of any new payments, and the beneficiaries whom they may serve are less apparent. Although such arrangements can help provide fiscal relief to states and are allowed under Medicaid, their use has implications for the intergovernmental nature of Medicaid and federal and state partnership. Such arrangements may also provide inappropriate incentives to states to increase payments to providers that are financing the nonfederal share above what states would have paid otherwise, effectively providing an incentive to make

---

[58]Under T-MSIS there will be approximately 1,000 data elements, as opposed to the approximately 400 data elements states report to CMS under the current Medicaid claims data system.

higher payments to those providers that supplied funds to finance the nonfederal share of the payments. To some extent, the use of providers and local governments that serve beneficiaries to fund new payments may obscure how the payments may be affecting beneficiary access, if at all.

To oversee the Medicaid program and assess the need for and make changes to the program, CMS, federal policymakers, and other stakeholders need accurate and complete information on provider payments and sources of funds to finance the nonfederal share. Without such information, it is difficult to track trends in financing the nonfederal share, to oversee compliance with current limits and requirements on financing the nonfederal share, and to examine the extent to which the federal government's increased spending is commensurate with an increase in net payments realized by providers and, in turn, improves beneficiary access to needed health care services. To understand how best to ensure that the growing program is sustainable and the burden of the program on providers that serve beneficiaries is manageable, it is important to understand the extent to which increased reliance on providers and local governments to fund the nonfederal share of Medicaid primarily serves as a method of fiscal relief for states. CMS does not collect accurate and complete data from all states on the various sources of funds to finance the nonfederal share to make such an assessment. Recent initiatives suggest that CMS recognizes that it needs more accurate and more complete data from states on the sources of the nonfederal share, particularly for Medicaid payments to institutional providers that states may rely on to help finance the nonfederal share, to effectively oversee the program. As currently designed, the initiatives will not provide all the data needed to do so.

## Recommendation for Executive Action

We recommend that the Administrator of CMS develop a data collection strategy that ensures that states report accurate and complete data on all sources of funds used to finance the nonfederal share of Medicaid payments. There are short- and long-term possibilities for pursuing the data collection strategy, including

- in the short-term, as part of its ongoing initiative to annually collect data on Medicaid payments made to hospitals, nursing facilities, and other institutional providers, CMS could collect accurate and complete facility-specific data on the sources of funds used to finance the nonfederal share of the Medicaid payments.

- in the long-term, as part of its ongoing initiative to develop an enhanced Medicaid claims data system (T-MSIS), CMS could ensure that T-MSIS will be capable of capturing information on all sources of funds used to finance the nonfederal share of Medicaid payments, and, once the system becomes operational, ensure that states report this information for supplemental Medicaid payments and other high-risk Medicaid payments.

## Agency Comments and Our Evaluation

We provided a draft of this report to HHS for comment. In its written comments, HHS acknowledged that it does not have adequate data on state financing methods for overseeing compliance with a certain federal requirement related to the nonfederal share—the 60 percent limit on contributions from local governments to finance the nonfederal share—and that it will examine efforts to improve data collection toward this end. HHS also stated that it is working to identify needs for improvement in current payment and financing review processes. HHS's acknowledgment is consistent with our recommendation to develop a data collection strategy that ensures states report accurate and complete data on all sources of funds used to finance the nonfederal share of Medicaid payments. However, HHS did not concur with two options our recommendation suggested for short- and long-term ways of improving agency data collection. In particular, HHS disagreed with suggestions that facility-specific data are needed for oversight and that T-MSIS may be an appropriate means for collecting financing data. HHS believes that its current financing reviews are sufficiently reviewing provider-level data.

We believe the findings of our report illustrate why more complete data collection is needed. States are increasingly relying on providers and local governments to finance Medicaid payments, which, while allowed under federal requirements, can have the effect of shifting costs of Medicaid from states to the federal government and may be contributing to a lack of transparency around net payments to individual providers. For these reasons we continue to believe it is important that CMS and federal policymakers have more complete information about how increasing federal costs are impacting the Medicaid program, including beneficiaries and the providers who serve them. HHS's comments are reprinted in appendix VI. HHS also provided technical comments, which we incorporated as appropriate.

We are sending copies of this report to the Secretary of Health and Human Services, the Administrator of the Centers for Medicare & Medicaid Services, and other interested parties. In addition, the report is available at no charge on the GAO website at http://www.gao.gov.

If you or your staff have any questions about this report, please contact me at (202) 512-7114 or iritanik@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. Major contributors to this report are listed in appendix VII.

Katherine M. Iritani
Director, Health Care

# Appendix I: Scope and Methodology of State Questionnaire and Analysis of Changes in Medicaid Financing in Three Selected States

To examine the extent to which states rely on funds from health care providers and local governments to finance the nonfederal share of Medicaid and the extent to which states' reliance on health care providers and local governments has changed over time, we compiled information from all 50 states and the District of Columbia using a web-based questionnaire.[1] For additional questionnaire results reproduced as an e-supplement, see GAO-15-227SP. To examine the implications of changes in states' reliance on health care providers and local governments to finance the nonfederal share, we analyzed Medicaid financing data for a selected financing arrangement instituted by the state in a nongeneralizable sample of three selected states.

