# EXHIBIT P

DEPARTMENT OF HEALTH AND HUMAN SERVICES
DEPARTMENTAL APPEALS BOARD
APPELLATE DIVISION

| | | |
|---|---|---|
| **TEXAS HEALTH AND HUMAN SERVICES** | § | |
| **COMMISSION,** | § | |
| **Appellant,** | § | |
| | § | |
| **v.** | § | **DOCKET NO. A-17-51** |
| | § | |
| **CENTERS FOR MEDICARE &** | § | |
| **MEDICAID SERVICES,** | § | |
| **Respondent.** | § | |

## BRIEF OF INTERVENORS

ON BEHALF OF BAYLOR HEALTH CARE
SYSTEM, METHODIST HOSPITALS OF
DALLAS, AND TEXAS HEALTH
RESOURCES

ON BEHALF OF NORTH TEXAS
DIVISION, INC.

Thomas E. Dowdell
R. Jeffrey Layne
Benjamin H. Wallfisch
Frances M. Hansen
Norton Rose Fulbright US LLP
799 9th Street NW, Suite 1000
Washington, DC 20001-4501
Telephone: (202) 662-4503
Facsimile: (202) 662-4643
thomas.dowdell@nortonrosefulbright.com

Lance J. Ramsey
Renee N. Rayne
Jeff M. Brinker
Gjerset & Lorenz, LLP
2801 Via Fortuna, Suite 500
Austin, Texas 78746
Telephone: (512) 899-3995
Facsimile: (512) 899-3939
ramsey@gl-law.com

# TABLE OF CONTENTS

FACTUAL BACKGROUND....................................................................................................3

I.  Background............................................................................................................................7
    A.  CMS first approved Texas' public/private collaborative model in 2005. ......................................7
    B.  The State, CMS, and Dallas and Tarrant County designed the public/private collaborations to support and expand indigent care in compliance with the CMS approved State plan..................................9
    C.  CMS again reviewed and approved the model in 2007. ...............................................................10
    D.  In 2010 and 2012,CMS approved SPAs in two other states that utilized identical public/private collaborative models as the ones approved by CMS in Texas........................................................12
    E.  In mid-2011, the OIG audited the Texas public/private collaborative model and identified no violations of Medicaid statutes or regulations. ..............................................................................................13
    F.  In late 2011, CMS approved an 1115 Waiver involving the Texas public/private collaborations............14
    G.  In 2014, CMS reversed course, indicating for the first time that the provision by a private provider of charity that had previously been furnished by a governmental entity constituted a non-bona fide provider related donation. ...............................................................................................................14
    H.  After using SDML #14-004 to call into question the public/private collaborative programs, CMS approved three SPAs in an expansion state that utilize the same conceptual framework for a public/private collaboration. ...............................................................................................................15

II.  Standard of Review ............................................................................................................17

ARGUMENT ..............................................................................................................................17

I.  CMS' disallowance has no legal basis because the public/private indigent care collaborations comply with federal provider-related donation law....................................................................................17

II.  CMS exceeds its statutory authority by changing what constitutes a "provider-related donation."....21
    A.  SMDL #14-004 contradicts the Social Security Act by ignoring the statutory test for a provider-related donation. ...............................................................................................................................21
    B.  CMS contradicts the Social Security Act by including arrangements not contemplated or sanctioned by Congress as constituting a provider-related donation...................................................................22

III.  CMS' reliance on SMDL #14-004 violates the APA. ...........................................................24

CONCLUSION ...........................................................................................................................27

## STATEMENT OF THE CASE

The Texas Health and Human Services Commission (HHSC) brought this appeal to challenge a $26.8 million disallowance of federal financial participation (FFP) by the Centers for Medicare & Medicaid Services (CMS) that threatens to significantly disrupt the provision of healthcare to indigent patients in Dallas County, Tarrant County, and across the State of Texas. In brief, CMS inconsistently argues that the provision of indigent care by private providers, when that care was formerly provided by local government entities, constitutes provider-related donations if the local government entity supports the Medicaid program by providing the non-federal share through an intergovernmental transfer (IGT). Under the public/private collaborative model being challenged by CMS, private hospitals have expanded charity care to low-income and indigent members of the community, which reduces the amount local governments need to spend on such care. The local government entity is able to use funds it previously spent on care to the indigent to increase the amount Texas spends on the Medicaid program.

Contrary to a decade of consistent CMS determinations that these public/private collaborations comply with federal requirements, CMS now contends the collaborations are impermissible provider-related donations. However, the public/private collaborations do not involve a provider-related donation because the private providers deliver services directly to patients and do not make payments, directly or indirectly, in cash or in kind to any of the governmental entities involved in the collaboration nor do the private providers assume the legal obligations of any governmental entity participating in the collaboration. CMS' abrupt reversal is inconsistent with the statutory and regulatory language as well as CMS' prior longstanding policy.

## INTRODUCTION

Public/private collaborations involve the governmental sector and the private sector sharing the effort and cost of delivering care to indigent patients. The private sector provides professional hands-on care givers to treat the indigent, and the governmental sector provides the facilities and infrastructure within which these professionals provide some services (many services are provided at the healthcare professionals' personal office). Prior to the collaboration concept, the governmental sector generally provided the facilities for treatment in addition to contracting with and paying professional care givers to treat some patients while the private hospitals duplicated this effort without any coordination.

Beginning more than ten years ago, HHSC worked jointly with CMS to structure innovative methods by which private hospitals and local government entities could form collaborations to coordinate ways to better utilize their individual resources in their communities. Under the collaborative model that Texas developed with CMS, private providers have voluntarily expanded the amount of charity care they provide to low-income and indigent members of the community by hundreds of thousands of dollars a year, which reduces the amount local governments choose to spend on care to the non-Medicaid indigent populations, leaving a surplus of local tax revenue that the governmental entity may use, at its sole discretion, to support the Texas Medicaid program. CMS has consistently approved this basic collaborative structure. For example:

