# EXHIBIT R

Responses to Informal Request for Additional Information (IRAI) TN 14-025

FORM-179
1. Form 179 - Box 7: A financial impact was noted. The federal dollar amounts were $508 million for FFY 2014 and $460 million for FFY 2015. Please provide a detailed analysis by facility of how this determination was made, and provide supporting documentation of the calculation. Does the State anticipate these estimate amounts will be offset by what the public hospitals would have claimed?

   **Response: The fiscal impact has been revised. Attached is the documentation of the revised calculation which includes the detail by facility. Yes, we do anticipate that these estimated amounts will be offset by what the hospitals would have claimed if they had continued to be public. See attached revised Form 179.**

STATE PLAN LANGUAGE
2. Please note that this methodology is not comprehensive. To comply with regulations at 42 CFR 447.252(b), the State plan methodology must be comprehensive enough to determine the required level of payment and the FFP to allow interested parties to understand the rate setting process and the items and services that are paid through these rates. Claims for federal matching funds cannot be based upon estimates or projections.

   The proposed DSH payment methodology on Attachment 4.19-A, Item 1 page 10k(4) is not comprehensively described. Please add language that fully explains how 100 percent of uncompensated costs are to be calculated and how the annual payment amount will be determined. The plan language should fully describe the cost and patient specific data the hospitals are required to submit, what time period the data is to be from, and when the data is to be submitted by the hospitals. The plan language should also fully describe how the Department will review costs and lengths of stay for reasonableness, how the costs and lengths of stay will be determined to be reasonable, and how the results of the reasonableness review will be used to adjust payments.

   **Response: The proposed plan language has been revised to be more comprehensive.**

3. Will the DSH payments be made annually or quarterly? This must be specified in the plan language.

   **Response: The proposed plan language has been revised to specify when payments will be made (See Attachment 4.19-A, Item 1, Page 10k (5)).**

4. The State should include language to ensure that a hospital does not exceed their hospital specific limit.

   **Response: This language was already in current plan language under "General Provisions" on page 10d. We have added the following statement to this SPA as well: "DSH payments to qualifying hospitals shall not exceed the disproportionate share limits as defined in Section 1923(g)(1)(A) of the Social Security Act for the state fiscal year to which the payment is applicable." (See Attachment 4.19-A, Item 1, Page 10k (4)).**

5. CMS wants the State's assurance regarding financial transactions including intergovernmental transfers (IGT). The following sentence should be included in the reimbursement methodology:

   "No payment under this section is dependent on any agreement or arrangement for providers or related entities to donate money or services to a governmental entity."

   **Response: This language has been added to the SPA (See [Attachment 4.19-A, Item 1, Page 10k (5)](#)).**

6. Please clarify the following:
   a. Does the proposal in Attachment 4.19-A, Item 1 page 10d and Item 1 page 10k(4), apply to private, State and/or Non-State hospitals?

      **Response: This SPA is only applicable to private hospitals.**

   b. Please provide a list that includes the name, the type (private, State, or Non-State), and the address of the Louisiana Low Income Academic Hospitals that will qualify for DSH payments under proposed TN#14-25.

      **Response: All qualifying hospitals under proposed TN#14-25 are private. They are:**
      1. **Medical Center of Louisiana at New Orleans**
         **Address: 1532 Tulane Ave, New Orleans, LA, 70140**
      2. **University Hospital and Clinics**
         **Address: 2390 W. Congress St, Lafayette, LA 70506**
      3. **Lake Charles Memorial Hospital**
         **Address: 1701 Oak Park Blvd., Lake Charles, LA 70601**
      4. **Our Lady of the Angels Hospital**
         **Address: 433 Plaza St, Bogalusa, LA, 70427**
      5. **University Health Shreveport (Pay to Name: BRFHH Shreveport LLC)**
         **Site Address: 1501 Kings Hwy, Shreveport, LA 71130**
         **Mailing Address: P.O. Box 732303, Dallas, TX 75373**
      6. **University Health Conway (Pay to Name: BRFHH Monroe LLC)**
         **Site Address: 4864 Jackson St, Monroe, LA 71202**
         **Mailing Address: P.O. Box 732313, Dallas, TX 75373**

   c. Please clarify if any of the Louisiana Low Income Academic Hospitals currently receive DSH payments.

      **Response: All would be eligible under federally mandated statutory hospital provision in the current approved state plan. Lake Charles Memorial is also eligible under the Mental Health Emergency Room Extension provision in the current approved state plan.**

d. Will these new DSH payments have any effect on DSH payments currently received by Louisiana Low Income Academic Hospitals?

