# EXHIBIT T

## DEPARTMENT OF HEALTH AND HUMAN SERVICES
## DEPARTMENTAL APPEALS BOARD
## APPELLATE DIVISION

| | | |
|---|---|---|
| **TEXAS HEALTH AND HUMAN** | § | |
| **SERVICES COMMISSION,** | § | |
| **Appellant,** | § | |
| | § | |
| **v.** | § | **DOCKET NO. A-17-51** |
| | § | |
| **CENTERS FOR MEDICARE &** | § | |
| **MEDICAID SERVICES,** | § | |
| **Respondent.** | § | |

### RESPONDENT'S BRIEF IN SUPPORT OF DISALLOWANCE

Respectfully Submitted,

Jeffrey S. Davis,
Acting General Counsel

Mervin D. Turner,
Acting Chief Counsel

//s// *Daniel R. Wolfe*

_____
**Daniel R. Wolfe, Jr.**
**Rama Lagadapati**
Assistant Regional Counsels
Department of Health and Human Services
Office of the General Counsel
1301 Young Street, Suite 1138
Dallas, Texas 75202
Telephone:    (214) 767-3665 (Wolfe)
Telephone:    (214) 767-0779 (Lagadapati)
Facsimile:    (214) 767-4663
E-Mail:        daniel.wolfe@hhs.gov
E-Mail:        rama.lagadapati@hhs.gov

# Table of Contents

I. Introduction ...................................................................................................................... 1

II. Issues Presented ............................................................................................................... 3

III. Background .................................................................................................................... 3

    A.    Statement of Facts ................................................................................................. 3

    B.    Superseded 2007 State Plan Amendments, Prior Deferrals, and Repayment ...................... 3

    C.    Section 1115 Waiver - Texas Healthcare Transformation and Quality Improvement Program ............................................................................................................... 8

    D.    CMS State Medicaid Director Letter #14-04 ..................................................... 10

    E.    CMS's 2014 Financial Management Review and Resulting Deferral ................... 11

    F.    CMS's January 2015 Deferral Release and Parties' Impasse Regarding the Supplemental Funding Lead to the Disallowance ......................................................... 11

IV. Argument& Authorities ................................................................................................ 13

    A.    Summary of the Argument .................................................................................. 13

    B.    Scope of Review ................................................................................................. 14

    C.    Burden of Proof .................................................................................................. 14

    D.    Applicable Legal Authorities for Medicaid ......................................................... 15

        1.    Medicaid Overview ..................................................................................... 15

        2.    Section 1115 Waivers Demonstration Projects ............................................ 16

    E.    CMS's Disallowance is Supported by the Medicaid Statute, Regulations, CMS Guidance, and Federal Cost Principles ...................................................................... 17

        1.    The Hospital Districts Received Indirect Provider-Related Donations in Violation of § 1903 (w) ...................................................................................... 17

            a.    The Affiliated Hospitals Contributed Cash to the Indigent Care Corporations .............. 18

            b.    As "Entities Related to Health Care Providers," the Indigent Care Corporations Served as Conduits for the Affiliated Hospitals' Indirect Donations to the Hospital Districts . 19

            c.    CMS is not Required to Demonstrate that an Entity Assumed the Legal Obligations of A Governmental Entity to Establish an In Kind Donation ............................................. 20

                i.    Texas Hospital Districts are Legally Required to Provide Indigent Care to Eligible Residents ...................................................................................... 21

ii.    All Hospitals are Required to Employ Physicians to Direct or Provide Patient Care 22

iii.   Funding Physician Personnel for a Hospital is a Transfer of Value (Benefit) to the Hospital and Constitute In Kind Contributions ........................................................23

2.    The Donations were Impermissible Because they were Made in Conjunction with a Hold Harmless Arrangement ........................................................................................25

a.   The Affiliation Agreement Participants' Performance and Expectations of Payment under The 1115 Waiver Funding Regulations Constituted a Direct Guarantee under 42 C.F.R. § 433.54 (c)(3) ........................................................................................25

b.   The 1115 Waiver Payment Regulations and Processes Support a "Direct Guarantee" Hold Harmless Arrangement........................................................................26

c.   The Affiliated Hospitals Received all or a Portion of their Donations Returned Through Increased Supplemental Payments ..................................................................28

3.    The Amounts TCICC and DCICC Paid for the Physicians' Services is an Appropriate Measure of the Fair Market Value of the In Kind Contributions ....................................29

4.    The In Kind Donations Should be Treated as Applicable Credits...................................30

5.    The State's and Intervenors' Procedural and Equitable Arguments do not Preclude CMS from taking the Disallowance ..........................................................................30

a.   SMDL #14-04 does not Violate the Administrative Procedures Act .............................31

b.   CMS's Interpretation of the Statute and Regulations is Reasonable and the State had Notice of CMS's Interpretation Prior to the Disallowance .............................................32

c.   CMS was not Estopped from Reviewing the Funding Arrangements............................33

d.   The State's Issue Regarding the Adequacy CMS' Notice of Disallowance is Untimely and Misplaced ..............................................................................................34

e.   CMS's Approval of State Plan Amendments in Nevada and Louisiana does not Relieve Texas of its Responsibility to Demonstrate Compliance .................................................35

f.   The HHS-OIG's Alleged Lack of Action against Bexar County is Irrelevant...............36

g.   CMS is not Estopped from taking a Disallowance Based on the State's Assertion that it Continued the Improper Funding Scheme in Reliance on CMS's Communications......36

V.  Conclusion.............................................................................................................40

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**DEPARTMENTAL APPEALS BOARD**
**APPELLATE DIVISION**

| | | |
|---|---|---|
| **TEXAS HEALTH AND HUMAN** | § | |
| **SERVICES COMMISSION,** | § | |
| **Appellant,** | § | |
| | § | |
| **v.** | § | **DOCKET NO. A-17-51** |
| | § | |
| **CENTERS FOR MEDICARE &** | § | |
| **MEDICAID SERVICES,** | § | |
| **Respondent.** | § | |

## RESPONDENT'S BRIEF IN SUPPORT OF DISALLOWANCE

### I. Introduction

During the quarter ending December 31, 2015, the Tarrant County Hospital District (TCHD) and Dallas County Hospital District (DCHD) (collectively referred to as the Hospital Districts) received impermissible in kind donations of physician personnel from entities related to private hospitals. Such arrangements violate Section 1903 (w) of the Social Security Act (the Act). Consequently, the Centers for Medicare & Medicaid Services (CMS) issued a disallowance in the amount of $26,844,551 in Federal Financial Participation (FFP) against the Texas Health and Human Services Commission (HHSC) on September 1, 2016. HHS Ex. 17. CMS upheld the disallowance in its December 21, 2016 reconsideration decision. HHSC Ex. 19 at 4-6.

CMS and the State have a longstanding dispute regarding the propriety of the State's local funding mechanisms and CMS has issued four deferrals against the State since 2006. Although the State and the local participants have ostensibly modified the funding mechanisms in response to CMS's actions, CMS's concerns were finally confirmed during a 2014 Financial Management Review, during which, CMS determined that the IGTs were financed with indirect provider-related donations. The mechanics of the funding scheme revealed the existence of indirect provider-related donations associated with a "direct guarantee" hold harmless arrangement:

1. Private hospitals with Affiliation Agreements (Affiliated Hospitals)[1] provide cash to nonprofit entities they control (i.e. Tarrant County Indigent Care Corporation (TCICC) and Dallas County Indigent Care Corporation (DCICC) (the Indigent Care Corporations).

2. The Indigent Care Corporations use the Affiliated Hospitals' cash to pay contracted physician groups to provide services at Hospital Districts' facilities.

3. The Hospital Districts save millions of dollars because they no longer pay for the physicians' services at their hospitals and other facilities.

4. The Hospital Districts transfer most of the freed up cash to the State via Intergovernmental Transfer (IGT).

5. The State uses the IGT funds as the non-Federal share of supplemental payments to the Affiliated Hospitals.

6. Once the federal share (i.e. 57.13%) of the supplemental payment is added, the Affiliated Hospitals receive supplemental payments exceeding the amounts the Affiliated Hospitals initially contributed toward the physicians' services.

Ultimately, once the "pump is primed," the federal government is the only governmental entity funding the supplemental payments. CMS Ex. 5 at 2; CMS Exs. 13; 25 at 2-3; 55. CMS issued a related deferral in 2014, but released it on January 7, 2015, on the condition that Texas correct any identified funding issues by December 2015.  HHSC Ex. 14.  In 2015, the parties met on multiple occasions but, by September 2015, had reached an impasse regarding whether the funding arrangements in Dallas and Tarrant Counties complied with federal law.  CMS Ex. 31-35; HHSC Ex. 25.  Ultimately, CMS issued this disallowance to resolve the legal dispute.

The Medicaid statute requires CMS to deduct from a state's expenditures for medical assistance, before calculating FFP, funds from provider-related donations received by the State or unit of local government. Act § 1903 (w)(1)(A); 42 C.F.R. § 433.57.  The Board should uphold CMS's revised disallowance of $25,293,547 (FFP) against the State resulting from the in kind donations to the Hospital Districts.

---

[1] The following hospitals participate in the Tarrant County Affiliation Agreement: Baylor Scott and White Med. Sys.(Baylor), Texas Health Resources (THR), Hospital Corp. of America (HCA and Methodist Health System (MHS). The same four systems, plus Tenet Healthcare Corp. (Tenet), participate in the Dallas County Affiliation Agreement.

## II. Issues Presented

1.  Did the Hospital Districts receive indirect provider-related donations when they accepted physicians' services from entities related to the Affiliated Hospitals?

2.  Did a hold harmless arrangement exist because Affiliated Hospitals' had reasonable expectations they would recover a portion of their donations through increased supplemental payments?

3.  Does the fair market value of the physicians' services donated by the Affiliated Hospitals through the Indigent Care Corporations support CMS's calculation of the disallowance?

4.  Should the contributed services be treated as applicable credits under 45 C.F.R. § 75.406 because the services reduced the Hospital Districts' expenditures and alleviated the State from funding the non-Federal share of the supplemental payments?

