# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** *ex rel.* **JOSHUA A. NEMZOFF,** | **CIVIL ACTION NO. 2:19-CV-11680 c/w 2:19-CV-11682** |
| **Plaintiffs,** | **SECTION: "P" (5)** |
| **VERSUS** | |
| | **JUDGE DARREL JAMES PAPILLION** |
| **LOUISIANA CHILDREN'S MEDICAL CENTER, INC., et al.,** | **MAGISTRATE JUDGE MICHAEL NORTH** |
| **Defendants.** | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**RELATOR'S MEMORANDUM IN OPPOSITION TO GJERSET & LORENZ LLP'S MOTION TO DISMISS RELATOR'S SECOND AMENDED COMPLAINT (Doc. 115)**

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................................... ii

INTRODUCTION ...........................................................................................................................1

LEGAL STANDARD .....................................................................................................................2

ARGUMENT ...................................................................................................................................2

    I.    The SAC Meets the Requirements of Rule 9(b). .................................................................2

    II.   The SAC Adequately Alleges that Gjerset Acted Knowingly. ............................................4

    III.  The SAC Adequately Alleges Gjerset Participated in a Conspiracy in Violation of
         31 U.S.C. § 3729(a)(1)(C). ..................................................................................................6

    IV.  The SAC Adequately Alleges Gjerset Caused Louisiana to Present False Claims and
         Make False Statements .........................................................................................................8

    V.   The SAC Seeks Accountability and Presents No Threat to the Legal Profession. ............10

CONCLUSION ..............................................................................................................................14

# TABLE OF AUTHORITIES

**Cases**

*Allison Engine Co. v. U.S. ex rel. Sanders*
   553 U.S. 662 (2008) ........................................................................................................ 9, 10

*Ashcroft v. Iqbal*
   556 U.S. 662 (2009) ................................................................................................................ 2

*Bach v. Amedisys, Inc.*
   2016 WL 4443177 (M.D. La. Aug. 19, 2016) ........................................................................ 5

*Cantey Hanger, LLP v. Byrd*
   467 S.W.3d 477 (Tex. 2015) ................................................................................................ 13

*Essex Crane Rental Corp. v. Carter*
   371 S.W.3d 366 (Tex. App. 2012) ....................................................................................... 13

*Haynes & Boone, LLP v. NFTD, LLC*
   631 S.W.3d 65 (Tex. 2021) ............................................................................................ 13, 14

*United States ex rel. Adams v. Chattanooga-Hamilton Cnty. Hosp. Auth.*
   2024 WL 221758 (E.D. Tenn. Jan. 19, 2024) ........................................................................ 7

*United States ex rel. Bane v. Breathe Easy Pulmonary Servs., Inc.*
   597 F. Supp. 2d 1280 (M.D. Fla. 2009) ........................................................................... 9, 10

*United States ex rel. Bilotta v. Novartis Pharms. Corp.*
   50 F. Supp. 3d 497 (S.D.N.Y. 2014) ...................................................................................... 5

*United States ex rel. Campie v. Gilead Scis., Inc.*
   862 F.3d 890 (9th Cir. 2017) .................................................................................................. 5

*United States ex rel. Druding v. Care Alts.*
   81 F.4th 361 (3d Cir. 2023) .................................................................................................. 12

*United States ex rel. Frey v. Health Mgmt. Sys., Inc.*
   2023 WL 2563239 (S.D. Tex. Feb. 10, 2023) ........................................................................ 5

*United States ex rel. Grubbs v. Kanneganti*
   565 F.3d 180 (5th Cir. 2009) .................................................................................................. 2

*United States ex rel. Hueseman v. Pro. Compounding Centers of Am., Inc.*
   664 F. Supp. 3d 722 (W.D. Tex. 2023) .................................................................................. 9

*United States ex rel. Steury v. Cardinal Health, Inc.*
   625 F.3d 262 (5th Cir. 2010) ................................................................................................ 10

*United States ex rel. Suarez v. AbbVie, Inc.*
  503 F. Supp. 3d 711 (N.D. Ill. 2020) ................................................................................... 4, 5

*United States ex rel. Taylor v. GMI USA Corp.*
  2024 WL 307791 (S.D.N.Y. Jan. 26. 2024) ............................................................................ 7

*United States ex rel. Taylor-Vick v. Smith*
  513 F.3d 228 (5th Cir. 2008) ................................................................................................ 12

*United States ex rel. Williams v. C. Martin Co.*
  2012 WL 1565279 (E.D. La. May 1, 2012) ............................................................................ 6

*United States v. Americus Mortg. Corp.*
  2017 WL 4117347 (S.D. Tex. Sept. 14, 2017) ........................................................................ 9