## Information on Funds Used to Finance the Nonfederal Share from 50 States and the District of Columbia

To provide information about the extent to which states are relying on funds from health care providers and local governments to finance the nonfederal share of Medicaid and how this reliance has changed in recent years, we analyzed data from our web-based questionnaire sent to knowledgeable Medicaid officials in all 50 states and the District of Columbia. The questionnaire asked about states' use of various sources of funds to finance the nonfederal share of Medicaid expenditures during state fiscal years 2008 through 2012. Specifically, the questionnaire requested data on the following:

- The total amount of each of the following sources of the nonfederal share:
  - state general funds;
  - health care provider taxes, fees, and/ or assessments;
  - provider donations;
  - intergovernmental transfers;
  - certified public expenditures;
  - intra-state agency payments/ transfers/ certified public expenditures; and
  - other funding sources

    that were used to finance each of four types of Medicaid payments—capitation payments to managed care organizations;

---

[1]For purposes of this report, "states" refers to the 50 states and the District of Columbia.

Appendix I: Scope and Methodology of State
Questionnaire and Analysis of Changes in
Medicaid Financing in Three Selected States

fee-for-service Medicaid payments; Medicaid Disproportionate
Share Hospital (DSH) payments; and other Medicaid payments,
including supplemental payments made under the Upper Payment
Limit, special funding pool payments made under Medicaid
demonstrations, and episodic or bundled payments, in each year;
and

- The types of provider taxes levied in each state, the ways in which
taxes are levied, and the uses of revenue collected from the taxes.

During the development of our questionnaire, we pretested it with state
Medicaid officials from four states—Connecticut, Georgia, Missouri, and
New York—to ensure that our questions and response choices were
clear, appropriate, and answerable. The states selected for a pretest were
diverse with respect to the size of Medicaid program and geography. We
made changes to the content of the questionnaire based on their
feedback. Questionnaire fielding began on July 1, 2013, and we received
the final state response on November 14, 2013. All 51 states responded
to the questionnaire.

Because we sent the questionnaire to knowledgeable Medicaid officials in
each of the 51 states, it was not subject to sampling error. However, the
practical difficulties of fielding any questionnaire may introduce errors,
commonly referred to as nonsampling errors. For example, differences in
how a particular question was interpreted, in the sources of information
that were available to respondents, or in how the data were entered into a
database or were analyzed could introduce unwanted variability, or bias,
into the questionnaire results. We encountered instances of nonsampling
error in analyzing the questionnaire responses. Specifically, in some
instances, respondents provided conflicting, unclear, or incomplete
information. We generally addressed these errors by contacting the state
Medicaid department officials involved and clarifying their responses. We
did not independently verify the data reported by states in the
questionnaire; however, we reviewed published data submitted by state
Medicaid programs to the Centers for Medicare & Medicaid Services
(CMS) and to outside researchers to assess the reasonableness of the
data reported. We believe the data are reliable for our purposes.
Assessing compliance with federal requirements and limits related to
nonfederal sources of funds was not within the scope of this review.

Appendix I: Scope and Methodology of State
Questionnaire and Analysis of Changes in
Medicaid Financing in Three Selected States

# Analysis of Changes in Financing of Nonfederal Share in California, Illinois, and New York for Selected Financing Arrangements

To obtain more in-depth information on the potential implications of changes in states' reliance on health care providers and local governments to finance the nonfederal share, we interviewed state Medicaid department officials and officials from hospitals and nursing home provider associations, and analyzed data from a nongeneralizable sample of three states: California, Illinois, and New York. To ensure that we identified a range of states for our in-depth analysis, we selected states with

- large Medicaid programs, based on spending for Medicaid services in 2010;

- large amounts of spending for certain supplemental Medicaid payments to providers;

- reported use of various sources of funds to finance the nonfederal share;

- reported changes to regular Medicaid payment rates or amounts in a given year from 2008 through 2011 and a reported new or changed provider tax during the same year;[2] and

- geographic diversity.

These criteria allowed us to obtain information from state Medicaid departments in a diverse mix of states, but the findings from our in-depth analysis cannot be generalized to all states.

We identified and selected one large financing arrangement in each selected state. We asked Medicaid officials from each selected state to identify the largest increase in funds from health care providers and local governments as a result of a new or revised source of funds during state fiscal years 2008 through 2012.[3] Based on states' responses, we then obtained and analyzed Medicaid payment data for one increase in each state. Specifically, we obtained and analyzed Medicaid payment data from before and after the increase to assess the effect of the change on

---

[2]See GAO, *Medicaid: State Made Multiple Program Changes, and Beneficiaries Generally Reported Access Comparable to Private Insurance,* GAO-13-55 (Washington, D.C.: Nov. 15, 2012).

[3]We asked for the largest change in funds for four types of Medicaid services—inpatient hospital services, outpatient hospital services, nursing facility services, and intermediate care facility services for the intellectually disabled.

Appendix I: Scope and Methodology of State
Questionnaire and Analysis of Changes in
Medicaid Financing in Three Selected States

the amounts of Medicaid payments providers received and on the amounts of state general funds and federal funds used for these payments. As part of our analysis in California and Illinois, we estimated the amount of regular Medicaid payments to providers, provider taxes collected, and the state and federal share of Medicaid had the increases in provider taxes and Medicaid payments not taken place. We did not independently verify the accuracy of the reported Medicaid data. However, we checked the data for discrepancies and omissions and interviewed state officials to resolve any identified discrepancies. On the basis of this review, we determined that the Medicaid data were sufficiently reliable for the purposes of this report.