| Date | CMS Direction and Corresponding State Disclosures | Source |
|---|---|---|
| June 30, 2006 | "The provision of these indigent services by the Affiliated Hospitals directly to indigent patients will alleviate a portion of the Local Taxing Entity's expense of providing indigent care. The Local Taxing Entity will utilize part of its ad valorem tax revenue dedicated to healthcare needs to fund the Medicaid program . . . ." | Letter from David Balland, HHSC, to Andrew Fredrickson, CMS at 4-5 [Exhibit 5]. |
| May 29, 2007 | "Local government tax dollars that are not contractually committed for the purpose of indigent care services or any other non-Medicaid activity can be directly transferred by the local government to a State as the non-Federal share of Medicaid payments." | 72 Fed. Reg. 29748, 29762 (May 29, 2007) – final rule vacated on other grounds. |
| February 4, 2008 | "The private hospital UPL program in Texas is built on the premise that private hospitals may provide charity care to indigent patients in a way that relieves local government entities from incurring expenses for such care that they might otherwise incur (without relieving local government entities of any actual obligations they might have under State law or under contracts). The local government entities, thus relieved, are able to contribute toward the support of Medicaid providers in their communities." | Letter from Chris Traylor, HHSC, to Bill Brooks, CMS at 2 [Exhibit 13]. |
| February 4, 2008 | "[The governmental entity's] contracts were terminated, after which the private hospitals, generally through a nonprofit healthcare organization, entered into new contracts with the providers . . . . With the [government entity's] money no longer being spent under the terminated contracts, the district was able to make an IGT to fund increased Medicaid payments." | Letter from Chris Traylor, HHSC, to Bill Brooks, CMS at 5 [Exhibit 13]. |
| May 1, 2008 | "[A] private hospital that receives UPL supplemental payments may provide indigent care by entering into its own arrangements (contracts or otherwise) with healthcare providers that had previously provided indigent care services to the transferring governmental entity." | Letter from Chris Traylor, HHSC, to James Frizzera, CMS at 4 [Exhibit 14]. |
| August 20, 2010 | "The Private Hospitals will enter into their own arrangements (contractual or otherwise) with the individuals or entities who provide care directly to low income and needy patients, including . . . . The provision of the low income and needy services by the Private Hospitals directly to patients will result in the alleviation of the expense of the public funds the governmental entity previously expended on this care." | Letter from Don Gregory, La. Dep't of Health & Hosps., to Bill Brooks, CMS at 2-3 [Exhibit 19]. |
| March 8, 2011 | "[A] governmental entity and Private Hospitals [] develop a plan for the Private Hospitals to reduce or alleviate the need for the governmental entity to provide care to the low income and needy patients that do not qualify for Medicaid benefits, thereby allowing the governmental entity to utilize its public funds to increase support for the Medicaid program." | Letter from Charles Duarte, Nev. Dep't of Health & Human Servs., to Mark Wong, CMS at 1-2 [Exhibit 24]. |
| June 17, 2014 | "DHH does not believe that the LINCCA arrangement mentioned in the currently approved State Plan involves a provider related donation. The participating hospital has voluntarily decided to take steps to ensure that low income and needy patients have access to, and receive, high quality hospital services." | La. Dep't of Health & Hosps., Responses to Informal Request for Additional Information (IRAI) TN 14-25 at 5 [Exhibit 28]. |
| November 30, 2016 | "We have reviewed the proposed State plan amendment (SPA) to Attachment 4.19-A of your Medicaid State plan [which states in part, '[A] hospital may qualify for this category by . . . increase[ing] its provision of inpatient Medicaid and uninsured services by providing services that were previously delivered and terminated or reduced by a state owned and operated facility'] . . . . Based upon the information provided by the State, Medicaid State plan amendment 16-0014 is approved effective July 1, 2016." | Letter from Kristin Fan, CMS to Jen Steele, La. Dep't of Health & Hosps. [Exhibit 29]. |

In 2014, CMS issued State Medicaid Director Letter (SMDL) #14-004, which states:

> In some cases, the IGT is derived from funds that the government entity previously would have spent on providing the services that are now being provided by the private entity. These funds would not be available if not for the public-private partnership agreements. As described in further detail below, this type of arrangement would not be considered a bona fide donation under Medicaid requirements.[1]

SMDL #14-004 is a 180-degree reversal in CMS' position since 2005 without any amendments to the portions of the Act defining or governing impermissible provider-related donations, and without notice and comment rulemaking revising the corresponding regulations. The definition of "provider-related donation" remains consistent with the federal regulations in effect between 2006 and 2016[2] when CMS approved and reapproved numerous times the collaborations in Texas and other states. Similarly, the Texas programs remain unchanged and consistent with the disclosures made to CMS from 2005 through today.

CMS based its numerous State Plan Amendment (SPA) approvals and its disallowance on the same authorities and disclosures. In essence, CMS changed the definition of a provider-related donation through SMDL #14-004 and relies on, without any change in statute or regulation, SMDL #14-004 as the legal basis to support its disallowance determination.

The Departmental Appeals Board (Board) should reverse CMS' disallowance because: (1) the public/private collaborations do not result in a provider-related donation; (2) CMS does not have the authority to redefine the term provider-related donation; and (3) relying on SMDL #14-004 as the basis for the disallowance violates the Administrative Procedures Act (APA) and is arbitrary and capricious.

---

[1] Intervenor Exhibit 1—SMDL #14-004 (May 9, 2014), at 3.
[2] 42 U.S.C. § 1396b(w) (West 2016); 42 C.F.R. §§ 433.52, 433.54 (West 2016).

**I.    Background**

*A.    CMS first approved Texas' public/private collaborative model in 2005.*

In 2005, HHSC proposed an arrangement to CMS under which private hospitals, at their own discretion, chose to provide care directly to indigent patients whose care was previously funded by a local governmental entity. In some communities where the governmental entity had already developed the infrastructure to deliver indigent care, the collaborative providers concluded that retaining that infrastructure best served the indigent population, so that the historical sites of care for low-income patients were not disrupted. Therefore, the private hospitals in those communities elected to bear a greater share of the costs of professional services to the indigent within the existing infrastructure while the public hospitals bore the cost of the facility component of care, furnishing the physical space for the hands-on professionals engaged by private entities to deliver some of the more acute care.

With the private hospitals' expansion of charity care to these indigent patients, the local governmental entities could, at their sole discretion, use a portion of the funds they formerly spent on individual professionals to support the Medicaid program. From both a legal and practical standpoint, the local government entity had no obligation to provide services to low-income patients or transfer funds in support of the Medicaid program; therefore, the expansion of charity care by the private sector did not result in the donation of anything of value to the governmental entity.

The expanded charitable efforts of, and collaboration between, the public and private sectors did result, however, in enormous benefits to local communities struggling to provide care for indigent populations, exacerbated by the State's refusal to expand Medicaid under the Affordable Care Act.

To effectuate the public/private collaborations, HHSC submitted two proposed amendments to its Medicaid state plan under which private hospitals could receive Medicaid supplemental payments (one for inpatient care and the other for outpatient care).[3] HHSC and hospital representatives independently discussed the public/private collaborations with CMS officials in the Dallas regional office and Baltimore central office, followed by the formal CMS review of the Texas SPAs.