   **Response: Yes. Payments under existing DSH methodologies would no longer be made to Louisiana Low Income Academic Hospitals because the total allowable uncompensated care costs incurred by them will be reimbursed under proposed TN 14-025.**

e. Does the State have enough room in their annual DSH allotment to make payments to the Louisiana Low Income Academic Hospitals for FFY 2014?

   **Response: Yes. Current estimates are that the unexpended DSH allotment in FFY 2014 will be in excess of $100 million after all approved plan DSH payments and these proposed DSH payments are made.**

f. Based upon current regulation, the overall annual DSH allotment will decrease in 2015. Does the State have a plan on how it will handle a decrease in its allotment?

   **Response: When the actual decrease in the FFY 2017 DSH allotment is determined, the state intends to review all DSH payments to hospitals under approved plan methodologies and will submit new state plan amendments if needed to comply with the revised DSH allotment amount.**

g. Are the DSH payments proposed under the SPA limited to the hospitals that were to receive either supplemental and/or DSH payments under LA SPAs 13-23, 13-25, and 13-28.

   **Response: No.**
   i. If yes, why are DSH payments not being made available to other hospitals that have an uninsured patient utilization of "greater than 10 percent" or "greater than 20 percent" as described in the proposed Low-Income Academic Hospital criteria?
   Response: not applicable.
   ii. If no, what is the relationship between these additional hospitals that will now qualify to receive DSH payments and Louisiana State University?

   **Response: The additional hospitals that are anticipated to qualify to receive DSH payments under this proposed SPA all have existing graduate medical education affiliation agreements with LSU Health Sciences Center.**

h. Please describe any SPA submissions, planned, or under consideration by the State, that are associated with the privatization of Louisiana State University (LSU)?

   **Response: TN 14-025 is the only SPA submission currently under consideration by the state which impacts the privatized LSU hospitals.**

7. Attachment 4.19-A, Item 1 page 10d item k, states the following:

   "Effective for dates of service on or after January 21, 2010, be a hospital participating in the Low Income and Needy Care Collaboration; or"

   Please explain how the State's inclusion of payments in Attachment 4.19A targeted to providers participating in Low Income and Needy Care Collaborations comports with the May 9, 2014 State Medicaid Director's Letter #14-004, Accountability #2 Financing and Donations.

   **Response:   As pointed out in the State Medicaid Director's Letter #14-004, and in accordance with federal regulations at 42 CFR 433.52, a provider related donation is a donation or other voluntary payment made directly, or indirectly, to a state or unit of local government by, or on behalf of, a health care provider, an entity related to such a health care provider, or an entity providing goods or services to the state for administration of the state's Medicaid plan.  The letter also properly pointed out the definition of a bona fide donation as established at 42 CFR 433.54.  The key element of such a donation is that it must not have a direct or indirect relationship to Medicaid payments made to a health care provider, any related entity providing health care items or services or other providers furnishing the same class of items or services as the provider or entity.  A final key element is that any such payments must not establish a "hold harmless" arrangement as defined by federal regulations.**

   **In addition to the above concerns, the letter also provided a reminder to the states that CMS always examines payment to providers to assure they meet the efficiency, economy and quality standard as laid out in Section 1902(a)(30) of the Social Security Act.**

   **According to Louisiana's currently approved Medicaid State Plan, a hospital may qualify for receipt of Disproportionate Share Hospital (DSH) payments by satisfying certain criteria specified therein.  One such qualifying criteria includes, among other criteria, that a hospital, for dates of service on or after January 21, 2010, be participating in the Low Income and Needy Care Collaboration Agreement (LINCCA).  In order to participate in this program, the hospital must make certain representations and warranties.  These representation and warranties are specifically designed to prevent and avoid the situations described in the State Medicaid Director's letter.  For example, the participating hospital must guarantee that they have not made, and will not make, any payments to the Governmental Entity with which they are collaborating in order to fund Medicaid supplemental payments.  The hospital must also guarantee that it has not entered into any fee arrangement under which the hospital's fee is a percentage of the hospital's payments funded by the Governmental Entity.  Finally, the hospital warrants that its agreement with the Governmental Entity complies with any applicable provider related donation regulations.**

   **In addition to the representations and warranties, via a separate certification, the hospital provider must certify that it has not entered any agreement which would condition either the amount of any public funds transferred by the Government**