5.  Do the Appellant's or Intervenors' procedural or equitable arguments preclude CMS from taking the disallowance?

## III. Background

### A.    Statement of Facts

The Hospital Districts are both local government entities established and operated under Article IX, Section 4 of the Texas Constitution and Chapter 281 of the Texas Health and Safety Code.  CMS Ex. 17 at 3.  Like all hospitals, the Hospital Districts require physicians to direct and deliver medical services at the Hospital Districts' facilities. In this case, the physician services at issue were primarily obtained through contracts with the physician faculty of a state-owned medical school or private physician groups.  HHSC Ex. 25 at 7.  What is interesting about this arrangement is that a substantial portion of the Hospital Districts' physician services are funded by the Affiliated Hospitals.  CMS Exs. 14; 15; and 25 at 2-4.  This dispute goes back many years.

### B.    Superseded 2007 State Plan Amendments, Prior Deferrals, and Repayment

On June 29, 2005, the State submitted a State Plan Amendment Transmittal Number (TN) TN-05-001 to CMS to add supplemental payments to Affiliated Hospitals in five counties. Int. Ex. 2.  The State assured CMS that, "initial funding of the State share will be done through Intergovernmental Transfers from public hospital districts or counties…" *Id.*  But, the State did not

disclose the role the Affiliated Hospitals played in financing the Upper Payment Limit (UPL) payments.

On Dec. 30, 2005, the State submitted a companion State Plan Amendment (TN 05-011) to add private hospital UPL to the remaining counties in the Texas (Private Hospital UPL Program). Int. Ex. 3. Once again, the State told CMS that the State's share of funds was derived from IGTs, but it omitted details describing the role of the Affiliated Hospitals.

On May 30, 2006, the State responded to CMS's Request for Additional Information (RAI) regarding the funding sources for TX 05-001. Int. Ex, 4. The State told CMS, "The counties and hospital districts, as applicable, have agreed to use ad valorem tax revenues presently used to pay for indigent health care services as the non-Federal share of the Medicaid supplemental payment programs." *Id.* During this time period, it appears CMS was concerned with funding arrangements in which supplemental funds were derived from provider taxes and then returned to the governmental entities. *Id.* CMS's inquiries did not focus on potential impermissible donations.

On June 30, 2006, the State responded to an RAI for TN 05-011, in which the State described the cost burden alleviation by Affiliated Hospitals through indigent care "affiliation agreements" with the governmental entities. HHSC Ex. 3. The State's letter explained that:

> An indigent care agreement is the agreement between the Local Taxing Entity and a group or local private hospitals ("Affiliated Hospitals") to develop a plan for the Affiliated Hospitals to alleviate the Local Taxing Entity's tax burden by providing care to the Indigent, thereby allowing the Local Taxing Entity to utilize ad valorem tax revenue to fund the Medicaid program. Examples of the types of Indigent care services the Affiliated Hospital may provide include inpatient and outpatient hospital services, specialty physician services, pharmaceutical services, kidney dialysis, dentistry, nursing hotline services, ambulance services, emergency and on call physician services, and ophthalmology. <u>The provision of these indigent services by the Affiliated Hospitals directly to indigent patients will alleviate a portion of the Local Taxing Entity's expense of providing indigent care.</u>

HHSC Ex. 3 at 4-5 (emphasis added). The phrase "directly to indigent patients," implies that the services would be provided by the Affiliated Hospitals, but that is not what occurred.

On July 26, 2006, CMS approved TN 05-001 to be effective for services provided after June 11, 2005. Int. Ex. 6. On Sept. 5, 2006, CMS approved TN 05-011 to be effective for services provided after Nov. 12, 2005. HHSC Ex. 4. The Private Hospital UPL Program SPAs did not expressly describe the details of the funding arrangements. HHSC Ex. 4.

On April 12, 2007, CMS initiated a Financial Management Review of the Private Hospital UPL program to determine if the State, hospital districts, and Affiliated Hospitals were complying with the State Plan. Int. Ex. 10. During the Financial Management Review, CMS determined that the Hospital Districts permitted various affiliated hospitals to directly fund the cost of physician services contracts for care provided at the Hospital Districts' hospitals. This permitted the Hospital Districts to free up and reallocate funds to support the IGTs funding the affiliated hospitals' supplemental payments. The affiliated hospitals were not providing care "directly to indigent patients" at their own facilities, but rather were directly funding the care provided at the Hospital Districts' facilities. HHSC Ex. 7, CMS Ex. 1.

On Oct. 5, 2007, CMS issued two deferral letters related to Private Hospital UPL for claimed expenditures for the federal fiscal quarter ending June 30, 2007 related to TN 07-001 and TN 07-011. One letter deferred funds in the amount of $37,583,374 (FFP) and the other letter deferred $72,633,689 (FFP). HHSC Ex. 7 at 1. CMS explained that, "preliminary documentation provided by HHSC, certain participating local governments, and consultants for hospitals participating in the private hospital UPL program appear to indicate that private hospitals may be satisfying certain fiscal obligations that are otherwise those of local governments. Such a circumstance would be inconsistent with the *bona fide* provider-related donation requirements of section 1903(w)(l)(A)(i)(l) of the Social Security Act." *Id*. at 1.

On January 28, 2008, CMS issued a third deferral for the quarter ending September 30, 2007, in the amount of $50,052.809. CMS Ex. 1. The rationale for the deferral remained similar, but CMS requested substantial information and specific documents from the State. *Id.*

On February 4, 2008, the State sent two letters to CMS responding to the October 2007 deferral letters. HHSC Ex. 8; CMS. Ex. 2. In each letter, the State described the funding arrangements and explained why the State believed the arrangements did not constitute provider-related donations:

> The private hospital UPL program in Texas is built on the premise that private hospitals may provide charity care to indigent patients in a way that relieves local government entities from incurring expenses for such care that they might otherwise incur (without relieving local government entities of any actual obligations they might have under State law or under contracts). **The local government entities, thus relieved, are able to contribute toward the support of Medicaid providers in their communities.** This arrangement, as well as the manner in which it was implemented at the community level, is consistent with State and federal law and with the purpose of the Medicaid program. **The program is driven by expectations** but not by binding requirements on any participant, and it neither depends upon provider-related donations nor induces improper redirection of Medicaid funds.

HHSC Ex. 8 at 2 (emphasis added). The phrase "charity care" is used more than 30 times in each letter, leaving the impression that the Affiliated Hospitals were providing "care" (i.e. medical services) to the indigent patients. In practice, the Affiliated Hospitals provided funding for unrelated physician groups to provide care at the Hospital Districts, consistent with the definition of "charity care" for Texas tax exemption reporting purposes. *Id.* The letters highlighted that, "with the money no longer being spent under the terminated contracts, the district was able to make an IGT to fund increased Medicaid payments." HHSC Ex. 8 at 5. The State argued that, "providing charity care does not relieve an obligation of the hospital district or county. Rather, it is a voluntary undertaking by a private hospital that benefits the patient." HHSC Ex. 8 at 4.

On March 31, 2008, the State sent a letter responding to CMS's letter of January 28, 2008. CMS Ex. 3. The State explained that, "both [funding] models operated not on the basis of binding

commitments on the part of the participating local governments or private hospitals (so-called "quid pro quos"), but rather on the basis **of legally unenforceable goals and reasonable expectations…**" CMS Ex. 3.

On May 1, 2008, the State sent a letter to CMS summarizing the steps it had reportedly taken to resolve the outstanding deferral and noted the total amount of deferred funds was now $157,662,161. HHSC Ex. 9. To correct the fiscal issue, the State unilaterally refunded $37,583,374 in FFP to CMS. *Id.* The State also attached a document entitled, "Prospective Conditions of Participation," dated April 30, 2008 (Proposed COPs), reporting funding changes to TN 07-001 and TN 07-011. The Proposed COPs supposedly resolved CMS's funding concerns.

On May 13, 2008, CMS sought assurances from the State's outside counsel that the Private Hospital UPL payments made for services beginning June 2007 would be funded exclusively by local tax dollars (non-obligated). HHSC Ex. 10 at 2. The State's outside counsel replied that, "the State is reluctant to represent that the funding will be exclusively from local tax dollars because the government entities do have other revenue sources and IGTs will typically be made from general accounts that obtain revenue from sources other than taxes. However, I believe the underscored wording provides CMS the protection it wants-**that the private hospitals are not in any way the source of the transferred funds**." HHSC Ex. 10 at 1 (emphasis added). Subsequently, CMS released the deferred funds, in reliance on that assurance. CMS Ex. 32 at 3.

On July 29, 2008, the State sent a letter to providers noting that it was resuming the Private Hospital UPL Program. Int. Ex. 18 at 7. The State attached the Prospective POC document, dated April 30, 2008, but did not include any documentation demonstrating the POCs were approved by CMS. HHSC Ex. at 5. The Prospective COPs include the following salient terms: 1) no linkage between indigent care obligations and UPL Payments; 2) private hospitals receiving UPL supplemental payments may not be assigned the indigent care contractual or statutory obligations of

a transferring governmental entity; 3) the Private Hospital UPL program must not include cash or in kind transfers from affiliated private hospitals to the governmental entities that supply the IGT to fund the state share of UPL payments.  HHSC Ex. 8 at 5.

C.      **Section 1115 Waiver - Texas Healthcare Transformation and Quality Improvement Program**

On December 12, 2011, CMS approved Texas' request for a section 1115(a) Waiver Demonstration Project, entitled "Texas Healthcare Transformation and Quality Improvement Program" (Project Number 11-W-00278/6), for the period starting December 12, 2011 through September 30, 2016.  CMS Ex. 4.  The "1115 Waiver" superseded the Private Hospital UPL State Plan Amendments TN 07 – 001 and TN 07 – 011.  *Id;* CMS Ex. 5 at 2.  The 1115 Waiver provided supplemental funding to certain Medicaid providers in the form of two new pools: the Uncompensated Care (UC) Pool and the Delivery System Reform Incentive Payment (DSRIP) Pool, both fully-funded by local funds. CMS Ex. 6 at 1; CMS Ex. 5; CMS Ex. 55.  Texas planned to work with private and public hospitals to create Regional Healthcare Partnerships (RHPs) anchored financially by public hospitals and/or local government entities.