*United States v. Bollinger Shipyards, Inc.*
  775 F.3d 255 (5th Cir. 2014) ........................................................................................... 2, 4, 6

*United States v. Corp. Mgmt., Inc.*
  78 F.4th 727 (5th Cir. 2023) ................................................................................................ 8, 9

*United States v. Hodge*
  933 F.3d 468 (5th Cir. 2019), as revised (Aug. 9, 2019) ........................................................ 8

*United States v. Napper*
  2021 WL 4992651 (M.D. Tenn. Oct. 27, 2021) ...................................................................... 7

*United States v. Snow*
  462 F.3d 55 (2d Cir. 2006) ..................................................................................................... 7

*United States v. Southland Mgmt. Corp.*
  326 F.3d 669 (5th Cir. 2003) .................................................................................................. 6

*United States v. Zolin*
  481 U.S, 554 (1989) .............................................................................................................. 13

*Universal Health Servs., Inc. v. United States*
  579 U.S. 176 (2016) .............................................................................................................. 11

**Statutes**

31 U.S.C. § 3729(a) ....................................................................................................... 6, 8, 10

31 U.S.C. § 3729(b) ........................................................................................................... 4, 12

42 U.S.C. § 1396b(w) ............................................................................................................ 10

**Rules**

Fed. R. Civ. P. 8(a) .................................................................................................................. 2

Fed. R. Civ. P. 9(b) ...................................................................................................................2, 4

Model Rules of Prof'l Conduct R. 1.2 ....................................................................................... 15

Model Rules of Prof'l Conduct R. 1.16 ..................................................................................... 15

Model Rules of Prof'l Conduct R. 8.4 ....................................................................................... 15

**Regulations**

42 C.F.R. § 433.54 ...................................................................................................................... 10

42 C.F.R. § 433.66 ...................................................................................................................... 10

42 C.F.R. § 433.67 ...................................................................................................................... 10

Medicaid Fiscal Accountability Regulation – Proposed Rule
   84 Fed. Reg. 63722 (Nov. 18, 2019) ..................................................................................... 11

**INTRODUCTION**

Relator incorporates by reference and reiterates the arguments set forth in his Opposition to Defendants' Consolidated Motion to Dismiss Second Amended Complaint's LINCCA Claims and his Opposition to United Professionals Company, LLC's ("UPC") Motion to Dismiss Relator's Second Amended Complaint ("Oppositions"). As detailed in Relator's Oppositions and described below, his Second Amended Complaint ("SAC") describes how Defendants conspired to carry out multiple fraudulent schemes to increase Medicaid supplemental payments that the hospital Defendants received from the federal government. Relator uncovered Defendants' schemes during his employment with Jefferson Parish through his firsthand observation and expertise in healthcare finance. Relator's observations include facts concerning the role of Gjerset & Lorenz LLP ("Gjerset") as the mastermind of the fraud.

The SAC alleges that Gjerset assisted UPC in devising a scheme to abuse Louisiana's Low-Income and Needy Care Collaboration Agreement ("LINCCA") program and advised its clients, the Defendant private hospital systems, to enter collaborative agreements knowing that their unlawful purpose was to provide Gjerset's clients supplemental Medicaid payments to which they were not entitled. The SAC further alleges that Gjerset maintained the books for pass-through entities to conceal the flow of the unlawful non-bona fide donations ("NBFD"). The State used these funds to pay its portion of Medicaid cost sharing and reported these funds in requests for supplemental payments on CMS Forms 64 without disclosing that they were NBFDs. As Gjerset knew, the State submitted these Forms 64 to CMS, which disbursed supplemental Medicaid payments to the Defendant private hospital systems based on the false representations on the Forms 64.

The SAC adequately details Gjerset's role as creator of, advisor to, record keeper of, and active participant in a scheme that it knew to be fraudulent, that Gjerset caused the submission of false claims, and that it profited from them. Gjerset's Motion to Dismiss should be denied.

1

**LEGAL STANDARD**

A "complaint that states a plausible claim for relief survives a motion to dismiss" under Rule 8(a). *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). If a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," this meets the plausibility standard. *United States v. Bollinger Shipyards, Inc.*, 775 F.3d 255, 260 (5th Cir. 2014).

Under Rule 9(b), a relator must "plead 'with particularity the circumstances constituting fraud or mistake,' although '[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally.'" *Id.* (internal citations omitted). Rule 9(b) "requires only 'simple, concise, and direct' allegations of the 'circumstances constituting fraud'" and "the 'time, place, contents, and identity' standard is not a straitjacket for Rule 9(b). Rather, the rule is context specific and flexible and must remain so to achieve the remedial purpose of the False Claim Act." *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 186, 190 (5th Cir. 2009). A complaint that alleges "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted" will be allowed to proceed to discovery. *Id.* at 190–91. The SAC meets these requirements as to all Defendants, including Gjerset.