To gather additional information related to both the extent to which states are relying on funds from health care providers and local governments to finance the nonfederal share of Medicaid and the extent to which states' reliance on funds from health care providers and local governments to finance the nonfederal share of Medicaid payments has changed over time, and the implications of any changes, we interviewed a range of experts and organizations. For example, we interviewed CMS officials, including representatives from regional offices; experts from the National Association of Medicaid Directors, the National Conference of State Legislatures, the National Association of State Budget Officers, the National Association of Counties, and the Medicaid and CHIP Payment and Access Commission; as well as officials from the American Hospital Association and American Health Care Association in each state of our nongeneralizable sample of states.

# Appendix II: Medicaid Financing Arrangements Used to Generate Federal Payments and Actions to Address Them

| Financing arrangement | Description | Federal legislative and regulatory action taken from 1987 through 2002 |
|---|---|---|
| Excessive payments to state health facilities | States made excessive Medicaid payments to state-owned health facilities, which subsequently returned these funds to the state treasuries. | In 1987, the Health Care Financing Administration (HCFA, now called the Centers for Medicare & Medicaid Services, or CMS) issued regulations that established payment limits specifically for inpatient and institutional facilities operated by states. |
| Provider taxes and donations | Revenues from provider-specific taxes on hospitals and other providers and from provider "donations" were matched with federal funds and paid to the providers. These providers could then return most of the federal payment to the states. | The Medicaid Voluntary Contribution and Provider-Specific Tax Amendments of 1991 imposed restrictions on provider donations and provider taxes. |
| Excessive Disproportionate Share Hospital (DSH) payments | DSH payments are meant to compensate those hospitals that care for a disproportionate number of low-income patients. Unusually large DSH payments were made to certain hospitals, which then returned the bulk of the state and federal funds to the state. | The Omnibus Budget Reconciliation Act of 1993 placed limits on which hospitals could receive DSH payments and capped the amount of DSH payments individual hospitals could receive. |
| Excessive DSH payments to state mental hospitals | A large share of DSH payments were paid to state-operated psychiatric hospitals, where they were used to pay for services not covered by Medicaid or were returned to the state treasuries. | The Balanced Budget Act of 1997 limited the proportion of a state's DSH payments that can be paid to institutions for mental disease and other mental health facilities. |
| Upper Payment Limit (UPL) for local government health facilities | In an effort to ensure that Medicaid payments are reasonable, federal regulations prohibit Medicaid from paying more than a reasonable estimate of the amount that would be paid under Medicare payment principles for comparable services. This UPL applies to payments aggregated across a class of facilities and not for individual facilities. As a result of the aggregate upper limit, states were able to make large supplemental payments to a few local public health facilities, such as hospitals and nursing homes. The local government health facilities then returned the bulk of the state and federal payments to the states. | The Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000 required HCFA to issue a final regulation that established a separate aggregate payment limit for local government health facilities. HCFA issued its final regulation on January 12, 2001. In 2002, CMS issued a regulation that further lowered the payment limit for local public hospitals. |

Source: GAO. | GAO-14-627

Note: See GAO, *Medicaid Financing: Long-standing Concerns about Inappropriate State Arrangements Support Need for Improved Federal Oversight,* GAO-08-650T (Washington, D.C.: Apr. 3, 2008).

# Appendix III: Percentage and Amount of the Nonfederal Share of Medicaid from Providers and Local Governments in 2012

Table 3 presents information from interactive figure 2 on the percentage and amount of the nonfederal share from health care providers and local governments in each state in state fiscal year 2012.

**Table 3: The Percentage and Amount of the Nonfederal Share of Medicaid Payments from Health Care Providers and Local Governments in State Fiscal Year 2012, by State**

| State | Percentage | Dollar amount |
|---|---|---|
| Alabama | 46.3% | $812,910,877 |
| Alaska | 0.0 | 0 |
| Arizona | 21.9 | 548,422,860 |
| Arkansas | 19.6 | 214,212,997 |
| California | 41.4 | 10,438,370,617 |
| Colorado | 27.2 | 622,957,553 |
| Connecticut | 16.0 | 524,890,185 |
| Delaware | 0.0 | 0 |
| District of Columbia | 10.6 | 43,149,746 |
| Florida | 33.6 | 3,481,414,295 |
| Georgia | 18.0 | 561,002,851 |
| Hawaii | 0.0 | 0 |
| Idaho | 18.6 | 83,074,695 |
| Illinois | 31.1 | 1,935,546,522 |
| Indiana | 37.3 | 817,409,302 |
| Iowa | 27.1 | 353,865,764 |
| Kansas | 3.2 | 35,689,873 |
| Kentucky | 21.3 | 345,738,461 |
| Louisiana | 8.1 | 181,976,351 |
| Maine | 18.1 | 152,827,017 |
| Maryland | 19.7 | 717,307,156 |
| Massachusetts | 12.6 | 795,911,726 |
| Michigan | 33.4 | 1,391,000,000 |
| Minnesota | 8.8 | 379,151,928 |
| Mississippi | 31.0 | 351,696,744 |
| Missouri | 52.5 | 2,002,329,551 |
| Montana | 7.0 | 21,632,887 |
| Nebraska | 4.8 | 33,874,996 |
| Nevada | 25.7 | 194,547,278 |
| New Hampshire | 30.2 | 192,902,003 |