During the formal review of the Texas SPAs, CMS requested additional information (RAI), and HHSC provided comprehensive responses explaining the collaborative arrangements and their intent.[4] In its June 2006 RAI response, HHSC made clear its rationale for implementing the SPAs:

> Due to reductions in Medicaid spending and a growing Medicaid and uninsured population ("indigent"), there is a growing gap between the costs hospitals incur for treating indigent patients and the reimbursement they receive. In light of the growing gap between the cost of care and reimbursement, the Local Taxing Entity in certain Texas communities joined with private safety-net hospitals to design a collaborative program to more fully fund the Medicaid program under current law and ensure the availability of quality healthcare services for the indigent population.[5]

Notably, HHSC's RAI responses plainly described a key aspect of these collaborations—private hospitals' expansion of indigent care that local governments previously provided:

> The provision of these indigent services[6] by the Affiliated Hospitals directly to indigent patients will alleviate a portion of the Local Taxing Entity's expense of

---

[3] Intervenor Exhibit 2—Letter from David Balland, State Medicaid Dir., HHSC, to Andrew Fredrickson, Assoc. Reg'l Adm'r, CMS (June 29, 2005) (transmitting State Plan Amendment [TN]-05-001); Intervenor Exhibit 3—Letter from David Balland, State Medicaid Dir., HHSC, to Andrew Fredrickson, Assoc. Reg'l Adm'r, CMS (Dec. 30, 2005) (transmitting State Plan Amendment [TN]-05-011).

[4] Intervenor Exhibit 4—Letter from David Balland, State Medicaid Dir., HHSC, to Andrew Fredrickson, Assoc. Reg'l Adm'r, CMS (May 30, 2006) (response to RAI); Intervenor Exhibit 5—Letter from David Balland, State Medicaid Dir., HHSC, to Andrew Fredrickson, Assoc. Reg'l Adm'r, CMS (June 30, 2006) (response to RAI).

[5] Intervenor Exhibit 5 at 4.

[6] The RAIs further specified "[e]xamples of the types of indigent care services the Affiliated Hospitals may provide include inpatient and outpatient hospital services, specialty physician services, pharmaceutical services, kidney dialysis, dentistry, nursing hotline services, air ambulance services, emergency and on-call physician services, and ophthalmology." *Id.*

> providing indigent care. The Local Taxing Entity will utilize part of its ad valorem
> tax revenue dedicated to healthcare needs to fund the Medicaid program, . . . .[7]

After more than a year of review, numerous RAI responses from HHSC, and multiple discussions amongst hospital representatives, HHSC, and CMS national and regional staff, CMS approved the Texas SPAs on July 26, 2006[8] and September 5, 2006[9] and began processing payments to private hospitals.

**B.** ***The State, CMS, and Dallas and Tarrant County designed the public/private collaborations to support and expand indigent care in compliance with the CMS approved State plan.***

In July 2007, a number of private safety net hospitals in the Dallas area created the Dallas County Indigent Care Corporation (DCICC), a Texas nonprofit corporation formed to provide and otherwise arrange for the healthcare of Dallas County's indigent population in the same manner approved by CMS in 2006.[10] With the exception of a limited number of employed professionals, the community relies on independent physicians to treat indigent and low-income patients. The Dallas collaboration increased the availability of independent physicians available to provide indigent care directly to patients. Although the collaboration in Tarrant County started in 2009 (i.e. TCICC), two years later than the one in Dallas, the structure of the relationship and delivery of care directly to low-income and needy patients is substantially similar to the charitable efforts in Dallas.[11]

---

[7] *Id.* at 4-5.

[8] Intervenor Exhibit 6—Letter from Dennis Smith, Dir., CMS, to David Balland, State Medicaid Dir., HHSC (July 26, 2006) (approving TN 05-001).

[9] Intervenor Exhibit 7—Letter from Dennis Smith, Dir., CMS, to Chris Traylor, State Medicaid Dir., HHSC (Sept. 5, 2006) (approving TN 05-011).

[10] Intervenor Exhibit 8—DCICC Certificate of Formation (July 2, 2007).

[11] Intervenor Exhibit 9—TCICC Certificate of Formation (Aug. 2, 2007).

## C. CMS again reviewed and approved the model in 2007.

One year after completing its initial formal approval, CMS audited hospital records relating to the Medicaid supplemental payments and the financing source for the non-federal share.[12] CMS then deferred FFP while it expanded its review of the details of the collaborations between private hospitals and governmental entities across the State, including the collaboration in Dallas County.[13] Both the governmental entity and the private hospitals in the Dallas public/private collaboration submitted detailed records and responses related to their collaborative efforts to HHSC and to CMS in response to the deferral.[14] CMS also performed extensive document review and on-site interviews with hospital executives.

HHSC was again transparent and comprehensive in its descriptions of the Texas arrangements. In support of the public/private collaborative arrangement, HHSC submitted extensive legal analyses showing that the private hospitals' election to provide indigent care services directly to patients did not result in a provider-related donation because the services being furnished by the private sector were not statutory or legal obligations of the governmental entities, even when the services had historically been provided or paid for by a local governmental entity.[15] HHSC reiterated the collaborative structure to CMS:

> [The governmental entity's] contracts were terminated, after which the private hospitals, generally through a nonprofit healthcare organization, entered into new contracts with the providers . . . . With the [government entity's] money no longer being spent under the terminated contracts, the district was able to make an IGT to fund increased Medicaid payments.[16]

---

[12] Intervenor Exhibit 10—Letter from Lynn Ward, Fin. Mgmt. Specialist, CMS, to Chris Traylor, State Medicaid Dir., HHSC (Apr. 12, 2007).

[13] Intervenor Exhibit 11—Letter from Bill Brooks, Assoc. Reg'l Adm'r, CMS, to Chris Traylor, Assoc. Comm'r for Medicaid & CHIP, HHSC (Oct. 5, 2007) (Deferral Notice TX/2007/3/E/12/MAP).

[14] Intervenor Exhibit 12—Memorandum from Thomas Dowdell *et al.* to CMS (Aug. 21, 2007).

[15] Intervenor Exhibit 13—Letter from Chris Traylor, Assoc. Comm'r for Medicaid & CHIP, HHSC, to Bill Brooks, Assoc. Reg'l Adm'r, CMS (Feb. 4, 2008) (response to Deferral Notice TX/2007/3/E/12/MAP).

[16] *Id.* at 5.