**Entity or the amount of Medicaid supplemental payments the hospital receives on the amount of low income and needy care the hospital has provided or will provide. The purpose of this certification, and its effect, is to expressly have the hospital and Government Entity understand that a "hold harmless" must not exist. Thus, it is crystal clear that the hospital is not guaranteed to receive any funding directly or indirectly correlated to the services it may provide.**

**As part of this certification, the provider also certifies that it has not made, nor will it make, any cash or in-kind transfers to the Governmental Entity other than transfers and transactions that are unrelated to the Supplemental Payment Program, transfers involving fair market value transactions, or transactions that represent independent, bona fide transactions negotiated at arms-length and in the ordinary course of business. The effect of this certification is to ensure that a provider related donation has not occurred and that all entities remain in compliance with the federal regulations mentioned in the above referenced State Medicaid Directors letter. The Government Entity has entered into a similar certification which further guarantees compliance with federal donation rules and ensures that all non-federal share funds are purely state dollars eligible for federal match.**

**The participating Governmental Entity must represent and warrant that it has not received, and will not receive, any payments from any hospitals in consideration for a contribution by the Government Entity to fund Medicaid supplemental payments. The Government Entity also certifies that any funds transferred are purely public funds available to contribute as the non-federal share of Medicaid payments to the Hospitals and that all public funds comply with provider related donation regulations. The Government Entity has also made the representation regarding fee arrangements made by the hospital.**

**Thus, at the very outset, DHH does not believe that the LINCCA arrangement mentioned in the currently approved State Plan involves a provider related donation. The participating hospital has voluntarily decided to take steps to ensure that low income and needy patients have access to, and receive, high quality hospital services. The amount of any Medicaid supplemental payment is not tied directly or indirectly to a specific amount or level of financial commitment. The Government Entity is not, in any way, forced to transfer any level or amount of purely public funds to Louisiana DHH. Thus, it is clear that federal "hold harmless" provisions are not triggered in that the hospital does not have any direct or indirect guarantee that it will receive any level of Medicaid supplemental payment.**

**After approval of this State Plan Amendment and after the program was in effect, CMS conducted an audit of Louisiana's LINCCA program. To the best of DHH's knowledge, CMS did not find any violations of federal regulations in the administration of this program.**

<u>FUNDING QUESTIONS</u>
The following questions are being asked and should be answered in relation to all payments made to all providers under Attachment 4.19-A of your State plan, including payments made outside of those being amended with this SPA. Please be aware that

some of the questions have been modified. If you have already provided this information in response to other requests for additional information, you may refer us to that response. Please indicate the SPA and date of the response.

**Response: This information was last provided to CMS with the State's response for additional information with TN 14-12 which was submitted on March 27, 2014.**

1. Section 1903(a)(1) provides that Federal matching funds are only available for expenditures made by States for services under the approved State plan. Do providers receive and retain the total Medicaid expenditures claimed by the State (includes normal per diem, supplemental, enhanced payments, other) or is any portion of the payments returned to the State, local governmental entity, or any other intermediary organization? If providers are required to return any portion of payments, please provide a full description of the repayment process.

   Include in your response a full description of the methodology for the return of any of the payments, a complete listing of providers that return a portion of their payments, the amount or percentage of payments that are returned and the disposition and use of the funds once they are returned to the State (i.e., general fund, medical services account, etc.)

   **Response: (See [Attachment 4.19-A](#)). There were 37 public non-state owned hospitals that qualified for DSH payments applicable to SFY 2013 (10 Non-Rural Hospitals and 27 Rural Hospitals), and each of these hospitals certified its allowable uncompensated care costs as expenditures eligible for Federal Financial Participation. The reportable DSH amount in SFY 2013 was $141,339,750 (FFP $86,433,243). DSH payments will be limited to 100% of each hospital's specific uncompensated care costs in accordance with Section 1923(g) and our approved State Plan. Act 10 of the 2009 Regular Session of the Louisiana Legislature directed these non-state public hospitals to certify their uncompensated care cost expenditures to be used as matching funds which was continued in Act 14 of the 2013 Regular Session. Attached are [Act 14 of the 2013 Regular Session (Attachment 1)](#) and a listing of the qualifying hospitals in SFY 2013 and the estimated payments/amounts received by the hospitals ([Attachment 2](#)). Medicaid payments are made directly to Medicaid providers. Providers retain all of the Medicaid payments. Providers do not return any portion of any payment.**