Under the Special Terms and Conditions, General Program Requirements, the State agreed, "All requirements of the Medicaid program and CHIP expressed in law, regulation, and policy statement, not expressly waived or identified as not applicable in the waiver and expenditure authority documents (of which these terms and conditions are part), must apply to the Demonstration." CMS Ex. 4 at 6.  The State further agreed, "[it] must, within the timeframes specified in law, regulation, or policy statement, come into compliance with any changes in Federal law, regulation, or policy affecting the Medicaid or CHIP program that occur during this Demonstration approval period, unless the provision being changed is expressly waived or identified as not applicable."  *Id.*  Section 43(a) of the Waiver Agreement further specifies that, "The non-Federal share of pool payments to providers may be funded by state general revenue

funds, transfers from units of local government, and certified public expenditures that are compliant

with section 1903(w) of the Act." *Id*. at 48- 49.  Under Section 55 of the Waiver Agreement, the

State certified that,

> the matching non-Federal share of funds for the Demonstration is State/local monies.
> The State further certifies that such funds shall not be used as the match for any other
> Federal grant or contract, except as permitted by law. All sources of non-Federal
> funding must be compliant with section 1903(w) of the Act and applicable
> regulations. In addition, all sources of the non-Federal share of funding are subject to
> CMS approval.
>
> a. CMS may review, at any time, the sources of the non-Federal share of funding for
> the Demonstration. The State agrees that all funding sources deemed unacceptable
> by CMS shall be addressed within the time frames set by CMS.

*Id*. at 65.

In conjunction with the 1115 Waiver, the State issued a document entitled

"Intergovernmental Transfer (IGT) Guidelines & Selected Examples," noting that the provider-

related donations could not form the source of IGT, but suggesting that, "federal law recognizes that

private providers can undertake to support community activities. Local government entities may

take that support into account when determining to make an IGT that will be based on Medicaid

payments to those providers." CMS Ex.  6 at 1-2.  The published version did not contain any

"selected examples," but a draft version of the document, dated March 13, 2012, contained 7

examples of potential funding arrangements. CMS Ex. 5.  "Example 1" appears to describe the

funding model at issue in this case. CMS Ex. Ex. 5.  Example 1 illustrates how a public hospital

with a $100 physician contract could allow a non-profit to take over the contract and, by using the

savings, the public hospital could make "an IGT on behalf of the private hospitals composing the

501 in the amount of $60 with the purpose of providing the state match necessary for the private

hospitals to draw a federal payment from the UC Pool to offset some/all of their allowable

uncompensated care costs." *Id*. The public hospital could then use the remaining $40 to fund other waiver projects. *Id*.[2] Under scenario described, both the public and private hospitals benefit. *Id*.

The State also issued a "RHP Matrix" describing the roles and responsibilities of each type of entity in the Regional Healthcare Partnerships. CMS Ex. 7. Under the RHP Matrix, one of the duties of the private hospitals is to "[coordinate] with IGT providers to offer transformational services uncompensated care as basis of receiving sponsored payments." CMS Ex. 7. With regard to the UC payments, the Affiliated Providers were required to provide "UC services as a basis for the UC waiver payments and contingent upon IGT provided by the IGT entities." CMS Ex. 7.

**D.      CMS State Medicaid Director Letter #14-04**

On May 14, 2014, CMS issued State Medicaid Director Letter 14-04 (SMDL #14-04) to "[provide] guidance to states concerning Federal statute and regulations related to the allowable and unallowable use of provider-related donations and also addresses the use of certain types of public-private arrangements." Int. Ex. 1. As the source of authority for the guidance, SMDL #14-04 cites § 1903(w), § 1902(a)(3) and CMS's implementing regulations. The letter discusses CMS's concerns about certain public-private partnerships including, cases in which IGTs are derived from funds the government unit previously would have spent on providing services that are now being provided by a private entity. *Id*. CMS noted that these IGT funds would not be available if not for the public-private partnership agreements. According to CMS, this type of an agreement would not be considered a *bona fide* donation under Medicaid. *Id*. at 3. One example CMS provided in the letter, involved an arrangement between a government agency, a nonprofit organization, and a private hospital to offload certain employment training and transportation obligations to a nonprofit entity to free up funds necessary to support an IGT. That example is analogous to the situation in this case. The letter also notified States that, "if a SPA is, or has been, approved and an

_____

[2] It appears the Hospital District IGT less than the amounts paid to the physicians groups. CMS Ex. 39; CMS Ex. 60.

inappropriate funding arrangement is discovered post-approval, CMS may pursue corrective action to ensure that the state changes its practices, and may recover Federal Financial Participation (FFP) associated with these supplemental payments. *Id*.

**E.      CMS's 2014 Financial Management Review and Resulting Deferral**

In May 2014, CMS conducted a Financial Management Review of Texas's 1115 Waiver program and discovered that private hospital funds, not local tax dollars, were the source of the non-Federal share of the supplemental payments in some counties.  HHSC Ex. 12.  In some service areas, the affiliated hospitals formed and funded indigent care corporations that, in turn, funded physician contracts previously held by the hospital districts, as described in Example 1. CMS Ex. 5 at 2.

On September 30, 2014, CMS issued a deferral questioning the source of IGTs made by various hospital districts in Dallas, Fort Worth, Austin, and Corpus Christi metropolitan areas. HHSC Ex. 13.

**F.      CMS's January 2015 Deferral Release and Parties' Impasse Regarding the Supplemental Funding Lead to the Disallowance**

On January 7, 2015, CMS released the deferral with the understanding the State would continue to work with CMS to better understand the nature of the IGT funding schemes.  HHSC Ex. 14.  CMS advised the State that, the "release of the deferral does not constitute CMS' acceptance of the financing arrangements." *Id*.  The letter established that, "in order to review and analyze all relevant information and to the extent that CMS determines that any financing structure within Texas' Medicaid program violates federal statute and regulation, we would expect Texas to make necessary adjustments by December 2015.  HHSC Ex. 14.

On or about March 6, 2015, HHSC and CMS leadership teams met in Baltimore to discuss the deferral.  CMS Ex. 31.  Prior to the meeting, the State sent four documents to CMS, including an Agenda for Private Hospital Funding (Deferral) Meeting.  CMS Exs. 30 and 31.  During the

meeting, CMS presented the State with an eight page document entitled, "Texas 1115 Waiver and Indigent Care Agreements – CMS Findings" and a notebook of supporting documents. CMS Exs. 32; 33; and 34. CMS's Findings were distributed to the RHPs. CMS Ex. 35. The parties continued to discuss the funding arrangements through August 2015.

On May 29, 2015, Monica Leo, Staff Counsel for HHSC, sent an email to Tim Hill, Deputy Director, Center for Medicaid and CHIP Services, CMS, seeking to confirm the State would have "until September 2017 to make any changes to private hospital funding that may be required following our scheduled discussions this summer." HHSC Ex. 15. The State also wanted to confirm that, "CMS would authorize the current private-hospital funding arrangements to continue for waiver-payment dates through August, 2017, without risk of disallowance." HHSC Ex. 15. Ms. Leo's email also noted that the conversations between the parties were still ongoing and the parties were seeking to work through their differences. *Id.*

On June 9, 2015, in an informal email (without a greeting or signature block), Mr. Hill responded to Ms. Leo's May 29, 2015, email, as follows: "Sorry for the delay. Your understanding of the timeline is correct." HHSC Ex. 15.

On August 27-28, 2015, Mr. Hill attended the Texas's Statewide Learning Collaborative Summit regarding the 1115 Waiver in Austin, TX. CMS Ex. 36. He was a keynote speaker along with Chris Traylor, Executive Commissioner, HHSC, and the two had an opportunity to discuss the 1115 Waiver program. *Id.*

On September 15, 2015, Kristin Fan, Director of the Financial Management Group, CMS, sent an email to Monica Leo canceling a previously scheduled call to discuss the private hospital financing. HHSC Ex. 28. Ms. Fan noted that, "We have received all of the information and I don't think we have any other questions that need to be answered. We are working with our leadership to

discuss next steps. I think Tim discussed some of this when he was visiting in late August." HHSC Ex. 28.

On September 1, 2016, CMS issued its disallowance for a single fiscal quarter, December 31, 2015. HHSC Ex. 17. On September 16, 2016, after a conference call regarding the disallowance, Monica Leo sent an email to Tim Hill confirming:

> During discussions last summer between you and HHSC Commissioner Chris Traylor, it became apparent that the agencies would not be able to reach agreement on whether funding arrangements like that in Dallas and Tarrant Counties complies with federal law. CMS proposed identifying a test case to get the issue before an independent arbiter. This disallowance is intended by CMS to fulfill that purpose.

HHSC Ex. 23 at 4.

On October 28, 2016, the State requested reconsideration of the disallowance. HHSC Ex. 18. The State denied CMS had identified any donations and argued that, "When private entities provide or pay for services in the community at their sole discretion, some of which may have previously been provided or paid for by a governmental entity, there is no donation. The **mere expectations** and historical practices of the private and the governmental entities do not somehow transpose the provision or payment of care to patients into a provider donation." *Id*. The State also argued that CMS's calculation was incorrect and, without conceding the merits, said the amount should be $25,276,116. HHSC Ex. 18 at 11. The State argued that CMS's "methodology yields absurd results" because the annual value of the alleged donations ($187 million) exceeded the total amount of the IGTS ($114 million) by $73 million. *Id*.

On December 21, 2016, CMS issued its reconsideration decision. HHSC Ex. 19 at 3-4.

### IV. Argument& Authorities

A.      **Summary of the Argument**

A voluntary contribution in cash or in kind (i.e. donation) may be considered *bona fide* or *non bona fide,* depending on whether the donation was made in conjunction with a hold harmless

arrangement. The donation element in this case is straightforward – the Affiliated Hospitals provided funds to the Indigent Care Corporations which paid for physicians to provide health care services at the Hospital Districts' facilities. Providing skilled personnel to another entity is type of in kind donation and the contributed services benefited the Hospital Districts by saving them millions of dollars and freeing up their funds for other purposes. As expressly described in the regulations, the Affiliated Hospitals made indirect, in kind donations to the Hospital Districts.