**ARGUMENT**

**I.      The SAC Meets the Requirements of Rule 9(b).**

The SAC describes with particularity the role that Gjerset played in the schemes to cause the submission of false claims. The SAC alleges how Gjerset created and executed an unlawful *quid pro quo* agreement for its clients to make non-bona fide donations in exchange for supplemental Medicaid payments and that it advised its private hospital clients to enter that agreement. Relator alleges the details of the scheme, setting forth the *who*, *what*, *when*, *where*, and *how* of Gjerset's involvement in causing the submission of false claims:

2

- *Who*: Gjerset, a healthcare law firm, together with UPC (and the Sisung Group of which UPC is a member)[1], devised the scheme with the five private hospital Defendants to transfer money to state and local entities in exchange for increased supplemental payments as part of a prohibited *quid pro quo* arrangement. [2d Am. Compl., Doc. 22, at ¶¶ 5–9, 11, 48–49, 53–55, 160–162, 164, 313–314, 320, 333].

- *What*: In coordination with Gjerset and UPC, the private hospital systems transferred money, via pass-through entities, to local and state entities to fund the State's Medicaid share, which generated inflated supplemental payments that were returned to the "donating" private hospitals. [*Id.* at ¶¶ 5, 7, 9–11, 19–20, 53–54, 126, 315–318].

- *When* and *where*: Since at least November 2010, in Louisiana, principally in and around New Orleans. [*Id.* at ¶ 313].

- *How*: Gjerset directed and assisted in the creation of, kept the books for, and reviewed the transactions of the hospitals and pass-through entities the hospitals used to funnel funds to the State and local entities to hide the trail of these hospitals' NBFDs. [*Id.* at ¶¶ 5, 7–9, 11, 20, 53–55, 313, 315, 320, 322, 327]. Gjerset received at least $72 million from the hospitals for its work in advising them, arranging the scheme, and bookkeeping. [*Id.* at ¶¶ 20, 54].

The SAC also supplies reliable indicia leading to a strong inference that claims were actually submitted. For example, the SAC alleges that the CFO of East Jefferson General Hospital told Relator that East Jefferson General Hospital had transferred $5 million to the State in return for $14 million in supplemental Medicaid funds. [*See id.* at ¶ 164].

To distract from the core of the SAC's allegations, Gjerset casts its role as innocuously advising its hospital clients consistent with an "alternative narrative of reasonable, lawful business decision-making." [Gjerset Mot. to Dismiss, Doc. 115-1, at 11].[2] But, as Relator has explained in his Opposition to Defendants' Consolidated Motion to Dismiss Second Amended Complaint's LINCCA Claims, at 28–29, the SAC's allegations are wholly at odds with any lawful business decisions. Gjerset advised and assisted its clients to cover up the nature of the agreement because it was wrongful. [*See* Doc. 22,

---

[1] UPC asserts that former Defendant Sisung Group is not a separate legal entity from UPC, and Relator dismissed his claims against the Sisung Group. [Doc. 103]. Relator now treats UPC and the Sisung Group, of which UPC is a member, as one entity, and references in the Complaint to the Sisung Group should be understood to also apply to UPC. [Doc. 22, at ¶¶ 48–49 (alleging UPC is a member of the Sisung Group)].

[2] For all paginated record sites, Plaintiff references the page numbering from the docket entry, not the internal document numbering (at bottom of page).

at ¶¶ 11, 20, 53–54, 164]. Although Defendant asserts that Relator must have spoken to a Defendant directly to satisfy Rule 9(b), [Doc. 115-1, at 10–11], neither the text of Rule 9(b) nor the Fifth Circuit's test set forth in *Grubbs* imposes requirements on the source of the detail. Rather, what is required are the details of the scheme and reliable indicia leading to a strong inference that claims were submitted. As described above, the SAC supplies both.

## II. The SAC Adequately Alleges that Gjerset Acted Knowingly.

A person acts "knowingly" under the FCA when they act with actual knowledge, deliberate ignorance, or reckless disregard of the truth or falsity of the claims, statements, or records. 31 U.S.C. § 3729(b)(1). Specific intent to defraud is not necessary as a showing of reckless disregard is sufficient, and knowledge may be alleged generally. 31 U.S.C. § 3729(b)(1)(B); Fed. R. Civ. P. 9(b); *see also Bollinger Shipyards*, 775 F.3d at 260.