Appendix III: Percentage and Amount of the
Nonfederal Share of Medicaid from Providers
and Local Governments in 2012

| State | Percentage | Dollar amount |
|---|---|---|
| New Jersey | 6.8 | 366,999,704 |
| New Mexico | 8.2 | 82,744,417 |
| New York | 35.9 | 10,279,054,243 |
| North Carolina | 9.7 | 452,901,232 |
| North Dakota | 1.5 | 4,719,614 |
| Ohio | 24.2 | 1,421,662,970 |
| Oklahoma | 13.3 | 207,411,553 |
| Oregon | 17.3 | 331,000,000 |
| Pennsylvania | 14.5 | 1,320,115,000 |
| Rhode Island | 22.5 | 199,800,000 |
| South Carolina | 31.1 | 462,578,752 |
| South Dakota | 0.5 | 1,283,367 |
| Tennessee | 33.4 | 928,596,969 |
| Texas | 13.0 | 1,487,906,059 |
| Utah | 19.1 | 105,665,100 |
| Vermont | 29.1 | 160,627,958 |
| Virginia | 0.9 | 32,874,899 |
| Washington | 20.8 | 517,066,896 |
| West Virginia | 21.7 | 161,760,948 |
| Wisconsin | 32.1 | 829,634,790 |
| Wyoming | 8.4 | 22,228,565 |

Source: GAO.  |  GAO-14-627

Note: "Health care providers and local governments" includes funds from health care providers
though provider taxes and provider donations and from local governments through intergovernmental
transfers and certified public expenditures.

# Appendix IV: Provider Tax Analysis

This appendix provides the results of our analysis of provider tax data states reported in our questionnaire and views expressed by provider association officials we interviewed. In analyzing states' reported data, we calculated the number of new taxes and the reported uses of tax revenue for new taxes implemented from state fiscal years 2008 through 2012 and reviewed the rates at which taxes were levied and how they compared to a federal threshold. In interviewing provider association officials, we obtained their views regarding states' use of provider taxes to finance the nonfederal share of Medicaid payments.

## Number of New Taxes and Reported Uses of Tax Revenue

The number of provider taxes in effect increased by 40, or about 34 percent, from 2008 through 2012, and the reported purposes of the new taxes were primarily to finance payments, rather than expand benefits or services, based on our analysis of state questionnaire responses. The total number of provider taxes increased from 119 in 42 states in 2008 to 159 in 47 states in 2012, for an increase of about 34 percent. A total of 63 new provider taxes were implemented in 32 states during this period.[1] When asked in the questionnaire about the uses of revenue from these taxes, states often cited multiple uses, such as financing fee-for-service Medicaid payments (cited 34 times), non-Disproportionate Share Hospital (DSH) supplemental payments (cited 31 times), and DSH supplemental payments (cited 13 times), as well as avoiding cuts in benefits (cited 27 times) and expanding benefits or services (cited 11 times).[2]

---

[1]From 2008 through 2012, 23 provider taxes were ended. When combined with the 63 new provider taxes implemented from 2008 through 2012, the net increase is 40 provider taxes.

[2]States could report multiple uses for each new tax.

## Rates at Which Taxes Are Levied and How They Compare to Federal Threshold

Based on our analysis of state questionnaire responses, of the 831 taxes reported by states, 63 were levied as a percentage of net patient service revenues from 2008 through 2012, and all 63 were at or below the federal hold-harmless threshold and therefore would be deemed not to have provided a guarantee that providers will receive their money back.[3] Under federal requirements, states must not hold providers harmless (e.g., must not provide a direct or indirect guarantee that providers will receive their money back). However, taxes at or below the threshold—6 percent of net patient service revenues in 2012—are deemed to comply with the guarantee requirement. Figure 9 illustrates for each year from 2008 through 2012 the number of tax rates levied as a percentage of net patient service revenue. From 2008 through 2012, most tax rates were within 1 percentage point of the threshold. From 2008 through 2012, the threshold was reduced from 6 to 5.5 percent from January 1, 2008, through September 30, 2011, and then returned to 6 percent beginning in October 1, 2011.[4] During the time the threshold was reduced, states with a tax that was previously at 6 percent reported that their tax rate was reduced to 5.5 percent. According to Centers for Medicare & Medicaid Services (CMS) officials, the agency did not conduct a comprehensive review of states' provider tax rates when the threshold was reduced to ensure that states' tax rates did not exceed the threshold. Moreover, states are not always required to demonstrate to CMS that their taxes are levied at a rate at or below the threshold. CMS may review tax rates on a case-by-case basis when reviewing state plan amendments or conducting other oversight reviews, such as reviews of provider taxes when a state requests a waiver of requirements that the tax be broad-based and uniformly imposed. CMS officials stated that they have an internal system for tracking these waivers. In May 2014, CMS officials stated that from 2008 through 2012, the agency reviewed and approved waivers of the

---

[3]For purposes of comparing provider taxes to the federal hold-harmless threshold, we identified taxes levied as a percentage of net patient service revenues, and when counting the total number of such taxes, we counted a tax more than once when a tax was levied using different tax rates during a given year. For example, if for 6 months of the year a tax was levied at 4 percent of net patient service revenues, and for the other 6 months the tax was levied at 6 percent of net patient service revenues, we counted this as two taxes. For taxes that were reported as not being levied as a percentage of net patient service revenues, we used a similar approach in counting these taxes.