HHSC, Texas providers, and participating local government entities worked extensively with CMS to formalize additional safeguards to ensure compliance with the Act and CMS regulations.[17] The parties jointly developed Conditions of Participation (CoPs) based on CMS' explanation of its interpretation of the provider-related donation provisions in the Act.[18] Notably, the CoPs, approved by CMS as safeguards, specifically permitted a private hospital to provide indigent care "by entering into its own arrangements (contractual or otherwise) with healthcare providers that had previously provided indigent care services to the transferring governmental entity."[19]

HHSC also revised the Private Hospital and Governmental Entity Certifications requested by CMS which all participants under the Texas SPAs were required to execute. These documents included assurances from governmental entities that they retained exclusive authority to determine how much the governmental entity would provide as an IGT, or if it would provide any IGT at all, and that the governmental entity was not requiring the hospitals to provide charity care services. Similarly, the hospitals were required to certify that there was no *quid pro quo* arrangement under which the governmental entity was obligated to IGT as a result of the amount or type of charity care services in the community.[20]

---

[17] Intervenor Exhibit 14—Letter from Chris Traylor, Assoc. Comm'r for Medicaid & CHIP, HHSC, to James Frizzera, Fin. Mgmt. Grp. Dir., CMS (May 1, 2008) (containing the Conditions of Participation that clearly identify limitations for hospital participants for CMS' review and approval).
[18] *Id.*
[19] *Id.* at 4.
[20] Intervenor Exhibit 15—Medicaid Supplemental Payment Program, Certification of Governmental Entity Participation, HHSC, at 2-3 (Fiscal Year 2009); Intervenor Exhibit 16—Medicaid Supplemental Payment Program, Certification of Hospital Participation, HHSC, at 1-3 (Fiscal Year 2009).

With implementation of these and other safeguards, CMS reaffirmed its prior approvals of the Texas public/private collaborations in July 2008 by lifting the deferral.[21] Between 2008 and 2014, CMS did not raise any concerns about the public/private collaborations in Texas.

D.    *In 2010 and 2012, CMS approved SPAs in two other states that utilized identical public/private collaborative models as the ones approved by CMS in Texas.*

Facing issues similar to Texas related to low Medicaid reimbursement and increasing uninsured indigent population, Louisiana submitted its own SPAs to operate Medicaid supplemental payment programs in which the State of Louisiana "joined with private safety-net hospitals to design a collaborative program substantially similar to the one approved by CMS for Texas."[22] During the SPA review process, Louisiana provided CMS clear disclosure of the collaborative:

> The Private Hospitals will enter into their own arrangements (contractual or otherwise) with the individuals or entities who provide care directly to low income and needy patients, including individuals or entities that had previously provided low income and needy care services to the governmental entity.[23]

To further illustrate how the hospitals would expand their charity care, Louisiana provided examples of "the types of low income and needy care services the Private Hospitals may provide, that were previously provided or paid for by a governmental entity"[24] and clarified that the provision of these example services "will result in the alleviation of the expense of the public funds the governmental entity previously expended on this care."[25] Consistent with the law and all prior

---

[21] *See, e.g.*, Intervenor Exhibit 17—Email from Steve Aragon, Chief Counsel (July 11, 2008, 18:10 CDT) (discussing requirements to resume UPL payments following CMS' lifting of the deferral). CMS lifted the deferral in July 2008. *See* Intervenor Exhibit 18—Letter from Albert Hawkins, Exec. Comm'r, HHSC, to private hospitals and public officials (July 29, 2008).

[22] Intervenor Exhibit 19—Letter from Don Gregory, Medicaid Dir., La. Dep't of Health & Hosps., to Bill Brooks, Assoc. Reg'l Adm'r, CMS, at 1 (Aug. 20, 2010) (response to RAI).

[23] *Id.* at 2.

[24] *Id.*

[25] *Id.* at 3.

action, CMS approved the Louisiana SPAs shortly thereafter on October 29, 2010 and November 2, 2010.[26]

CMS also approved a SPA in Nevada in 2012,[27] which was described by Nevada as "a collaborative program substantially similar to the one approved by CMS for Texas."[28] In the process of the application and CMS' approval of the SPA, CMS again approved the concept that private hospitals would provide charity services to patients who formerly received services from providers that were paid by a governmental entity.[29]

E.    *In mid-2011, the OIG audited the Texas public/private collaborative model and identified no violations of Medicaid statutes or regulations.*

In August 2011, the Department of Health & Human Services (HHS) Office of the Inspector General (OIG) conducted an audit of the Texas collaborative programs to determine whether the private sector's provision of charity care to patients who previously received charity care from a governmental entity constituted a provider-related donation, in violation of CMS regulations.[30] Once again, HHSC and the private hospitals submitted comprehensive responses to inquiries and provided considerable documentation regarding their collaboratives. Not only did the OIG decline to take action against any Texas collaborative or collaborative participant, the OIG neither published any findings that would challenge the legal basis of the collaborative nor notified HHSC of any remaining concerns.

---

[26] Intervenor Exhibit 20—Letter from Bill Brooks, Dir., CMS, to Don Gregory, Dir., La. Dep't of Health & Hosps. (Oct. 29, 2010) (approving TN 09-56); Intervenor Exhibit 21—Letter from Cindy Mann, Dir., CMS, to Don Gregory, Dir., La. Dep't of Health & Hosps. (Nov. 2, 2010) (approving TN 09-55); Intervenor Exhibit 22—Letter from Cindy Mann, Dir., CMS, to Don Gregory, Dir., La. Dep't of Health & Hosps. (Nov. 2, 2010) (approving TN 10-26).

[27] Intervenor Exhibit 23—Letter from Cindy Mann, Dir., CMS, to Michael Willden, Dir., Nev. Dep't of Health & Human Servs. (Nov. 7, 2011) (approving TN 10-002C).

[28] Intervenor Exhibit 24—Letter from Charles Duarte, Adm'r, Nev. Dep't of Health & Human Servs., to Mark Wong, CMS, at 1 (Mar. 8, 2011).

[29] Intervenor Exhibit 23.

[30] Intervenor Exhibit 25—Letter from Patricia Wheeler, OIG Reg'l Inspector for Audit Servs., HHS, to Graham Reeve, President, Bexar County Clinical Servs. (Aug. 1, 2011).