2. Section 1902(a)(2) provides that the lack of adequate funds from local sources will not result in lowering the amount, duration, scope, or quality of care and services available under the plan. Please describe how the state share of each type of Medicaid payment (normal per diem, supplemental, enhanced, other) is funded. Please describe whether the state share is from appropriations from the legislature to the Medicaid agency, through IGTs, certified public expenditures (CPEs), provider taxes, or any other mechanism used by the state to provide state share. Note that, if the appropriation is not to the Medicaid agency, the source of the state share would necessarily be derived through either an IGT or CPE. In this case, please identify the agency to which the funds are appropriated. Please provide an estimate of total expenditure and State share amounts for each type of Medicaid payment. If any of the non-federal share is being provided using IGTs or CPEs, please fully describe the matching arrangement including when the state

agency receives the transferred amounts from the local government entity transferring the funds. If CPEs are used, please describe the methodology used by the state to verify that the total expenditures being certified are eligible for Federal matching funds in accordance with 42 CFR 433.51(b). For any payment funded by CPEs or IGTs, please provide the following:

(i)      a complete list of the names of entities transferring or certifying funds;
(ii)     the operational nature of the entity (state, county, city, other);
(iii)    the total amounts transferred or certified by each entity;
(iv)    clarify whether the certifying or transferring entity has general taxing authority; and,
(v)     whether the certifying or transferring entity received appropriations (identify level of appropriations).

**Response: (See Attachment 4.19-A). The Legislature does not appropriate funds for specific line item programs, such as inpatient hospitals. Appropriations for the total Medicaid Program are divided into four categories: (1) private provider payments; (2) public providers; (3) Medicare Buy-Ins, Supplements, and Clawbacks; and (4) Uncompensated Care Costs. For State fiscal year 2014 (July 1, 2013- June 30, 2014), the amounts appropriated are $4,175,873,037 for private providers, $270,304,274 for public providers, $2,393,128,806 for Medicare Buy-Ins, Supplements and Clawbacks, and $865,024,767 for uncompensated care costs. As indicated in our response to question 1 above, the non-Federal share of the estimated $141,339,750 in SFY 2013 of DSH payments was provided using CPEs for hospital payments as set forth in question 1 above. The following steps are taken by Louisiana to verify that the total expenditures certified are eligible for Federal matching funds in accordance with 42 CFR 433.51(b):**

1. **Each qualifying public hospital completes a "Calculation of Uncompensated Care Costs" Form (Attachment 3) based on cost and payment data per the latest filed Medicare/Medicaid cost report. This form includes a certification statement that the hospital signs. Please see the attached explanation of Louisiana's process for the determination of DSH CPEs (Attachment 4).**

2. **Upon receipt of the completed form, the State Medicaid agency verifies the figures for accuracy utilizing the as filed cost report and paid claims data.**

3. **The Medicaid contract auditor reconciles the uncompensated care costs to the State fiscal year that the DSH payments are applicable to using initially the as filed cost reports, and ultimately the finalized cost reports for the period. Louisiana Medicaid follows Medicare cost reporting and audit standards.**

**The listing of hospitals which provided CPEs in SFY 2013, along with estimated payment amounts and amounts retained by each hospital, is supplied in the attachment which responds to question 1 above. These providers are all Hospital Service Districts which have taxing authority, per Louisiana RS 46:1064 (see Attachment 5). As Hospital Service Districts are not State agencies, there is no funding appropriated by the State.**

3. Section 1902(a)(30) requires that payments for services be consistent with efficiency, economy, and quality of care. Section 1903(a)(1) provides for FFP to States for expenditures for services under an approved State plan. If supplemental or enhanced payments are made, please provide the total amount for each type of supplemental or enhanced payment made to each provider type.

   **Response: (See [Attachment 4.19-A](#)). Our response to question 1 above also applies to this question.**

4. Please provide a detailed description of the methodology used by the state to estimate the upper payment limit (UPL) for each class of providers (State owned or operated, non-state government owned or operated, and privately owned or operated). Please provide a current (i.e. applicable to the current rate year) UPL demonstration.