The donations were impermissible because a hold harmless arrangement existed under the "Guarantee Test." The Affiliated Hospitals reasonably expected, and actually received, all of their contributions back through their participation in the supplemental payment programs set forth in the 1115 Waiver program. The payment regulations, policies, and mutualistic relationships between the participants (State, Hospital Districts, and Affiliated Hospitals) furnished each Affiliated Hospital with a "direct guarantee" their contributions would be returned. The funding mechanism shifts the costs of the 1115 Waiver program to the Federal government in violation of § 1903(w) of the Act.

**B.      Scope of Review**

The record that the Board reviews is not merely what was represented to the agency officials, but also includes any additional materials submitted to the Board on appeal. *Md. Dept. of Human Res.*, DAB No. 1875 (2003). The Board is, in essence, taking a fresh look at the evidence presented by both parties. *Id.* Moreover, the Board may, on the basis of the factual record, reach different legal conclusions than those reached by the constituent agency and may reverse or modify the basis for a disallowance.

**C.      Burden of Proof**

In Medicaid disallowance cases, the regulations clarify that the State has the burden of documenting the allowability of its claims for FFP. 42 C.F.R. § 430.42 (g)(1). The State has the burden of identifying, documenting, and justifying its claimed costs and establishing its defense to

the respondent's disallowance. The State always bears a general burden of proof. *See*, Appellate Division Practice Manual, "Who has the Burden of Proof"; *New Jersey Dept. of Human Services*, DAB No. 2318, at 5 (2010).

The State cannot shift the burden of proof to CMS, or demonstrate compliance, by simply arguing that the local governments and the hospitals have "certified" they are in compliance. *See*, HHSC's Br. at 16-17. It is the State's responsibility to "[m]aintain an accounting system and supporting fiscal records to assure that claims for Federal funds are in accord with applicable Federal requirements." 42 C.F.R. § 433.32(a); *Mo. Dept. of Soc. Servs.*, DAB No. 2589 (2014)(State failed to document it met the IGT exemption of §1903(w)(6) of the Act and 42 C.F.R. § 433.51). Additionally, applicable federal cost principles include the fundamental premise that the non-Federal entity is responsible for the efficient and effective administration of the Federal award through the application of sound management practices. 45 C.F.R. § 75.400(a); 42 C.F.R. § 430.2 (a)(incorporating 45 C.F.R. Part 75); 42 C.F.R. § 430.30. Furthermore, the non-Federal entity assumes responsibility for administering Federal funds in a manner consistent with underlying agreements, program objectives, and the terms and conditions of the Federal award. 45 C.F.R. § 75.400(b). Ultimately, the State is responsible for its Medicaid program's compliance and thus retains the burden of proof.

**D.      Applicable Legal Authorities for Medicaid**

**1.      Medicaid Overview**

The Medicaid program is jointly financed by the federal and state governments and administered by the states. Act § 1903; 42 C.F.R. § 430.0. Each state that elects to participate operates its own Medicaid program in accordance with broad federal requirements and the terms of its Medicaid state plan, as approved by the Secretary of the Department of Health and Human Services. A state with an approved Medicaid plan is eligible to receive FFP for a percentage of the

Medicaid program expenditures it makes in accordance with the State Plan. Act § 1903; 42 C.F.R. §§ 433.10(a), 433.15(a). The federal government pays each state specified percentages of allowable expenditures made under its Medicaid state plan. Act § 1903(a); 42 C.F.R. §§ 433.10, 433.15. The rate at which the federal government provides funding for most of a state's expenditures for health care services under Medicaid is called the federal medical assistance percentage (FMAP). The bulk of a state's Medicaid expenditures are for "medical assistance," defined in section 1905(a) of the Act to mean particular categories of care and services that must or may be included in a state plan (as "covered services"), when provided to certain groups of individuals who meet specific requirements ("eligible individuals").

Section 1903(a)(1) of the Act directs the Secretary to reimburse a state for the amount that it expends "as medical assistance under the State plan." The term "medical assistance" means payment for various categories of medical services, including "hospital services." Act § 1905(a). Within 30 days after the end of each annual quarter, the state must submit to CMS a Quarterly Statement of Expenditures (QSE). 42 C.F.R. § 430.30(c)(1). The QSE is an "accounting of actual recorded expenditures" for which the state believes it is entitled to FFP. *Id.*

**2.      Section 1115 Waivers Demonstration Projects**

Section 1115(a) of the Act gives the Secretary authority to approve "any experimental, pilot, or demonstration project which ... is likely to assist in promoting the objectives of the Medicaid program" and to waive compliance with certain requirements "to the extent and for the period he finds necessary to enable such State or States to carry out such project ...." A demonstration project may, for example, expand coverage to individuals not eligible for Medicaid, provide services not typically covered by Medicaid, or use innovative service delivery systems to improve care, increase efficiency, or reduce costs. CMS approves each section 1115(a) demonstration project subject to

specific terms and conditions.  States must comply with the terms and conditions of the agreement between the Secretary and the State. 42 C.F.R. § 431.420 (a)(2).

CMS can only waive provisions specified in the Act as waivable and "any provision of the Social Security Act that is not expressly waived by CMS in its approval of the demonstration project are not waived, and States may not stop compliance with any of these provisions not expressly waived."  42 C.F.R. § 431.420 (a)(1).  CMS cannot waive the prohibition on provider donations in § 1903(w) and the 1115 Waiver agreement in this case expressly required the sources of non-Federal funding to comply with § 1903 (w).  CMS Ex. 4 at 49, 53, 65, 69.

**E.      CMS's Disallowance is Supported by the Medicaid Statute, Regulations, CMS Guidance, and Federal Cost Principles**

**1.      The Hospital Districts Received Indirect Provider-Related Donations in Violation of § 1903 (w)**

Section 1903(w)(1)(A) of the Act provides that, before calculating the amount of FFP, certain revenues received by a State or by unit of local government will be deducted from the State's medical assistance expenditures.  42 C.F.R. § 433.57.  The deductible revenues include donations made by health providers and entities related to providers (except for bona-fide donations and, subject to a limitation, donations made by providers for the direct costs of out-stationed eligibility workers).  Act §§ 1903(w)(1)(A)(i)(I-II); 42 C.F.R. § 433.57.  Section 1903(w) of the Act was enacted as part of the Medicaid Voluntary Contribution and Provider-Specific Tax Amendments of 1991, Public Law No. 102-234, 105 Stat. 1793 (Dec.12, 1991).  The statute broadly defines the term "provider-related donations" to include any donation or other voluntary payment (whether in cash or in kind) made (directly or indirectly) to a State or unit of local government by a health care provider or an entity related to a health care provider.  Act § 1903(w)(2)(A).

Section 1903(w)(6) of the Act generally protects a state's ability to use IGTs from units of government if the funds "are derived from State or local taxes." Section 1903(w)(6) provides in relevant part:

> (A) Notwithstanding the provisions of this subsection, the Secretary may not restrict States' use of funds where such funds are derived from State or local taxes ... transferred from or certified by units of government within a State as the non-Federal share of expenditures under this title, regardless of whether the unit of government is also a health care provider ...**unless the transferred funds are derived by the unit of government from donations or taxes that would not otherwise be recognized as the non-Federal share under this section.**

(emphasis added). The Board has noted, "Public Law No. 102-234 constituted a nuanced response including protections for states' abilities to fund their Medicaid programs with IGTs derived from state and local taxes, but also imposing significant *restrictions* on states' use of taxes and donations from health care providers." *Ala. Medicaid Agency*, DAB No. 2716 (2016)(emphasis in original). Here, the Hospital Districts IGT's were not "protected" under §1903(w)(6) because they were derived from impermissible donations, as explained below.

**a.      The Affiliated Hospitals Contributed Cash to the Indigent Care Corporations**

The State does not dispute that the Affiliated Hospitals financially support the Indigent Care Corporations. HHSC Br. at 24, 30. According to the Indigent Care Corporations' financial records, each of the Affiliated Hospital systems made significant cash contributions to the Indigent Care Corporations, during the fiscal quarter subject to this disallowance:

**Dallas County (October 1, 2015 - December 31, 2015)**

| Hospital System | Contributions to DCICC by System | Allocated Percentage | Paid to UTSW Providers |
|---|---|---|---|
| Baylor | $15,126,132 | 43.5% | |
| THR | $ 5,841,816 | 16.8% | |
| MHS | $ 7,371,816 | 21.2% | |
| HCA | $ 4,589,999 | 13.2% | |
| Tenet | $ 1,842,954 | 5.3% | |
| **Total** | **$ 34,772,717** | | **$34,772,717** |

**Tarrant County (October 1, 2015 - December 31, 2015)**

| Hospital System | Contributions to TCICC by System | Allocated Percentage | Paid to Medical Providers |
|---|---|---|---|
| Baylor | $ 1,511,856 | 14.47% | |
| THR | $ 8,012,732 | 76.68% | |
| MHS | $    681,223 | 6.52% | |
| HCA | $    242,398 | 2.32% | |
| **Total** | **$10,448,210** | | **$9,500,952** |

CMS Ex. 14 at 23, 35; CMS Ex. 15; CMS Ex. 21; CMS Ex. 22, at 23, 35; CMS Ex. 23.  The cash

donations to the Indigent Care Corporation are the first step in the indirect donation process.

**b.      As "Entities Related to Health Care Providers," the Indigent Care Corporations Served as Conduits for the Affiliated Hospitals' Indirect Donations to the Hospital Districts**

Pursuant to statutory definitions in § 1903(w)(7)(C)(i), both DCICC and TCICC are

considered "entities related to health care providers" because they were "formed by or on behalf" of

the Affiliated Hospitals.  42 C.F.R. § 433.52; CMS Ex. 19 at 14.  The "related to health care

provider" designation is important because the term "provider-related donation means a donation or

other voluntary payment (in cash or in kind) made directly or indirectly to a State or unit of local

government by or on behalf of a health care provider, **an entity related to such a health care**

**provider**, or an entity providing goods or services to the State for administration of the State's

Medicaid plan.  42 C.F.R. § 433.52 (emphasis added).