The SAC plausibly alleges that Gjerset acted with actual knowledge, or at a minimum, reckless disregard, that the scheme it devised, advised its co-conspirators to enter, and assisted in executing was unlawful. Relator alleges that the core purpose of the scheme Gjerset masterminded and, along with UPC, implemented, was to evade the statutory prohibition against NBFDs, and that Gjerset advised its clients to hide any evidence of the agreement. [Doc. 22, at ¶¶ 11, 20, 53–54, 164]. That Gjerset advised its co-conspirators to take steps to conceal the *quid pro quo* relationship at the heart of the agreement highlights Gjerset's knowledge that the arrangement was unlawful. Moreover, Relator alleges that Gjerset created and, with the Defendant hospitals, managed the complex arrangement of 26 pass-through entities that funneled NBFDs to the State to obfuscate the illicit nature of the donations. [*See id.* at ¶¶ 9, 11, 20, 54]. Defendants concealing their actions, or the true purpose of their actions, is classic evidence of scienter, as a cover-up demonstrates knowledge that the action was wrongful. *See*, *e.g.*, *United States ex rel. Suarez v. AbbVie, Inc.*, 503 F. Supp. 3d 711, 735 (N.D. Ill. 2020) (finding defendant's cover-up efforts sufficient to create an inference that it required its representatives to hide the nature of the work because it knew it was wrongful); *United States ex rel. Campie v. Gilead Scis.*,

4

*Inc.*, 862 F.3d 890, 904 (9th Cir. 2017) (allegation that defendant took actions to hide its fraud was adequate to plead scienter).

Contrary to Gjerset's assertion that the SAC uses improper group pleading, [Doc. 115-1, at 12], the SAC identifies Gjerset's role in the fraud and how it was different from those of the other Defendants. [*See* Doc. 22, at ¶¶ 7–9, 11, 20, 52–55, 160–162, 164, 313, 315, 320, 322, 327–328]. Similarly, Defendant's contention that Relator's *only* allegation of scienter is that Gjerset is a sophisticated law firm in the healthcare business and thus knew its co-conspirators were in violation of the NBFD statute disregards the individualized facts the SAC alleges: that Gjerset devised the *quid pro quo* agreement precisely to evade the statutory prohibition on NBFDs, created and managed pass-through entities to disguise the violations, [*id.* at ¶¶ 7, 9, 11, 20, 53–54, 315, 320], and acted as bookkeeper for these entities. [*Id.* at ¶¶ 7, 20, 54]. Moreover, courts have found that a defendant being a sophisticated entity aware of industry laws and standards can bolster an inference of knowledge where, as here, it is paired with other allegations of scienter. *See*, *e.g.*, *Suarez*, 503 F. Supp. 3d at 735–36 (conduct alleged in complaint violated industry standards that were known to the company, supporting an inference it acted knowingly); *United States ex rel. Bilotta v. Novartis Pharms. Corp.*, 50 F. Supp. 3d 497, 520 (S.D.N.Y. 2014) (same). The cases Defendant cites in support of its argument are inapposite. In *United States ex rel. Frey v. Health Mgmt. Sys., Inc.*, the *only* allegation of scienter was that Defendants were sophisticated companies. 2023 WL 2563239, at *10 (S.D. Tex. Feb. 10, 2023). In contrast, the SAC alleges that Gjerset had actual knowledge, arranged the *quid pro quo* agreement, and took steps to conceal it because it knew the agreement was prohibited. *Bach v. Amedisys, Inc.*, cited by Gjerset, is a securities case with a different scienter standard, where, unlike here, the plaintiff did not allege a cover-up or that the defendant knew its scheme was wrongful. *See* 2016 WL 4443177, at *12 (M.D. La. Aug. 19, 2016).

Similarly, Gjerset's contention that "[t]he fact that regulations differentiate between 'bona fide' and 'non-bona fide' donations does not mean that the LINCCAs at issue involved 'non-bona fide'

5

donations, let alone that Gjerset knew they did," [Doc. 115-1, at 13], is a red herring. The SAC alleges that, in *this case*, Gjerset *did in fact know* the collaborative agreements involved prohibited *quid pro quo* arrangements and took elaborate steps to conceal those arrangements because it knew they violated the NBFD statute. [*See* Doc. 22, at ¶¶ 11, 20, 53–54, 164].