[4]The Tax Relief and Health Care Act of 2006 lowered the threshold from 6 percent to 5.5 percent, from January 1, 2008, to September 30, 2011. The threshold returned to 6 percent on October 1, 2011. Pub. L. No. 109-432, § 403, 120 Stat. 2922, 2994-5 (2006).

requirements that provider taxes be broad-based and uniformly imposed in 29 states.

Figure 9: Federal Provider Tax Threshold and State Provider Tax Rates for Taxes Levied as a Percentage of Net Patient Service Revenue from 2008 through 2012



Federal hold-harmless threshold

One provider tax rate

Source: GAO. | GAO-14-627

Notes: The federal hold-harmless threshold is based on a federal fiscal year. The Tax Relief and Health Care Act of 2006 lowered the federal hold-harmless threshold from 6 percent to 5.5 percent, from January 1, 2008, to September 30, 2011. The provider tax rates are based on state fiscal years.

The 768 remaining taxes reported by states in our questionnaire were either levied on a percentage of revenues other than net patient service revenues or were not levied as a percentage of revenue. A total of 445 taxes were levied on a percentage of revenues other than net patient services revenues, and included gross revenues, net operating revenues, and non-Medicare patient revenue. In some cases, these taxes were levied at a rate above 6 percent. In May 2014, CMS officials stated that if the agency reviewed a tax levied on a type of revenue other than net patient service revenues, CMS would have the state perform calculations to demonstrate to CMS that if the tax was levied as a percentage of net patient service revenues, it would fall at or below the threshold. A total of 323 taxes were not levied on revenues, and included taxes based on dollar amounts per bed day or a flat tax per year. According to CMS officials, in reviewing these types of taxes, the agency would have the state perform calculations to demonstrate to CMS that if the tax was levied as a percentage of net patient service revenues, it would fall at or below the threshold.

# Views of Provider Associations

The officials we interviewed from provider associations representing inpatient hospitals and nursing homes, the most common types of providers taxed, reported that while the providers would prefer not to be subject to a provider tax, the associations have worked with the states to make them acceptable to the providers they represent. Officials from the provider associations said that factors that made provider taxes acceptable to the providers they represent included recognition that

- without the tax revenue, states would likely reduce Medicaid payments to providers;

- revenue from the taxes would be used for making Medicaid payments to providers; and

- the state would provide assurances that tax revenue would be used for Medicaid payments. For example, officials said that one state passed a law requiring the tax revenues to be used to make Medicaid payments, and one state created a fund into which all tax revenues were deposited. Revenues in the fund were used to make Medicaid payments to providers.

Officials noted that providers are more reluctant to accept provider taxes when they lack assurance that the tax revenue would be used for Medicaid payments. Officials also noted that providers that serve fewer Medicaid patients are less accepting of new provider taxes.

# Appendix V: Changes in Percentage and Amount of the Nonfederal Share of Medicaid from Providers and Local Governments

Table 4 presents information from interactive figure 4 on changes in the percentage and amount of the nonfederal share from health care providers and local governments in each state during state fiscal years 2008 through 2012.

Table 4: Changes in the Percentage and Amount of the Nonfederal Share of Medicaid Payments from Health Care Providers and Local Governments, State Fiscal Years 2008 through 2012, by State

| State | Percentage in 2008 | Percentage in 2012 | Percentage change from 2008 through 2012 | Dollar amount in 2008 | Dollar amount in 2012 | Dollar amount change from 2008 through 2012 |
|---|---|---|---|---|---|---|
| Alabama | 31.3% | 46.3% | 48.0% | $473,154,906 | $812,910,877 | $339,755,971 |
| Alaska | 0.0 | 0.0 | 0.0 | 0 | 0 | 0 |
| Arizona | 18.8 | 21.9 | 16.3 | 455,602,156 | 548,422,860 | 92,820,704 |
| Arkansas | 13.1 | 19.6 | 50.3 | 118,040,777 | 214,212,997 | 96,172,220 |
| California | 33.4 | 41.4 | 24.1 | 6,274,278,047 | 10,438,370,617 | 4,164,092,570 |
| Colorado | 10.1 | 27.2 | 169.6 | 155,313,803 | 622,957,553 | 467,643,750 |
| Connecticut | 6.4 | 16.0 | 151.4 | 143,430,953 | 524,890,185 | 381,459,232 |
| Delaware | 0.0 | 0.0 | 0.0 | 0 | 0 | 0 |
| District of Columbia | 8.9 | 10.6 | 19.8 | 25,392,187 | 43,149,746 | 17,757,559 |
| Florida | 25.4 | 33.6 | 32.5 | 1,862,821,898 | 3,481,414,295 | 1,618,592,397 |
| Georgia | 15.6 | 18.0 | 15.7 | 478,021,765 | 561,002,851 | 82,981,086 |
| Hawaii | 0.0 | 0.0 | 0.0 | 0 | 0 | 0 |
| Idaho | 0.3 | 18.6 | 5361.5 | 1,174,757 | 83,074,695 | 81,899,938 |
| Illinois | 12.6 | 31.1 | 146.6 | 793,649,165 | 1,935,546,522 | 1,141,897,357 |
| Indiana | 6.7 | 37.3 | 452.8 | 120,708,692 | 817,409,302 | 696,700,610 |
| Iowa | 21.0 | 27.1 | 29.0 | 214,509,247 | 353,865,764 | 139,356,517 |
| Kansas | 4.3 | 3.2 | (26.4) | 38,826,223 | 35,689,873 | (3,136,350) |
| Kentucky | 22.2 | 21.3 | (4.1) | 319,339,753 | 345,738,461 | 26,398,708 |
| Louisiana | 6.9 | 8.1 | 17.5 | 113,087,417 | 181,976,351 | 68,888,934 |
| Maine | 16.7 | 18.1 | 8.8 | 131,019,354 | 152,827,017 | 21,807,663 |
| Maryland | 3.9 | 19.7 | 411.3 | 107,533,362 | 717,307,156 | 609,773,794 |
| Massachusetts | 10.8 | 12.6 | 16.1 | 565,902,437 | 795,911,726 | 230,009,289 |
| Michigan | 32.1 | 33.4 | 4.0 | 1,314,900,000 | 1,391,000,000 | 76,100,000 |
| Minnesota | 11.3 | 8.8 | (22.3) | 366,101,779 | 379,151,928 | 13,050,149 |
| Mississippi | 23.2 | 31.0 | 33.5 | 195,350,214 | 351,696,744 | 156,346,530 |
| Missouri | 55.3 | 52.5 | (5.1) | 1,587,922,848 | 2,002,329,551 | 414,406,703 |
| Montana | 13.5 | 7.0 | (48.3) | 30,793,497 | 21,632,887 | (9,160,610) |
| Nebraska | 1.1 | 4.8 | 335.1 | 7,533,963 | 33,874,996 | 26,341,033 |
| Nevada | 30.5 | 25.7 | (15.8) | 183,648,519 | 194,547,278 | 10,898,759 |