13

F.     *In late 2011, CMS approved an 1115 Waiver involving the Texas public/private collaborations.*

During the time of the OIG audit of the Texas collaborations, HHSC entered into and successfully completed negotiations with CMS to implement the Texas Health Care Transformation and Quality Improvement Program 1115 Waiver (Waiver). The current structure of the Texas public/private collaborations was integral to the Waiver application,[31] and Texas made it clear to CMS during the negotiations that under the Waiver, private hospitals would continue to engage or otherwise arrange for professional care givers to provide charity care to patients who previously received similar care from a governmental entity, and governmental entities would continue to finance the State share of some of the Waiver payments. CMS approved the Waiver on December 12, 2011.[32]

G.     *In 2014, CMS reversed course, indicating for the first time that the provision by a private provider of charity care that had previously been furnished by a governmental entity constituted a non-bona fide provider related donation.*

On May 9, 2014, during intense discussions between the federal government and states over the acceptance of Medicaid expansion, CMS released SMDL #14-004. In SMDL #14-004, CMS pronounced a complete reversal regarding public/private collaborations that would completely undermine the Texas, Louisiana, and Nevada public/private collaborative programs CMS had approved in the prior eight years. In SMDL #14-004, CMS went outside the scope of the Act and its regulations and eviscerated longstanding policy in declaring there was no need to conduct the statutorily defined test to determine whether a provider-related donation existed. In SMDL #14-004, CMS broadly asserted that any private entity that performs services that were, at

---

[31] Intervenor Exhibit 26—HHSC, Texas Health Care Transformation and Quality Improvement Program Medicaid 1115 Waiver Proposal, at 11 (July 13, 2011) (explaining the non-federal share of Waiver pool expenditures will be financed by intergovernmental transfers voluntarily made by local governmental entities).
[32] Intervenor Exhibit 27—Letter from Marilyn Tavenner, Adm'r, CMS, to Billy Millwee, State Medicaid Dir., HHSC (Dec. 12, 2011) and accompanying Special Terms & Conditions at ¶¶ 43-44.

14

any time in the past, provided by a governmental entity is assuming a "programmatic responsibility" of the governmental entity and has therefore made a *non-bona fide* provider-related donation. In SMDL #14-004, CMS did not reconcile or explain its shift to a "programmatic responsibility" test from the "legal or contractual obligation" standard in effect since 2006. SMDL #14-004 purported to create a universal prohibition on any private entity providing charity care that a governmental entity had ever furnished—regardless of whether the governmental entity discontinued the service for budgetary reasons, only performed the services on a one-time basis (such as health screenings or free mammograms), or discontinued the services on any grounds—because to do so as a private entity now constitutes a *non-bona fide* provider-related donation.

*H.*     *After using SDML #14-004 to call into question the public/private collaborative programs, CMS approved three SPAs in an expansion state that utilize the same conceptual framework for a public/private collaboration.*

On three occasions after issuing SMDL #14-004, CMS approved arrangements in Louisiana that are similar to the Texas public/private collaborative arrangements. On December 23, 2014—six months after releasing SMDL #14-004—CMS approved a Louisiana SPA wherein Louisiana private hospitals agree to expand their charity services by taking over all services previously paid for and/or furnished by the State.[33] In return, the State agreed to pay each hospital 100% of their Medicaid Disproportionate Share Hospital (Medicaid DSH) cap.[34] In November 2016, CMS approved a second SPA, reaffirming Louisiana's 2014 SPA, whereby private hospitals would increase their "Medicaid and uninsured services by providing services that were previously

---

[33] *DHH Receives Final Federal Approval for Public-Private Partnerships*, LA. DEPT. OF HEALTH (Dec. 23, 2014), http://dhh.louisiana.gov/index.cfm/newsroom/detail/3195; *State Health Officials Announce Landmark Public-Private Partnership Agreements for LSU Hospitals*, LA. DEPT. OF HEALTH (Dec. 10, 2012), http://dhh.louisiana. gov/index.cfm/newsroom/detail/2722.
[34] Intervenor Exhibit 28—La. Dep't of Health & Hosps., Responses to Informal Request for Additional Information TN 14-25 (June 17, 2014).

delivered and terminated or reduced by a state owned or operated facility."[35] *CMS issued the November 2016 SPA approval two months after disallowing funds in Texas.*

In 2016, CMS approved a third Louisiana SPA that conditioned Medicaid payments on a hospital entering a Memorandum of Understanding ("MOU") with the State-owned medical school ("LSU").[36] Those MOUs require the private hospitals to make "academic support payments" to LSU to broadly support their academic endeavors.[37] LSU, in return, agrees to provide IGTs to fund the non-federal share of the Medicaid DSH payments made to the private hospitals.[38] Therefore, in 2014 and in 2016, CMS approved three separate SPAs under which private hospitals pay for services or responsibilities once held by a governmental entity, and that governmental entity uses its savings to subsequently finance Medicaid payments for those hospitals.

These three post-SMDL #14-004 Louisiana SPAs are in addition to the 2010 Louisiana SPAs referenced in Section D above, where CMS first approved a Louisiana "collaborative program substantially similar to the one approved by CMS for Texas."[39] The Louisiana programs CMS authorized in 2010 are still operating today, after CMS performed substantial on-site auditing of the programs in 2012. CMS also reapproved the Louisiana 2010 SPAs in December 2014 as part of its approval of Louisiana SPA 14-25 (discussed above), after specifically asking Louisiana about the impact of SMDL #14-004 on those 2010 programs.[40] CMS re-approved the Louisiana

---

[35] Intervenor Exhibit 29—Letter from Kristin Fan, Dir., CMS, to Jen Steele, Dir., La. Dep't of Health (Nov. 30, 2016) (approving TN 16-0014).

[36] Intervenor Exhibit 30—Letter from Kristin Fan, Dir., CMS, to Jen Steele, Dir., La. Dep't of Health (Nov. 16, 2016) (approving TN 16-0018).

[37] Intervenor Exhibit 31—Memorandum of Understanding by and between Willis-Knighton Medical Center, a Louisiana nonprofit corporation, the State of Louisiana through the Division of Administration, and the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College through its LSU Health Sciences Center, Shreveport, at 2 (Sept. 11, 2016).

[38] Intervenor Exhibit 32—Letter from Jen Steele, Dir., La. Dep't of Health, to Bill Brooks, Assoc. Reg'l Adm'r, CMS (Sept. 15, 2016) (response to RAI question #8, at 6).

[39] Intervenor Exhibit 19.

[40] *See generally*, Intervenor Exhibit 28; Intervenor Exhibit 33—Letter from Timothy Hill, Dir., CMS, to Ruth Kennedy, Dir., La. Dep't of Health & Hosps. (Dec. 23, 2014) (approving TN 14-25).