   **Response: (See [Attachment 4.19-A](#)). The following steps are used to calculate the Medicare upper payment limit for:**

   **State Hospitals**

   **1.    Accumulate Medicaid costs, charges, payments, and reimbursement data for each state hospital per the latest filed cost reporting period.**

   **2.    Subtract the amount paid by Medicaid from the Medicaid costs for each hospital. Trend the difference forward to the midpoint of the current state fiscal year using the CMS Market Basket Index for PPS hospitals.**

   **3.    The sum of the difference for each hospital, including inflation, is the supplemental payment that can be reimbursed to state hospitals subject to the limitations on Medicaid inpatient hospital payments in 42 CFR 447.271 and 447.272.**

   **Non-state Hospitals (Public and Private)**
   **1.    Calculate estimated Medicare payment per discharge for each hospital by totaling a.-c. below:**

   **a) Medicare operating payments are calculated by taking the Medicaid claims data and running each claim through the Medicare MS-DRG grouper to assign the appropriate DRG and weight from the current Medicare Inpatient PPS system. Total Medicare operating payments are then calculated for each hospital by multiplying the Medicaid case mix index under the Medicare weight set by the Medicare current FFY operating rate, using information from the Federal Register current FFY final rule, the Medicare inpatient Public Use File to determine the CBSA of each hospital, and the Medicare Inpatient Pricer to verify the operating rate for each facility. Since this payment includes the current FFY operating rate, no inflation is applied to this payment.**

b) **Medicare non-operating acuity-adjusted payments include Medicare payments for IME and Capital and are taken from the Medicare cost report. The per discharge payment is calculated by dividing by the Medicare discharges from the same cost report. The Medicare per discharge payment represents reimbursement at the Medicare patient acuity-level, so the calculated per discharge amount is adjusted by multiplying by the ratio of the CMI of Medicaid claims under the Medicare PPS to the CMI of Medicare claims under the Medicare PPS, which is taken from the Public Use File. This acuity-adjusted per discharge amount represents the estimate of what Medicare would for these services at each hospital if specifically for the Medicaid patient population. The acuity-adjusted payment per discharge is then inflated from the cost report period to current year.**

c) **Non-Acuity based Medicare payments include Medicare reimbursement from the cost report for outliers, DSH, Direct Graduate Medical Education, pass through costs, and reimbursable bad debt. Each payment total is taken from the Medicare cost report and then divided by the Medicare discharges to create an estimated per discharge payment, which is then inflated from the Medicare cost report period to current year.**

2. **For Critical Access Hospitals, there is insufficient claims data to assign a reliable DRG under the Medicare PPS and the Medicare PPS system is an inappropriate model for estimating Medicare payments, so an alternative methodology is used. For each of these facilities, total Medicare cost and Medicare days are taken from the cost report and a cost per day is calculated. The acuity level of this cost is then tied to the hospital's Medicaid population by multiplying by the claim days per discharge from the MMIS system to create an estimated cost per discharge for the Medicaid population. This cost per discharge is then inflated from the cost report period to current year.**

3. **Medicaid allowed payments are estimated from the reported hospital payments and TPL payments on the claims from the latest fiscal year or calendar year, scaled to represent the allowed amount for current year. Allowed payments from the claims data are adjusted by the total effect of each rate adjustment which impacted Medicaid hospital payments from the beginning service dates of the historical claims through current state fiscal year to estimate the amount the claims are paid under the Louisiana Medicaid system in the current year. To calculate total Medicaid payments per discharge for comparison to the Medicare allowed rate, Medicaid outlier payments, GME Payments, and supplemental payments for LINCCA, high Medicaid facilities and Major Teaching facilities were added to Medicaid claim payments. The total payments received from Medicaid are divided by claims discharges in the data set to yield the adjusted Medicaid payments per discharge in current year.**

4. **To determine the separate aggregate UPL caps for the inpatient non-state public and private hospital groups, each hospital's adjusted Medicaid payments per discharge is subtracted from their Medicare adjusted payments per discharge. The difference per discharge rate by hospital is multiplied by the hospital's number of claims discharges to determine the individual hospital payments difference between Medicare and Medicaid. The sum of the difference for each hospital for all hospitals in the group is the upper payment limit for that group of hospitals.**

5. Does any governmental provider receive payments that in the aggregate (normal per diem, supplemental, enhanced, other) exceed their reasonable costs of providing services? If payments exceed the cost of services, do you recoup the excess and return the Federal share of the excess to CMS on the quarterly expenditure report?

    **Response: In accordance with our approved State Plan, both Medicaid and DSH payments to State governmental hospitals are limited to costs. DSH payments to non-State public governmental hospitals are limited to costs, per our approved State plan and Section 1923(g). Medicaid payments (including those in excess of Medicaid cost) must be deducted from costs in the determination of each hospital's specific DSH limit. The end result is a reconciliation of the Medicaid overpayments against the hospital's DSH limit which causes a corresponding decrease in the amount of DSH paid to the hospital. Only payments determined by audit to exceed allowable payments as defined in our approved State Plan are identified as overpayments.**