The regulations explain that, "[d]onations made by a health care provider to an organization,

which in turn donates money to the State, may be considered to be a donation made indirectly to the

State by a health care provider."  42 C.F.R. § 433.52.  This is the precisely the factual situation in

this case – the Affiliated Hospitals donated "cash" to the Indigent Care Corporations, which used

the funds to make in kind donations to the Hospital Districts.

"When the organization receives more than 25 percent of its revenue from donations from providers or provider-related entities, the organization always will be considered as acting on behalf of health care providers if it makes a donation to the State." 42 C.F.R. § 433.52. The amount of the organization's donation to the State, in a State fiscal year, that will be considered health care related, will be based on the percentage of donations the organization received from the providers during that period. 42 C.F.R.§ 433.52.

According to their federal tax filings, both DCICC and TCICC received 100% of their cash contributions from the Affiliated Hospitals. CMS Ex. 14, at 23; CMS Ex. 22 and 23.[3] All of their "programs service expenses" were payments to medical providers that rendered care at the Hospital Districts. CMS Ex. 14 at 9,11; CMS Ex. 22 at 9,11. Therefore, the voluntary in kind contributions DCICC and TCCIC made to the Hospital Districts, by providing necessary skilled personnel, constituted indirect provider-related donations.

**c.    CMS is not Required to Demonstrate that an Entity Assumed the Legal Obligations of A Governmental Entity to Establish an In Kind Donation**

The State and Intervenors argue that CMS's disallowance depends on the Indigent Care Corporations assuming a legal obligation of Hospital Districts to provide indigent care or employ physicians. *See* HHSC Br. at 20-21; Int. Brief at 20. CMS disagrees. Certainly, if a private entity assumes a legal, financial, or programmatic obligation of a governmental entity, this could indicate the existence of a donation. However, the term "provider-related donation" in the statute simply requires "any donation or other voluntary payment (whether in cash or in kind)[4] made (directly or indirectly) to a State or unit of local government by a health care provider or an entity related to a health care provider. Act §1903 (w)(2)(A). CMS has broadly interpreted this provision to include donated services and other transfers of value from health care provider to the governmental entity;

---

[3] TCICC is co-located with Texas Health Resources and DCICC is co-located with Methodist Hospital System. CMS Ex. 14 at 1, CMS Ex. 22 at 1, CMS Ex. 19, at 14.

these would generally include assuming the legal or programmatic obligations of a governmental entity.  SMDL #14-04.

i.      **Texas Hospital Districts are Legally Required to Provide Indigent Care to Eligible Residents**

Even if CMS's disallowance was contingent on the existence of a legal or programmatic obligation, an overwhelming body of Texas law firmly establishes that the Hospital Districts are required to provide basic health care services to eligible indigent residents in their service areas. [5] Article IX, Section 4 of the Texas Constitution provides that if a hospital district is legislatively authorized and created, that "[h]ospital [d]istrict shall assume full responsibility for providing medical and hospital care to need inhabitants of the county." CMS Ex. 49 at 1.[6] Pursuant to this authority, the Texas Health and Safety Code authorized the creation of hospital districts in counties over populations of 190,000.  Tex. Health and Safety Code § 281.002.  The statute creating the Dallas and Tarrant County hospital districts is Chapter 281 of the Health and Safety Code.  Tex. Health & Safety Code §§ 281.282; 281.286.  When a hospital district is created, "[b]eginning on the date on which taxes are collected for the district, the district assumes full responsibility for furnishing medical and hospital care for indigent and needy persons residing in the district."  Tex. Health and Safety Code § 281.046.  As the Supreme Court of Texas has noted, "Section 281.046 language parallels that of the Constitution insofar as mandating that once a district begins collecting taxes for purposes of providing health care to indigents, then it has the responsibility to provide such care." *Harris Cnty. Hosp. Dist. v. Tomball Reg'l Hosp.,* 283 S.W. 3d 838, 844 (Tex. 2009)(CMS Ex. 48); Hon. John Vance, Tex. Atty. Gen. Op. DM-29 (1991)(CMS Ex. 50).

---

[4] An in kind donation could include goods or services. See, IN KIND, Black's Law Dictionary (10th ed. 2014).
[5] "Service area" means the geographic region in which a governmental entity, public hospital, or hospital district has a legal obligation to provide health care services. Tex. Health & Safety Code § 61.002 (11).
[6] For the Board's convenience and reference, CMS has included a number of Texas authorities in CMS Exhibits 48-50.

The State's brief cites to Texas Health and Safety Code §§ 61.055 (a),(b) to support its argument that the Hospital districts do not have a legal obligation to provide care to the indigent.[7] HHSC Br. at 21-22.  However, the State's quotation of the statute leaves out the language in section (c) which expressly bars the State's interpretation:

> (c)This section may not be construed to discharge a hospital district from its obligation to provide the health care services required under the Texas Constitution and the statute creating the district.

Tex. Health & Safety Code § 61.055 (c).  Given that the Affiliated Hospitals assumed the Chapter 281 responsibilities of the Hospital Districts, an indirect in kind donation occurred through the contribution of physicians' services.

### ii.     All Hospitals are Required to Employ Physicians to Direct or Provide Patient Care

Hospitals must have doctors, but the State cites Texas statutory provisions to suggest Texas law "does not impose on the Dallas and Tarrant County hospital districts a legal obligation to contract for or employ physicians."  HHSC's Br. at 22.  The provision cited is in the "District Administration" section of Chapter 281 and simply gives the hospital districts flexibility with the manner in which they employ physicians, *not the option to employ physicians.*  CMS Ex. 49 at 15, 17.  Under Texas law, a governmental unit may not establish or maintain a hospital without a license and Texas law requires that each hospital show evidence that at least one physician is on the medical staff of the hospital to be licensed. Tex. Health & Safety Code §§ 241.021; 241.022 (c)(1). Hospital districts are required to provide the same basic health services as counties, which include inpatient, outpatient, and physician services. Tex. Health & Safety Code § 61.028(a)(2), (6).  Texas regulations require that the basic inpatient and outpatient services required of counties be "provided by or under the direction of a physician."  25 TX ADC § 14.201(a)(1)(c); (a)(2)(c); CMS Ex. 49 at 2-4.  Medicare and Medicaid conditions of participation also require a medical staff comprised of

---

[7] Tex. Health & Safety Code § 61.002 (11) states, "'Service area' means the geographic region in which a governmental

doctors of medicine or osteopathy.  42 C.F.R. § 482.22 (a).  The hospital districts had a legal obligation to employ physicians in order to maintain their hospital licenses and the Hospital Districts' receipt of physician personnel, funded by the Affiliated Hospitals, constituted in kind donations.

### iii.    Funding Physician Personnel for a Hospital is a Transfer of Value (Benefit) to the Hospital and Constitute In Kind Contributions

The State and Intervenors argue that there is no donation to the Hospital Districts because funding care (which they label "charity care") benefits the indigent patients and is not a benefit to the Hospital Districts because it does not relieve the Hospital Districts of a legal obligation. HHSC Br. 20, 24-25; Int. Br. 7, 20.

CMS recognizes that non-profit hospitals in Texas are required by statute to provide free or reduced-cost care to indigent patients to maintain their tax-exempt status.  John W. Vinson, The Charity Oversight Authority of the Texas Attorney General, 35 St. Mary's L.J. 243, 261 (2004); TX Health and Safety Code, Chapter 331; TX Tax Code § 11.1801 (g).  The State and Intervenors appear to argue that Texas's definition of "charity care," which includes *funding* health care services, somehow creates a safe haven from § 1903(w)'s prohibition against provider-related donations.  HHSC's Br. 27-28; Int. Br. at 26; Tex. Health & Safety Code § 311.031 (2); CMS Ex. 49 at 20.  The State argues that, "because the hospitals are providing charity care to individual indigent persons, the hospitals are not providing a donation that meets the statutory definition."  HHSC Br. 24.  Funding health care services may constitute "charity care" for Texas tax exemption purposes, but providing funds for care still constitutes a donation under Federal law.

Also, the State's definition of "donations," in the same definition section reads:

> "Donations" means the unreimbursed costs of providing cash and in kind services and gifts, including facilities, equipment, personnel, and programs, to other nonprofit or public outpatient clinics, hospitals, or health care organizations.

---

entity, public hospital, or hospital district has a legal obligation to provide health care services."

Tex. Health & Safety Code § 311.031 (5); CMS Ex. 49 at 20.  Under Texas law the Indigent Care

Corporations are "health care organizations," thus their providing personnel to public hospitals

appears to be a "donation," even under Texas. *Id*. at § 311.031 (9).

The State also argues that, "Services are being provided to individuals, not governmental

entities." HHSC Br. 25.  While this may be true, the State's argument misses the point – the

"donations" are not the actual physicians' services, but Indigent Care Corporation proving

necessary personnel for free, which fiscally benefits the Hospital Districts.

There is no dispute the Affiliated Hospitals, through their Indigent Care Corporations, saved

the Hospitals District millions of dollars by funding physicians services that the Hospital District

otherwise would have paid for themselves to some degree.  Saving millions of dollars is benefit to

Hospital Districts, particularly, if they can use any extra savings to fund their own supplemental

payments (UC or DSRIP). CMS Ex. 5 at 2; CMS Ex. 39; CMS Ex. 60.

In contradiction to the argument that the Hospital Districts receive no benefits, the Tarrant

County Hospital District (TCHD) found that it received "contributed services" from TCICC and

recognized revenue from the contributed services in its financial statements:

> Services provided by TCICC were valued at approximately [$33,721,000] and
> [$45,308,000] for the years ended September 30, 2016 and 2015, respectively. As
> part of the affiliation agreement, the District provided [$25,549,000] and
> [$34,012,000] in funding to the program for the years ended September 30, 2016 and
> 2015, respectively. **The District recognizes revenue from contributed services
> equal to the difference in the value of the services provided by TCICC and the
> program funding provided by the District.** Contributed services revenue was
> [$8,171,000] and [$11,296,000] for 2016 and 2015, respectively.