Finally, that CMS has not administratively challenged the LINCCA program is another red herring. While the "government knowledge" inference may in some instances overcome a finding of scienter, doing so requires "that the government knew of the falsity of the statement and was willing to pay anyway." *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 682 (5th Cir. 2003) (Jones, J. concurring). Neither Gjerset nor any other Defendant has argued, let alone demonstrated, that CMS knew, prior to payment, of the existence of a hold harmless arrangement, how much money was unlawfully donated, when, to whom, or any other particulars of the agreement between the private hospital systems, their advisors Gjerset and UPC, and the State. That CMS broadly reviewed the representations put forth by the State and the hospitals in the LINCCA program—which did not disclose the *quid pro quo* arrangements that Defendants concealed from CMS—does not support a government knowledge inference. *Id*. Moreover, even when it exists, government knowledge is only one factor and does not negate a defendant's knowledge at the motion to dismiss stage. *Bollinger Shipyards*, 775 F.3d at 264.

The facts alleged in the SAC, taken as true, create an inference that Gjerset acted, at a minimum, with reckless disregard for the truth or falsity of the claims submitted to the government.

### III. The SAC Adequately Alleges Gjerset Participated in a Conspiracy in Violation of 31 U.S.C. § 3729(a)(1)(C).

The SAC also adequately pleads a conspiracy in violation of 31 U.S.C. § 3729(a)(1)(C), which requires an agreement between one or more persons to do an act that violates the FCA. *United States ex rel. Williams v. C. Martin Co.*, 2012 WL 1565279, at *5 (E.D. La. May 1, 2012). As courts have acknowledged, "conspiracies are rarely evidenced by explicit agreements and nearly always must be

proven through inferences that may fairly be drawn from the behavior of the alleged conspirators." *United States ex rel. Adams v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 2024 WL 221758, at *9 (E.D. Tenn. Jan. 19, 2024) (citing cases); *see also United States ex rel. Taylor v. GMI USA Corp.*, 2024 WL 307791, at *9 (S.D.N.Y. Jan. 26. 2024). "[C]onspiracy by its very nature is a secretive operation" and even at trial "it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *United States v. Snow*, 462 F.3d 55, 68 (2d Cir. 2006).

The SAC provides ample detail about the conduct of the parties showing a conspiracy to defraud Medicaid. It describes an agreement among the hospital defendants, the consultants, and the individual executives, all of which was orchestrated by Gjerset. [*See* Doc. 22, at ¶ 313 (agreement); *id.* at ¶¶ 313, 315, 318 (participants)]. The SAC also alleges the purpose of the conspiracy, which was to engage in a series of unlawful acts that would defraud Medicaid. [*Id.* at ¶¶ 314, 317–318]. The SAC details how the conspiracy was carried out, [*id.* at ¶¶ 17–18], with separate agreements between Gjerset and each hospital, [*id.* at ¶ 322], a web of 26 sham entities to serve as conduits for the transfer of funds that were governed by interlocking directorships populated by the executives of the hospitals, [*id.* at ¶¶ 7, 9–11, 19–21, 53–54, 317, 320], with the law firm reviewing all transactions and maintaining the books for the sham entities, [*id.* at ¶¶ 5, 7, 20, 54, 327], and everyone agreeing to deny the existence of the scheme. [*Id.* at ¶ 341]. That is sufficient at the motion to dismiss stage. *United States v. Napper*, 2021 WL 4992651, at *19 (M.D. Tenn. Oct. 27, 2021) (plaintiffs adequately alleged that "all of the actions taken were part of a comprehensive, coordinated unlawful business scheme").

Gjerset's assertion that the private hospital Defendants' "parallel conduct" is "best explained by the receipt of similar legal advice" to "similarly situated clients interested in doing similar things" who "independently engaged" Gjerset [Doc. 115-1, at 16–17], ignores, among other facts, the SAC's allegation that a Jefferson Parish Council resolution states, "in order for the public Parish Hospitals to participate in a Private UPL Program with these private hospitals (the Parish Hospital UPL Programs), East Jefferson and West Jefferson were required to separately enter into joint legal representation

7

agreements with [Gjerset] and the private hospitals [already] represented [by Gjerset]." [Doc. 22, at ¶ 322]. That the hospital Defendants' participation in UPL programs was conditioned upon their joint representation by Gjerset supports the allegation that the hospitals operated in concert under the direction of Gjerset and UPC and did not coincidentally all happen to engage the same law firm. The SAC also alleges that the firm was involved in reviewing all the financial transactions among the entities and was paid, at a minimum, $72 million for its services. [*See id.* at ¶¶ 5, 20, 54, 327].

Gjerset's contention that the SAC fails to allege a conspiracy because it fails to allege a violation of the FCA should be rejected. The SAC adequately alleges a fraudulent course of conduct to cause the submission of false claims to the government, that the conduct was done knowingly and was material. *See supra*, at 3–6, *see also* Relator's Op. to Con. Mot. To Dismiss, at 23–35.