Appendix V: Changes in Percentage and
Amount of the Nonfederal Share of Medicaid
from Providers and Local Governments

| State | Percentage in 2008 | Percentage in 2012 | Percentage change from 2008 through 2012 | Dollar amount in 2008 | Dollar amount in 2012 | Dollar amount change from 2008 through 2012 |
|---|---|---|---|---|---|---|
| New Hampshire | 43.7 | 30.2 | (30.9) | 356,894,685 | 192,902,003 | (163,992,682) |
| New Jersey | 6.6 | 6.8 | 3.9 | 308,083,588 | 366,999,704 | 58,916,116 |
| New Mexico | 6.8 | 8.2 | 21.1 | 55,636,581 | 82,744,417 | 27,107,836 |
| New York | 34.7 | 35.9 | 3.5 | 8,101,812,951 | 10,279,054,243 | 2,177,241,292 |
| North Carolina | 27.8 | 9.7 | (65.2) | 1,164,912,666 | 452,901,232 | (712,011,434) |
| North Dakota | 2.0 | 1.5 | (26.8) | 3,983,220 | 4,719,614 | 736,394 |
| Ohio | 16.5 | 24.2 | 46.6 | 813,475,652 | 1,421,662,970 | 608,187,318 |
| Oklahoma | 6.0 | 13.3 | 122.6 | 65,052,561 | 207,411,553 | 142,358,992 |
| Oregon | 10.2 | 17.3 | 70.4 | 120,000,000 | 331,000,000 | 211,000,000 |
| Pennsylvania | 14.4 | 14.5 | 0.9 | 1,117,884,000 | 1,320,115,000 | 202,231,000 |
| Rhode Island | 16.2 | 22.5 | 39.1 | 139,400,000 | 199,800,000 | 60,400,000 |
| South Carolina | 25.4 | 31.1 | 22.4 | 368,674,155 | 462,578,752 | 93,904,597 |
| South Dakota | 0.3 | 0.5 | 68.0 | 683,279 | 1,283,367 | 600,088 |
| Tennessee | 12.6 | 33.4 | 165.8 | 314,507,257 | 928,596,969 | 614,089,712 |
| Texas | 13.7 | 13.0 | (5.1) | 1,133,953,554 | 1,487,906,059 | 353,952,505 |
| Utah | 12.2 | 19.1 | 56.2 | 52,094,200 | 105,665,100 | 53,570,900 |
| Vermont | 21.2 | 29.1 | 37.2 | 93,882,425 | 160,627,958 | 66,745,533 |
| Virginia | 0.1 | 0.9 | 1371.2 | 1,725,674 | 32,874,899 | 31,149,225 |
| Washington | 8.2 | 20.8 | 153.3 | 131,320,302 | 517,066,896 | 385,746,594 |
| West Virginia | 31.0 | 21.7 | (30.1) | 183,478,121 | 161,760,948 | (21,717,173) |
| Wisconsin | 17.5 | 32.1 | 83.8 | 380,198,819 | 829,634,790 | 449,435,971 |
| Wyoming | 3.0 | 8.4 | 185.7 | 6,634,910 | 22,228,565 | 15,593,655 |

Source: GAO.  |  GAO-14-627

Notes: "Health care providers and local governments" includes funds from health care providers
though provider taxes and provider donations and from local governments through intergovernmental
transfers and certified public expenditures. Percentages and dollar amounts in parentheses represent
a negative number.