2010 public/private collaborative SPA in November 2016 under the federal approval of SPA 16-0018.[41]

## II.     Standard of Review

In a proceeding before the Board, the federal agency has the burden to articulate clearly the basis of the disallowance.[42] In its review, the Board "shall be bound by all applicable laws and regulations."[43]

## ARGUMENT

The Board should reverse CMS' disallowance in its entirety because (I) none of the hospitals in Dallas or Tarrant County gave a payment in cash or in kind, directly or indirectly, to any governmental entity nor paid for an obligation of a governmental entity and, therefore, did not violate the provider-related donation statute or regulations; (II) CMS exceeded its statutory authority in attempting to redefine a "provider-related donation" through SMDL #14-004 and the Texas disallowance; (III) relying on SMDL #14-004 as the basis for the disallowance violates the APA and is arbitrary and capricious.

## I.     CMS' disallowance has no legal basis because the public/private indigent care collaborations comply with federal provider-related donation law.

CMS has not presented any evidence that in expanding charity care to indigent patients, DCICC or TCICC or any of their member hospitals assumed any legal obligation of a governmental entity or otherwise gave any governmental entity anything of value. The Act and implementing regulations define a provider-related donation as: (1) a donation or other voluntary payment (whether in cash or in kind), (2) made (directly or indirectly) *to a state or unit of local*

---

[41] Intervenor Exhibit 30.
[42] DEPT. APPEALS BOARD, APPELLATE DIVISION PRACTICE MANUAL, *available at* https://www.hhs.gov/about/agencies/dab/different-appeals-at-dab/appeals-to-board/practice-manual/index.html#18 (last visited May 24, 2017).
[43] 45 C.F.R. § 16.14; *Hawaii Dep't of Human Services Board*, DAB No. 1981, at 28 (2005).

17

*government*, (3) by a healthcare provider or related entity.[44] CMS, in the preamble to its May 29, 2007 final rule, recognized that the pivotal issue in assessing compliance with provider-related donation regulations was whether a private hospital provides services that are the *legal obligation* of a governmental entity.[45] In 2008, CMS agreed through the release of its deferral that the existence of a government legal obligation is the threshold decision as to whether the provision of a service by a private provider constitutes a provider-related donation.[46] CMS concluded that limiting the examination to the existence of a legal obligation to define when a provider-related donation occurs is vital because any other standard leads to a murky area that is impossible to define, audit, or enforce.[47]

In determining whether the public/private collaborations comply with federal law, it is, therefore necessary to distinguish between legal obligations and historical practices of local governmental entities in order for CMS' disallowance to be enforceable.[48] Otherwise, private hospitals have no ability to determine whether their actions represent "fund[ing] contracts previously held by the local governments" (which CMS disallowed in Texas in September 2016) or "providing services that were previously delivered and terminated or reduced by a state owned and operated facility" (which CMS approved in Louisiana in November 2016).

---

[44] 42 U.S.C. § 1396b(w)(2)(A); 42 C.F.R. § 433.52 (emphasis added).

[45] "Local government tax dollars that are not contractually committed for the purpose of indigent care services or any other non-Medicaid activity can be directly transferred by the local government to a State as the non-Federal share of Medicaid payments." Cost Limit for Providers Operated by Units of Government and Provisions to Ensure the Integrity of Federal-State Financial Partnership, 72 Fed. Reg. 29748, 29,762–99 (May 29, 2007) (subsequently vacated on other grounds). CMS also explained a provider-related donation would result if a private hospital provides services "which were otherwise State only or local government only obligations." *Id.*

[46] Intervenor Exhibit 17 (outlining required next steps to resume Texas' UPL program following CMS' release of the deferral).

[47] Intervenor Exhibit 14 (stating the Texas programs will be "governed by the criteria referred to previously and attached to this letter" (i.e. may not fulfill a legal obligation)).

[48] *See, e.g., Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) ("[I]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.").

In Texas, there is no evidence that any private hospital ever made a "donation or other voluntary payment (in cash or in kind)" directly or indirectly to the State or a governmental entity. The documents CMS relied upon in issuing the disallowance clearly show private hospitals gave funds to a nonprofit corporation whose members are private hospitals to provide or otherwise arrange for healthcare directly to individuals who receive charity care, which is exactly the action CMS approved in the numerous SPAs in Texas, Louisiana, and Nevada. None of the documents referenced by CMS in its denial evidence payment in cash or in kind by any private entity to a unit of local government.

Similarly, the private hospitals have not assumed a legal obligation of a governmental entity. The private hospitals went to great lengths to ensure that they did not furnish any charity services that were a statutory or contractual obligation of a governmental entity. The hospitals and governmental entities also ensured there was no linkage between the Medicaid payments the hospitals received and the indigent care services they provided. Specifically, Texas designed the public/private collaboration (based on CMS review and direction) to operate on two separate, but parallel, tracks under which the governmental entity has sole discretion whether it wants to use any tax revenue for the Medicaid program and, independently, the private hospitals have the sole discretion over the amount of charity care they provide.[49]

There is no legal authority supporting an argument by CMS that the private hospitals assumed a governmental entity's statutory or contractual obligation to provide charity care; no such statutory obligation exists for governmental entities in Texas. Texas statutes and regulations specifically and intentionally do not impose an obligation on local governmental entities to provide

---

[49] *See, e.g.*, Intervenor Exhibit 14, at 5 (stating in the attachment Prospective Conditions of Participation that private hospitals may consider the expected amount of supplemental payments when determining the level of charity care to provide and governmental entities may consider historical charity care provided by private hospitals when determining whether, and in what amount, to IGT).

all indigent care. Rather, the Texas Indigent Health Care & Treatment Act governs the responsibilities of hospital districts in Texas. The Texas Legislature explicitly contemplated language requiring a "hospital district shall provide the basic health services," but in 1999, the legislature replaced the language with a lessor standard requiring the hospital district to "endeavor to provide" basic health services.[50] This deliberate legislative language demonstrates the Texas Legislature recognized local entities did not have the fiscal resources to provide every basic healthcare service to every person in their community in perpetuity. CMS' belief that this is the case in Texas (or anywhere in the United States) is erroneous. The clear legislative language and basic common sense confirm a hospital district is not legally obligated to provide any healthcare services to indigent patients in perpetuity. Therefore, the private hospitals' provision of charity care to indigent patients is not a benefit to the hospital district because it does not relieve a legal obligation of the hospital district, provided the hospital district does not have a contract to provide these services to the same patients receiving care under private providers. Instead, the provision of charity care is an independent undertaking by private providers that benefit the patient receiving the care.