CMS Ex. 13 at 49.  As reported on its financial statements, TCHD recognized net revenue of $8.2

million from the services it received from TCICC.[8]  TCHD's financial statements note that, "should

---

[8] TCHD's treatment of the "contributed services" is consistent with nonauthoritative accounting literature published by
the Federal Accounting Standards Board (FASB), Statement 116, which is one of the few sources on this topic.  Under
FASB 116, "contributions for services" are recognized [by non-profits] only if they created or enhanced nonfinancial

TCICC cease providing these services, the District has entered a standby agreement with physicians participating in this program under which the District would assume the payment obligations of TCICC." Based on the State's payment and IGT documents, it appears both Hospital Districts sent less money to the State via IGTs than they saved by offloading their physician contracts. CMS Ex. 39; CMS 60 at 1-2. Both Hospital Districts benefited from the Indigent Care Corporations' "contributed services."

In summary, there is no dispute that IGTs were derived from the Indigent Care Corporations' funding of physician services at the Hospital Districts facilities, so they are not protected IGTs under §1903(w)(6). TCICC and DCICC are both entities related to the Affiliated Hospitals and their payments for in kind contributions of physicians' services at the Tarrant and Dallas County Hospital District facilities constituted indirect provider-related donations to the Hospital Districts. Paying the Hospital Districts' operating expenses (e.g. physician services) has the same real-world outcome as giving the Hospital Districts an equivalent amount of cash. The Hospital Districts benefit by saving millions of dollars in operating expenses and the funding scheme depends on these cost savings.

**2.      The Donations were Impermissible Because they were Made in Conjunction with a Hold Harmless Arrangement**

**a.      The Affiliation Agreement Participants' Performance and Expectations of Payment under The 1115 Waiver Funding Regulations Constituted a Direct Guarantee under 42 C.F.R. § 433.54 (c)(3)**

Based on the statutory language, CMS has established three "hold harmless arrangement" tests. § 1903 (w)(4); 42 C.F.R. § 433.54 (c). Under the "Guarantee Test," the State has the burden to demonstrate that, the State (or other unit of government) receiving the donation provided no direct or indirect payment, offset, or waiver such that the provision of that payment, offset, or

---

assets or require specialized skills and are provided by individuals with those specialized skills that would have typically been purchased if not provided by donation. CMS Ex 51 at 6-7; CMS Ex. 52 at 11.

waiver directly or indirectly guaranteed to return any portion of the donation to the provider (or other parties responsible for the donation). 42 C.F.R. § 433.54 (c)(3).

On February 22, 2008, CMS issued a final rule clarifying the standard for determining the existence of hold harmless arrangements for provider taxes and making conforming changes to parallel provisions concerning hold harmless arrangements with respect to provider-related donations[9]). Medicaid Program; Health Care-Related Taxes, 73 Fed. Reg. 9685-01(February 22, 2008); CMS Ex. 20 at 1, 4. In the preamble, CMS explained that:

> A direct guarantee will be found when a State payment is made available to a taxpayer or a party related to the taxpayer with the **reasonable expectation** that the payment would result in the taxpayer being held harmless for any part of the tax (through direct or indirect payments). A direct guarantee does not need to be an explicit promise or assurance of payment. **Instead, the element necessary to constitute a direct guarantee is the provision for payment by State statute, regulation, or policy.**

*Id*. at 9693 (emphasis added); CMS Ex. 20 at 15-17. CMS reinforced this interpretation in SMDL #14-04, which states, "Regardless of the expressed intent of providers and governmental entities, when there is an effective return of some, or all, of the donation to the private provider through Medicaid supplemental payments, a hold harmless arrangement exists." Int. Ex. 1.

**b.    The 1115 Waiver Payment Regulations and Processes Support a "Direct Guarantee" Hold Harmless Arrangement**

The element necessary to constitute a direct guarantee is the provision for payment by State statute, regulation, or policy, with the **reasonable expectation** that the payment would result in the provider-donor being held harmless for any part of the donation. *See* 73 Fed. Reg. 9685, 9693.

Only certain providers are eligible for 1115 Waiver payments. Private hospital eligibility for 1115

---

[9] Parallel hold harmless tests apply to taxes and donations. Medicaid Program; Limitations on Provider-Related Donations and Health Care-Related Taxes; Limitations on Payments to Disproportionate Share Hospitals, 57 Fed. Reg. 55118, 55120 (November 24, 1992)(In defining the conditions under which a State or local government receiving a provider-related donation is determined to hold providers harmless for such donations, we have adopted the same statutory tests of hold harmless that apply to health care-related taxes).

Waiver payments is contingent upon having a source of public funding for the non-Federal share of waiver payments and an affiliation agreement. 1 TAC § 355.8201 (c)(1)(A-B).

In this case, the State's payment regulations and policies offer the Affiliated Hospitals an opportunity to receive supplemental payments based on their ability to secure IGTs. CMS Ex. 8 (1 TAC § 355.8201); CMS Ex. 9 (1 TAC § 355.8203). In relevant part, the UC payment regulation states:

> the amount of the payment to a hospital will be determined based on the amount of funds transferred by the affiliated governmental entity or entities as follows:
>
> (A) If the governmental entity transfers the maximum amount referenced in paragraph (1) of this subsection, the hospital will receive the full payment amount calculated for that payment period.
>
> (B) If a governmental entity does not transfer the maximum amount referenced in paragraph (1) of this subsection, HHSC will determine the payment amount to each hospital owned by or affiliated with that governmental entity as follows:
>
> (i) At the time the transfer is made, the governmental entity notifies HHSC, on a form prescribed by HHSC, of the share of the IGT to be allocated to each hospital owned by or affiliated with that entity and provides the non-Federal share of uncompensated-care payments for each entity with which it affiliates in a separate IGT transaction;

*See* CMS Ex. 8, at 16 (1 TAC § 355.8201 (h)); CMS Ex. 8 (1 TAC § 355.8203 (h)) (similar); CMS Ex. 38 at 2. There is a clear nexus between the donations, IGTs allocations, cost savings, and the supplemental payments.

Each Affiliated Hospital system is responsible for making payments to the Indigent Care Corporations based on allocated percentages, in amounts calculated by the Indigent Care Corporations from the State and RHP's data. CMS Ex. 15 at 2, 4, 6; CMS Ex. 21; CMS Ex. 23; CMS Ex. 10 at 3; CMS Ex. 19 at 3. The Affiliated Hospitals that contribute more cash to the Indigent Care Corporations are allocated a greater portion of the Hospital Districts' IGTs to the State. *See* e.g., CMS Ex. 37 at 5, 8. As a result, the Affiliated Hospitals that contribute more to the

Indigent Care Corporations also receive a higher amount of the supplemental payments (up to a maximum amount) per the payment regulations. CMS Ex. 40-41, 43-44, 46-47.

The State has consistently argued that the parties are under no legal obligations, **but operate merely on their "reasonable expectations."** CMS Ex. 3; HHSC Ex. 8 at 2; HHSC Ex. 18. Although the State and Intervenors argue that the parties operate on a voluntary basis, CMS notes that the failure of any entity to fulfill its expected role would result in the collapse of the mutualistic relationship. Each party's financial participation in the Affiliation is contingent upon the performance of the other parties. For example, if the Hospital Districts send the maximum IGT amount, the Affiliated Hospital "will receive the full payment amount." 1 TAC § 355.8203 (h)(2)(A). But, if the Hospital District fails to send the IGT to the State, as reasonably expected, the Affiliated Hospitals will receive no payments. But, as recourse, they may stop funding care at the Hospital Districts.

CMS contends that the waiver payment provisions, coupled with the parties collaborative relationships and reasonable expectations of payment, constitute a hold harmless arrangement under the "Guarantee Test" in 42 C.F.R. § 433.54 (c)(3).

c.      **The Affiliated Hospitals Received all or a Portion of their Donations Returned Through Increased Supplemental Payments**

All 5 hospital systems involved in this appeal also reported net revenues from their participation in the 1115 Waiver program during their associated fiscal years. CMS Exs 26 at 3; 27 at 5; 28 at 3, 5; 53 at 2; 54 at 3. For example, during the its fiscal year ending June 30, 2016, Baylor recorded $165,385,000 in revenue from its participation in the Dallas and Tarrant Counties Affiliation Agreements and noted that it paid a total of $88,793,000 to the Indigent Care Corporations. CMS Ex. 27. Not only did it receive all of its contributions back via supplemental payments, it reported receipt of an additional $76,592,000 due to its participation. *Id*. Tenet recognized $133 million in statewide revenues from the Texas 1115 Waiver programs, but reported

$121 million in expenses related to funding indigent care services. CMS Ex. 54 at 3. The Affiliated Hospitals net gains further support CMS's argument that the Affiliated Hospitals had a direct guarantee of payment.

### 3. The Amounts TCICC and DCICC Paid for the Physicians' Services is an Appropriate Measure of the Fair Market Value of the In Kind Contributions

CMS contends the amounts paid by the Indigent Care Corporations to the physicians' groups represent an appropriate measure of the in kind donations for this case. The payments made by TCICC and DCICC were in accordance with detailed service agreements that the parties to those agreements believed to be at fair market value. *See* HHSC Ex. 25 at 112-113; CMS Ex. 18 at 3. Under federal cost principles, "third-party in kind contributions means the value of non-cash contributions (i.e., property or services) that: (1) benefit a federally assisted project or program; and (2) are contributed by non-Federal third parties, without charge, to a non-Federal entity under a Federal award." 45 C.F.R. §75.2.

CMS's original disallowance amount was expressly based on estimated amounts. HHSC Ex. 17. CMS revises the disallowance to reflect the amount paid by the Indigent Care Corporations to the medical providers for services rendered during the quarter at issue. CMS Ex. 15; Ex. 21, Ex. 23.

#### Disallowance Revision Based on the Value of In Kind Donations

|  | Total Computable | FFP (57.13%) |
|---|---|---|
| **Dallas County** | $34,772,717 | $19,865,653 |
| **Tarrant County** | $ 9,500,952 | $ 5,427,894 |
| **Total** | $44,273,669 | $25,293,547 |

CMS's revised calculation for Tarrant County is the same amount the State presented in its Request for Reconsideration and the revised Dallas County amount differs by just $30,000 from the State's

calculation.  HHSC Ex. 18 at 11. The State has not presented an alternative calculation or methodology.