## IV. The SAC Adequately Alleges Gjerset Caused Louisiana to Present False Claims and Make False Statements.

The FCA imposes liability on any person who "causes to be presented" a false claim for payment or "causes to be made or used, a false record or statement material to a false or fraudulent claim" is liable for a FCA violation. 31 U.S.C. § 3729(a)(1)(A), (B). "'The FCA applies to anyone who knowingly assists in causing the Government to pay claims grounded in fraud, without regard to whether that person has direct contractual relations with the Government.' . . . 'Knowing assistance' does not require that a person 'be the one who actually submitted the claim forms in order to be liable.'" *United States v. Corp. Mgmt., Inc.*, 78 F.4th 727, 741 (5th Cir. 2023) (internal citations omitted). Courts evaluate causation using the standard for "proximate cause" which "'is often explicated in terms of foreseeability or the scope of the risk created by the predicate conduct'" and serves "'to preclude liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity.'" *United States v. Hodge*, 933 F.3d 468, 475 (5th Cir. 2019), as revised (Aug. 9, 2019).

The SAC alleges that Gjerset caused the submission of false claims by creating the scheme, advising its clients to conceal the scheme, assisting the execution of the scheme by creating pass-through entities to funnel non-bona fide donations to the State, and serving as bookkeeper for those entities. [*See* Doc. 22, at ¶¶ 8–9, 11, 20, 53–54, 320]. All these actions are "affirmative acts" that "caus[ed] or assist[ed]" in the presentation of the claims to CMS and go far beyond just "advising" its clients, though advising clients to circumvent the NBFD statute for the purpose of submitting false claims is sufficient to establish causation on its own. *Corp. Mgmt.*, 78 F.4th at 741. It is more than "reasonably foreseeable" to anticipate that Gjerset's clients, who paid the firm at least $72 million dollars, would act upon its advice, and that Gjerset orchestrating the flow of NBFDs from private hospitals to the public hospitals, and through pass-through entities to the State for the purpose of funding the Louisiana's Medicaid share would naturally result in the State claiming this as part of the state share on CMS Form 64, resulting in payment from CMS. The receipt of increased supplemental Medicaid payments while concealing from CMS the *quid pro quo* arrangement that Gjerset masterminded was the anticipated, foreseeable, and natural consequence of the scheme. *See United States v. Americus Mortg. Corp.*, 2017 WL 4117347, at *2 (S.D. Tex. Sept. 14, 2017) ("'Defendants' conduct may be found to have caused [the FCA violation] if the conduct was (1) a substantial factor in inducing providers to submit claims … and (2) if the submission of claims … was reasonably foreseeable or anticipated as a natural consequence of Defendants' conduct.'" (citations omitted)); *United States ex rel. Hueseman v. Pro. Compounding Centers of Am., Inc.*, 664 F. Supp. 3d 722, 752 (W.D. Tex. 2023) (same).

Defendant's authority, *United States ex rel. Bane v. Breathe Easy Pulmonary Servs., Inc.*, 597 F. Supp. 2d 1280, 1292 (M.D. Fla. 2009), [*see* Doc. 115-1, at 14], does not support its argument for two reasons. First, the case's causation analysis relied on an interpretation of the FCA's false statement provision that has been superseded by statute. *Bane* relied on *Allison Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662 (2008) for the proposition that the phrase "to get" in the predecessor to section

9

3729(a)(1)(B) "denotes purpose, and thus a person must have the purpose of getting a false or fraudulent claim 'paid or approved by the Government' in order to be liable under § 3729(a)(2)." *Bane*, 597 F. Supp. at 1292 (quoting *Allison Engine*, at 668–69). But, in 2009, Congress amended the FCA to eliminate the intent requirement that *Allison Engine* read into the false statements and records provision by (1) deleting the phrases "to get" and "paid or approved" from former subsection (a)(2); (2) adding the word "material" in place of "to get," requiring a false statement or record to be "material" to a false or fraudulent claim; and (3) defining the term "material." *See United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 267 n.1 (5th Cir. 2010) (recognizing "legislative intent to overrule *Allison Engine*"). Second, *Bane* was decided on a motion for summary judgment, not a motion to dismiss, where the well-pled allegations of the complaint must be taken as true.