# Appendix VI: Comments from the Department of Health and Human Services



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

**OFFICE OF THE SECRETARY**

Assistant Secretary for Legislation
Washington, DC 20201

'JUL 1 8 2014

Katherine Iritani
Director, Health Care
U.S. Government Accountability Office
441 G Street NW
Washington, DC  20548

Dear Ms. Iritani:

Attached are comments on the U.S. Government Accountability Office's (GAO) report entitled, "Medicaid Financing:  States' Increased Reliance on Funds from Health Care Providers and Local Governments Warrants Improved CMS Data Collection" (GAO-14-627).

The Department appreciates the opportunity to review this report prior to publication.

Sincerely,

Jim R. Esquea
Assistant Secretary for Legislation

Attachment

**GENERAL COMMENTS OF THE DEPARTMENT OF HEALTH AND HUMAN
SERVICES (HHS) ON THE GOVERNMENT ACCOUNTABILITY OFFICE'S DRAFT
REPORT ENTITLED: MEDICAID FINANCING: STATES' INCREASED RELIANCE ON
FUNDS FROM HEALTH CARE PROVIDERS AND LOCAL GOVERNMENTS
WARRANTS IMPROVED CMS DATA COLLECTION (GAO-14-627)**

The Department appreciates the opportunity to review and comment on this draft report.

**GAO Recommendation**

GAO recommends that the Administrator of the Centers for Medicare & Medicaid Services
(CMS) develop a data collection strategy that ensures states report accurate and complete data on
all sources of funds used to finance the nonfederal share of Medicaid payments. There are short-
and long-term possibilities for pursuing the data collection strategy including--

- In the short-term, as part of its ongoing initiative to annually collect data on Medicaid
  payments made to hospitals, nursing facilities, and other institutional providers, CMS
  could collect accurate and complete facility-specific data on the source of funds used to
  finance the nonfederal share of the Medicaid payments.

**CMS Response**

HHS non-concurs with GAO's recommendation that additional facility-specific reporting on the
source of funds is appropriate at this time. HHS currently collects information necessary to review
state compliance with federal regulations and statute related to sources of the non-federal share as
part of our regular review procedures. Most of the federal limitations (including contributions from
local governments) are aggregate limits; however, to the extent that HHS requires information
pertaining to specific providers or units of government to assess state compliance with federal
regulations and statute, we believe our current processes are sufficient to gather this information
from states. Further, to the extent that state governments (such as counties or other localities) are
contributing units of government for the non-federal share, but do not directly receive Medicaid
services payments, facility level reporting would not aid HHS in its regulatory oversight
responsibilities.

HHS thoroughly reviews the financing associated with each state plan amendment that states
submit to propose changes to service payments. With each request, HHS gathers information on
the source of the non-federal share, the units of government that intergovernmental transfer (IGT)
funds or use certified public expenditures (CPEs), as well as supporting documentation related to
health care-related taxes and provider-related donations. The information is analyzed and must be
determined as an acceptable basis to serve as a source of the non-federal share before HHS
approves a State Plan Amendment (SPA) proposal.

In addition, HHS has recently embarked on new initiatives to improve analytic capacity and provide
a more regular process for state financing and upper payment limit data reporting. HHS issued a
policy letter on March 18, 2013, that discusses the mutual obligations of states and HHS to apply
safeguards to ensure the proper use of federal and state Medicaid funds. As part of the letter, HHS
instituted a new policy to require annual submissions that demonstrate compliance with federal
upper payment limits (UPL) and information on the source of the non-federal share that is used to
fund in some cases facility specific "UPL" supplemental payments. We have engaged with our
regional offices to analyze the first state UPL submissions and have engaged with a contractor to
aid in the ongoing effort.

set

As a follow-up to the March letter and in consideration of increased interest by states in financing Medicaid payments through public/private endeavors, we released a second "accountability" State Medicaid Directors Letter on May 9, 2014. This letter clarifies the relationship of public/private endeavors with respect to the provider related donations requirements, so that states have a full understanding of the requirements and examples of arrangements that would be unacceptable.

We do agree that HHS does not have adequate data to verify that states adhere to the 60 percent limitation on contributions from local governments to fund the non-federal share. Currently, we rely on states' assurances within the Medicaid State Plan of compliance with this requirement. As part of our new oversight initiatives, we will examine the feasibility and means for collecting information from states to verify that local government contributions comply with the statutory limit.

### GAO Recommendation

GAO recommends that the Administrator of CMS develop a data collection strategy that ensures states report accurate and complete data on all sources of funds used to finance the nonfederal share of Medicaid payments. There are short- and long-term possibilities for pursuing the data collection strategy including--

- In the long-term, as part of its ongoing initiative to develop an enhanced Medicaid claims data system Transformed Medicaid Statistical Information System (T-MSIS), CMS could ensure that T-MSIS will be capable of capturing information on all sources of funds used to finance the nonfederal share of Medicaid payments, and once the system becomes operational, ensure that states report this information for supplemental Medicaid payments and other high-risk Medicaid payments.

### Response

HHS non-concurs that T-MSIS, as a claims based system, is the correct method to gather information on the sources of funds that states use to support their Medicaid programs as discussed in the report. T-MSIS will be a valuable tool in other oversight responsibilities, and we will be assessing the potential for using T-MSIS data to assist HHS in analyzing state UPL submissions in the future.

We are also working to identify any data gaps and recommendations for improvement in our current processes for UPL and state share financing reviews, which include provider-level data. The outcome of this work will inform our future policy work and, if necessary, additional data points that may help assess state compliance.