CMS' argument that the past practice of a governmental entity electing to pay for certain services creates a "programmatic responsibility" to continue to provide the same services forever has no basis in law. Hospital districts—like any other person, corporation, or governmental entity—have discretionary authority to decide what services to provide, how to provide those services, whether to enter into a contract with a third party to provide services or hire employees, and whether to renew or terminate a contract with a particular third party or employee. In order to argue the public/private collaborative creates a provider donation, CMS infers a legal

---

[50] Intervenor Exhibit 34—1999 Tex. Sess. Law Serv. 14, at 21 (West) (effective Sept. 1, 1999), codified at TEX. HEALTH & SAFETY CODE § 61.055(a) (2005).

"responsibility" on local government entities to continue to provide the same care and employ the same people to provide that care in perpetuity.

CMS essentially says Texas local government entities have a moral responsibility to continue any previous practices. However, if CMS prohibits a governmental entity from discontinuing charity services for fear of creating an alleged provider-related donation, CMS is— in essence—creating an ongoing legal obligation for governmental entities to provide the same amount and type of service forever. Consequently, governmental entities that support both indigent patients who are not eligible for Medicaid services and also support the Medicaid program (including the State) could never choose to reduce the parameters of a public welfare program, whether due to policy reasons or budget necessities, in a manner that shifts some of the historical financial responsibility for care from the government to the private sector.

## II. CMS exceeds its statutory authority by changing what constitutes a "provider-related donation."

### A. *SMDL #14-004 contradicts the Social Security Act by ignoring the statutory test for a provider-related donation.*

In determining whether an agency has exceeded its statutory authority, the analysis will "necessarily entail[] a firsthand judicial comparison of the claimed excessive action with the pertinent statutory authority."[51] To begin, the analysis will assess the "scope of the [agency's] authority and discretion."[52] The determination then shifts to whether the agency's action falls within its scope of authority.[53] The Act confers certain authority to CMS, specifically stating the "Secretary may by regulation specify the types of provider-related donations . . . that will be

---

[51] *Louisiana Forestry Assoc. Inc. v. Sec'y United States Dep't. of Labor*, 745 F.3d 653, 679 (3d Cir. 2014) (citation omitted).

[52] *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16 (1971)(citing *Schilling v. Rogers*, 363 U.S. 666, 676-77 (1960)), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

[53] *See, e.g., N.H. Hosp. Assoc. v. Burwell*, No. 15 Civ. 460 (D.N.H. Mar. 2, 2017).

considered to be *bona fide* provider-related donations."[54] This provision evidences Congress' plain

intent that CMS' authority pertains only to clarifying the types of provider-related donations that

will be considered *bona fide* (i.e., once a provider-related donation has been deemed to exist, CMS

only then looks to determine whether the provider-related donation is permissible). The Act does

not allow CMS to redefine "provider-related donation" or disregard the threshold requirement of

identifying a provider-related donation.

In the Texas disallowance, CMS relies on SMDL #14-004 as its sole support to disregard

the threshold requirement of identifying an action that constitutes a provider-related donation to a

governmental entity. Instead, SMDL #14-004 assumes that any collaboration between a

governmental entity and a private entity creates a provider-related donation.[55] Consequently, this

policy—and any implementation in Texas through the disallowance—is inconsistent with the Act

and is unlawful.[56]

> ### B. CMS contradicts the Social Security Act by including arrangements not contemplated or sanctioned by Congress as constituting a provider-related donation.

As set forth above, a provider-related donation is defined as (1) any donation or voluntary

payment (whether in cash or in kind) (2) made (directly or indirectly) to a State or unit of local

government (3) by a healthcare provider or related entity.[57] CMS attempts to institute a new

standard for supporting the existence of a provider-related donation by applying a "programmatic

responsibility"[58] or "financial responsibility"[59] test to determine whether a provider-related

---

[54] 42 U.S.C. § 1396b(w)(2) (emphasis added).
[55] Intervenor Exhibit 1 ("Government entities are free to enter into agreements with private entities; however, such agreements may affect the allowability of Medicaid funding if there is a hold harmless provision or practice.").
[56] 5 U.S.C. § 706(2)(C).
[57] 42 U.S.C. § 1396b(w)(2)(A).
[58] Intervenor Exhibit 1, at 4.
[59] Intervenor Exhibit 35—Letter from Bill Brooks, Assoc. Reg'l Adm'r, CMS, to Jami Snyder, Assoc. Comm'r for Medicaid and CHIP, HHSC, at 2 (Sept. 1, 2016) (Disallowance Notice TX/2016/001/MAP).

donation exists. The Act's plain language and underlying congressional intent, however, do not permit CMS to articulate alternative tests to determine whether a provider-related donation exists inconsistent with the Act and implementing regulations. Once a provider-related donation is found to exist under the statutory scheme, the Act and CMS regulations detail how to determine whether such donation constitutes a *bona fide* donation. Perhaps because of its statutory limitation, CMS attempted to forego the threshold test for the determination of a *bona fide* (or *non-bona fide*) donation.

If CMS is permitted to expand the Act's definition of a provider-related donation to include additional tests, the "programmatic responsibility" and "financial responsibility" standards are unlawful because they do not create an ascertainable standard of enforcement.[60] CMS gives no indication of how a private hospital would be able to determine whether its actions violate CMS' standard. For instance, would the private hospital be able to contract for the same services but through a different provider? If an indigent patient received primary care from a governmental entity's outpatient clinic, would the private hospital's later treatment of that patient for primary care result in a provider-related donation? Applying the "programmatic responsibility" or "financial responsibility" test posited by CMS leads to an impossible standard to follow for patients, states, local governments, the federal government, and providers and that puts the well-established indigent care safety net in Texas, Louisiana and Nevada at risk.

---

[60] *E.g., Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971); *Gentile v. State Bar of Nevada*, 501 U.S. 1030 (1991); *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972) ("A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.").

## III. CMS' reliance on SMDL #14-004 violates the APA.

SMDL #14-004 is subject to review under the APA because it constitutes "final agency action" under the two-prong test articulated by the Supreme Court.[61] First, SMDL #14-004 represents "the 'consummation' of the agency's decisionmaking [sic] process" because CMS uses affirmative and definitive language when discussing its future SPA approvals and disallowances.[62] Second, CMS clearly intends for "legal consequences" to flow from SMDL #14-004, as evidenced by CMS' reliance on the letter as its basis for the current Texas disallowance.[63]

Agencies have authority to create two types of rules: legislative and interpretive rules.[64] Legislative rules have the force and effect of law and "impose legally binding obligations or prohibitions on regulated parties."[65] Due to the binding nature of these rules, agencies must use formal rulemaking procedures to promulgate legislative rules.[66] Conversely, interpretive rules advise the public of how the agency interprets statutes and regulations and "do not have the force and effect of law and are not accorded that weight in the adjudicatory process."[67] If a rule is inconsistent with a prior legislative rule, like a regulation, then the second rule is also legislative because it effectively amends the regulation.[68] An agency may not circumvent the required rulemaking procedure simply by labeling its statement or action as an interpretation.[69] If an

---

[61] 5 U.S.C. § 704; *Bennett v. Spear*, 520 U.S. 154 (1977).