**4.        The In Kind Donations Should be Treated as Applicable Credits**

Even if the Board finds that the Hospital Districts did not receive impermissible donations, CMS contends that the Hospital Districts' receipt of contributed services should be considered applicable credits under general federal cost principles.  The Hospital Districts' receipt of in kind contributions reduced their expenditures and allowed them to fund the non-Federal share of the supplemental payments.  Under 45 C.F.R. § 75.406 (a), "[applicable] credits refer to those receipts or reduction-of-expenditure-type transactions that offset or reduce expense items allocable to the Federal award as direct or indirect costs."  The Board has repeatedly stated that a common theme in cases where states have had to account for applicable credits is "the receipt of monies (or reductions of expenditures) by a state related to its federally funded program which, if unaccounted for in the program, would result in a savings or gain to the state alone." *Me. Dep't of Health & Human Servs.*, DAB 2168 (2008)(citations omitted).  The Board has found a credit to be applicable to a program expenditure where there is a direct relationship or nexus between the questioned receipt and the federally-funded program.  *Id.*  In this case, there is direct relationship between the Hospital Districts' receipt of the in kind contributions and the supplemental payments – the Hospital Districts' used the cost savings to fund the IGTs for the supplemental payments.  HHSC Br. 9, 23. The Medicaid program should share in the Hospital Districts' reduction of expenditures, otherwise, the State and local governments will receive a windfall because they have not contributed any funds to support the supplemental payments. CMS Ex. 55 at 2.  Rather, the State has shifted the entire cost of the supplemental payments to the Federal Government.

**5.        The State's and Intervenors' Procedural and Equitable Arguments do not Preclude CMS from taking the Disallowance**

a.    **SMDL #14-04 does not Violate the Administrative Procedures Act**

The State intervenors argue that SMDL #14-04 cannot be applied to support the disallowance because it allegedly violates the notice and comment rulemaking provisions of Administrative Procedures Act.  HHSC Br. at 32-35; Int. Br. at 24-26.  Both participants' arguments also weave in elements of selective enforcement and estoppel. *Id.*

CMS asserts that §1903 (w) and its implementing regulations are the legal foundation for the disallowance without reliance on SMDL #14-04, other than to show the State had notice of CMS's interpretations. When the language of a statute or regulation is clear, the Board will apply it by its terms.  *N. J. Dep't. of Human Servs.*, DAB No. 2780 (2017).

CMS further contends that SMDL #14-04 is an "interpretative rule" exempt from APA formal rulemaking procedures.  5 U.S.C. § 553(b).  *N.H. Dep't Health & Human Servs.,* DAB No. 2399 (2011).  The APA provides that, unless another statute states otherwise, the notice-and-comment requirement "does not apply" to "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A).  The critical feature of interpretive rules is that they are "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Perez v. Mortgage Bankers Ass'n*, 135 S.Ct. 1199 (2015), quoting, *Shalala v. Guernsey Mem. Hosp.,* 514 U.S. 87, 99, (1995) (internal quotation marks omitted). SMDL #14-04 expressly "provides guidance to states concerning Federal statute and regulations related to the allowable and unallowable use of provider-related donations." Int. Ex. 1 at 1.

Even if SMDL #14-04 represented a change in policy, a change in an interpretative rule does not trigger notice-and-comment rulemaking procedures. *Perez,* 135 S.Ct. at 1199.  Additionally, the State expressly agreed in the 1115 Waiver Agreement that it would, "within the timeframes specified in law, regulation, or policy statement, come into compliance with any changes in Federal

law, regulation, or policy affecting the Medicaid program." CMS Ex. 4 at 6. CMS gave the State until December 2015 to come into compliance with the provider-related donation requirements and explained the ongoing issues in its Findings. HHSC Ex. 14; CMS Ex. 32.

Finally, CMS contends that SMDL #14-04 is not arbitrary, capricious, or contrary to law; it simply provides notice and describes situations that the statute and regulations were designed to prevent - State or local governments' receipt of in kind donations from health-care providers.

**b.** **CMS's Interpretation of the Statute and Regulations is Reasonable and the State had Notice of CMS's Interpretation Prior to the Disallowance**

Even if §1903 (w) is ambiguous, the Board defers to CMS's interpretation of an ambiguous statutory provision if that interpretation "is reasonable and the grantee had adequate notice of the interpretation or, in the absence of notice, did not reasonably rely on its own contrary interpretation." *Mass. Exec. Office of Health & Human Servs.*, DAB No. 2218 (2008), citing *Alaska Dept. of Health and Social Services,* DAB No. 1919, at 14 (2004); see also *Guernsey Mem.,*514 U.S. 87 at 99. When a statute or regulation does not directly address the precise question at issue, the Board will defer to the agency's interpretation so long as it is reasonable and the non-Federal party had actual and timely notice of that interpretation or did not rely to its detriment on another reasonable interpretation. *See, e.g., N.J. Dep't of Human Servs.*, DAB No. 1773, at 5-6 (2001); *La. Dep't of Health and Hosp.*, DAB No. 1772, at 4-5 (2001)(citations omitted). In determining whether the non-Federal party had actual and timely notice, the Board will take into account, among other things, whether the agency's interpretation predates a disallowance or represents a position first articulated in litigation that the agency seeks to enforce retroactively. *Alaska Dep't of Health & Social Servs.*, DAB No. 1919 at 14 (2004).

CMS issued a disallowance for the quarter ending December 31, 2015. HHSC Ex. 17. Prior to that quarter, the State was on notice regarding CMS's interpretations of the provider-related donation provisions. In 2007 and 2008, CMS issued 3 deferrals against the State based on similar

financing arrangements.  HHSC Ex. 7, CMS Ex. 1; Int. Ex. 14.  In February 2008, CMS issued a

final rule that clarified its hold harmless regulations. CMS Ex. 20.  In 2014, CMS issued SMDL

#14- 04, which provided further guidance on provider-related donations.  Int. Ex 1.  Subsequently,

in 2014, CMS performed a Financial Management Review and issued a fourth deferral against the

State. CMS Ex. 13.  After releasing the deferral in January 2015, CMS presented State with detail

findings related to the provider-related donations.  CMS Ex. 32.  Finally, in the summer of 2015, the

parties reached an impasse regarding the legality of the private hospital financing and CMS noted

that it would issue a disallowance as "test case." HHSC 24, 25.  All of these events proceeded the

fiscal quarter that was disallowed.

**c.**      **CMS was not Estopped from Reviewing the Funding Arrangements**

State and intervenors briefs also inject elements of estoppel into their APA arguments.

Throughout their briefs, they argue that CMS previously approved the State's financing

arrangements with full knowledge and then changed its interpretations of § 1903 and the

implementing regulations.  CMS disagrees that it was fully aware of the private hospital funding

arrangements or that it changed its interpretations.

In 2008, the State assured CMS that going forward, "the private hospitals are not in any way

the source of the transferred funds."  HHSC Ex. 10 at 1.  In the 1115 Waiver Agreement, the State

certified that "the matching non-Federal share of funds for the Demonstration is State/local monies"

and that "all sources of non-Federal funding must be compliant with section 1903(w) of the Act and

applicable regulations."  CMS Ex. 4, at 65.  As noted above, CMS disputes that it had a full

working knowledge of the private hospital funding arrangements until the 2014 Financial

Management Review. *Vt.  Agency of Human Servs.,* DAB 599 (1984)(The Agency told the State

that its revised plan met federal regulations. This does not mean, however, that the Agency is

estopped from taking a disallowance if the State's actual practice violates federal regulations).  The

1115 Wavier Agreement also states, "CMS may review, at any time, the sources of the non-Federal share of funding for the Demonstration." CMS Ex. 4 at 65. CMS's prior approval of superseded State Plan Amendments does not preclude its review of the source of the non-Federal share of funding for the 1115 Waiver.

**d.      The State's Issue Regarding the Adequacy CMS' Notice of Disallowance is Untimely and Misplaced**

The State's complains that CMS's September 1, 2016 disallowance letter, and subsequent correspondence, did not contain all the information required by 42 C.F.R. § 430.42. HHSC Br. at 15-20. The State asks the Board to "reverse disallowance on the grounds that the record does not contain sufficient support for the donation determination or the disallowed amount." *Id*. Contrary to the State's assertion, CMS's September 1, 2016 disallowance letter contained a factual background, the applicable law, a disallowance calculation, and the basis for the disallowance with supporting legal authority. CMS Ex. 17.

 The State's request for a procedural default is untimely because it could have objected to the content of the disallowance or reconsideration letters prior to briefing. If the Board agreed with the State's objection, it could have ordered CMS to clarify its position. 42 C.F.R. 42 CFR 430.42 (g)(2); 45 C.F.R. §§ 16.9; 16.13. Additionally, the State could have requested discovery regarding the disallowance or the documents relied upon by CMS. When requested, CMS responded to the questions raised by the State regarding how it estimated the disallowance amount and also provided supporting documents. HHSC Ex. 23 and 24.

The State was able to present an alternative calculation in its reconsideration letter and file an extensive legal brief disputing all aspect of CMS's disallowance. *See Cal. Dep't of Health Servs.*, DAB 1490 (1994). The State will also have an opportunity to review CMS's exhibits and reply to CMS Brief, which will cure any procedural issue.

### e.    CMS's Approval of State Plan Amendments in Nevada and Louisiana does not Relieve Texas of its Responsibility to Demonstrate Compliance

CMS has not barred public-private collaborations and does not automatically assume any such relationship include donations, as suggested by the Intervenors. Int. Br. 22.  As noted in SMDL #14-04, "nothing in this letter is intended to limit the ability of governments and businesses to establish these normal and important business relationships."  CMS has recognized that, "it is simply impossible to anticipate every hold harmless arrangement that may be implemented by States." CMS Ex. 20 at 10.  Each situation must be examined on cases-by-case basis; the other states' plans vary from Texas's 1115 Waiver demonstration and are not before the Board.