## V.     The SAC Seeks Accountability and Presents No Threat to the Legal Profession.

Gjerset attempts to minimize the SAC's allegations, asserting that "Relator contends that the Court can infer that Gjerset & Lorenz knowingly defrauded the United States because (1) it is a law firm that (2) advised its clients on how to navigate an ambiguous regulatory environment, and (3) Relator (but not CMS) believes that the firm and its clients should have read the rules differently." [Doc. 115-1, at 17]. But only the first prong of this statement is correct. The NBFD statute and regulations are clear, and CMS does not read the statute or regulations differently from their plain meaning. Nor has CMS taken any position at all on how the firm or its clients have read the rules. By Gjerset's design, CMS is unaware of what the firm and its clients have been doing because they purposefully hid that information from CMS.

The NBFD statute and regulations are unambiguous and prohibit what Relator alleges Defendants did—have a *quid quo pro* arrangement exchanging donations for the receipt of supplemental Medicaid funds from the federal government. *See* 42 U.S.C. § 1396b(w); 42 C.F.R. §§ 433.67(b), 433.66, 433.54(a)–(c). No discretionary exceptions exist. It is thus unsurprising that Gjerset

does not identify the provision(s) of the NBFD statute, regulations or guidance that allegedly created the "ambiguous regulatory environment" to which it refers. [Doc. 115-1, at 17].

Moreover, the 2019 proposed rulemaking does not suggest that the NBFD statute and regulations were ambiguous. CMS "clarif[ied] the regulatory language" because "certain states, localities, and private health care providers have designed complex financing structures to *mask* non-bona fide, provider-related donations[,] . . . *obfuscate* the source of non-federal share and *avoid the statutorily-required* reduction to state medical assistance expenditures." Medicaid Fiscal Accountability Regulation – Proposed Rule, 84 Fed. Reg. 63722, 63735–36 (Nov. 18, 2019) (emphasis added). "Often, th[ese] arrangement[s] will not be executed as a contract . . . or otherwise reduced to writing of which evidence is available to us. Instead [they] will be based on a series of reciprocal actions performed by each party." *Id.* at 63736 (emphasis added). In other words, CMS determined that entities similarly situated to Defendants had not only violated the NBFD statute but had done so in ways that were expressly designed to evade detection by the federal government, and thus were acting in bad faith, not out of confusion about what the law permitted. Against this backdrop, it is not surprising that CMS considered various strategies to combat this kind of fraud.

That "CMS reauthorized the LINCCA program in 2014 and 2016, and has continued to fund supplemental Medicaid payments to Louisiana hospitals participating in the program," [Doc. 115-1, at 18], does not mean that CMS knew of, let alone approved, Defendants' fraud. Relator alleges that Defendants concealed their fraud because they understand that "the existence of the agreements or practices would, if discovered by CMS, put an end to the deals." [Doc. 22, at ¶ 170]. The SAC alleges that Defendants hid the fraud precisely to ensure that CMS would continue to pay matching funds. [*Id.* at ¶¶ 24–25, 37]. Continued payment by the government is only relevant if the government has "actual knowledge" of the violations. *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 195 (2016). Because CMS did not have actual knowledge of Defendants' fraud, *see supra*, at 6, its continued payment has no bearing on the viability of Relator's claims. Knowledge of allegations in a complaint

11

is not actual knowledge of the underlying conduct. *United States ex rel. Druding v. Care Alts.*, 81 F.4th 361, 375 (3d Cir. 2023) ("Like our sister circuits, we will not equate the government's awareness of allegations of fraud with 'actual knowledge' that fraud occurred.").

Gjerset's due process concerns are also misplaced. For FCA liability to attach, a defendant must act with actual knowledge, deliberate ignorance, or reckless disregard, although no specific intent to defraud is required. *See* 31 U.S.C. § 3729(b)(1)(A)–(B). To the extent Defendant's reference to "tripping over rules that even the government has admitted are unclear" refers to honest mistakes or mere negligence, the FCA's scienter standard would not be met if that were what the SAC alleged. *See United States ex rel. Taylor-Vick v. Smith*, 513 F.3d 228, 229, 231 (5th Cir. 2008) (holding Act does not extend to negligence or innocent mistakes). But that is not what the SAC alleges. The SAC alleges that Gjerset helped orchestrate and cover up a scheme to defraud Medicaid by doing precisely what the law forbids and was not making an innocent mistake about an unclear requirement.