HHS thanks GAO for the work done on this issue and looks forward to working with GAO in the future.

# Appendix VII: GAO Contact and Staff Acknowledgments

## GAO Contact

Katherine M. Iritani, (202) 512-7114 or iritanik@gao.gov

## Staff Acknowledgments

In addition to the contact named above, Tim Bushfield (Assistant Director), Leonard Brown, Carolyn Fitzgerald, Peter Mangano, Vikki Porter, Roseanne Price, and Hemi Tewarson made key contributions to this report.

# Related GAO Products

*High-Risk Series: An Update*. GAO-13-283. Washington, D.C.: February 2013.

*Medicaid: More Transparency of and Accountability for Supplemental Payments Are Needed*. GAO-13-48. Washington, D.C.: November 26, 2012.

*Medicaid: States Made Multiple Program Changes, and Beneficiaries Generally Reported Access Comparable to Private Insurance*. GAO-13-55. Washington, D.C.: November 15, 2012.

*Medicaid: States Reported Billions More in Supplemental Payments in Recent Years*. GAO-12-694. Washington, D.C.: July 20, 2012.

*Opportunities to Reduce Potential Duplication in Government Programs, Save Tax Dollars, and Enhance Revenue*. GAO-11-318SP. Washington, D.C.: March 1, 2011.

*High-Risk Series: An Update*. GAO-11-278. Washington, D.C.: February 2011.

*Medicaid: Ongoing Federal Oversight of Payments to Offset Uncompensated Hospital Care Costs Is Warranted*. GAO-10-69. Washington, D.C.: November 20, 2009.

*Medicaid: CMS Needs More Information on the Billions of Dollars Spent on Supplemental Payments*. GAO-08-614. Washington, D.C.: May 30, 2008.

*Medicaid Financing: Long-standing Concerns about Inappropriate State Arrangements Support Need for Improved Federal Oversight*. GAO-08-650T. Washington, D.C.: April 3, 2008.

*Medicaid Financing: Long-Standing Concerns about Inappropriate State Arrangements Support Need for Improved Federal Oversight*. GAO-08-255T. Washington, D.C.: November 1, 2007.

*Medicaid Financing: Federal Oversight Initiative Is Consistent with Medicaid Payment Principles but Needs Greater Transparency*. GAO-07-214. Washington, D.C.: March 30, 2007.

*Medicaid Financial Management: Steps Taken to Improve Federal Oversight but Other Actions Needed to Sustain Efforts*. GAO-06-705. Washington, D.C.: June 22, 2006.

*Medicaid Financing: States' Use of Contingency-Fee Consultants to Maximize Federal Reimbursements Highlights Need for Improved Federal Oversight*. GAO-05-748. Washington, D.C.: June 28, 2005.

*Medicaid: States' Efforts to Maximize Federal Reimbursements Highlight Need for Improved Federal Oversight*. GAO-05-836T. Washington, D.C.: June 28, 2005.

*Medicaid: Intergovernmental Transfers Have Facilitated State Financing Schemes*. GAO-04-574T. Washington, D.C.: March 18, 2004.

*Medicaid: Improved Federal Oversight of State Financing Schemes Is Needed*. GAO-04-228. Washington, D.C.: February 13, 2004.

*Major Management Challenges and Program Risks: Department of Health and Human Services*. GAO-03-101. Washington, D.C.: January 2003.

*Medicaid: HCFA Reversed Its Position and Approved Additional State Financing Schemes*. GAO-02-147. Washington, D.C.: October 30, 2001.

*Medicaid: State Financing Schemes Again Drive Up Federal Payments*. GAO/T-HEHS-00-193. Washington, D.C.: September 6, 2000.

*Medicaid: Disproportionate Share Payments to State Psychiatric Hospitals*. GAO/HEHS-98-52. Washington, D.C.: January 23, 1998.

*Medicaid: Disproportionate Share Hospital Payments to Institutions for Mental Diseases*. GAO/HEHS-97-181R. Washington, D.C.: July 15, 1997.

*Medicaid: States Use Illusory Approaches to Shift Program Costs to Federal Government*. GAO/HEHS-94-133. Washington, D.C.: August 1, 1994.

| GAO's Mission | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
|---|---|
| Obtaining Copies of GAO Reports and Testimony | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's website (http://www.gao.gov). Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. To have GAO e-mail you a list of newly posted products, go to http://www.gao.gov and select "E-mail Updates." |
| Order by Phone | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, http://www.gao.gov/ordering.htm. <br><br> Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537. <br><br> Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| Connect with GAO | Connect with GAO on Facebook, Flickr, Twitter, and YouTube. Subscribe to our RSS Feeds or E-mail Updates. Listen to our Podcasts. Visit GAO on the web at www.gao.gov. |
| To Report Fraud, Waste, and Abuse in Federal Programs | Contact: <br><br> Website: http://www.gao.gov/fraudnet/fraudnet.htm <br> E-mail: fraudnet@gao.gov <br> Automated answering system: (800) 424-5454 or (202) 512-7470 |
| Congressional Relations | Katherine Siggerud, Managing Director, siggerudk@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548 |
| Public Affairs | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 U.S. Government Accountability Office, 441 G Street NW, Room 7149 Washington, DC 20548 |



Please Print on Recycled Paper.