[62] *See Bennett*, 520 U.S. at 177–78.

[63] *Id.*

[64] "Legislative rules" are also referred to as "substantive rules." *E.g.*, *White v. Shalala*, 7 F.3d 296, 303 (2d Cir. 1993).

[65] *Perez v. Mortgage Bankers Assoc.*, 135 S. Ct. 1199, 1219, n.4 (2015) (Thomas, J. concurring).

[66] 5 U.S.C. § 553.

[67] *Perez*, 135 S. Ct. at 1203–04 (majority opinion). Interpretive rules are exempt from the notice-and-comment rulemaking requirements. 5 U.S.C. § 553.

[68] *E.g.*, *SBC Inc. v. F.C.C.*, 414 F.3d 486, 497–98 (3d Cir. 2005) (citations omitted); *see also Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 100 (1995) ("We can agree that APA rulemaking would still be required if PRM § 233 adopted a new position inconsistent with any of the Secretary's existing regulations.").

[69] *E.g.*, *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1024 (D.C. Cir. 2000); *see also Lewis-Mota v. Secretary of Labor*, 469 F.2d 478, 481–82 (2d Cir. 1972) (citing *Columbia Broadcasting System, Inc. v. United States*, 316 U.S. 407, 416 (1942))(courts are more concerned with the effect or operation of the rule).

agency's rule does not go through the appropriate rulemaking procedure, it is unlawful and must be set aside.[70]

In a similar case, the Sixth Circuit set aside an Ohio SPA disapproval because HHS' claimed "clarifying guidance" was inconsistent with existing regulations and did not go through formal rulemaking.[71] The Sixth Circuit concluded that HHS' new requirement in the "clarifying guidance" was inconsistent with both the regulation's language and the agency's own practice. [72] For these reasons, the court held that HHS's new clarifying guidance must go through notice and comment rulemaking.

SMDL #14-004 is contrary to CMS' regulation because it omits the threshold requirement of identifying a "provider-related donation" and is inconsistent with CMS' prior approvals of the two Texas SPAs, the Texas 1115 Waiver, the three Louisiana SPAs and the Nevada SPA; therefore, SMDL #14-004 is an improperly promulgated "legislative rule" and CMS may not rely on it to disallow Texas Medicaid payments.

CMS' disallowance is also arbitrary and capricious because CMS fails to support its allegation that the Dallas and Tarrant collaborative arrangements constitute *non-bona fide* provider-related donations and because CMS' disallowance is inconsistent with its prior and subsequent program approvals without any change in current law or fact.[73] The APA requires a federal agency to "examine the relevant data and articulate a satisfactory explanation for its action

---

[70] 5 U.S.C. § 706(2)(D).

[71] *Ohio Dept. of Human Servs. v. HHS*, 862 F.2d 1228 (6th Cir. 1988).

[72] *Id.* (concluding that if HHS' new clarifying guidance were consistent with the regulation, "the agency presumably would not have [previously] approved . . . an Ohio plan admittedly inconsistent with [the regulation].").

[73] 5 U.S.C. § 706(2)(A).

including a 'rational connection between the facts found and the choice made.'"[74] Additionally, an agency's action will be found arbitrary and capricious if it applies its policies inconsistently.[75]

The record does not support CMS' conclusion that the private hospitals' provision of charity care to indigent patients in the Dallas and Tarrant communities creates a provider-related donation. Moreover, CMS has not identified any data supporting its decision for why the private hospitals' actions would be impermissible in 2016 but compliant with federal Medicaid statutes and regulations in 2006 or 2008 or 2011 when CMS previously reviewed and approved the public/private charity collaboratives in Texas and in 2010, 2011, 2014, and 2016 when CMS approved public/private charity collaboratives in Louisiana and Nevada. For those reasons, it is clear that "the fundamental nexus between evidence and agency action is absent."[76]

Without any change in relevant laws or regulations, CMS is applying a different standard today than it previously applied at least seven times. In addition, CMS is applying different standards to Texas than it is applying to other states over the same time period – issuing a disallowance in Texas while approving substantially similar public/private collaborative efforts in Louisiana. Therefore, CMS' disallowance is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and the Board should hold the disallowance unlawful.[77]

---

[74] *St. James Hosp. v. Heckler*, 760 F.2d 1460, 1465 (7th Cir. 1985) (quoting *Motor Vehicle Mfrs. Assoc. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29 (1983)).

[75] *See, e.g.*, *Encino Motorcars, LLC v. Navarro*, 136 S.Ct. 2117, 2126 (2016) ("An unexplained inconsistency in agency policy is a reason for holding [the action] to be an arbitrary and capricious change from agency practice." (internal citations and quotations marks omitted)); *State ex rel. White v. Parsons*, 199 W.Va. 1 (1996) ("[A]n agency may not act in such a way as to result in disparate or inconsistent treatment of similarly situated parties, and to adopt different standards for similar situations is to act arbitrarily." (citation omitted)).

[76] *Humana of Aurora, Inc. v. Heckler*, 753 F.2d 1579, 1582 (10th Cir. 1985) (denying agency intervention because the evidence was contrary to the administrative action).

[77] 5 U.S.C. § 706(2)(A).

26

## CONCLUSION

Based on the foregoing, Intervenors respectfully request that the Board reverse CMS' disallowance in its entirety.

Respectfully Submitted,

*(signature)* for T.E.D.

ON BEHALF OF BAYLOR HEALTH CARE
SYSTEM, METHODIST HOSPITALS OF
DALLAS, AND TEXAS HEALTH RESOURCES

Thomas E. Dowdell
R. Jeffrey Layne
Benjamin H. Wallfisch
Frances M. Hansen
Norton Rose Fulbright US LLP
799 9th Street NW, Suite 1000
Washington, DC 20001-4501
Telephone: (202) 662-4503
Facsimile: (202) 662-4643
thomas.dowdell@nortonrosefulbright.com

*(signature)* for LJR

ON BEHALF OF NORTH TEXAS DIVISION,
INC.

Lance J. Ramsey
Renee N. Rayne
Jeff M. Brinker
Gjerset & Lorenz, LLP
2801 Via Fortuna, Suite 500
Austin, Texas 78746
Telephone: (512) 899-3995
Facsimile: (512) 899-3939
ramsey@gl-law.com