CMS not made findings that the other states' programs are in violation of §1903(w), but CMS may take a Medicaid disallowance at any time.  The Act does not specify any time limit for the issuance of a disallowance. *Cal. Dep't of Health Servs.*, DAB 1490 at 5 (1994); Section 1116(d).  CMS could still review others states' programs and pursue any issues.

The Board previously has held that "allegations of disparate treatment, even if true, do not prohibit an agency of this Department from exercising its responsibility to enforce statutory requirements.'" *Municipality of Santa Isabel*, DAB No. 2230, at 12 (2009), quoting *Nat. Behavioral Ctr.*, DAB No. 1760, at 4-5 (2001); *N.H Dep't of Health & Human Servs.,* DAB No. 2399, at 18 (2011); *Wills Eye Hosp.*, DAB No. 2743 (2016);  See, also, *Jewish Home of E. Penn.,* DAB No. 2254, at 15 (2009)("CMS's treatment of other facilities cannot undercut [Petitioner's] responsibility to show that it was in compliance with the applicable legal requirements or remove CMS's authority to take actions which it is authorized by statute ... to take.").

CMS has taken other § 1903(w) disallowances.  On December 14, 2014, CMS also took a disallowance against Louisiana in the amount of $189,999,295 (FFP) due to Louisiana's receipt of impermissible provider-related donations based on a factual situation described in SMDL #14-04.

*La. Dep't of Health & Hospitals,* Docket No. A-15-79 (case closed July 21, 2017). The State has the burden to demonstrate that it is in compliance, not that other entities *may* also be out of compliance.

f.      **The HHS-OIG's Alleged Lack of Action against Bexar County is Irrelevant**

Intervenors' Brief states that, "the Department of Health & Human Services (HHS) Office of the Inspector General (OIG) conducted an audit of the Texas collaborative programs to determine whether the private sector's provision of charity care to patients who previously received charity care from a governmental entity constituted a provider-related donation, in violation of CMS regulations." Int.'s Br. at 13. Intervenors argue, "Not only did the OIG decline to take action against any Texas collaborative or collaborative participant, the OIG neither published any findings that would challenge the legal basis of the collaborative nor notified HHSC of any remaining concerns." *Id.* Intervenors support this sweeping implication with an OIG letter requesting documents from Bexar County Clinical Services in August 2011. Int. Ex. 25. The letter contains no information regarding Bexar County Clinical Services' financing arrangements. HHS-OIG's alleged lack of action against Bexar County Clinical Services cannot reasonably be construed to prove the OIG had no concerns or approved the financing of other Texas collaborative arrangements. The "document request" letter standing alone is simply irrelevant.

Furthermore, CMS makes the final determination on audit findings and is not bound by the OIG's findings. 42 C.F.R. § 430.33(b)(3); *Colo. Dep't of Soc. Servs.*, DAB 1272 (1991); *N.Y. State Dep't of Soc. Servs.,* DAB 1235 (1991). Here, OIG made no findings, thus, the document request letter has no probative value.

g.      **CMS is not Estopped from taking a Disallowance Based on the State's Assertion that it Continued an Improper Funding Scheme in Reliance on CMS's Communications**

The State essentially contends CMS is estopped from taking the disallowance based the State's purported reliance on a CMS letter in January 2015 and an email from CMS dated June 9,

2015. HHSC Br. 38-39. The circumstances surrounding the documents erode the State's claim of equitable estoppel against CMS, if estoppel is even available.

The Board is bound by applicable laws and regulations and has no authority to waive a disallowance based on equitable principles. 45 C.F.R. § 16.14; *Mo. Dept. of Soc. Servs.*, DAB No. 2677, at 12 (2016) (holding that the Board could not issue a decision which circumvent[ed]" or was "inconsistent with" an applicable expenditures reporting requirement); *Telamon Corp.*, DAB No. 1603, at 2 (1996)(stating that the Board "does not have authority to grant a waiver of the non-Federal matching requirement or to authorize the application of the current or a subsequent year's overmatch to [[the grantee's] non-Federal shortfall").

In general, estoppel is an equitable remedy where one party has used dishonest means to lead the other to act against interest. The traditional elements required to assert estoppel are misrepresentation of fact, reasonable reliance, and detriment to the opposing party. *Heckler v. Comm. Health Servs. of Crawford Cnty.*, 467 U.S. 51, 59 (1984). The Supreme Court has said that estoppel will not ordinarily lie against the federal government, especially in cases involving claims for federal funds based on misrepresentations of federal officials. *Office of Pers. Mgt. v. Richmond*, 496 U.S. 414, 423-34 (1990). Government agents cannot "by their unauthorized oral or written statements" be held to "obligate the Treasury for payment of funds," without the anomalous effect of giving their erroneous advice "the practical force of law" overriding Congressional intent. *Richmond,* 496 U.S. at 428.

If estoppel against the government is available, the party seeking estoppel must establish five things: (1) affirmative misconduct by the government, (2) that the government was aware of the relevant facts and (3) intended its act or omission to be acted upon, (4) that the party seeking estoppel had no knowledge of the relevant facts and (5) reasonably relied on the government's

conduct and as a result of [its] reliance, suffered substantial injury. *U.S. v. Bloom,* 112 F.3d 200,

205 (5th Cir.1997); *Bright Beginnings for Kittitas Cnty.,* DAB No. 2623, at 8 (2015)

First, the State alleges that CMS is precluded from taking the disallowance because CMS's

January 7, 2015 deferral release letter stated, "to the extent CMS determines that any financing

structure within Texas' Medicaid program violates federal statute and regulation, we would expect

Texas to make necessary adjustments by December 2015." HHSC Br. at 38. Although the State

says that CMS did not "determine" the financing scheme violated federal law, the parties met in

Washington DC in March 2015 and State was provided with a document entitled "Texas 1115

Waiver and Indigent Care Agreements - CMS Findings" with 15 supporting documents. CMS Ex.

30-35. CMS's Findings included a detailed factual and legal analysis concluding that the funding

scheme in Dallas and Tarrant Counties involved impermissible donations. CMS Ex. 32 at 1-3.

Although the Texas Legislature was in session during 2015, the State did not modify its 1115

waiver funding mechanism by December 2015 – the time frame noted in CMS's January 7, 2015

letter. Under this factual scenario, the State has not identified any affirmative misconduct,

reasonable reliance, injury, or that CMS intended the State to remain out of compliance.

Next, the State contends that CMS "agreed that Texas would have until September 1, 2017,

to make changes to the funding arrangements, if required following the discussions between CMS

and the State during the summer of 2015." HHSC Br. at 38; HHSC Ex. 15. The State's purported

reliance on Tim Hill's brief email ("Your understanding of the timeline is correct.") is seriously

undercut by the State's acknowledgment that the during the summer of 2015, the parties reached an

impasse and CMS's wanted to issue a "test case" disallowance to decide the legal issues:

> During discussions last summer between [Tim Hill] and HHSC Commissioner Chris
> Traylor, it became apparent that the agencies would not be able to reach agreement
> on whether funding arrangements like that in Dallas and Tarrant Counties complies
> with federal law. CMS proposed identifying a test case to get the issue before an
> independent arbiter. This disallowance is intended by CMS to fulfill that purpose.

HHSC Ex. 23 at 4. *Colo. Dep't of Health Care Policy & Fin.,* DAB No. 2558 (2014)(claims of reasonable reliance eroded by CMS's subsequent letter). The State was on notice prior to October 1, 2015, that CMS intended to take a disallowance. The State could not reasonably rely on the brief email because CMS itself cannot waive the donation prohibition in § 1903(w). Furthermore, the 1115 Waiver agreement expressly required the source of non-Federal funding to comply with § 1903 (w) and required an Amendment to change the source of funding. CMS Ex. 4 at 49, 53, 65, 69. The State could not reasonably rely on the vague, one sentence email because it contradicted CMS's official January 7, 2015 notice letter that required compliance by December 2015. HHSC Ex. 14.

The State has not provided any evidence that it was actually in the process of modifying the payment scheme, but ceased its efforts based on the letter or email. Although the Texas Legislature met again in 2017, the State has still has not changed its funding mechanism based on the October 2016 disallowance. Thus, despite the 2014 deferral and 2016 disallowance, it does not appear the State has taken any action to the change the financing scheme. *See Minn. Dep't of Human Servs.* DAB 1791 (2001). Texas has failed to establish the minimum requisite elements for the application of estoppel in relation to the June 9, 2015 email.

The material submitted by HHSC, at most, portray events that amount to mutual misunderstandings and inadequate clarity in communications, not misrepresentations by federal officials (and certainly not any affirmative misconduct). At a minimum, estoppel requires that the governmental party to be estopped have made affirmative misrepresentations. *Hartford Healthcare at Home,* DAB No. 2787 at 9 (2017). The Board has recognized that affirmative misconduct appears to require "something more" than "failing to provide accurate information or negligently giving wrong advice," such as fraud or deliberate misrepresentation. *Id*. at 10. The State has not met the elements for estoppel against CMS and the Board lacks authority to overturn CMS's disallowance for equitable reasons.

## V. Conclusion

CMS's Brief and exhibits support its assertions that the Hospital Districts received indirect, provider related in kind donation from the Affiliated Hospitals. The Hospital Districts' IGTs were not protected IGTs under § 1903(w)(6) because they were derived from the impermissible donations. The Affiliated Hospitals expected, and systematically received, all of their donations back in the form of supplemental payments, thus establishing a "direct guarantee" hold harmless arrangement. The amounts paid by the Indigent Care Corporations to the physicians groups were presented as fair market value and support the revised calculation of the overpayment disallowance. The State failed to meet its burden to support its entitlement to FFP and none of the State's arguments merit a reversal of the disallowance. The Board should uphold CMS's disallowance in the amount of $25,293,547 (FFP) for the quarter ending December 31, 2015.

Dated: August 25, 2017

Respectfully Submitted,

Jeffrey S. Davis,
Acting General Counsel

Mervin D. Turner,
Acting Chief Counsel

//s// *Daniel R. Wolfe*
**Daniel R. Wolfe, Jr.**
**Rama Lagadapati**
Assistant Regional Counsels
Department of Health and Human Services
Office of the General Counsel
1301 Young Street, Suite 1138
Dallas, Texas 75202

**Attorneys for Respondent**