Gjerset also resorts to hyperbole, asserting "any law firm that ever advises a healthcare provider regulated by CMS could face treble damages whenever CMS later decides that it interprets its regulations differently." [Doc. 115-1, at 15, 18 (suggesting that lawyers would be chilled in their zealous advocacy)]. Yet, as described above, the NBFD statute and regulations are clear. More fundamentally, a lawyer's zealous representation of a client's interests does not include conspiring with their client to wrongfully obtain federal funds. The SAC alleges that Gjerset was more than a law firm providing legal advice, but rather was an active participant in the scheme, orchestrating the web of sham entities, managing the books and records, reviewing all transactions that in fact violated the NBFD statute, and profiting at an extraordinary level. Holding accountable an active participant in a scheme to defraud Medicaid will not chill lawyers' duty of zealous advocacy or their ability to advance

their clients' interests. Lawyers already face substantial consequences for assisting their clients with unlawful activity.[3]

As Gjerset concedes, Louisiana does not recognize attorney immunity. [Doc. 115-1, at 15]. Even if attorney immunity were applicable, the doctrine is not absolute, and it would not immunize Gjerset here. In Texas, where Gjerset is based, attorney immunity protects attorneys against claims by non-clients where the claims (1) constitute the provision of legal services that (2) the attorney engages in to fulfill their duties in representing a client within an adversarial context in which the client and the non-client do not share the same interests. *Haynes & Boone, LLP v. NFTD, LLC*, 631 S.W.3d 65, 78 (Tex. 2021). The purpose of the immunity is "to ensure loyal, faithful, and aggressive representation by attorneys employed as advocates." *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 481 (Tex. 2015) (internal citation and quotations omitted).

However, the "defense is not without its limits." *Haynes & Boone*, 631 S.W.3d at 77. As the Texas Supreme Court has explained, "When an attorney personally participates 'in a fraudulent business scheme *with* his client,' as opposed to on his client's behalf, the attorney 'will not be heard to deny his liability' because 'such acts are entirely foreign to the duties of an attorney.'" *Id.* (quoting *Cantey Hanger*, 467 S.W.3d at 482) (emphasis in original). For example, a Texas appellate court held "that attorneys were not immune from claims that they knowingly assisted their clients in evading a judgment through a fraudulent transfer." *Cantey Hanger*, 467 S.W.3d at 482 (citing *Essex Crane Rental Corp. v. Carter*, 371 S.W.3d 366, 382 (Tex. App. 2012)).

---

[3] *See, e.g.*, Model Rules of Prof'l Conduct R.1.2(d) (lawyer shall not engage or assist a client in conduct the lawyer knows is criminal or fraudulent); R. 1.16 (lawyer shall withdraw from representation if the client seeks to use the lawyers services to commit or further a crime or fraud); R. 8.4 (defining professional misconduct for lawyers to include fraud, deceit, and misrepresentation); *United States v. Zolin*, 481 U.S, 554, 561 (1989) (crime-fraud exception to attorney-client privilege assures secrecy between lawyers and clients does not extend to communications for purpose of getting advice for commission of fraud or crime).

Here, Relator alleges that Gjerset was neither providing legal services nor acting to fulfill "duties in representing the client within an adversarial context in which the client and the non-client do not share the same interests." *Haynes & Boone*, 631 S.W.3d at 78. The SAC alleges that Gjerset "masterminded" the fraud, [Doc. 22, at ¶ 6], and was intimately involved in the business details, reviewing details of the financial transactions necessary to carry out the *quid pro quo* arrangement. [*See id.* at ¶¶ 5, 54, 328]. The SAC also alleges that it and the clients shared the same interests as Gjerset, which was profiting from the scheme to a level inconsistent with the role of a lawyer providing disinterested legal advice. [*See, e.g.*, *id.* at ¶ 20 (alleging Gjerset "was paid at least $72 million in fees by the hospital system Defendants"), ¶ 54 (same)]. That the Defendant hospitals paid Gjerset $72 million or more strongly suggests that Gjerset was not acting merely as a legal advisor, but also as a co-conspirator who profited from the fraud scheme.

## CONCLUSION

For the foregoing reasons, Gjerset's motion should be denied.

Respectfully submitted,

By: /s/ *Melissa D. Fuller*
Melissa D. Fuller (La. Bar No. 33093)
melissa.fuller@formanwatkins.com
Chelsea E. Gaudin (La. Bar No. 37692)
cheslea.gaudin@formanwatkins.com
FORMAN WATKINS & KRUTZ, LLP
201 St. Charles Ave., Suite 2100
New Orleans, LA 70170
TELEPHONE: (504) 799-4383
FACSIMILE: (504) 799-4384

-AND-

Peter Chatfield
pchatfield@phillipsandcohen.com
John Tremblay
jtremblay@phillipsandcohen.com
PHILLIPS & COHEN LLP
2000 Massachusetts Avenue, NW
Washington, DC 20036
Tel: (202) 833-4567
Fax: (202) 833-1815

Emily Stabile
estabile@phillipsandcohen.com
PHILLIPS & COHEN LLP
100 The Embarcadero, Suite 300
San Francisco, CA 94105
Tel: (415) 836-9000

*Counsel for Relator, Joshua Nemzoff*